[NOT YET SCHEDULED FOR ORAL ARGUMENT]

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 16-5366**

_____

**JUDICIAL WATCH, INC.**

**Plaintiff-Appellant,**

**v.**

**NATIONAL ARCHIVES AND RECORDS ADMINISTRATION**

**Defendant-Appellee.**

_____

## ON APPEAL FROM THE U.S. DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

## JOINT APPENDIX

_____

<table>
<tr>
<td>

Paul J. Orfanedes
Lauren M. Burke
JUDICIAL WATCH, INC.
425 Third Street, S.W., Suite 800
Washington, DC 20024
(202) 646-5172
*Counsel for Plaintiff-Appellant*

</td>
<td>

Douglas N. Letter
Nicolas Y. Riley
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 514-4814
*Counsel for Defendant-Appellee*

</td>
</tr>
</table>

# **TABLE OF CONTENTS**

1.     Docket Sheet…………..……………………….………..………..……..……..1

2.     Complaint, Filed October 20, 2015......………..……..……......………..……....5

3.     Answer (with Exhibits), Filed November 24, 2015...……..……..………....9

4.     Exhibit A (Declaration of Martha Wagner Murphy with Exhibits A-E)
   to Defendant's Motion For Summary Judgment,
   Filed February 2, 2016.……..………………….……..……......……..………21

5.     Defendant's Statement under LCvR 7(h)(1), Filed as
   Attachment to Defendant's Motion for Summary Judgment
   on February 2, 2016....………..…………......................................................48

6.     Exhibit 1 (Declaration of Paul J. Orfanedes with Exhibits A and B)
   to Plaintiff's Response to Defendant's Statement of Material Facts
   Not in Dispute and Statement of Undisputed Material Facts in
   Support of Cross-Motion for Summary Judgment, Filed as
   Attachment to Plaintiff's Opposition to Defendant's Motion
   for Summary Judgment and Cross-Motion for Summary
   Judgment on March 11, 2016………..…………..……..……..……........52

7.     Exhibit 2 (Independent Counsel Final Report – Part B -
   The Relationship of Madison Guaranty, CMS, and The
   Rose Law Firm - Chapter 3: Mrs. Clinton's Madison Guaranty
   Representation) to Plaintiff's Response to Defendant's Statement
   of Material Facts Not in Dispute and Statement of Undisputed
   Material Facts in Support of Cross-Motion for Summary Judgment,
   Filed as Attachment to Plaintiff's Opposition to Defendant's Motion
   for Summary Judgment and Cross-Motion for Summary Judgment
   on March 11, 2016………………..………..……..……..………......70

8.    Exhibit 3 (Parts 1-5) (Independent Counsel "Summary of Evidence"
      Memorandum) to Plaintiff's Response to Defendant's Statement
      of Material Facts Not in Dispute and Statement of Undisputed
      Material Facts in Support of Cross-Motion for Summary Judgment,
      Filed as Attachment to Plaintiff's Opposition to Defendant's Motion
      for Summary Judgment and Cross-Motion for Summary Judgment
      on March 11, 2016……………….…………..………...………..………......158

9.    Exhibit A (Second Declaration of Martha Wagner Murphy)
      to Defendant's Combined Reply in Support of its Motion for
      Summary Judgment and Opposition to Plaintiff's Cross Motion
      for Summary Judgment, Filed April 18, 2016…………………………….369

10.   Defendant's Response to Plaintiff's Statement under LCvR 7(h),
      Filed as Attachment to Defendant's Combined Reply in Support of
      its Motion for Summary Judgment and Opposition to Plaintiff's
      Cross Motion for Summary Judgment on April 18, 2016………..……..375

11.   Exhibit 1 (Second Declaration of Paul J. Orfanedes with Exhibit C)
      to Plaintiff's Reply to Defendant's Opposition to Plaintiff's
      Cross-Motion for Summary Judgment, Filed May 2, 2016………………378

12.   Order of Judge Reggie B. Walton Granting Defendant's Motion
      for Summary Judgment and Denying Plaintiff's Cross-Motion
      for Summary Judgment, Filed on October 4, 2016…...……......................386

13.   Memorandum Opinion of Judge Reggie B. Walton Granting
      Defendant's Motion for Summary Judgment and Denying
      Plaintiff's Cross-Motion for Summary Judgment,
      Filed on October 4, 2016…………………………………………..….387

14.   Notice of Appeal, Filed on December 3, 2016…….……..…..................…417

APPEAL,CLOSED,TYPE I–FOIA

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:15–cv–01740–RBW

JUDICIAL WATCH, INC. v. NATIONAL ARCHIVES AND RECORDS ADMINISTRATION
Assigned to: Judge Reggie B. Walton
Case in other court:  USCA, 16–05366
Cause: 05:552 Freedom of Information Act

Date Filed: 10/20/2015
Date Terminated: 10/04/2016
Jury Demand: None
Nature of Suit: 895 Freedom of Information Act
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**JUDICIAL WATCH, INC.**                represented by   **Paul J. Orfanedes**
                                                         JUDICIAL WATCH, INC.
                                                         425 Third Street, SW
                                                         Suite 800
                                                         Washington, DC 20024
                                                         (202) 646–5172
                                                         Fax: (202) 646–5199
                                                         Email: porfanedes@judicialwatch.org
                                                         *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**NATIONAL ARCHIVES AND RECORDS ADMINISTRATION**    represented by   **David Michael Glass**
                                                                     U.S. DEPARTMENT OF JUSTICE
                                                                     Civil Division
                                                                     20 Massachusetts Avenue, NW
                                                                     Room 7200
                                                                     Washington, DC 20530
                                                                     (202) 514–4469
                                                                     Fax: (202) 616–8470
                                                                     Email: david.glass@usdoj.gov
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/20/2015 | 1 | COMPLAINT against NATIONAL ARCHIVES AND RECORDS ADMINISTRATION ( Filing fee $ 400 receipt number 0090–4284703) filed by JUDICIAL WATCH, INC.. (Attachments: # 1 Civil Cover Sheet, # 2 Summons U.S. Attorney for D.C., # 3 Summons U.S. Attorney General, # 4 Summons NARA)(Orfanedes, Paul) (Entered: 10/20/2015) |
| 10/20/2015 | 2 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by JUDICIAL WATCH, INC. (Orfanedes, Paul) (Entered: 10/20/2015) |
| 10/20/2015 |  | Case Assigned to Judge Reggie B. Walton. (md) (Entered: 10/22/2015) |
| 10/22/2015 | 3 | SUMMONS (3) Issued Electronically as to NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Consent Forms)(zrdj) (Entered: 10/22/2015) |
| 10/29/2015 | 4 | NOTICE of Appearance by David Michael Glass on behalf of NATIONAL ARCHIVES AND RECORDS ADMINISTRATION (Glass, David) (Entered: 10/29/2015) |
| 11/16/2015 | 5 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 10/26/2015. ( Answer due for ALL FEDERAL DEFENDANTS by 11/25/2015.), RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States |

| | | Attorney General. Date of Service Upon United States Attorney General 10/27/2015., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. NATIONAL ARCHIVES AND RECORDS ADMINISTRATION served on 11/16/2015 (Attachments: # 1 Declaration of Cristina Rotaru)(Orfanedes, Paul) (Entered: 11/16/2015) |
|---|---|---|
| 11/24/2015 | 6 | ANSWER to Complaint by NATIONAL ARCHIVES AND RECORDS ADMINISTRATION.(Glass, David) (Entered: 11/24/2015) |
| 11/24/2015 | 7 | ORDER. In accordance with the attached Order, it is hereby ORDERED that the parties shall submit to the Court by December 4, 2015, a joint status report, proposing a schedule for the filing of, if any, dispositive motions, oppositions thereto, and replies. Signed by Judge Reggie B. Walton on November 24, 2015. (lcrbw2) (Entered: 11/24/2015) |
| 11/25/2015 | | Set/Reset Deadlines: Joint Status Report, proposed schedule, dispositive motions, oppositions, and replies due by 12/4/2015 (mpt) (Entered: 11/25/2015) |
| 12/04/2015 | 8 | Joint STATUS REPORT by JUDICIAL WATCH, INC.. (Orfanedes, Paul) (Entered: 12/04/2015) |
| 12/04/2015 | | MINUTE ORDER. Upon consideration of the Joint Status Report, and in light of the parties' consent, it is hereby ORDERED that: (1) the defendant shall file its motion for summary judgment on or before January 19, 2016; (2) the plaintiff shall file its opposition to the defendant's summary judgment motion and/or its cross−motion for summary judgment on or before February 19, 2016; (3) the defendant shall file its reply in support of its summary judgment motion and/or opposition to the plaintiff's cross−motion for summary judgment on or before March 14, 2016; and (4) the plaintiff shall file its reply in support of its summary judgment motion on or before March 28, 2016. Signed by Judge Reggie B. Walton on December 4, 2015. (lcrbw2) (Entered: 12/04/2015) |
| 12/08/2015 | | Set/Reset Deadlines: Summary Judgment motions due by 1/19/2016; Opposition and Cross Motions due by 2/19/2016, Reply and Opposition to Cross Motion due by 3/14/15, Reply due by 3/14/16. Response to Cross Motions due by 3/14/2016. Reply to Cross Motions due by 3/28/2016. (mpt) (Entered: 12/08/2015) |
| 01/15/2016 | 9 | Unopposed MOTION to Modify *Briefing Schedule* by NATIONAL ARCHIVES AND RECORDS ADMINISTRATION (Glass, David) (Entered: 01/15/2016) |
| 02/02/2016 | 10 | MOTION for Summary Judgment by NATIONAL ARCHIVES AND RECORDS ADMINISTRATION (Attachments: # 1 Mem. Supp., # 2 Prop. Order, # 3 Ex. A, # 4 LCvR 7(h)(1) Statement)(Glass, David) (Entered: 02/02/2016) |
| 03/02/2016 | 11 | Unopposed MOTION for Extension of Time to *Modify Briefing Schedule* by JUDICIAL WATCH, INC. (Attachments: # 1 Text of Proposed Order)(Orfanedes, Paul) (Entered: 03/02/2016) |
| 03/03/2016 | | MINUTE ORDER granting 11 Motion for Extension of Time. Upon consideration of the Plaintiff's Unopposed Motion to Modify Briefing Schedule; Memorandum of Points and Authorities in Support Thereof, and in light of the parties' consent, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that the following briefing schedule shall govern future proceedings in this case: (1) the plaintiff's opposition to the defendant's motion for summary judgment and the plaintiff's cross−motion for summary judgment shall be filed on or before March 11, 2016; (2) the defendant's reply in support of its motion for summary judgment and opposition to the plaintiff's cross−motion shall be filed on or before April 4, 2016; and (3) the plaintiff's reply in support of its cross−motion for summary judgment shall be filed on or before April 18, 2016. Signed by Judge Reggie B. Walton on March 3, 2016. (lcrbw2) (Entered: 03/03/2016) |
| 03/04/2016 | | Set/Reset Deadlines: Plaintiff's Cross−Motion/opposition to Motion for Summary Judgment due by 3/11/2016; Defendant's Opposition to Cross−Motion/Reply to Opposition to Motion for Summary Judgment due by 4/4/2016; Plaintiff's Reply to Opposition to Cross−Motion due by 4/18/2016. (tg) (Entered: 03/04/2016) |
| 03/11/2016 | 12 | Memorandum in opposition to re 10 MOTION for Summary Judgment *and Response to Statement of Facts* filed by JUDICIAL WATCH, INC.. (Attachments: # 1 |

| | | |
|---|---|---|
| | | Declaration of Paul J. Orfanedes, # 2 Exhibit 2, # 3 Exhibit 3 – Part 1, # 4 Exhibit 3 – Part 2, # 5 Exhibit 3 – Part 3, # 6 Exhibit 3 – Part 4, # 7 Exhibit 3 – Part 5, # 8 Text of Proposed Order)(Orfanedes, Paul) (Entered: 03/11/2016) |
| 03/11/2016 | 13 | Cross MOTION for Summary Judgment *and Statement of Material Facts* by JUDICIAL WATCH, INC. (Attachments: # 1 Declaration of Paul J. Orfanedes, # 2 Exhibit 2, # 3 Exhibit 3 – Part 1, # 4 Exhibit 3 – Part 2, # 5 Exhibit 3 – Part 3, # 6 Exhibit 3 – Part 4, # 7 Exhibit 3 – Part 5, # 8 Text of Proposed Order)(Orfanedes, Paul) (Entered: 03/11/2016) |
| 03/21/2016 | | MINUTE ORDER finding as moot 9 Motion to Modify. In light of the Court's March 3, 2016 Minute Order, it is hereby ORDERED that the Defendant's Unopposed Motion to Modify Briefing Schedule and Points and Authorities in Support Thereof is DENIED AS MOOT. Signed by Judge Reggie B. Walton on March 21, 2016. (lcrbw2) (Entered: 03/21/2016) |
| 03/28/2016 | 14 | Unopposed MOTION for Briefing Schedule *(Modification of Existing Schedule)* by NATIONAL ARCHIVES AND RECORDS ADMINISTRATION (Glass, David) (Entered: 03/28/2016) |
| 03/28/2016 | | MINUTE ORDER granting 14 Motion for Briefing Schedule. Upon consideration of the Defendant's Unopposed Motion to Modify Briefing Schedule and Points and Authorities in Support Thereof, and in light of the parties' consent, it is hereby ORDERED the motion is GRANTED. It is further ORDERED that the briefing schedule established by the Minute Order dated March 3, 2016, is modified to provide that the defendant's combined reply in support of its motion for summary judgment and opposition to the plaintiff's cross–motion for summary judgment shall be filed on or before April 18, 2016, and that plaintiff's reply in support of its cross–motion for summary judgment shall be filed on or before May 2, 2016. Signed by Judge Reggie B. Walton on March 28, 2016. (lcrbw2) (Entered: 03/28/2016) |
| 03/29/2016 | | Set/Reset Deadlines: Defendant's Response to Cross Motions due by 4/18/2016, Plaintiff's Reply in support of its Cross Motion for Summary Judgment due by 5/2/2016. (hs) (Entered: 03/29/2016) |
| 04/18/2016 | 15 | REPLY to opposition to motion re 10 MOTION for Summary Judgment *and Opposition to Plaintiff's Cross Motion for Summary Judgment* filed by NATIONAL ARCHIVES AND RECORDS ADMINISTRATION. (Attachments: # 1 Ex. A, # 2 LCvR 7(h) Resp.)(Glass, David) (Entered: 04/18/2016) |
| 04/18/2016 | 16 | Memorandum in opposition to re 13 Cross MOTION for Summary Judgment *and Statement of Material Facts* filed by NATIONAL ARCHIVES AND RECORDS ADMINISTRATION. (See Docket Entry 15 to view document). (znmw) (Entered: 04/19/2016) |
| 05/02/2016 | 17 | REPLY to opposition to motion re 13 Cross MOTION for Summary Judgment *and Statement of Material Facts* filed by JUDICIAL WATCH, INC.. (Attachments: # 1 Declaration (Second) of Paul J. Orfanedes)(Orfanedes, Paul) (Entered: 05/02/2016) |
| 09/26/2016 | 18 | ORDER. For the reasons to be set forth in the Memorandum Opinion to be issued by the Court within the next thirty days, absent extraordinary circumstances, the Court will grant the Defendant's Motion for Summary Judgment (ECF No. 10), and deny the Plaintiff Judicial Watch, Inc.'s Cross–Motion for Summary Judgment (ECF No. 13) in a final Order that will be issued contemporaneously with the forthcoming Memorandum Opinion. Accordingly, it is hereby ORDERED that the defendant National Archives and Records Administration's Motion for Summary Judgment is GRANTED. It is further ORDERED that the plaintiff Judicial Watch, Inc.'s Cross–Motion for Summary Judgment is DENIED. It is further ORDERED that this Order is not a final Order subject to appeal. Signed by Judge Reggie B. Walton on September 26, 2016. (lcrbw2) (Entered: 09/26/2016) |
| 10/04/2016 | 19 | ORDER. In accordance with the Memorandum Opinion, issued on this same date, it is hereby ORDERED that the defendant National Archives and Records Administration's Motion for Summary Judgment is GRANTED. It is further ORDERED that the plaintiff Judicial Watch, Inc.'s Cross–Motion for Summary Judgment is DENIED. It is further ORDERED that this case is CLOSED. Signed by Judge Reggie B. Walton on October 4, 2016. (lcrbw2) (Entered: 10/04/2016) |

USCA Case #16-5366        Document #1668146        Filed: 03/28/2017        Page 7 of 421

| 10/04/2016 | 20 | MEMORANDUM OPINION. Signed by Judge Reggie B. Walton on October 4, 2016. (lcrbw2) (Entered: 10/04/2016) |
|---|---|---|
| 12/03/2016 | 21 | NOTICE OF APPEAL TO DC CIRCUIT COURT by JUDICIAL WATCH, INC.. Filing fee $ 505, receipt number 0090–4763913. Fee Status: Fee Paid. Parties have been notified. (Orfanedes, Paul) (Entered: 12/03/2016) |
| 12/05/2016 | 22 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date re 21 Notice of Appeal to DC Circuit Court. (znmw) (Entered: 12/05/2016) |
| 12/08/2016 | | USCA Case Number 16–5366 for 21 Notice of Appeal to DC Circuit Court filed by JUDICIAL WATCH, INC. (zrdj) (Entered: 12/08/2016) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,                    )
425 Third Street SW, Suite 800           )
Washington, DC 20024,                    )
                                         )
                    Plaintiff,           )
                                         )        Civil Action No.
v.                                       )
                                         )
NATIONAL ARCHIVES AND                    )
RECORDS ADMINISTRATION,                  )
8601 Adelphi Road                        )
Washington, DC 20740,                    )
                                         )
                    Defendant.           )
_____)

## COMPLAINT

Plaintiff Judicial Watch, Inc. brings this action against Defendant National Archives and Records Administration to compel compliance with the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"). As grounds therefor, Plaintiff alleges as follows:

### JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(e).

### PARTIES

3.      Plaintiff Judicial Watch, Inc. is a not-for-profit, educational organization incorporated under the laws of the District of Columbia and headquartered at 425 Third Street SW, Suite 800, Washington, DC 20024. Plaintiff seeks to promote transparency, integrity, and accountability in government and fidelity to the rule of law. As part of its mission, Plaintiff

regularly requests records from federal agencies pursuant to FOIA. Plaintiff analyzes the

agencies' responses and disseminates both its findings and the requested records to the American

public to inform them about "what their government is up to."

4.    Defendant National Archives and Records Administration is an agency of the

United States Government and is headquartered at 8601 Adelphi Road, College Park, MD 20740.

Defendant has possession, custody, and control of records to which Plaintiff seeks access.

## STATEMENT OF FACTS

5.    On March 9, 2015, Plaintiff served a FOIA request on Defendant seeking access

to certain draft indictments of Hillary Rodham Clinton prepared while Mrs. Clinton was First

Lady of the United States. Specifically, Plaintiff requested:

> All versions of indictments against Hillary Rodham Clinton, including but not
> limited to, Versions 1, 2, and 3 in box 2250 of the Hickman Ewing Attorney Files,
> the "HRC/___ Draft Indictment" in box 2256 of the Hickman Ewing Attorney
> Files, as well as any and all versions written by Deputy Independent Counsel
> Hickman Ewing, Jr. prior to September of 1996.

6.    By letter dated March 19, 2015, Defendant admitted receiving Plaintiff's FOIA

request on March 17, 2015 and informed Plaintiff that it had assigned the request "FOIA case

number 46068." Defendant's letter also admitted locating records responsive to the request.

Specifically, Defendant admitted that it found 38 pages of responsive records in a folder entitled

"Draft Indictment" in box 2250 and approximately 200 pages of responsive records in a folder

entitled "Hillary Rodham Clinton/Webster L. Hubbell Draft Indictment" in box 2256. Defendant

denied Plaintiff's request in full, however, invoking FOIA Exemption (b)(7)(C) to withhold all

238 pages of responsive records. No responsive records or portions thereof have ever been

produced to Plaintiff.

7.     On May 14, 2015, Plaintiff administratively appealed Defendant's denial of the request. On that date, Plaintiff sent a written appeal, via email and certified mail, to the Deputy Archivist of the National Archives and Records Administration at the email address and street address identified in the agency's denial letter. Plaintiff complied with all requirements for properly appealing the denial.

8.     Pursuant to 5 U.S.C. § 552(a)(6)(A)(ii), Defendant was required to make a determination on the appeal within twenty working days of receipt and to notify Plaintiff of the right to seek judicial review if the denial was upheld in whole or in part. More than twenty working days have elapsed since Defendant received Plaintiff's May 14, 2015 appeal, but Plaintiff has received no notification of any determination or its right to seek judicial review of any denial. Plaintiff has not received any communication at all from Defendant regarding the appeal.

9.     Because Defendant has failed to comply with the time limit set forth in 5 U.S.C. § 552(a)(6)(A)(ii), Plaintiff is deemed to have exhausted any and all administrative remedies pursuant to 5 U.S.C. § 552(a)(6)(C).

### COUNT 1
**(Violation of FOIA, 5 U.S.C. § 552)**

10.    Plaintiff realleges paragraphs 1 through 9 as if fully stated herein.

11.    Defendant is violating FOIA by unlawfully withholding records responsive to Plaintiff's request.

12.    Plaintiff is being irreparably harmed by reason of Defendant's violation of FOIA, and Plaintiff will continue to be irreparably harmed unless Defendant is compelled to comply fully with FOIA.

WHEREFORE, Plaintiff respectfully requests that the Court: (1) order Defendant to demonstrate that it employed search methods reasonably calculated to uncover all records responsive to Plaintiff's request; (2) order Defendant to produce, by a date certain, any and all non-exempt records responsive to the request and a *Vaughn* index of any responsive records withheld under claim of exemption; (3) enjoin Defendant from continuing to withhold any and all non-exempt records responsive to the request; (4) grant Plaintiff an award of attorney's fees and other litigation costs reasonably incurred in this action pursuant to 5 U.S.C. § 552(a)(4)(E); and (5) grant Plaintiff such other relief as the Court deems just and proper.

Dated:  October 20, 2015

Respectfully submitted,

JUDICIAL WATCH, INC.

*/s/ Paul J. Orfanedes*
Paul J. Orfanedes
D.C. Bar No. 429716
425 Third Street SW, Suite 800
Washington, DC  20024
(202) 646-5172

*Counsel for Plaintiff*

USCA Case #16-5366   Document #1668146       Filed: 03/28/2017     Page 12 of 421

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JUDICIAL WATCH, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. 1:15-cv-1740-RBW |
| | ) |
| NATIONAL ARCHIVES AND | ) |
| RECORDS ADMINISTRATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## ANSWER

Defendant, the National Archives and Records Administration, by and through its undersigned counsel, respectfully submits the following as its answer to the numbered paragraphs of the complaint, filed on October 20, 2015 (ECF No. 1):

### FIRST DEFENSE

The complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

Plaintiff seeks records under the Freedom of Information Act, 5 U.S.C. § 552, that are exempt from disclosure under the statue.

### THIRD DEFENSE

Defendant responds to the numbered paragraphs of the complaint as set forth below:

1-2.  These paragraphs consist of legal conclusions, to which no response is required.

3.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

4.  The allegation that defendant "is an agency of the United States Government" is a legal conclusion, to which no response is required.  Denies that defendant is "headquartered at 8601 Adelphi Road, College Park, MD 20740" but admits that defendant is headquartered at that location and at 700 Pennsylvania Avenue, N.W., Washington, D.C.  20408.  Sentence 2 consists of legal conclusions, to which no response is required.

5.  This paragraph characterizes a letter dated March 9, 2015, from Kate Bailey to defendant, (Attachment A), to which the Court is respectfully referred for its contents.

6.  Sentences 1-4 of this paragraph characterize a letter dated March 19, 2015, from Martha Wagner Murphy to Ms. Bailey, (Attachment B), to which the Court is respectfully referred for its contents.  Admits Sentence 5.

7.  Sentences 1-2 of this paragraph characterize a letter dated May 14, 2015, from Ms. Bailey to the Deputy Archivist of the United States, (Attachment C), to which the Court is respectfully referred for its contents.  Sentence 3 consists of legal conclusions, to which no response is required.

8.  Sentence 1 of this paragraph consists of legal conclusions, to which no response is required.  Admits that "[m]ore than twenty working days have elapsed since Defendant received Plaintiff's May 14, 2015 appeal" but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Sentence 2 or the allegations contained in Sentence 3.

9.  This paragraph consists of legal conclusions, to which no response is required.

10.  Defendant repeats and re-alleges its responses to Paragraphs 1-9 above.

11-12.  These paragraphs consist of legal conclusions, to which no response is required, but to the extent a response is required, denies.

The remaining paragraph represents plaintiff's prayer for relief to which no answer is required, but to the extent an answer is required, defendant denies that plaintiff is entitled to the requested relief or any other relief whatsoever.

Except to the extent previously admitted or qualified above, defendant denies each and every allegation in the complaint.

WHEREFORE, having fully answered the complaint, defendant asks this Court for a judgment dismissing the complaint with prejudice, and for such further relief as the Court may deem just and proper.

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

CHANNING D. PHILIPS
United States Attorney

ELIZABETH J. SHAPIRO
Deputy Director

s/ David M. Glass
DAVID M. GLASS, DC Bar 544549
Senior Trial Counsel
Department of Justice, Civil Division
20 Massachusetts Ave., N.W., Room 7200
Washington, D.C.  20530-0001
Tel: (202) 514-4469/Fax: (202) 616-8470
E-mail: david.glass@usdoj.gov
Dated: November 24, 2015                    Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2015, I served the within answer on all counsel of record by filing it with the Court by means of its ECF system.

s/ David M. Glass

3



# Judicial Watch®

*Because no one
is above the law!*

March 9, 2015

## VIA CERTIFIED MAIL & EMAIL

National Archives and Records Administration
Special Access and FOIA Staff (NWCTF)
8601 Adelphi Road, Room 6350
College Park, MD 20740

### Re:  Freedom of Information Act Request

Dear Freedom of Information Officer:

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, Judicial Watch, Inc. hereby requests that the National Archives and Records Administration produce the following within twenty (20) business days:

> **All versions of indictments against Hillary Rodham Clinton, including, but not limited to, Versions 1, 2, and 3 in box 2250 of the Hickman Ewing Attorney Files, the "HRC/___Draft Indictment" in box 2256 of the Hickman Ewing Attorney Files, as well as any and all versions written by Deputy Independent Counsel Hickman Ewing, Jr. prior to September of 1996.**

The records in question are located in the material submitted to the National Archives and Records Administration by the Office of Independent Counsel In Re: Madison Guaranty Savings & Loan Association, also known as "the records of IC Starr."

We call your attention to President Obama's January 21, 2009 Memorandum concerning the Freedom of Information Act, in which he states:

> All agencies should adopt a presumption in favor of disclosure, in order to renew their commitment to the principles embodied in FOIA...The presumption of disclosure should be applied to all decisions involving

425 Third St., SW, Suite 800, Washington, DC 20024 • Tel: (202) 646-5172 or 1-888-593-8442
FAX: (202) 646-5199 • Email: info@JudicialWatch.org • www.JudicialWatch.org

Attachment A

12

National Archives and Records Administration
March 9, 2015
Page 2 of 4

FOIA.[1]

The memo further provides that "The Freedom of Information Act should be administered with a clear presumption: In the case of doubt, openness prevails."

Nevertheless, if any responsive record or portion thereof is claimed to be exempt from production under FOIA, please provide sufficient identifying information with respect to each allegedly exempt record or portion thereof to allow us to assess the propriety of the claimed exemption. *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974). In addition, any reasonably segregable portion of a responsive record must be provided, after redaction of any allegedly exempt material. 5 U.S.C. § 552(b).

For purposes of this request, the term "record" shall mean: (1) any written, printed, or typed material of any kind, including without limitation all correspondence, memoranda, notes, messages, letters, cards, facsimiles, papers, forms, telephone messages, diaries, schedules, calendars, chronological data, minutes, books, reports, charts, lists, ledgers, invoices, worksheets, receipts, returns, computer printouts, printed matter, prospectuses, statements, checks, statistics, surveys, affidavits, contracts, agreements, transcripts, magazine or newspaper articles, or press releases; (2) any electronically, magnetically, or mechanically stored material of any kind, including without limitation all electronic mail or e-mail; (3) any audio, aural, visual, or video records, recordings, or representations of any kind; (4) any graphic materials and data compilations from which information can be obtained; and (5) any materials using other means of preserving thought or expression.

Judicial Watch also hereby requests a waiver of both search and duplication fees pursuant to 5 U.S.C. §§ 552(a)(4)(A)(ii)(II) and (a)(4)(A)(iii). Judicial Watch is entitled to a waiver of search fees under 5 U.S.C. § 552(a)(4)(A)(ii)(II) because it is a member of the news media. *Cf. National Security Archive v. Department of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989)(defining news media within FOIA context). Judicial Watch has also been recognized as a member of the news media in other FOIA litigation. *See, e.g., Judicial Watch, Inc. v. U.S. Department of Justice*, 133 F. Supp.2d 52 (D.D.C. 2000); and, *Judicial Watch, Inc. v. Department of Defense*, 2006 U.S. Dist. LEXIS 44003, *1 (D.D.C. June 28, 2006). Judicial Watch regularly obtains information about the operations and activities of government through FOIA and other means, uses its editorial skills to turn this information into distinct works, and publishes and disseminates these works to the public. It intends to do likewise with the records it receives in response to this request.

Judicial Watch also is entitled to a complete waiver of both search fees and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). Under this provision, records:

---

[1] Freedom of Information Act. Pres. Mem. of January 21, 2009, 74 Fed. Reg. 4683.

Attachment A

National Archives and Records Administration
March 9, 2015
Page 3 of 4

> shall be furnished without any charge or at a charge
> reduced below the fees established under clause (ii) if
> disclosure of the information is in the public interest
> because it is likely to contribute significantly to public
> understanding of the operations or activities of government
> and is not primarily in the commercial interest of the
> requester.

5 U.S.C. § 552(a)(4)(A)(iii).

In addition, if records are not produced within twenty (20) business days, Judicial Watch is entitled to a complete waiver of search and duplication fees under Section 6(b) of the OPEN Government Act of 2007, which amended FOIA at 5 U.S.C. § (a)(4)(A)(viii).

Judicial Watch is a 501(c)(3), not-for-profit, educational organization, and, by definition, it has no commercial purpose. Judicial Watch exists to educate the public about the operations and activities of government, as well as to increase public understanding about the importance of ethics and the rule of law in government. The particular records requested herein are sought as part of Judicial Watch's ongoing efforts to document the operations and activities of the federal government and to educate the public about these operations and activities. Once Judicial Watch obtains the requested records, it intends to analyze them and disseminate the results of its analysis, as well as the records themselves, as a special written report. Judicial Watch will also educate the public via radio programs, Judicial Watch's website, and/or newsletter, among other outlets. It also will make the records available to other members of the media or researchers upon request. Judicial Watch has a proven ability to disseminate information obtained through FOIA to the public, as demonstrated by its long-standing and continuing public outreach efforts.

Given these circumstances, Judicial Watch is entitled to a public interest fee waiver of both search costs and duplication costs. Nonetheless, in the event our request for a waiver of search and/or duplication costs is denied, Judicial Watch is willing to pay up to $350.00 in search and/or duplication costs. Judicial Watch requests that it be contacted before any such costs are incurred, in order to prioritize search and duplication efforts.

In an effort to facilitate record production within the statutory time limit, Judicial Watch is willing to accept documents in electronic format (e.g. e-mail, .pdfs). When necessary, Judicial Watch will also accept the "rolling production" of documents.

If you do not understand this request or any portion thereof, or if you feel you require clarification of this request or any portion thereof, please contact us immediately at 202-646-5172 or kbailey@judicialwatch.org. We look forward to receiving the

Attachment A

**National Archives and Records Administration**
**March 9, 2015**
**Page 4 of 4**

requested documents and a waiver of both search and duplication costs within twenty
(20) business days. Thank you for your cooperation.

Sincerely,

*Kate Bailey*

Kate Bailey
Judicial Watch

Attachment A

NATIONAL ARCHIVES *and* RECORDS ADMINISTRATION
8601 ADELPHI ROAD    COLLEGE PARK, MD 20740-6001
*www.archives.gov*

NATIONAL
ARCHIVES

March 19, 2015

Kate Bailey
Judicial Watch
425 Third Street, SW, Suite 800
Washington, DC 20024

Dear Ms. Bailey,

This is in response to your Freedom of Information Act request of March 17, 2015 for
records in the custody of the National Archives and Records Administration. Your request
was received in this office on March 17, 2015 and assigned FOIA case number 46068.
You requested Independent Counsel Kenneth Starr records related to several versions of
indictments of Hillary Clinton.

We have examined the folders from Hickman Ewing's attorney files that you requested.
From box 2250 the folder "Draft Indictment" (38 pages) is denied in full under Exemption
(b)(7)(C). From box 2256 the folder "Hillary Rodham Clinton/Webster L. Hubbell Draft
Indicment" (approximately 200 pages) is denied in full under Exemption (b)(7)(C).

You requested a waiver for reproduction fees ordinarily charged to researchers, however,
records transferred to the custody of the National Archives are exempted from the fee and
fee waiver provisions of the Freedom of Information Act because there was a fee
schedule in place prior to enactment of the FOIA. The applicable section states that
"nothing in this subparagraph shall supersede fees chargeable under a statute specifically
providing for setting the level of fees for particular types of records" (5 U.S.C. 552
(a)(4)(A)(vi)). The relevant fee statute authorizes the National Archives "to charge a fee
for making or authenticating copies or reproductions of materials transferred to the
Archivist's custody." (44 U.S.C. 2116(c)).

The inability to grant the requested fee waiver does not constitute a denial under the
terms of the Freedom of Information Act. However, if you consider this response to be a
denial of your request, or if you wish to appeal the document denials, you may appeal my
decision within 60 calendar days from the date of this letter. Appeals must be submitted in
writing and addressed to the Deputy Archivist of the United States, National Archives and
Records Administration, 8601 Adelphi Road, Room 4200, College Park, MD 20740. In
your letter, please cite your case number and clearly label both the letter and envelope as
a FOIA Appeal. As an alternative, you may e-mail your appeal to foia@nara.gov. If you
choose this option, please use the words "FOIA appeal" in the subject line and also cite
your case number.

Attachment B

This concludes the processing of your request. If you have any question about the way we handled your request, or about our FOIA regulations or procedures, please contact David Paynter at david.paynter@nara.gov or (301) 837-2041.

Sincerely,

MARTHA WAGNER MURPHY
Chief
Special Access and FOIA Staff

NATIONAL ARCHIVES *and*
RECORDS·ADMINISTRATION

8601 ADELPHI ROAD
COLLEGE PARK, MD 20740-6001
*www.archives.gov*

17

Attachment B



**Judicial**
**Watch**
*Because no one*
*is above the law!*

<table>
<tr><td>NGC Log No:</td><td>NGCIS-021 A</td></tr>
<tr><td>Date Received:</td><td>05/14/2015</td></tr>
<tr><td>Date Due:</td><td>06/12/2015</td></tr>
<tr><td>Assigned to:</td><td>JAS</td></tr>
</table>

**VIA EMAIL & CERTIFIED US MAIL**

May 14, 2015

Deputy Archivist of the United States
National Archives and Records Administration
8601 Adelphi Road, Room 4200
College Park, MD 20740

**Re: FREEDOM OF INFORMATION ACT APPEAL**

**FOIA Case Number 46086**

Dear Sir/Madam:

On March 9, 2015, Judicial Watch Inc. (hereafter "Judicial Watch"), filed a Freedom of Information Act (hereafter "FOIA") request with the National Archives and Records Administration requesting the following records:

> **All versions of indictments against Hillary Rodham Clinton, including, but not limited to, Versions 1, 2, and 3 in box 2250 of the Hickman Ewing Attorney Files, the "HRC/___ Draft Indictment" in box 2256 of the Hickman Ewing Attorney Files, as well as any and all versions written by Deputy Independent Counsel Hickman Ewing, Jr. prior to September of 1996.**

In a response letter dated March 19, 2015, Martha Wagner Murphy, Chief of Special Access and FOIA Staff, stated that after examination of the requested records, 38 pages from box 2250 and approximately 200 pages from box 2256 were all "denied in full under Exemption (b)(7)(C)." This letter respectfully appeals these denials.

Ms. Murphy's response amounts to no more than a barren assertion that the responsive records are being withheld pursuant to FOIA Exemption (b)(7)(C). Yet such a response "cannot suffice to establish the fact." *Founding Church o/Scientology o/Washington, D.C., Inc.* v. *National Security Agency,* 610 F.2d 824,831 (D.C. Cir. 1979). Moreover, it is longstanding precedent that "an agency cannot meet its obligation simply by quoting the statutory language of an exemption." *Army Times Pub. Co. v. Department o/the Air Force,* 998 F.2d 1067, 1070 (D.C.

Attachment C

National Archives and Records Administration
FOIA Appeal
May 14, 2015
Page 2 of 3

Cir. 1993) (remarking that affidavits "[p]arroting the case law" were insufficient); *Voinche* v.
*Federal Bureau o/Investigation,* 412 F. Supp. 2d 60,69 (D.D.C. 2006) (agency failed to satisfy
its burden where declaration "merely quote [ d] the statutory language" of an exemption).

Because the National Archives and Records Administration has done nothing more than
quote the statutory language of the claimed exemptions, it clearly has not met its burden under
FOIA. To satisfy its burden, at a minimum, the National Archives and Records Administration
must provide sufficient identifying information with respect to each of the records that it
withheld to enable Judicial Watch to assess the propriety of the claimed exemption. *Vaughn* v.
*Rosen,* 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1974). Similarly, the National
Archives and Record Administration has failed to demonstrate that all non-exempt information
has been segregated. *Sussman* v. *Us. Marshals Service,* 494 F.3d 1106, 1116 (D.C. Cir. 2007).

Furthermore, Exemption (b)(7)(C) excuses from the agency's overarching duty to
disclose such "records or information" as are "compiled for law enforcement purposes, but only
to the extent that the production of such law enforcement records or information could
reasonably be expected to constitute an unwarranted invasion of personal privacy." For the
records responsive to Judicial Watch's request, however, any privacy concerns are overwhelmed
by the public interest in such records. Public interest was, in fact, the reason cited by the U.S.
Supreme Court as most likely to quash Exemption (b)(7)(C):

the Supreme Court suggested that the justification most likely to satisfy Exemption 7(C)'s
public interest requirement is that the information is necessary to show the investigative
agency or other responsible officials acted negligently or otherwise improperly in the
performance of their duties

*Citizens for Responsibility & Ethics in Wash.* v. *Us. Dep 't of Justice,* 2012 U.S.
Dist. LEXIS 27298 (D.D.C. Mar. 2,2012) (citing *Nat'l Archives & Records Admin.* v. *Favish,*
541 U.S. 157, 172 (2004).

As a former First Lady, former U.S. Senator, former Secretary of State, and current
presidential candidate, Hillary Clinton is a highly public figure who has exercised vast political
power throughout her career. The public interest in records concerning possible unlawful
activity on her part far outweighs the privacy interest of (b)(7)(C).

Judicial Watch respectfully appeals and requests full access to all documents in
possession of the National Archives and Records Administration responsive to our FOIA request
of March 17, 2015 for all versions of indictments against Hillary Rodham Clinton, including, but
not limited to, Versions 1, 2, and 3 in box 2250 of the Hickman Ewing Attorney Files, the
"HRC/___Draft Indictment" in box 2256 of the Hickman Ewing Attorney Files, as well as any

National Archives and Records Administration
FOIA Appeal
May 14, 2015
Page 3 of 3

and all versions written by Deputy Independent Counsel Hickman Ewing, Jr. prior to September of 1996.

If there are any questions regarding this appeal, please do not hesitate to contact me at (202) 646-5172 or by email at kbailey@judicialwatch.org. Thank you for your attention to this matter.

Sincerely,

Kate Bailey
FOIA Program Manager

Attachment C

*Judicial Watch v. Nat'l Archives & Records Admin.*
No. 1:15-cv-01740-RBW

Def. Mot. Summ. J.
Ex. A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,               )
                                    )
    Plaintiff,                      )
                                    )
        v.                          )        Civ. A. No. 15-CV-1740 (RBW)
                                    )
NATIONAL ARCHIVES AND               )
RECORDS ADMINISTRATION,             )
                                    )
    Defendant.                      )

## DECLARATION OF MARTHA WAGNER MURPHY

I, Martha Wagner Murphy, hereby declare as follows:

1.      I currently serve as Chief of the Special Access and Freedom of Information Act

("FOIA") Branch, Research Services, National Archives and Records Administration ("NARA")

located in College Park, Maryland. I have held this position since 2009. Prior to this position, I

was an Archivist in the Special Access and FOIA Staff from 1995 to 2009, and I have worked as

an Archivist at NARA since 1991. I hold a Masters in U.S. History from Loyola University of

Chicago, and a Bachelor of Arts in History from Loyola College of Baltimore.

2.      In my current position as the Chief of the Special Access and FOIA Staff, I

supervise a total of 20 Archivists and one Government Information Specialist whose

responsibilities are focused on providing access – either through special access requests or

through FOIA – to thousands of pages of archival records. Each Archivist on my staff holds at

least a Bachelors' degree in either History or a related subject matter, and over the course of time

has become very familiar with the subject matters of the collections to which access is sought.

3. Due to the nature of my official duties, I am familiar with the procedures followed by NARA in responding to requests for material from its archival collection pursuant to the provisions of the FOIA, 5 U.S.C. § 552. I am also specifically aware of the handling of plaintiff Judicial Watch's March 9, 2015 FOIA request to NARA for "[a]ll versions of indictments against Hillary Rodham Clinton, including, but not limited to, Versions 1, 2, and 3 in box 2250 of the Hickman Ewing Attorney Files, the "HRC/__Draft Indictment" in box 2256 of the Hickman Ewing Attorney Files, as well as any all versions written by Deputy Independent Counsel Hickman Ewing, Jr. prior to September of 1996."

4. In accordance with <u>Vaughn v. Rosen</u>, 484 F.2d 820 (D.C. Cir. 1973), I provide this declaration in support of NARA's motion for summary judgment and to provide justifications for the withholding of information in full from the total of 451 pages of documents[1] identified as responsive to plaintiff's request and further described in detail in **Exhibit A** attached hereto, pursuant to FOIA Exemptions 3, 6 and 7(C), 5 U.S.C. §§ 552 (b)(3), (b)(6) and (b)(7)(C).

5. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

### Procedural History of Judicial Watch's FOIA Request

6. By letter dated March 9, 2015, Judicial Watch submitted a FOIA request to NARA for:

> All versions of indictments against Hillary Rodham Clinton, including, but not limited to, Versions 1, 2, and 3 in box 2250 of the Hickman Ewing[2] Attorney Files, the "HRC/__Draft Indictment" in box 2256 of the

---

[1] The discrepancy in the total number of pages is attributable to the fact that at the administrative stage we did not include identical duplicates in our page count.

[2] Hickman Ewing was a lawyer who worked as Kenneth Starr's deputy in Little Rock.

Hickman Ewing Attorney Files, as well as any and all versions written by Deputy Independent Counsel Hickman Ewing, Jr. prior to September of 1996.

The records in question are located in the material submitted to the National Archives and Records Administration by the Office of Independent Counsel In Re: Madison Guaranty Savings & Loan Association, also known as "the records of IC Starr."[3]

*See* **Exhibit B**.

7.      My staff assigned the request FOIA No. 46068.

8.      By letter dated March 19, 2015, we informed Judicial Watch that "[w]e have examined the folders from Hickman Ewing's attorney files that you requested. From box 2250 the folder "Draft Indictment" (38 pages) is denied in full under Exemption (b)(7)(C). From box 2256 the folder "Hillary Rodham Clinton/Webster L. Hubbell Draft Indicment" (sic) (approximately 200 pages) is denied in full under Exemption (b)(7)(C)." (*See* **Exhibit C**). Our March 19, 2015 letter also provided Judicial Watch with administrative appeal rights.

9.      By letter dated May 14, 2015, Judicial Watch appealed NARA's denial under Exemption (b)(7)(C). In relevant part, Judicial Watch asserted that:

> [NARA's] response amounts to no more than a barren assertion that the responsive records are being withheld pursuant to FOIA Exemption (b)(7)(C)…it clearly has not met its burden under FOIA [to]…provide sufficient identifying information with respect to each of the records that it withheld to enable Judicial Watch to assess the propriety of the claimed exemption…[and] has failed to demonstrate that all non-exempt information has been segregated…[t]he Supreme Court has suggested that the justification most likely to satisfy Exemption 7(C)'s public interest requirement is that the information is necessary to show that the investigative agency or other responsible officials acted negligently or otherwise improperly in the performance of their duties…Hillary Clinton is a highly public figure who has exercised political power throughout her career. The public interest in records concerning possible unlawful activity on her part far outweighs the privacy interest of (b)(7)(C).

---

[3] Plaintiff included a fee waiver request in its March 9, 2015 letter, but NARA did not address the request since it withheld all documents in full. Plaintiff does not raise the fee waiver issue in its Complaint.

-3-

10.     By letter dated October 16, 2015, NARA acknowledged receipt of the appeal,
apologized for the delay in the acknowledgment, advised Judicial Watch that the request had
been assigned FOIA Appeal No. NGC15-071A, and provided information on how Judicial
Watch might obtain an update on the status of the appeal. *See* **Exhibit D**.

11.     On October 22, 2015, plaintiff filed the instant lawsuit.

12.     In accordance with 36 C.F.R. § 1250.74(a)(2), by letter dated December 4, 2015,
NARA advised Judicial Watch it had administratively closed the appeal due to the filing of the
lawsuit. *See* **Exhibit E**.

<div align="center">

**National Archives and Records Administration and its Holdings**

</div>

13.     The National Archives was established in 1934 by President Franklin Roosevelt
to preserve and care for the records of the U.S. Government, but its major holdings date back to
1775. They capture the sweep of the past: slave ship manifests and the Emancipation
Proclamation; captured German records and the Japanese surrender documents from World War
II; journals of polar expeditions and photographs of Dust Bowl farmers; Indian treaties making
transitory promises; and a richly bound document bearing the bold signature "Bonaparte" — the
Louisiana Purchase Treaty that doubled the territory of the young republic.

14.     In 1985, the National Archives became an independent executive agency, and it
now has over 40 facilities nationwide including field archives, Federal Records Centers,
Presidential Libraries, the Federal Register, and the National Historical Publications and Records
Commission. NARA keeps only those Federal records that are judged to have continuing value
— about two to five percent of those generated in any given year. By now, they add up to a
formidable number, diverse in form as well as in content. There are approximately 10 billion
pages of textual records; 12 million maps, charts, and architectural and engineering drawings; 25

<div align="center">

-4-

</div>

million still photographs and graphics; 24 million aerial photographs; 300,000 reels of motion picture film; 400,000 video and sound recordings; and 133 terabytes of electronic data. All of these materials are preserved because they are important to the workings of Government, have long-term research worth, or provide information of value to citizens.[4]

15.     Among its many holdings, NARA maintains custody of the records of independent counsels who have completed their investigations.[5] Title VI of the Ethics in Government Act of 1978, Pub. L. No. 97-521, 92 Stat. 1867, "allow[ed] for the appointment of an 'independent counsel' to investigate and, if appropriate, prosecute certain high-ranking Government officials for violation of federal criminal laws." Enacted originally for a period of five years, the statutory authority was renewed several times thereafter, ultimately terminating in 1999.

16.     An independent counsel was required by Title VI to "transfer to the Archivist of the United States all records which ha[d] been created or received" by the independent counsel's office upon termination of that office. 28 U.S.C. § 594(k)(1). Access to records transferred to the Archivist under Title VI was to be "governed by [FOIA]," except in the case of certain records provided to an independent counsel by a committee of Congress. *Id.* § 594(k)(3)(A).

17.     Before transferring its records to the Archivist, an independent counsel was required by Title VI to "clearly identify" which of the records was "subject to Rule 6(e) of the Federal Rules of Criminal Procedure as grand jury materials." 28 U.S.C. § 594(k)(1). "Rule 6(e) provides, in pertinent part, that the parties and witnesses to a grand jury proceeding may not 'disclose a matter occurring before the grand jury.'" *See* Rule 6(e)(2)(B)).

---

[4] *See* http://www.archives.gov/publications/general-info-leaflets/1-about-archives.html.

[5] *See* http://www.archives.gov/research/investigations/special-prosecutors-indept-counsels.html.

**Records of Independent Counsel Kenneth Starr**

18.   In August 1994, Kenneth W. Starr was named the independent counsel to lead the investigation into the so-called Whitewater Affair. In 1999, Independent Counsel (IC) Starr resigned. He was replaced by Robert W. Ray who resigned in March 2002. The Whitewater investigation was then left for Ray's deputy to wrap up. The office officially ended operations in 2004,[6] and the records were transferred to NARA under Title VI in connection with the cessation of operations.

19.   As a result, the records of Former IC Starr and his successors are now part of NARA's holdings ("IC Starr records"). The IC Starr records, which consist of approximately 3149 cubic feet of records, have been in NARA's custody since March 2004. A finding aid reference to the Starr records has been available to the public, in redacted form, since approximately June 2015 ("Index").[7] The Index consists of two manifests – a Little Rock Office File Manifest and a District of Columbia Office File Manifest – that together list over 3300 boxes of material, with specific box numbers, as well as many thousands of folder titles noted in the "Box Contents" field.

**Search Conducted in Response to Judicial Watch's FOIA Request**

20.   Both boxes identified by plaintiff in its request, Boxes 2250 and 2256, have the same name, "Hickman Ewing Attorney Work Product." The boxes also have the same subject heading, "HRC [Hillary Rodham Clinton]." Each box, on its face, has a note indicating that the contents include material subject to Rule 6(e) of the Federal Rules of Criminal Procedure.

---

[6]   CNN.com/Inside Politics, *Whitewater Independent Counsel Robert Ray Resigns* (Mar. 12, 2002), http://edition.cnn.com/2002/ALLPOLITICS/03/12/indy.counsel.resigns/index.html (accessed Nov. 16, 2015); UPI News Track, *Whitewater Counsel Closes Doors* (Mar. 23, 2004).

[7]   By letter dated June 11, 2014, plaintiff Judicial Watch filed a FOIA request with NARA seeking access to the Index. NARA released the Index to Judicial Watch on May 4, 2015.

Within Box 2250 is a folder labeled "Draft Indictment," and within Box 2256 is a folder labeled "Hillary Rodham Clinton/Webster L. Hubbell Draft Indictment."

21.    My staff also searched the "Box Contents" and "Subject" fields of the Index to identify any other folders that might contain "Indictment" and "Hillary Rodham Clinton" or "Hillary Clinton" or "HRC." Other than the folder in box 2256, we did not locate any other responsive folders.

22.    At the time NARA responded to the FOIA request, all the material in the "Draft Indictment" folder in Box 2250, and the material in the "Hillary Rodham Clinton/Webster Hubell Draft Indictment" folder in Box 2256, were considered responsive. For the purposes of the instant lawsuit, and in accordance with the specific wording of the FOIA request for "[a]ll versions of indictments against Hillary Rodham Clinton," only draft indictments are considered responsive.

23.    Each of the responsive documents is a draft and is either clearly marked as such on the draft or on an accompanying cover memo, or is an obviously incomplete draft. Some of these drafts contain marginalia or annotations, Doc. Nos. 6, 10, 15, 17, 19; some are identical duplicates of each other, Doc. Nos. 1 – 4, 7 – 9, 12 - 13; some are non-identical duplicates, Doc. Nos. 5 – 6; some are accompanied by cover memos, Doc. Nos. 1 – 4, 5, 6, 10, 16; some are accompanied by handwritten notes on separate pieces of paper, Doc. No. 14; and some are accompanied by cover fax sheets, Doc. Nos. 5, 6. One draft consists merely of "[s]craps of a draft indictment," Doc. No. 11. The responsive documents are described in further detail in the attached index. *See* **Exhibit A**.

## FOIA Exemptions Applicable to the Responsive Documents

### *Exemption 3*

24.     FOIA Exemption 3, 5 U.S.C. § 552(b)(3), exempts from disclosure information

which is:

> specifically exempted from disclosure by statute . . . provided that such
> statute (A) requires that the matters be withheld from the public in such a
> manner as to leave no discretion on the issue, or (B) establishes particular
> criteria for withholding or refers to particular types of matters to be
> withheld.

One commonly recognized (b)(3) statute is Rule 6(e) of the Federal Rules of Criminal Procedure,

which prohibits the disclosure of matters occurring before a Grand Jury. My office routinely

screens all responsive records for (b)(3) matters, including records that would reveal the

workings of a grand jury

25.     All the responsive documents are directly related to the Independent Counsel's

consideration of presenting an indictment to a grand jury. The material collectively reflects

names and identifying information of individuals subpoenaed – or intended to be subpoenaed –

to testify before the grand jury, as well as information identifying specific records subpoenaed

during the grand jury process. They reflect and quote grand jury testimony, and reveal the inner

workings and direction of the grand jury. Disclosure would violate the secrecy of the grand jury

proceedings by disclosing the inner workings of the federal grand jury that was tasked with

considering these matters. Similarly, the consideration of possible witnesses before the Grand

Jury, and internal memoranda and notes about the strategy and considerations regarding possible

indictments reveal the direction of the grand jury investigation. Accordingly, all the documents

have been properly withheld in full pursuant to Exemption (b)(3). *See* **Exhibit A**.

-8-

29

### *Exemption 7 Threshold*

26.    Exemption 7 of the FOIA protects from mandatory disclosure records or

information compiled for law enforcement purposes, but only to the extent that disclosure could

reasonably be expected to cause one of the harms enumerated in the subparts of the exemption.

*See* 5 U.S.C. § 552(b)(7).  In this case, the harm that could reasonably be expected to result from

disclosure concerns invasion of personal privacy.

27.    Before an agency can invoke any of the harms enumerated in Exemption 7, it

must first demonstrate that the records or information at issue were compiled for law

enforcement purposes.  The records at issue in this case were compiled for criminal law

enforcement purposes during the course of the Independent Counsel's performance of its

statutorily-imposed law enforcement mission: to investigate and, if appropriate, prosecute certain

high-ranking Government officials for violation of federal criminal laws.  Given the function of

an Independent Counsel and the nature of the particular documents at issue, there is little doubt

that these materials were compiled for a law enforcement purpose.  Since the records clearly

meet the Exemption 7 threshold, the remaining inquiry for Exemption 7 purposes is whether

their disclosure would invade personal privacy.

### *Exemptions (b)(6) and (b)(7)(C)*
### *Clearly Unwarranted and Unwarranted Invasion of Personal Privacy*

28.    5 U.S.C. § 552 (b)(6) exempts from disclosure:

> personnel and medical files and similar files when the disclosure of
> such information would constitute a clearly unwarranted invasion
> of personal privacy.

29.    5 U.S.C. § 552 (b)(7)(C) exempts from disclosure:

> records or information compiled for law enforcement purposes, but
> only to the extent that the production of such law enforcement
> records or information . . . could reasonably be expected to
> constitute an unwarranted invasion of personal privacy.

30

30.    Exemption 6 of the FOIA protects from mandatory disclosure personnel and medical files records when disclosure would constitute a clearly unwarranted invasion of personal privacy. For purposes of this case, NARA is asserting Exemption 6 in conjunction with Exemption 7(C) to protect the responsive documents at issue here. Because the analysis and balancing required by exemptions 6 and 7 is sufficiently similar to warrant a consolidated discussion, both exemptions are discussed directly below.

31.    The balancing test for Exemption 6 is whether disclosure "would constitute a clearly unwarranted invasion of personal privacy," whereas the test for Exemption 7(C) is the lower standard of whether disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." Nevertheless, under the analysis of both exemptions, the privacy interests are balanced against the public's interest in disclosure under the analysis of both exemptions.

32.    When withholding information pursuant to these privacy exemptions, an agency is required to balance the privacy interests of the individuals mentioned in these records against any public interest in disclosure. In asserting these exemptions, information is examined to determine the nature and strength of the privacy interest of every individual whose names and/or identifying information appears in the documents at issue. In making this analysis, the public interest in disclosure of this information is determined by assessing whether the information in question would shed light on the Independent Counsel's statutorily-imposed law enforcement mission to investigate and, if appropriate, prosecute individuals for violation of federal criminal laws. In each instance where information was withheld, it was determined that individual privacy rights outweighed the public interest. The only recognized public interest is that which sheds light on the operations and activities of the Independent Counsel. In asserting Exemptions

-10-

31

6 and 7(C), we have determined that the individuals' privacy interests, and in particular, the interests of Hillary Rodham Clinton, are not outweighed by any public interest in disclosure.

33.    With respect to the potential invasion of personal privacy, all individuals are entitled to a presumption of innocence. When, in the context of a criminal investigation, an Independent Counsel determines not to bring an indictment, the subject of the investigation has a significant privacy interest in not being associated with any underlying criminal activity. NARA's policy is not to release records from investigations if the records clearly identify people who, although they may have been investigated, never faced criminal charges.

34.    In this case, all the responsive documents relate to the Independent Counsel's consideration of whether to proceed with an indictment of Hillary Rodham Clinton as well as other individuals. The documents reflect numerous drafts and internal discussions as to how to they might proceed; ultimately, however, an indictment against Mrs. Clinton was never issued. Despite the role that Mrs. Clinton occupied as the First Lady during President Clinton's administration, Mrs. Clinton maintains a strong privacy interest in not having information about her from the files of the Independent Counsel disclosed.   As an uncharged person Hillary Rodham Clinton retains a significant interest in her personal privacy despite any status as a public figure.

35.    In its administrative appeal, plaintiff argued that these "privacy concerns are overwhelmed by the public interest in such records," and that the "public interest in records considering possible unlawful activity on [Hillary Rodham Clinton's] part far outweighs the privacy interest of (b)(7)(C)." While there may be a scintilla of public interest in these documents since Mrs. Clinton is presently a Democratic presidential candidate, that fact alone is not a cognizable public interest under FOIA, as disclosure of the draft indictments would not

shed light on what the government is up to. Moreover, the fact remains that the responsive

records were compiled for law enforcement purposes and no charges were brought. The release

of the responsive records could reasonably be expected to constitute a clearly unwarranted and

an unwarranted invasion of personal privacy, while revealing little or nothing about the workings

of the government. As a result, FOIA Exemptions 6 and 7(C) are fully applicable to the

documents at issue here.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct, and that Exhibits A through F are true and correct copies.

Executed this 1st day of February, 2016.

MARTHA WAGNER MURPHY
Chief, Special Access and FOIA Branch
Research Services Division
National Archives and Records Administration
College Park, Maryland

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,                    )
                                         )
    Plaintiff,                           )
                                         )
        v.                               )        Civ. A. No. 15-CV-1740 (RBW)
                                         )
NATIONAL ARCHIVES AND                    )
RECORDS ADMINISTRATION,                  )
                                         )
    Defendant.                           )
                                         )

# EXHIBIT A

# RG 449, Records of Independent Counsel Kenneth Starr/Robert Ray/Julie Thomas

| Document # | Description of Document | Total # of Pages | Applicable FOIA Exemptions | Withheld in Full/ Released in Part/ Released in Full |
|---|---|---|---|---|
| 1 - 4 | One-page memorandum with attached draft indictment; (Four identical copies) | 92 (23 pages each) | (b)(3), (b)(6), (b)(7)(C) | Withheld in Full |
| 5 | One-page memorandum and one-page cover fax sheet with attached draft indictment) | 24 pages | (b)(3), (b)(6), (b)(7)(C) | Withheld in Full |
| 6 | One-page memorandum and one-page cover fax sheet with attached draft indictment (with marginalia) | 24 pages | (b)(3), (b)(6), (b)(7)(C) | Withheld in Full |
| 7-9 | Draft indictment; (Three identical copies) | 45 pages (15 pages each) | (b)(3), (b)(6), (b)(7)(C) | Withheld in Full |
| 10 | One-page memorandum with attached draft indictment; contains some annotations on indictment and handwritten notes on the back of last page of draft indictment | 23 pages | (b)(3), (b)(6), (b)(7)(C) | Withheld in Full |
| 11 | Scraps of a draft indictment with no caption | 4 pages | (b)(3), (b)(6), (b)(7)(C) | Withheld in Full |
| 12-13 | Draft indictment without a caption, listing overt acts. (Two identical copies) | 6 pages (3 pages each) | (b)(3), (b)(6), (b)(7)(C) | Withheld in Full |
| 14 | Draft indictment with two pages of handwritten notes | 24 pages | (b)(3), (b)(6), (b)(7)(C) | Withheld in Full |
| 15 | Draft indictment; contains some annotations | 22 pages | (b)(3), (b)(6), (b)(7)(C) | Withheld in Full |
| 16 | One-page memorandum with attached draft indictment | 37 pages | (b)(3), (b)(6), (b)(7)(C) | Withheld in Full |
| 17 | Draft indictment; contains some annotations | 37 pages | (b)(3), (b)(6), (b)(7)(C) | Withheld in Full |
| 18 | Draft indictment | 36 pages | (b)(3), (b)(6), (b)(7)(C) | Withheld in Full |
| 19 | Draft indictment; contains some annotations | 40 pages | (b)(3), (b)(6), (b)(7)(C) | Withheld in Full |
| 20 | Draft indictment | 37 pages | (b)(3), (b)(6), (b)(7)(C) | Withheld in Full |

**TOTAL = 451 pages**

**Exhibit A** to Declaration of Martha Wagner Murphy,
*Judicial Watch, Inc. v. NARA*, Civ. A. No. 15-CV-1740 (RBW)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,                          )
                                               )
        Plaintiff,                             )
                                               )
            v.                                 )        Civ. A. No. 15-CV-1740 (RBW)
                                               )
NATIONAL ARCHIVES AND                          )
RECORDS ADMINISTRATION,                        )
                                               )
        Defendant.                             )
                                               )

# EXHIBIT B



**Judicial Watch®**
*Because no one is above the law!*

March 9, 2015

**VIA CERTIFIED MAIL & EMAIL**

National Archives and Records Administration
Special Access and FOIA Staff (NWCTF)
8601 Adelphi Road, Room 6350
College Park, MD 20740

**Re: Freedom of Information Act Request**

Dear Freedom of Information Officer:

      Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, Judicial Watch, Inc. hereby requests that the National Archives and Records Administration produce the following within twenty (20) business days:

> **All versions of indictments against Hillary Rodham Clinton, including, but not limited to, Versions 1, 2, and 3 in box 2250 of the Hickman Ewing Attorney Files, the "HRC/___Draft Indictment" in box 2256 of the Hickman Ewing Attorney Files, as well as any and all versions written by Deputy Independent Counsel Hickman Ewing, Jr. prior to September of 1996.**

      The records in question are located in the material submitted to the National Archives and Records Administration by the Office of Independent Counsel In Re: Madison Guaranty Savings & Loan Association, also known as "the records of IC Starr."

      We call your attention to President Obama's January 21, 2009 Memorandum concerning the Freedom of Information Act, in which he states:

> All agencies should adopt a presumption in favor of
> disclosure, in order to renew their commitment to the
> principles embodied in FOIA...The presumption of
> disclosure should be applied to all decisions involving

425 Third St., SW, Suite 800, Washington, DC 20024 • Tel: (202) 646-5172 or 1-888-593-8442
FAX: (202) 646-5199 • Email: info@JudicialWatch.org • www.JudicialWatch.org

37

FOIA.[1]

The memo further provides that "The Freedom of Information Act should be administered with a clear presumption: In the case of doubt, openness prevails."

Nevertheless, if any responsive record or portion thereof is claimed to be exempt from production under FOIA, please provide sufficient identifying information with respect to each allegedly exempt record or portion thereof to allow us to assess the propriety of the claimed exemption. *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974). In addition, any reasonably segregable portion of a responsive record must be provided, after redaction of any allegedly exempt material. 5 U.S.C. § 552(b).

For purposes of this request, the term "record" shall mean: (1) any written, printed, or typed material of any kind, including without limitation all correspondence, memoranda, notes, messages, letters, cards, facsimiles, papers, forms, telephone messages, diaries, schedules, calendars, chronological data, minutes, books, reports, charts, lists, ledgers, invoices, worksheets, receipts, returns, computer printouts, printed matter, prospectuses, statements, checks, statistics, surveys, affidavits, contracts, agreements, transcripts, magazine or newspaper articles, or press releases; (2) any electronically, magnetically, or mechanically stored material of any kind, including without limitation all electronic mail or e-mail; (3) any audio, aural, visual, or video records, recordings, or representations of any kind; (4) any graphic materials and data compilations from which information can be obtained; and (5) any materials using other means of preserving thought or expression.

Judicial Watch also hereby requests a waiver of both search and duplication fees pursuant to 5 U.S.C. §§ 552(a)(4)(A)(ii)(II) and (a)(4)(A)(iii). Judicial Watch is entitled to a waiver of search fees under 5 U.S.C. § 552(a)(4)(A)(ii)(II) because it is a member of the news media. *Cf. National Security Archive v. Department of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989)(defining news media within FOIA context). Judicial Watch has also been recognized as a member of the news media in other FOIA litigation. *See, e.g., Judicial Watch, Inc. v. U.S. Department of Justice*, 133 F. Supp.2d 52 (D.D.C. 2000); and, *Judicial Watch, Inc. v. Department of Defense*, 2006 U.S. Dist. LEXIS 44003, *1 (D.D.C. June 28, 2006). Judicial Watch regularly obtains information about the operations and activities of government through FOIA and other means, uses its editorial skills to turn this information into distinct works, and publishes and disseminates these works to the public. It intends to do likewise with the records it receives in response to this request.

Judicial Watch also is entitled to a complete waiver of both search fees and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). Under this provision, records:

---

[1] Freedom of Information Act. Pres. Mem. of January 21, 2009, 74 Fed. Reg. 4683.

National Archives and Records Administration
March 9, 2015
Page 3 of 4

> shall be furnished without any charge or at a charge
> reduced below the fees established under clause (ii) if
> disclosure of the information is in the public interest
> because it is likely to contribute significantly to public
> understanding of the operations or activities of government
> and is not primarily in the commercial interest of the
> requester.

5 U.S.C. § 552(a)(4)(A)(iii).

In addition, if records are not produced within twenty (20) business days, Judicial
Watch is entitled to a complete waiver of search and duplication fees under Section 6(b)
of the OPEN Government Act of 2007, which amended FOIA at 5 U.S.C. §
(a)(4)(A)(viii).

Judicial Watch is a 501(c)(3), not-for-profit, educational organization, and, by
definition, it has no commercial purpose. Judicial Watch exists to educate the public
about the operations and activities of government, as well as to increase public
understanding about the importance of ethics and the rule of law in government. The
particular records requested herein are sought as part of Judicial Watch's ongoing efforts
to document the operations and activities of the federal government and to educate the
public about these operations and activities. Once Judicial Watch obtains the requested
records, it intends to analyze them and disseminate the results of its analysis, as well as
the records themselves, as a special written report. Judicial Watch will also educate the
public via radio programs, Judicial Watch's website, and/or newsletter, among other
outlets. It also will make the records available to other members of the media or
researchers upon request. Judicial Watch has a proven ability to disseminate information
obtained through FOIA to the public, as demonstrated by its long-standing and
continuing public outreach efforts.

Given these circumstances, Judicial Watch is entitled to a public interest fee
waiver of both search costs and duplication costs. Nonetheless, in the event our request
for a waiver of search and/or duplication costs is denied, Judicial Watch is willing to pay
up to $350.00 in search and/or duplication costs. Judicial Watch requests that it be
contacted before any such costs are incurred, in order to prioritize search and duplication
efforts.

In an effort to facilitate record production within the statutory time limit, Judicial
Watch is willing to accept documents in electronic format (e.g. e-mail, .pdfs). When
necessary, Judicial Watch will also accept the "rolling production" of documents.

If you do not understand this request or any portion thereof, or if you feel you
require clarification of this request or any portion thereof, please contact us immediately
at 202-646-5172 or kbailey@judicialwatch.org. We look forward to receiving the

39

**National Archives and Records Administration**
**March 9, 2015**
**Page 4 of 4**

requested documents and a waiver of both search and duplication costs within twenty (20) business days. Thank you for your cooperation.

Sincerely,

Kate Bailey
Judicial Watch

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,                    )
                                         )
   Plaintiff,                            )
                                         )
            v.                     )    Civ. A. No. 15-CV-1740 (RBW)
                                         )
NATIONAL ARCHIVES AND                    )
RECORDS ADMINISTRATION,                  )
                                         )
   Defendant.                            )
                                         )

# EXHIBIT C

NATIONAL ARCHIVES and RECORDS ADMINISTRATION
8601 ADELPHI ROAD   COLLEGE PARK, MD 20740-6001
www.archives.gov



NATIONAL
ARCHIVES

March 19, 2015

Kate Bailey
Judicial Watch
425 Third Street, SW, Suite 800
Washington, DC 20024

Dear Ms. Bailey,

This is in response to your Freedom of Information Act request of March 17, 2015 for
records in the custody of the National Archives and Records Administration. Your request
was received in this office on March 17, 2015 and assigned FOIA case number 46068.
You requested Independent Counsel Kenneth Starr records related to several versions of
indictments of Hillary Clinton.

We have examined the folders from Hickman Ewing's attorney files that you requested.
From box 2250 the folder "Draft Indictment" (38 pages) is denied in full under Exemption
(b)(7)(C). From box 2256 the folder "Hillary Rodham Clinton/Webster L. Hubbell Draft
Indicment" (approximately 200 pages) is denied in full under Exemption (b)(7)(C).

You requested a waiver for reproduction fees ordinarily charged to researchers, however,
records transferred to the custody of the National Archives are exempted from the fee and
fee waiver provisions of the Freedom of Information Act because there was a fee
schedule in place prior to enactment of the FOIA. The applicable section states that
"nothing in this subparagraph shall supersede fees chargeable under a statute specifically
providing for setting the level of fees for particular types of records" (5 U.S.C. 552
(a)(4)(A)(vi)). The relevant fee statute authorizes the National Archives "to charge a fee
for making or authenticating copies or reproductions of materials transferred to the
Archivist's custody." (44 U.S.C. 2116(c)).

The inability to grant the requested fee waiver does not constitute a denial under the
terms of the Freedom of Information Act. However, if you consider this response to be a
denial of your request, or if you wish to appeal the document denials, you may appeal my
decision within 60 calendar days from the date of this letter. Appeals must be submitted in
writing and addressed to the Deputy Archivist of the United States, National Archives and
Records Administration, 8601 Adelphi Road, Room 4200, College Park, MD 20740. In
your letter, please cite your case number and clearly label both the letter and envelope as
a FOIA Appeal. As an alternative, you may e-mail your appeal to foia@nara.gov. If you
choose this option, please use the words "FOIA appeal" in the subject line and also cite
your case number.

This concludes the processing of your request. If you have any question about the way
we handled your request, or about our FOIA regulations or procedures, please contact
David Paynter at david.paynter@nara.gov or (301) 837-2041.

Sincerely,

*Martha W. Murphy*

**MARTHA WAGNER MURPHY**
Chief
Special Access and FOIA Staff

NATIONAL ARCHIVES *and*
RECORDS-ADMINISTRATION

8601 ADELPHI ROAD
COLLEGE PARK, MD 20740-6001
*www.archives.gov*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,                     )
                                          )
        Plaintiff,                        )
                                          )
                v.                        )        Civ. A. No. 15-CV-1740 (RBW)
                                          )
NATIONAL ARCHIVES AND                     )
RECORDS ADMINISTRATION,                   )
                                          )
        Defendant.                        )
                                          )

# EXHIBIT D



## NATIONAL ARCHIVES

October 16, 2015

**VIA FIRST CLASS MAIL**
Ms. Kate Bailey
Judicial Watch
425 Third Street, SW, Suite 800
Washington, DC 20024

Re: NARA Case No. RD 46086; NARA Appeal No. NGC15-071A

Dear Ms. Bailey:

This is to advise you that your administrative appeal, dated May 14, 2015, from the initial decision of the Special Access and FOIA Staff, was received by this office on behalf of the Deputy Archivist of the United States on May 14, 2015. Your appeal has been assigned number NGC15-071A. We apologize for our delay in acknowledging your administrative appeal.

The Deputy Archivist of the United States has the responsibility to adjudicate such appeals. We regret any delay in responding to your appeal. In an attempt to afford each appellant equal and impartial treatment, we have adopted a general practice of assigning appeals in the approximate order of receipt. As stated above, your appeal has been assigned number NGC15-071A. Please provide this number in any future correspondence to this office regarding this matter. Please note, if you provide an e-mail address or another electronic means of communication with your appeal, this office may respond to you electronically even if you submitted your appeal via regular U.S. Postal Service.

We will notify you of the decision on your appeal as soon as we can. If you have any questions about the status of your appeal, you may contact me at the number and/or email below. If you have submitted your appeal through the *FOIAonline* electronic portal, you may also obtain an update on the status of your appeal by logging into your *FOIAonline* account.

Sincerely,

JOSEPH A. SCANLON
FOIA Officer
Office of General Counsel
(301) 837-0583
joseph.scanlon@nara.gov

NATIONAL ARCHIVES *and*
RECORDS ADMINISTRATION

8601 ADELPHI ROAD
COLLEGE PARK, MD 20740-6001
*www.archives.gov*

45

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC., )
)
   Plaintiff, )
)
          v. )   Civ. A. No. 15-CV-1740 (RBW)
)
NATIONAL ARCHIVES AND )
RECORDS ADMINISTRATION, )
)
   Defendant. )
)

# EXHIBIT E

46



## NATIONAL
## ARCHIVES

December 4, 2015

Ms. Kate Bailey
Judicial Watch
425 Third Street, SW, Suite 800
Washington, DC 20024

Re: Freedom of Information Act Appeal NGC15-071A

Dear Ms. Bailey:

This is in response to your Freedom of Information Act (FOIA) letter in which you appeal the
initial decision of the Special Access and FOIA Staff regarding your FOIA request, RD 46068,
which asked for access to accessioned records within the holdings of the National Archives and
Records Administration (NARA).

I have been informed that you filed a lawsuit in the United States District Court for the District
of Columbia concerning NARA's initial decision in this matter. As a result, and in accordance
with 36 C.F.R. § 1250.74(a)(2), I am closing your appeal file now that your request is the subject
of a FOIA lawsuit.

Sincerely

DEBRA STEIDEL WALL
Deputy Archivist of the United States

NATIONAL ARCHIVES and
RECORDS ADMINISTRATION

8601 ADELPHI ROAD
COLLEGE PARK, MD 20740-6001
www.archives.gov

47

USCA Case #16-5366   Document #1668146   Filed: 03/28/2017   Page 51 of 421

<div align="center">

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

</div>

|                                              |     |                          |
| -------------------------------------------- | --- | ------------------------ |
|                                              | )   |                          |
| **JUDICIAL WATCH, INC.**                     | )   |                          |
|                                              | )   |                          |
| **Plaintiff,**                               | )   |                          |
|                                              | )   |                          |
| **v.**                                       | )   | **No. 1:15-cv-01740-RBW** |
|                                              | )   |                          |
| **NATIONAL ARCHIVES AND**                    | )   |                          |
| **RECORDS ADMINISTRATION,**                  | )   |                          |
|                                              | )   |                          |
| **Defendant.**                               | )   |                          |
|                                              | )   |                          |

<div align="center">

**DEFENDFANT'S STATEMENT UNDER LCvR 7(h)(1)**

</div>

Defendant, the National Archives and Records Administration (NARA), hereby states pursuant to LCvR 7(h)(1) that no genuine issue exists as to the following material facts:

1. NARA maintains custody of the records of the independent counsels who served under Title VI of the Ethics in Government Act of 1978. Decl. of Martha Wagner Murphy ¶ 15.

2. The records maintained by NARA include the records of Kenneth W. Starr and his successors. *Id.* ¶ 18.

3. Mr. Starr served as an independent counsel under Title VI from 1994 until 1999; his successors served until 2004. *Id.*

4. Included among the records of Mr. Starr and his successors are drafts of a proposed indictment of Hillary Rodham Clinton. *Id.* ¶ 23.

5. The records of Mr. Starr and his successors fill approximately 3149 cubic feet of space at NARA. *Id.*. ¶ 19.

6. An index to those records was prepared by the second and last of Mr. Starr's successors and her staff in connection with the transfer of the records to NARA. *Id.*

<div align="center">

48

</div>

7.  A copy of that index was provided to plaintiff, Judicial Watch, by NARA in May 2015.  *Id.* ¶ 19 n.7.

8.  By letter dated March 9, 2015, plaintiff submitted a request to NARA under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, for the following records:

> All versions of indictments against Hillary Rodham Clinton, including, but not limited to, Versions 1, 2, and 3 in box 2250 of the Hickman Ewing Attorney Files, the "HRC/__Draft Indictment" in box 2256 of the Hickman Ewing Attorney Files, as well as any all versions written by Deputy Independent Counsel Hickman Ewing, Jr. prior to September of 1996.

*Id.* ¶ 6.

9.  Hickman Ewing was a lawyer who worked as Kenneth Starr's deputy in Little Rock. *Id.* ¶ 6 n.2.

10.  Plaintiff said in its request that "[t]he records in question are located in the material submitted to [NARA] by the Office of Independent Counsel In Re: Madison Guaranty Savings & Loan Association, also known as 'the records of IC Starr.'"  *Id.* ¶ 6.

11.  NARA responded to plaintiff's request by locating the two boxes in the records of Mr. Starr and his successors to which the request referred, Boxes 2250 and 2256.  *Id.* ¶¶ 20-21.

12.  Both boxes bear the name, "Hickman Ewing Attorney Work Product"; both boxes bear the heading "HRC," the initials of Hillary Rodham Clinton; and both boxes state on their face that their contents include "material subject to Rule 6(e) of the Federal Rules of Criminal Procedure."  *Id.* ¶ 20.

13.  Box 2250 contains a folder labeled "Draft Indictment."  *Id.*

14.  Box 2256 contains a folder labelled "Hillary Rodham Clinton/Webster L. Hubbell Draft Indictment."  *Id.*

15. Multiple drafts of the proposed indictment of Mrs. Clinton were located by NARA within these folders. *See id.* ¶ 21 & Ex. A.

16. NARA also responded to plaintiff's FOIA request by "search[ing] the 'Box Contents' and 'Subject' fields [of the index to the records of Mr. Starr and his successors] to identify any other folders that could contain 'Indictment' and 'Hillary Rodham Clinton" or 'Hillary Clinton' or 'HRC.'" *Id.* ¶ 21.

17. This search "did not locate any other responsive folders." *Id.*

18. Each of the drafts of the proposed indictment that NARA located is marked on its face as a draft; is denominated as a draft in accompanying cover memos; or shows through its incompleteness that it is a draft. *Id.* ¶ 23.

19. Some of the drafts contain marginalia or annotations; some are identical duplicates of each other; some are non-identical duplicates; some are accompanied by cover memos; some are accompanied by handwritten notes on separate pieces of paper; and some are accompanied by fax cover sheets. *Id.*

20. One of the drafts consists merely of "scraps of a draft indictment." *Id.*

21. NARA is withholding each of the drafts in full pursuant to FOIA Exemption 3 and Rule 6(e), *id.* ¶ 25, and, separately, pursuant to FOIA Exemptions 7(C) and 6. *Id.* ¶ 35.

22. No indictment of Mrs. Clinton was ever issued, *id.* ¶ 34, and no charges against her were ever brought. *Id.* ¶ 35.

23. By letter dated March 19, 2015, NARA advised plaintiff that it had "examined the folders from Hickman Ewing's attorney files that you requested" and was withholding the following records "in full" pursuant to FOIA Exemption 7(C): "From box 2250 the folder 'Draft

Indictment' (38 pages) . . . From box 2256 the folder 'Hillary Rodham Clinton/Webster L.

Hubbell Draft [Indictment] (approximately 200 pages)." *Id.* ¶ 8.

  24.  The records to which NARA referred in its letter included records other than drafts

of the proposed indictment.  *See id.* ¶ 22.

  25.  By letter dated May 14, 2015, plaintiff appealed administratively the withholding of

the above records.  *Id.* ¶ 9.

  26.  By letter dated October 16, 2015, NARA advised plaintiff that its administrative

appeal had been placed into the processing queue.  *Id.* ¶ 10.

  27.  On October 20, 2015, plaintiff commenced this action.  *Id.* ¶ 11.

  28.  Plaintiff's commencement of this action caused NARA to close plaintiff's

administrative appeal.  *Id.* ¶ 12.

       Respectfully submitted,

       BENJAMIN C. MIZER
       Principal Deputy Assistant Attorney General

       CHANNING D. PHILIPS
       United States Attorney

       ELIZABETH J. SHAPIRO
       Deputy Director

       s/ *David M. Glass*
       DAVID M. GLASS, DC Bar 544549
       Senior Trial Counsel
       Department of Justice, Civil Division
       20 Massachusetts Ave., N.W., Room 7200
       Washington, D.C.  20530-0001
       Tel: (202) 514-4469/Fax: (202) 616-847
Dated: February 2, 2016    E-mail: david.glass@usdoj.gov

# **EXHIBIT 1**

to

Plaintiff's Response to Defendant's Statement of Material Facts
Not in Dispute and Statement of Undisputed Material Facts
in Support of Cross-Motion for Summary Judgment

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,       )
                  )
       Plaintiff,      )
                  )     Civil Action No.  15-cv-1740 (RBW)
v.                       )
                  )
NATIONAL ARCHIVES AND    )
RECORDS ADMINISTRATION,   )
                  )
       Defendant.    )
_____)

## DECLARATION OF PAUL J. ORFANEDES

I, Paul J. Orfanedes, hereby declare as follows:

1.      I am counsel for Judicial Watch, Inc. ("Judicial Watch"), Plaintiff in the above-captioned matter.  I also am an officer and director of Judicial Watch, and, as such, have personal knowledge of the matters set forth below.

2.      The following five (5) reports are publicly available on the U.S. Government Publishing Office's website:  https://www.gpo.gov/fdsys/browse/collection.action?collectionCode=GPO&browsePath=Independent+Counsel+Investigations%2FLewinsky&isCollapsed=true&leafLevelBrowse=false&isDocumentResults=true&ycord=191:

    (1)    Final Report of the Independent Counsel, *In re Madison Guaranty Savings and Loan Association* (In re Anthony Marceca) (published March 16, 2000);

    (2)    Final Report of the Independent Counsel, *In Re Madison Guaranty Savings and Loan Association* (In re Bernard Nussbaum) (published March 16, 2000);

    (3)    Final Report of the Independent Counsel, *In Re Madison Guaranty Savings and Loan Association* (In re William David Watkins and In re Hillary Rodham Clinton) (published June 22, 2000);

(4)    Final Report of the Independent Counsel, *In re Madison Guaranty Savings and Loan Association* (published January 5, 2001); and

(5)    Final Report of the Independent Counsel, *In Re Madison Guaranty Savings and Loan Association* (Regarding Monica Lewinsky and Others) (published March 6, 2002).

I am familiar with these reports based on my prior work at Judicial Watch and also reviewed the reports in the course of my representation of Judicial Watch in this litigation.  Each report contains enormous quantities of investigative materials, including grand jury testimony.  Each report also appears to have been approved for publication by the U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") pursuant to Section 594(h), Title 28 of the United States Code.

3.    In the course of my representation of Judicial Watch in this litigation, I have become familiar with the January 5, 2001 Final Report of the Independent Counsel in *In re Madison Guaranty Savings and Loan Association* ("Final Report")*.*  In particular, I reviewed Chapter 3 of Volume II, Part B of the January 5, 2001 Final Report, entitled "Mrs. Clinton's Madison Guaranty Representation."  A true and correct copy of Volume II, Part B, Chapter 3 of the January 5, 2001 Final Report is attached to Plaintiff's Statement of Undisputed Material Facts in Support of Cross-Motion for Summary Judgment as Exhibit 2.

4.    Based on my review of Chapter 3, I prepared a chart identifying the various sources of information relied on, cited, and quoted in the chapter.  A true and correct copy of the chart, entitled "January 5, 2001 Final Report – Sources of Information" is attached hereto as Exhibit A.  The chart differentiates between non-grand jury information, grand jury information, and documentary evidence.  Each entry also includes a reference to the page(s) in the chapter where the citation was found.  As the chart demonstrates, Chapter 3 cites, references, and quotes,

in some cases extensively, from as many as 44 different, non-grand jury sources of information, not including numerous individual documents, gathered from various investigations.   These non-grand jury sources of information include:

- independent counsel witness interviews;

- interrogatory responses to regulators;

- deposition testimony;

- trial testimony;

- congressional testimony;

- witness interviews by regulators;

- regulatory reports;

- media reports;

- television interviews; and

- at least one book.

The chapter also cites, references, and quotes grand jury testimony from at least 25 grand jury appearances by 21 witnesses between 1995 and 1998.

5.      In June 2014, Judicial Watch submitted a Freedom of Information Act ("FOIA") request to the National Archives and Records Administration ("Archives") seeking access to a binder of materials prepared by the Office of the Independent Counsel ("OIC"), as referenced in *The Death of American Virtue:  Clinton vs. Starr* (Broadway Books 2011) by Ken Gormley.  The Archives subsequently produced 246 pages of records in response to the request.

6.      Among the records produced by the Archives to Judicial Watch in response to the June 2014 FOIA request was a 206-page memorandum, dated April 22, 1998, to "All OIC Attorneys," from the "HRC Team" and bearing the subject line "Summary of Evidence:  Hillary

Rodham Clinton and Webb Hubbell."  A true and correct copy of the memorandum is attached to Plaintiff's Statement of Undisputed Material Facts in Support of Cross-Motion for Summary Judgment as Exhibit 3.

7.      I reviewed the April 22, 1998 "Summary of Evidence" memorandum produced by the Archives and, based on that review, prepared a second chart identifying the various sources of information cited, referenced, and quoted in the memorandum.  A true and correct copy of this second chart, entitled "April 22, 1998 Summary of Evidence Memorandum – Sources of Information; Non-Exhaustive" is attached hereto as Exhibit B.  Like the chart I prepared for Volume II, Part B, Chapter 3 of the January 5, 2001 Final Report, this second chart differentiates between non-grand jury information, grand jury information, and documentary evidence.  Each entry also includes a reference to the page(s) in the memorandum where the citation was found. Because the memorandum's citations are in different formats (*e.g.* "GJ," "G.J.," vs. "Grand Jury" and "Deposition vs. Dep.") and I searched the memorandum electronically in preparing the chart, I am not confident that I was able to identify all of the relevant citations in the memorandum. The information I was able to gather nonetheless demonstrates that the memorandum cites, references, and quotes from many of the same, non-grand jury sources of information cited in Volume II, Part B, Chapter 3 of the January 5, 2001 Final Report.  It also cites, references, and quotes from a great many additional sources, including as many as 12 separate FBI 302s. Although not an exhaustive count, it also cites, references, and quotes testimony from at least 34 grand jury appearances by some 27 witnesses between 1995 and 1998, including 12 witnesses not referenced in Volume II, Part B, Chapter 3 of the January 5, 2001 Final Report.  *Id.*

8.      The April 22, 1998 "Summary of Evidence" memorandum, which is largely unredacted, is available to the public on Judicial Watch's website along with the other records

- 4 -

56

produced by Archives in response to Judicial Watch's June 2014 FOIA request.  Judicial Watch

did not pursue an administrative appeal of the Archives' relatively few number of redactions for

reasons unrelated to whether Judicial Watch believes those redactions have merit.

9.      On March 9, 2015, Judicial Watch submitted a FOIA request to the Archives

seeking access to Ewing's draft indictments.  Specifically, Judicial Watch requested:

> All versions of indictments against Hillary Rodham Clinton, including but not
> limited to Versions 1, 2, and 3 in box 2250 of the Hickman Ewing Attorney Files,
> the "HRC/___ Draft Indictment" in box 2256 of the Hickman Ewing Attorney
> Files, as well as any and all versions written by Deputy Independent Counsel
> Hickman Ewing, Jr. prior to September of 1996.

10.      On March 5, 2016, I performed a simple google search using the words "Starr

Report."  The search yielded 13,200,000 search results.  A google search for "Hillary Clinton

draft indictment" on March 5, 2016 yielded 547,000 search results.

11.      Judicial Watch's efforts to gain access to the draft indictments has been the

subject of news reports by CNN, Politico, The New York Post, Investor's Business Daily, The

National Review, and even the United Kingdom's Daily Mail.  *See*, *e.g.*, Eric Bradner, "Judicial

Watch sues for draft Whitewater indictments of Hillary Clinton," *CNN* (Oct. 20, 2015); Josh

Gerstein, "Feds fight disclosure of Hillary Clinton Whitewater indictment drafts," *Politico*  (Feb.

3, 2016); John Crudle, "Skeletons in Hill's closet are ready to rumble," *New York Post*" (Feb. 16,

2016); "Whitewater Indictment Haunts Hillary All the Way to Benghazi," *Investor's Business

Daily* (Oct. 21, 2015); Brendan Bordelon, "Lawsuit:  Obama Administration Withholding Draft

of Clinton Whitewater Indictment," *National Review* (Oct. 20, 2015); and J. Taylor Rushing,

//

//

//

"Indictment drafted against Hillary Clinton 20 years ago in Whitewater scandal must be published, conservative group demands," *Daily Mail* (Oct. 21, 2015).

I declare under penalty of perjury that the foregoing is true and correct.  Executed on March **11**, 2016 in Washington, D.C.

Paul J. Orfanedes

USCA Case #16-5366   Document #1668146   Filed: 03/28/2017   Page 62 of 421

# **EXHIBIT A**

to

Declaration of Paul J. Orfanedes

### JANUARY 5, 2001 FINAL REPORT – SOURCES OF INFORMATION

I.    <u>Non-Grand Jury</u>.

    1.    Campbell, George, June 28, 1996 Interview (Report at 460)

    2.    Clark, FNU, July 26, 1997 Interview (Report at 474)

    3.    Clinton, Hillary, November 10, 1994 FDIC Interview (Report at 474)

    4.    Clinton, Hillary, April 22, 1995 Deposition Testimony (Report at 431-434, 435-36, 458, 472-73, 473, and 474)

    5.    Clinton, Hillary, May 24, 1995 RTC Interrogatory Responses (Report at 437)

    6.    Clinton, Hillary, January 20, 1996 RTC Interrogatory Responses (Report at 483, 484-85, and 487)

    7.    Clinton, Hillary, February 14, 1996 RTC/FDIC Interview (Report at 437-39, 470, 474-75, 481-82, 486, and 488)

    8.    Clinton, Hillary, April 25, 1998 Deposition Testimony (Report at 430-431, 439-41, 441-49, 467, 478-80, 486, and 489-90)

    9.    Clinton, William J., April 22, 1995 Deposition Testimony (Report at 420 and 421)

    10.   Clinton, William J., April 28, 1996 Deposition Testimony (Report at 421-22)

    11.   Clinton, William J., April 28, 1996 Testimony at Jim McDougal's criminal trial (Report at 420)

    12.   Denton, Don, June 20, 1996 Interview (Report at 475

    13.   Denton, Don, June 26, 1996 Interview (Report at 483)

    14.   Ford, Darlene, July 29, 1996 Interview (Report at 483)

    15.   Gregory, Watt, May 24, 1995 Interview (Report at 459)

    16.   Heritage-Hays, Pat, January 6, 1995 Interview (Report at 453)

17.     Strayhorn, Susan March 30, 1994 Interview (Report at 423)

18.     Hubbell, Webster, February 1, 1995 Interview (Report at 454 and 458)

19.     Hubbell, Webster, October 26, 1995 Senate Whitewater Committee Testimony (Report at 455, 456, and 458-59)

20.     Hubbell, Webster, February 7, 1996 Senate Whitewater Committee Testimony (Report at 489)

21.     Jones, Wilson, June 27, 1996 Interview (Report at 460)

22.     Kennedy, William, January 16, 1996 Senate Whitewater Committee Testimony (Report at 460)

23.     Knight, David, May 16, 1996 Senate Whitewater Committee Testimony (Report at 451 and 452)

24.     Latham, John, February 14, 1995 Interview (Report at 425 and 453)

25.     Latham, John, May 15, 1996 Senate Banking Committee Testimony (Report at 425 and 453)

26.     Latham, John, May 15, 1996 Senate Whitewater Committee Testimony (Report at 425, 452, and 453)

27.     Latham, John, May 16, 1996 Senate Whitewater Committee Testimony (Report at 425, 452, and 453)

28.     Latham, John, July 12, 1995 RTC Interview (Report at 453)

29.     Massey, Rick, January 11, 1996 Senate Whitewater Committee Testimony (Report at 449, 450, 451, 457, 460-61, 463, and 464-65)

30.     McDougal, Jim, May 8, 1996 Criminal Trial Testimony (Report at 414, 415, 416 and 417)

31.     McDougal, Jim, June 22, 1995 Interview (Report at 417 and 422)

32.     McDougal, Jim, August 96-June 97 Interview (Report at 415, 416, 417, 418, 419, 422, 423-24, 427, and 434)

33.     Moles, Rae Ann, August 4, 1994 and February 9, 1995 Interview (Report at 425-26)

34.     Patton, Martha, September 25, 1996 Interview (Report at 483)

35.     Schaufele, Mike, May 27, 1988 Deposition Testimony (Report at 472)

36.     Ward, Seth, February 12, 1996 Senate Whitewater Testimony (Report at 470)

37.     Pillsbury Madison & Sutro, LLP, "A Report on Certain Real Estate Loans and Instruments Made by Madison Guaranty Savings & Loan and Related Entities:  Prepared for Resolution Trust Corporation" (December 19, 1995) (Report at 468-69)

38.     Pillsbury Madison & Sutro LLP, "A Supplemental Report on the Representation of Madison Guaranty Savings & Loan by the Rose Law Firm:  Prepared for Federal Deposit Insurance Corporation" (February 25, 1996) (Report at 481 and 484)

39.     FDIC-OIG Supplemental Report on Rose Law Firm Conflicts of Interest (September 20, 1996) (Report at 474)

40.     Frantz, Rempel, "Fallout form Collapse of S&L Shadows Clinton," *Los Angeles Times*, November 7, 1993 (Report at 417)

41.     Maraniss, David and WeissKopf, Michael, "Lawyer Will Review Arkansas Land Deal," *Washington Post*, March 12, 1992 (Report at 424)

42.     Stewart, James B., *Blood Sport* (1996) (Report at 423)

43.     Prime Time Live:  Diane Sawyer Interview of Susan McDougal (ABC Television, August 30, 1996) (Report at 425)

44.     Larry King Live:  Larry King Interview of Susan McDougal (CNN, September 6, 1996) (Report at 425)

II.     <u>Grand Jury</u>.

1.      Bunch, Gary, January 20, 1998 Grand Jury Testimony (Report at 462)

2.      Clark, R., December 5, 1995 Grand Jury Testimony (Report at 473)

3.      Clinton, Hillary, January 26, 1996 Grand Jury Testimony (Report at 428-30 and 491)

4.      Denton, Don, August 20, 1996 Grand Jury Testimony (Report at 472, 474, 475, 476-77, 478, and 490)

5.      Denton, Don, March 19, 1998 Grand Jury Testimony (Report at 482)

6.      Donovan, Rick, December 6, 1995 Grand Jury Testimony (Report at 480)

7.      Giroir, Joe, July 18, 1996 Grand Jury Testimony (Report at 436, 456, and 460)

8.      Gregory, Watt, January 3, 1996 Grand Jury Testimony (Report at 459 and 460)

9.      Handley, Sarah, October 31, 1995 Grand Jury Testimony (Report at 427)

10.     Henley, William, June 18, 1996 Grand Jury Testimony (Report at 422 and 423)

11.     Hubbell, Webster, December 19, 1995 Grand Jury Testimony (Report at 457, 458, and 491)

12.     Hubbell, Webster, May 7, 1996 Grand Jury Testimony (Report at 455 and 473)

13.     Hubbell, Webster, August 22, 1996 Grand Jury Testimony (Report at 471-72)

14.     Knight, David, December 6, 1995 Grand Jury Testimony (Report at 457)

15.     Lynch, Loretta, February 1, 1996 Grand Jury Testimony (Report at 453 and 454)

16.     Massey, Rick, November 7, 1995 Grand Jury Testimony (Report at 449, 450, 456, 457, 460, and 463)

17.     Massey, Rick, December 3, 1997 Grand Jury Testimony (Report at 449, 450, 451, and 454)

18.     McDougal, Jim, April 2, 1997 Grand Jury Testimony (Report at 415, 416, 417, 418, and 423)

19.     Moles, Rae Ann, October 19, 1995 Grand Jury Testimony (Report at 426 and 427)

20.     Randoph, R.D., September 17, 1996 Grand Jury Testimony (Report at 427)

21.     Schaufele, Mike, January 30, 1996 Grand Jury Testimony (Report at 482 and 495)

22.     Selig, John, July 18, 1996 Grand Jury Testimony (Report at 466)

23.     Thomases, Susan, February 29, 1996 Grand Jury Testimony (Report at 454)

24.     Tucker, Jim Guy, March 18, 1998 Grand Jury Testimony (Report at 467 and 482)

25.     Ward, Seth, January 17, 1996 Grand Jury Testimony (Report at 470 and 482)

III.     <u>Documentary Evidence</u>.

Report at 419, 420, 430, 431, 436, 439-40, 441, 444, 449, 452, 453-54, 454, 463, 466, 469, 470, 471, 473, 474, 475, 478, 480, 481, 482, 483, and 490.

## **EXHIBIT B**

to

Declaration of Paul J. Orfanedes

## APRIL 22, 1998 SUMMARY OF EVIDENCE MEMORANDUM – SOURCES OF INFORMATION; NON-EXHAUSTIVE

I.    <u>Non-Grand Jury</u>.

1.    Adams, Roger, July 27, 1995 Senate Testimony (Memo at 98)*

2.    Breslaw, April, April 1994 Interview (Memo at 64)*

3.    Breslaw, April, July 28, 1994 Senate Banking Committee Deposition Testimony (Memo at 55)*

4.    Breslaw, April, June 6, 1995 Senate Banking Committee Deposition Testimony (Memo at 57 and 64)*

5.    Breslaw, April, August 10, 1995 House Testimony (Memo at 56)*

6.    Breslaw, April, October 23, 1995 Senate Banking Committee Deposition Testimony (Memo at 57 and 58)*

7.    Breslaw, April, November 30, 1995 Senate Banking Committee Testimony (Memo at 51, 55, 58 and 63)*

8.    Castleton, Thomas, June 27, 1995 Senate Deposition Testimony (Memo at 102)*

9.    Castleton, Thomas, August 3, 1995 Senate Hearing Testimony (Memo at 102)*

10.    Clinton, Hillary, April 22, 1995 Deposition Testimony (Memo at 24)

11.    Clinton, William J., April 22, 1995 Deposition Testimony (Memo at 31)

12.    Hubbell, Webster, April 20, 1995 Interview (Memo at 63)

13.    Hubbell, Webster, August 10, 1995 House Banking Committee Testimony (Memo at 51, 52 and 63)*

14.    Hubbell, Webster, December 1, 1995 Senate Testimony (Memo at 55 and 63)*

15.    Hubbell, Webster, February 7, 1996 Senate Testimony (Memo at 58 and 61)

16.    Latham, Rick, May 15, 1996 Senate Deposition Testimony (Memo at 37)

* Indicates source was not included in Chapter 3, Vol. II, Part B of 2001 Final Report.

17.  Latham, Rick, May 16, 1996 Senate Hearing Testimony (Memo at 37)

18.  Margolis, David, August 10, 1995 Senate Hearing Testimony (Mem at 98)*

19.  Massey, Rick, January 11, 1996 Senate Hearing Testimony (Memo at 24 and 33)

20.  Neuwirth, Steve, July 10, 1995 Senate Deposition Testimony (Memo at 101)*

21.  Salter, FNU, June 30, 1995 Deposition Testimony (Memo at 98)*

22.  Thomases, Susan, August 8, 1995 Senate Hearing Testimony (Memo at 101)*

23.  Vernon, Jordan, July 24, 1997 House Testimony (Memo at 161, 162 and 163)*

24.  Williams, Maggie, October 24, 1994 Interview (Memo at 101)*


II.  <u>Grand Jury</u>.

1.  Adams, Roger, May 9, 1995 Grand Jury Testimony (Memo at 98)*

2.  Bassett Schaffer, Beverly, November 8, 1995 Grand Jury Testimony (Memo at 75)*

3.  Breslaw, April, June 16, 1994 Grand Jury Testimony (Memo at 51)*

4.  Castleton, Thomas, April 4, 1995 Grand Jury Testimony (Memo at 102)*

5.  Clark, Ron, March 30, 1994 Grand Jury Testimony (Memo at 23)*

6.  Clark, Ron, December 2, 1997 Grand Jury Testimony (Memo at 91)*

7.  Donovan, Rick, January 6, 1998 Grand Jury Testimony (Memo at 56, 69, 70 and 72)*

8.  Donovan, Rick, January 21, 1998 Grand Jury Testimony (Memo at 56, 59 and 66)*

9.  Giroir, Joe, July 18, 1996 Grand Jury Testimony (Memo at 15, 24 and 38)

10.  Gregory, Watt, January 3, 1996 Grand Jury Testimony (Memo at 40)

* Indicates source was not included in Chapter 3, Vol. II, Part B of 2001 Final Report.

- 2 -

11.      Handley, Sarah, October 31, 1995 Grand Jury Testimony (Memo at 32)

12.      Henley, William, June 18, 1996 Grand Jury Testimony (Memo at 27)

13.      Heuer, Sam, April 1, 1997 Grand Jury Testimony (Memo at 70 and 71)*

14.      Heuer, Sam, October 8, 1997 Grand Jury Testimony (Memo at 70)*

15.      Heymann, Phillip, June 13, 1995 Grand Jury Testimony (Memo at 97 and 98)*

16.      Hubbell, Webster, December 19, 1995 Grand Jury Testimony (Memo at 23 and 90)

17.      Hubbell, Webster, August 22, 1996 Grand Jury Testimony (Memo at 65)

18.      Kennedy, Gail, January 24, 1995 Grand Jury Testimony (Memo at 96)*

19.      Kumpe, Peter, February 3, 1998 Grand Jury Testimony (Memo at 69 and 77)*

20.      Lynch, Loretta, February 1, 1996 Grand Jury Testimony (Memo 79, 80, 81, 82 and 83)

21.      Margolis, David, June 14, 1995 Grand Jury Testimony (Memo at 98)*

22.      Massey, Rick, November 7, 1995 Grand Jury Testimony (Memo at 33, 37 and 38)

23.      Massey, December 3, 1997 Grand Jury Testimony (Memo at 89 and 90)

24.      McDougal, James, April 2, 1997 Grand Jury Testimony (Memo at 15)

25.      McLarty, Mack, April 17, 1997 Grand Jury Testimony (Memo at 156, 157 and 158)*

26.      Moles, Rae Ann, October 19, 1995 Grand Jury Testimony (Memo at 31)

27.      Neuwirth, Steve, February 28, 1995 Grand Jury Testimony (Memo at 97 and 101)*

28.      Neuwirth, Steve, April 2, 1996 Grand Jury Testimony (Memo at 101)*

29.      Nussbaum, Bernard, June 13, 1995 Grand Jury Testimony (Memo at 97)*

* Indicates source was not included in Chapter 3, Vol. II, Part B of 2001 Final Report.

30.    O'Neill, Henry, June 6, 1995 Grand Jury Testimony (Memo at 97)*

31.    Sloan, Cliff, April 4, 1995 Grand Jury Testimony (Memo at 97)*

32.    Thomases, Susan, February 29, 1996 Grand Jury Testimony (Memo at 40, 84, 86, 87 and 88)

33.    Ward, Seth, January 17, 1996 Grand Jury Testimony (Memo at 11)

34.    Ward, Seth, January 21, 1998 Grand Jury Testimony (Memo at 76)*


III.    <u>FBI 302s</u>.

1.    Alford, Jimmie (Memo at 51 and 73)*

2.    Castleton, Thomas (Memo at 102)*

3.    Dover, Darrell (Memo at 6)*

4.    Gregory, Watt (Memo at 40)*

5.    Heritage-Hays, Pat (Memo at 37)*

6.    Hubbell, Webster (Memo at 39 and 40)*

7.    Latham, John (Memo at 22 and 37)*

8.    McDougal, Jim (Memo at 15, 18, 21, 22, 27, 28, 29 and 30)*

9.    Moles, Rae Ann (Memo at 31 and 32)*

10.    OIC (Memo at 65)*

11.    Strayhorn, Susan (Memo at 27)*

12.    Williams, Gary (Memo at 102)*


* Indicates source was not included in Chapter 3, Vol. II, Part B of 2001 Final Report.

- 4 -

# **EXHIBIT 2**

to

Plaintiff's Response to Defendant's Statement of Material Facts
Not in Dispute and Statement of Undisputed Material Facts
in Support of Cross-Motion for Summary Judgment

USCA Case #16-5366      Document #1668146       Filed: 03/28/2017      Page 74 of 421

**PART B**

**THE RELATIONSHIP OF MADISON GUARANTY, CMS, AND
THE ROSE LAW FIRM**

**Chapter 3:**

**Mrs. Clinton's Madison Guaranty Representation**

# I.      INTRODUCTION

Mrs. Clinton represented Madison Guaranty between April 1985 and July 1986, a time when the institution was in severe financial trouble and when insiders committed numerous criminal and otherwise fraudulent acts.  The most serious of those fraudulent and criminal acts are the subject of Chapter 1 of this Part.  Several individuals were eventually convicted of or pleaded guilty to federal crimes for their roles in connection those transactions.  As Chapter 1 showed, Mrs. Clinton represented Madison Guaranty in regard to some of the fraudulent transactions, and Madison Guaranty insiders used and misused her legal services to thwart federal examiners.

After July 14, 1986, when federal regulators had demanded that the McDougals be removed from control of Madison Guaranty and Mrs. Clinton ended Madison Guaranty's retainer arrangement, it was clear that the insiders had engaged in substantial misconduct, including possibly having committed crimes.  The Clintons' association with the McDougals, and in particular Mrs. Clinton's representation of Madison Guaranty, were, at a minimum, a substantial political liability.  Moreover, Mrs. Clinton's representation of Madison Guaranty could have been a civil liability for Mrs. Clinton and the Rose Law Firm.

Rose, and in particular Webster Hubbell, also represented Madison Guaranty and its conservators, the FDIC and the RTC, beginning in 1989.  Hubbell concealed numerous potential conflicts of interest from the FDIC and RTC during that representation.  That representation and Hubbell's acts of concealment are discussed in Chapter 2 of this Part.  Hubbell eventually pleaded guilty to a felony for those acts.

410

When Governor Clinton ran for president in 1992, Mrs. Clinton's representation of Madison Guaranty, including how the representation had come about, became matters of public inquiry.  At that time, Madison Guaranty had failed, a failure that ultimately cost the American tax payers about $73 million.  Mrs. Clinton and the Clinton campaign made public statements regarding her representation that minimized her role.

After 1993, the conduct of insiders at Madison Guaranty and the Rose Law Firm became the subject of multiple federal investigations.  The RTC investigated whether insiders had committed criminal acts, and also examined whether the agency had viable civil claims against any insiders or professionals who had represented Madison Guaranty, including the Rose Law Firm.  Also, the FDIC and RTC investigated whether Rose attorneys had concealed potential conflicts of interest from the agencies.  The FBI and the United States Department of Justice also conducted criminal investigations of the conduct of the Madison Guaranty insiders and others, including Rose attorneys, who had been associated with the institution.  Beginning in 1994, those investigations were continued by this Office.

In the course of the federal investigations, Mrs. Clinton made numerous statements and gave sworn testimony regarding her representation of Madison Guaranty.  This Office investigated whether Mrs. Clinton had committed perjury, made false statements, or obstructed justice during those investigations.  The Independent Counsel concluded that there was insufficient evidence to prove beyond a reasonable doubt that Mrs. Clinton had committed any federal criminal offense.  While the evidence did show that some of Mrs. Clinton's statements had been factually inaccurate, the evidence did not establish beyond a reasonable doubt that she

411

73

knew that they were factually inaccurate when she made them.

This Chapter details the results of the investigation of Mrs. Clinton's statements regarding her representation of Madison Guaranty and the origin of that representation.

## II.     ANALYSIS

### A.     Madison Guaranty Hired Rose.

In April 1985, Madison Guaranty retained the Rose Law Firm, and that relationship continued until July 1986, when the federal regulators removed the McDougals from Madison Guaranty and Mrs. Clinton terminated the retainer.  The circumstances leading to Rose's being retained were later disputed by the individuals involved -- Jim McDougal stated that he hired Rose and Mrs. Clinton as a favor to Governor Clinton, while Mrs. Clinton stated that Madison Guaranty hired Rose because a Rose associate, Rick Massey, was a friend of Madison Guaranty's president, John Latham.

The circumstances of Rose's being retained by Madison Guaranty were investigated by numerous federal bodies, including this Office, the FDIC, the RTC, and Congressional committees.  The FDIC and RTC investigation included determining whether Madison Guaranty's retaining Rose had been proper, or whether it had caused any losses to the institution.  This Office's investigation included determining whether anyone had committed perjury, made a false statement, or obstructed any federal investigation.

The principals involved in the retention disagreed as to how it came about.  Jim McDougal said he hired Rose as a favor to Governor Clinton.  Mrs. Clinton said Rick Massey brought in the work and her only role was to collect on an old bill still owed by Madison Bank

and Trust, McDougal's other institution.  President Clinton said he could not remember asking

McDougal to give his wife business, but did not say that McDougal's recollection was false.

Massey testified he did not remember bringing Madison Guaranty to Rose, asking Mrs. Clinton

to act as billing partner, or discussing McDougal's unpaid bill.  Massey said that when partner

David Knight had asked Latham for business, Latham said he wanted to give Knight and Massey

the business, but Jim McDougal hired Madison Guaranty's lawyers.  Latham said McDougal was

satisfied with Madison Guaranty's principal counsel, Mitchell Williams, which was the firm of

Jim Guy Tucker, McDougal's long-time friend and business partner.

　　　　Documents establish that some of Mrs. Clinton's statements were factually inaccurate.

Mrs. Clinton stated that in April 1985, Rick Massey tried to bring Madison Guaranty to Rose as a

client, but was told by some partners that he could not do so until McDougal agreed to pay the

outstanding bill owed to Rose by Madison Bank and Trust.  Mrs. Clinton stated that on April 23

she arranged for McDougal to have the old bill paid so that Massey could bring Madison

Guaranty in as a client.  That statement was factually incorrect.  The evidence uncovered by this

Office conclusively established that the old bill had been settled in October 1984, six months

before Mrs. Clinton's supposedly having arranged for it to be paid.  In October 1984, Madison

Bank and Trust paid $5,000 of the outstanding balance of $5,893.  Rose never attempted to

collect the remaining $893, and Madison Bank and Trust never paid it; the understanding was

apparently that the $5,000 payment was a final settlement of the debt.

　　　　Although the evidence thus conclusively established that Mrs. Clinton's statements had

been to some extent factually inaccurate, the Independent Counsel concluded that the evidence

413

75

did not establish beyond a reasonable doubt that Mrs. Clinton knew the statements were factually inaccurate when she made them.

### 1.    McDougal's Account of Madison Guaranty's Retention of Rose.

Jim McDougal said Rose hired Madison Guaranty after Governor Clinton jogged by Madison Guaranty early one morning in August or September 1984, and sat in a new leather chair in McDougal's office, leaving a sweat stain.  Governor Clinton had complained about Mrs. Clinton's earnings at Rose.  McDougal offered to send her some legal work, putting Rose on retainer of $2,000 per month.  Mrs. Clinton came by McDougal's office later that day to finalize the arrangement.

McDougal's version of events -- sometimes called the "jogging incident" -- was first reported by the national media during the 1992 Presidential campaign.  McDougal related the incident to Jeff Gerth, but it was excluded from Gerth's initial article by his editors.  But other articles soon reported McDougal's story within the next few weeks, and Madison Guaranty's hiring of Rose became a campaign issue.

McDougal's initial statements to the press during the '92 campaign were consistent with his later sworn testimony and statements to this Office about the retainer.  There were some inconsistencies in the details of McDougal's recollection, and McDougal conceded at his 1996 criminal trial that his memory of the specifics of the jogging incident may have become jumbled.[1735]

---

[1735] Tr. at 7299, <u>United States v. McDougal et al.</u>, No. LR-CR-95-173 (E.D. Ark. May 8, 1996) (testimony of James McDougal) ("I've been asked about it so many hundreds of times, it's

414

McDougal's statements can be summarized as follows:

Regarding the time that the jogging incident happened, McDougal said Governor Clinton

jogged to McDougal's office between 6:00 a.m. and 7:00 a.m. one morning near the end of

August, or the first part of September 1984, but before Madison Bank & Trust's September 25

board meeting.[1736]  McDougal said he and Susan McDougal's brother Bill Henley were at the

office early to catch up on abstracting and title work:[1737]

> I remember it was very early in the morning, or early for office hours, probably
> about 6:30.  My brother-in-law and I were down at the office trying to catch up on
> the paperwork because we were running such a huge volume of sales at these
> various subdivisions.  And we were in there very early, and the governor came by
> obviously jogging.  He was wearing jogging clothes and was -- you know, it was
> hot weather.  He was sweating.[1738]

McDougal placed the date of the jogging incident using three events:  1) he said it

happened soon after he received a leather chair, which Susan McDougal gave him as a birthday

gift on August 25, 1984;[1739]  2) McDougal said it happened four to five months before Rose did

work for Madison Guaranty in front of the Arkansas Securities Department -- work Rose started

---

running together in my mind in terms of specifics").

[1736]  J. McDougal 4/2/97 GJ at 97, 108-09; J. McDougal 8/96-6/97 Int. at 9-10.  McDougal
testified that the jogging incident could have occurred even earlier:  "[I]t was pretty hot weather .
. . . I thought it was in the summertime, but I'm basing that on the profuse amount of sweat he left
on my chair."  Tr. at 7299, 7304, United States v. McDougal et al., No. LR-CR-95-173 (E.D.
Ark. May 8, 1996) (testimony of James McDougal).  McDougal did not remember the exact date
of the jogging incident.  J. McDougal 4/2/97 GJ at 100.

[1737]  Tr. at 7298, United States v. McDougal et al., No. LR-CR-95-173 (E.D. Ark. May 8,
1996) (testimony of James McDougal); J. McDougal 8/96-6/97 Int. at 9.

[1738]  J. McDougal 4/2/97 GJ at 97.

[1739]  J. McDougal 8/96-6/97 Int. at 10.

April 23, 1985;[1740] and (3) McDougal said it happened before an April 5, 1985 fundraiser

McDougal hosted for Governor Clinton at Madison Guaranty.[1741]

McDougal said he was annoyed when Governor Clinton stained his chair because

McDougal had just received it as a birthday gift from his wife.[1742]  McDougal described the event

to the grand jury in 1997:

> I had this new chair that Susan had just given me that was expensive because it
> was designed to take care of a back problem.  And he plopped down in that chair,
> and when he got up, the outline of his body was there in sweat.[1743]

On how the topic of Rose's and the Clintons' finances came up, McDougal said he

casually asked Governor Clinton how things were going, and Governor Clinton responded that

something at Rose had decreased Hillary's earnings:

> Well, I think we had . . . just the general polite conversation you usually have
> among friends, you know.  But when I said, "How are y'all doing," he said that
> they weren't doing too well because they had run into some kind of big expense at
> the Rose Law Firm which had cut down on Mrs. Clinton's income.  I don't
> remember what it was.[1744]

---

[1740] Id. at 11.

[1741] Id.

[1742] Id. at 10; J. McDougal 4/2/97 GJ at 99:

Q.    Now, at some point, have you made a statement that the President actually
      sweated on your new chair?

A.    Well, that's why it kindly burned at my mind, because the chair was brand new
      and he was sweating pretty profusely.  So when he got up, I had a salty outline of
      Bill Clinton on my new chair.

[1743] J. McDougal 4/2/97 GJ at 99; see also Tr. at 7299, United States v. McDougal et al.,
No. LR-CR-95-173 (E.D. Ark. May 8, 1996) (testimony of James McDougal).

[1744] J. McDougal 4/2/97 GJ at 98; see also J. McDougal 8/96-6/97 Int. at 9 ("McDougal
could not recall how they got onto the topic of Clinton's finances.  McDougal speculated that he
may have just asked Clinton how things were going and then Clinton told him about the cutbacks

416

McDougal said he asked Governor Clinton if it would help if Madison Guaranty sent work to Hillary,[1745] and agreed to when Governor Clinton said yes.[1746]  At his 1996 criminal trial, McDougal testified that after hearing about Rose's problems, "I said to Bill something to the effect of, 'We're needing more legal work.  Would it help Hillary if we gave some of the work to the Rose firm?'  And he said yes."[1747]

On the $2,000 monthly retainer, McDougal said though he had never paid a retainer, he suggested the retainer and the $2,000 monthly amount when he spoke with Mrs. Clinton after the meeting with Bill Clinton.[1748]  McDougal also remembered telling John Latham, then president of

---

at the Rose Law Firm").  McDougal did, however, at one point suggest that Governor Clinton, not McDougal, initiated the conversation about financial problems.  J. McDougal 6/22/95 Int. at 6-7 ("Clinton came in claiming he had financial problems").  When asked about the notes from his 1995 interview during his 1996 criminal trial, McDougal said the notes were wrong: "[Governor Clinton] did not specifically raise the question of needing money or elaborate beyond responding to what I asked him. . . . I did not say [in the '95 interview] that Clinton came in claiming he had financial problems."  Tr. at 7300-02, United States v. McDougal, et al., No. LR-CR-95-173 (E.D. Ark. May 8, 1996) (testimony of James McDougal); see also Rempel Frantz, Fallout from Collapse of S&L Shadows Clinton, L.A. Times, Nov. 7, 1993, at A17 (McDougal quoted saying, "I hired Hillary because Bill came in whimpering they needed help").

[1745] J. McDougal 8/96-6/97 Int. at 9.  McDougal says Madison Guaranty's retainer of Rose had nothing to do with the Clintons' needing money to meet any obligation related to Whitewater.  Id. at 12.

[1746] J. McDougal 6/22/95 Int. at 7; J. McDougal 8/96-6/97 Int. at 9.

[1747] Tr. at 7298, United States v. McDougal et al., No. LR-CR-95-173 (E.D. Ark. May 8, 1996) (testimony of James McDougal); see also J. McDougal 4/2/97 GJ at 98 ("And I said, 'Would it help Hillary if we gave her some of this legal work,' and he said, 'Yes'").

[1748] J. McDougal 8/96-6/97 Int. at 10; J. McDougal 4/2/97 GJ at 98-99 (McDougal did not agree with Governor Clinton on the amount of the retainer).  But see Rempel Frantz, Fallout from Collapse of S&L Shadows Clinton, L.A. Times, Nov. 7, 1993, at A17 ("I asked him how much he needed, and [Governor] Clinton said 'about $2,000 a month,' McDougal said"); J. McDougal 8/96-6/97 Int. at 10 ("McDougal could not initially recall whether he or Hillary

417

Madison Guaranty, to write a $2,000 check to Rose the same day as McDougal's meeting with Mrs. Clinton.[1749]  McDougal could not explain why Rose's first retainer check was issued in May 1985, rather than the fall of 1984.[1750]

Finally McDougal said Mrs. Clinton came to Madison Guaranty about an hour after Bill Clinton.[1751]  Mrs. Clinton said Bill Clinton sent her:

> Q.     And [after Bill Clinton's visit] did you then talk to Mrs. Clinton?
>
> A.     Yes, sir.  She came by, I would say, about between 8:00 and 8:30.  It was before the opening of business.  She came by and said, "Bill asked me to stop, said you wanted to visit about some legal work or whatever."
>
> Q.     And did you agree with her to give her and the Rose Law Firm some legal work?
>
> A.     Yes, sir.
>
> Q.     And was this as a result of the President . . . or the governor at the time and you having a conversation earlier in the day?
>
> A.     Yes, sir.[1752]

---

Clinton came up with the $2,000 per month figure").

[1749] J. McDougal 8/96-6/97 Int. at 10 ("On the same day as Hillary Clinton's visit, McDougal requested Latham to prepare a $2,000 check to Rose for the first month's retainer. McDougal never saw the check that he instructed Latham to prepare.  If Latham did not prepare the check on the day of Hillary Clinton's visit, then Latham failed to follow his instruction").

[1750] Id. at 11 ("McDougal was informed that the first retainer check to Rose was not issued until May 2, 1985.  McDougal thought the checks should have started the same day as [Hillary] Clinton's visit which McDougal thought was in approximately September 1984. McDougal could not explain why he thinks the retainer was in September 1984 and yet no checks were issued to the Rose Law Firm until May 1985").

[1751] Id. at 9.

[1752] J. McDougal 4/2/97 GJ at 99.

418

80

McDougal said he told Mrs. Clinton he needed her help on some real estate abstract work.[1753]  McDougal said the meeting with Mrs. Clinton lasted about five minutes, and Mrs. Clinton left Madison Guaranty before 8:30 a.m.[1754]  McDougal said that day was the last time he remembered actually meeting with Mrs. Clinton.[1755]

## 2. Evidence Reflecting on the Accuracy of McDougal's Version.

### a. Mrs. Clinton's Income.

Tax records showed Mrs. Clinton's Rose income dropped from 1983 to 1985, consistent with McDougal's testimony that Governor Clinton told him Mrs. Clinton's Rose earnings had fallen.  The Clintons' tax returns for 1983-85 show the following earnings for Mrs. Clinton at Rose:

| Year | Wages from Rose |
|------|-----------------|
| 1983 | $ 82,741[1756] |
| 1984 | $ 72,989[1757] |
| 1985 | $ 55,382[1758] |

---

[1753]  J. McDougal 8/96-6/97 Int. at 10.

[1754]  Id.  ("McDougal was fairly certain that Hillary Clinton left just prior to 8:30 a.m. because he wanted to introduce Hillary Clinton to John Latham who had not yet arrived to work.  Latham arrived shortly after Hillary Clinton left").

[1755]  McDougal did remember speaking to Mrs. Clinton by phone in 1986 about a proposed brewery.  Id. at 13.

[1756]  Tax Return and W-2 Statements for William J. and Hillary R. Clinton (1983) (Doc. No. DEK001329).

[1757]  Tax Return and W-2 Statements for William J. and Hillary R. Clinton (1984) (Doc. No. DEK000753).

419

81

### b.    Others' Statements about McDougal's Account.

**President Clinton** -- President Clinton testified he had been to Madison Guaranty "[l]ess than 10 times, more than two, three"[1759] and agreed that while jogging by Madison Guaranty he had "once or twice actually went in."[1760]  When asked about the jogging incident, President Clinton said he had "tried to remember" and was not accusing McDougal of lying, but he did not remember it:  "I don't recall that.  I am aware that he has recounted a conversation about that. But I don't have any specific recollection of doing that."[1761]  President Clinton said he did not remember asking McDougal to send Mrs. Clinton legal work.[1762]  President Clinton also said he did not remember complaining to McDougal about finances or saying "Hillary and I need some money."[1763]  The President was asked whether he thought McDougal was lying:

> Q.    Do you have any reason to believe that Jim McDougal is not being truthful--
>
> A.    No.
>
> Q.    -- about [the jogging incident]?
>
> A.    I have absolutely -- I have no reason to believe that.  And I have really tried to search my memory to see if there was anything remotely similar to what he said.  I mean, I really tried to remember the conversations that I've

---

[1758] Tax Return and W-2 Statements for William J. and Hillary R. Clinton (1985) (Doc. No. DEK001371).

[1759] W. Clinton 4/22/95 Depo. at 66.

[1760] Tr. at 70, United States v. McDougal et al., No. LR-CR-95-173 (E.D. Ark. Apr. 28, 1996) (testimony of William J. Clinton).

[1761] W. Clinton 4/22/95 Depo. at 67.  President Clinton testified, "I don't recall that I did know [in 1985 that Hillary was doing some work for Madison Guaranty].  Normally Hillary didn't discuss her legal work with me."  Id. at 65-66.

[1762] Id. at 69.

[1763] Id. at 72.

420

82

had with him to try to figure it out, because I am not accusing him of not
telling the truth.  I do not … I simply do not remember the conversation he
says occurred. [1764]

President Clinton gave similar testimony in 1996 for the McDougals' and Governor

Tucker's criminal trial:

> Q.    And you are aware, sir, that Mr. McDougal has a recollection of an event
> in which you jogged by and asked Mr. McDougal to place Ms. Clinton's
> law firm on a retainer.  Do you remember that, sir?  I'm saying, do you
> remember that that's one of Mr. McDougal's recollections?

> A.    I remember that -- I am now aware that Mr. McDougal remembers that I
> asked -- I believe he has testified that he thought I asked him to give
> Hillary some law business, I don't know about a retainer.

> Q.    And you're now aware that Mr. McDougal remembers that event occurring
> and you don't remember it; is that correct, sir?

> A.    I remember going in to see him.  I do not remember asking him to do that,
> no.

> Q.    Okay.  But you don't recall asking him to place Ms. Clinton on a retainer;
> is that correct?

> A.    I do not, no.

> Q.    You don't recall -- do you recall asking him to give her a specific amount
> per month in reference to that retainer?

> A.    No, I don't.

> Q.    Do you recall any -- you say you remember going in to see him.  Do you
> remember going in to see him and discussing Ms. Clinton and law
> business for Madison Guaranty Savings & Loan?

> A.    I do not.

---

[1764] Id. at 83.

421

83

Q.      Is there any -- I just want to make sure I'm asking you the right question, I'm not asking you a question that you don't understand.  Is there any combination of facts that I can ask you that comes anywhere close to what Mr. McDougal recalls as far as that particular conversation is concerned?

A.      Well, I don't remember the specific request.  You know, we spoke in passing about a lot of things over the years.  I don't know whether he asked me, "How is Hillary doing," "How are we doing[.]"[1765]

**Bill Henley** -- Susan McDougal's brother Bill Henley supported aspects of Jim McDougal's testimony.  McDougal said Henley had been at the office when the jogging incident occurred.[1766]  Henley testified that one morning between 6:30 a.m. and 8:30 a.m. he met McDougal at Madison Guaranty.[1767]  The door to McDougal's office was closed, so Henley waited about fifteen minutes.  Henley said Governor Clinton, in jogging clothes and sweating, left McDougal's office.  Henley and Governor Clinton said hello, and Governor Clinton left. Henley said that once Governor Clinton was gone, McDougal commented, "I don't mind the son of a bitch coming by here and taking up my time, but I wish he wouldn't sweat through my chairs."[1768]  Henley said he and McDougal went into McDougal's office.  Henley noticed a fresh sweat stain on one of the two chairs facing McDougal's desk.[1769]

Henley said the only conversation he had with McDougal about the jogging incident was

---

[1765] W. Clinton 4/28/96 Depo. at 119-20, United States v. McDougal et al., No. LR-CR-95-173 (E.D. Ark. Apr. 28, 1996).

[1766] J. McDougal 6/22/95 Int. at 7  ("McDougal advised that Bill Henley was present during this meeting"); J. McDougal 8/96-6/97 Int. at 9 ("Bill Henley was also present in McDougal's office when Clinton came by in jogging attire").

[1767] W. Henley 6/18/96 GJ at 24.

[1768] Id. at 27, 50.

[1769] Id. at 46-47.

422

at the McDougals' and Governor Tucker's 1996 criminal trial.[1770]  McDougal told Henley that he did not refer to Governor Clinton as a "son of a bitch," as a recent book seemed to indicate Henley had stated.[1771]

Henley remembered one detail not consistent with McDougal's statements.  Henley thought that McDougal's secretary, Sue Strayhorn, was sitting at her desk outside McDougal's office when the jogging incident happened.[1772]  If true, this would contradict McDougal on the date of the incident, because Strayhorn started at Madison Guaranty in February 1985, after McDougal said the incident happened.[1773]  Henley could only place the incident as sometime in 1984 or 1985.[1774]

**Susan McDougal** -- Jim McDougal was certain he discussed the jogging incident with Susan McDougal.[1775]  She refused to give a statement to this Office, and spent eighteen months in

---

[1770]  Id. at 50

[1771]  Id. at 50-51.

The quote in the book read:

McDougal gently steered [Clinton] out of the office.  Susan's brother Bill Henley was standing nearby.  With the governor safely out of earshot, McDougal turned to Henley.  "I don't mind the fat little son of a bitch coming by and taking up my time.  I just wish he wouldn't ruin my chair."

James B. Stewart, Blood Sport 124 (1996).

[1772]  W. Henley 6/18/96 GJ at 24, 30.

[1773]  Strayhorn 3/30/94 Int. at 1.

[1774]  W. Henley 6/18/96 GJ at 33.  Just as McDougal had, Henley also testified he thought the event happened in the "summertime," because Clinton was sweating and it must have been hot.  Id. at 33-34.

[1775]  J. McDougal 8/96-6/97 Int. at 10-11; J. McDougal 4/2/97 GJ at 103-04:

Q.      Susan was also quoted in the Washington Post and other publications, I

423

jail for contempt because she refused to testify pursuant to a grand jury subpoena, even after

being given immunity.  She did give statements to print and television media that agreed with

Jim McDougal.  In March 1992 the <u>Washington Post</u> quoted Susan McDougal saying:

> Hillary came in one day and was telling us about the problem.  The problem was
> finances, her finances. . . . She came to Jim's office.  I remember Jim laughing and
> saying afterward, 'Well, one lawyer's as good as another, we might as well hire
> Hillary.' . . . She was on retainer.  I remember everyone sitting around laughing
> and saying:  'We need to hire Hillary Clinton.'[1776]

Susan more closely corroborated Jim's story in a 1996 television interview:

Q.      There are things that you can help clear up a little bit from -- for some of
us.  The decision to have Mrs. Clinton help with some of the legal affairs
for Madison Guaranty.

A.      I'll tell you what I know about it. As I wasn't present at the time.  But I do
know that Bill came by the bank one day.  He was jogging.  And . . .
sweating.  The famous story of the sweat in the chair I didn't see that.  But
I did see that he was running, and he was sweating.  And he came by the
bank.  And he did talk with Jim.  After that, Jim came to me and said, I've
just given Hillary some work from the bank.  Is that all right with you?  I
was at the bank that day.

. . . .

Q.      And did he say then that -- that Mr. Clinton had asked for her?

A.      What he said was, she needs the work.  And I said, that's fine with me.

---

think, saying, "Yes, I know about this."  Do you recall talking to her about
this?  Would that have been something you would have told her about?

A.      I'm sure I -- yes.  It would have been something I would have told her
within the business day, I would think.

[1776] Maraniss & Weisskopf, <u>Lawyer Will Review Arkansas Land Deal</u>, Wash. Post, Mar.
12, 1992, at A1.  In an interview with the Independent Counsel's Office, Jim McDougal was read
Susan's quote from the <u>Washington Post</u>.  McDougal agreed with Susan McDougal's statement
but added that either Bill Henley or he must have told her about the jogging incident.  J.
McDougal 8/96-6/97 Int. at 10-11.

> Those were his exact words.  At that time, at that day, she needs the work. And I said, that's fine, Jim.

Q.    Because, again, she has talked about the business coming in a different way -- coming through a connection between someone who was in her office and someone who knew your husband.

A.    I don't know about that.

Q.    But this you do know?  It did take place?

A.    Oh, yes.[1777]

On the eve of being incarcerated for refusing to discuss these subjects with the grand jury, Susan told talk show host Larry King she did not witness the jogging incident and her only knowledge came from Jim:

> I only know that Jim came to me and said, "They need the money.  I'm going to give her the work.  Is that all right with you?"  And I said yes.  That's all I know about how that came to be.[1778]

**John Latham** -- Latham said although he was Madison Guaranty's president, Jim McDougal hired the attorneys.[1779]  Latham said McDougal never mentioned the jogging incident to him.[1780]

**Rae Ann Moles** -- Madison Guaranty hired Moles in April 1983 to perform clerical

---

[1777]  Prime Time Live:  Tr. of Diane Sawyer Interview of Susan McDougal at Doc. Nos. 2053-000000069 through 72 (ABC television broadcast, Aug. 30, 1996) (transcript contains additional interview portions not included in the public broadcast).

[1778]  Larry King Live (CNN television broadcast, Sept. 6, 1996) (videotape).

[1779]  Latham 2/14/95 Int. at 1; Latham 5/15/96 Senate Banking Comm. Depo. at 12-13; Senate Whitewater Comm. Hearing, supra note 147, at 14-15 (May 16, 1996) (testimony of J. Latham).

[1780]  Latham 2/14/95 Int. at 2; Latham 5/15/96 Senate Whitewater Comm. Depo. at 18.

425

work.[1781]  Moles said that late one afternoon in August or September 1984, Governor Clinton rushed into Jim McDougal's office wearing jogging clothes, and she heard most of their conversation because McDougal's office door was open.[1782]  McDougal complained to Governor Clinton that they - the Clintons - needed to pay their fair share on a Whitewater loan.[1783]  Governor Clinton told McDougal that Webb Hubbell was telling Rose attorneys to get more savings and loan business, and asked McDougal to put Mrs. Clinton on a $2,000 per month retainer.[1784]  Moles said McDougal told Clinton "he really didn't have anything for the Rose Law Firm to do [and] that the Mitchell law firm was representing the institution and performing as he expected."[1785]  Moles said McDougal asked Clinton how Rose would credit the new business, and Clinton said Hubbell would likely credit a young associate for the business.[1786]

Moles said Clinton and McDougal met for over an hour and a half and she left before the meeting ended.[1787]  Moles said when she came to work the next morning, Jim McDougal said, "Well, we've put Hillary on the payroll.  Susan will be in shortly.  She doesn't know about it.

---

[1781]  Moles 8/4/94 & 2/9/95 Int. at 3.

[1782]  Moles 10/19/95 GJ at 18.  But see Moles 8/4/94 & 2/9/95 Int. at 7 ("McDougal had Moles into his office and he introduced her to Clinton").

[1783]  Moles 8/4/94 & 2/9/95 Int. at 8.

[1784]  Moles 10/19/95 GJ at 22 ("Mr. Clinton asked him to hire the Rose Law Firm"); Moles 8/4/94 & 2/9/95 Int. at 8 (uppercase in original) ("CLINTON said that he and HILLARY CLINTON were in need of some money and because he was a government servant, he only made so much.  CLINTON then asked McDOUGAL to have MGSL put HILLARY RODHAM CLINTON of the ROSE LAW FIRM on a $2,000 per month retainer").

[1785]  Moles 10/19/95 GJ at 22.

[1786]  Id. at 24.

[1787]  Id. at 26

426

When I tell her, she's going to be really upset.  There may be quite an incident.  If you get uncomfortable, go downstairs."[1788]  Moles asked Jim McDougal if Madison Guaranty was going to split the legal work between Mitchell Williams and Rose, and McDougal responded, "You are to send the Rose Law Firm nothing."[1789]

Moles' testimony was partly corroborated by her sister, Sarah Handley, a former financial examiner for the Arkansas Securities Department.  Handley testified that her sister told her "Clinton had come by [Madison Guaranty] and that at the conclusion of that visit,  . . . McDougal had retained Hillary, the Rose Law Firm."[1790]

**R.D. Randolph** -- Jim McDougal said he might have told R.D. Randolph about Governor Clinton's sweating in his chair.[1791]  Randolph testified that he remembered McDougal telling him about retaining Mrs. Clinton, but not about the jogging incident.[1792]

**3.    Mrs. Clinton's Version.**

Mrs. Clinton has made numerous statements about Madison Guaranty's hiring Rose. During the 1992 campaign, Mrs. Clinton drafted a statement contradicting Jim McDougal's press statements.  Her statement was never released.  In April 1994, Mrs. Clinton discussed the issue at a press conference.  Mrs. Clinton gave several more statements on the subject to federal investigators after that press conference.

---

[1788]  Id.

[1789]  Id. at 27.

[1790]  S. Handley 10/31/95 GJ at 22.

[1791]  J. McDougal 8/96-6/97 Int. at 12.

[1792]  R.D. Randolph 9/17/96 GJ at 69-70.

427

89

Mrs. Clinton's version of how Madison Guaranty hired Rose was essentially as follows. In the spring of 1985, Rose associate Rick Massey, a friend of Madison Guaranty president John Latham, spoke with Latham about Madison Guaranty sending legal work to Rose. Latham agreed, but partners at Rose were opposed. McDougal's Madison Bank and Trust still had an outstanding bill for work Rose had done in 1981-82. The partners did not want Rose to do any work until the old bill was paid. Massey knew that Mrs. Clinton knew Jim McDougal, and asked her to help get the bill paid. Mrs. Clinton spoke with several Rose partners who said if McDougal paid the old bill, and paid new fees in advance, Massey could do the work. Mrs. Clinton saw McDougal on April 23, 1985, and told him Rose would not let Massey work until his old bill was paid and a prepayment arrangement was agreed to. McDougal agreed to the retainer and paid the old bill. Massey asked Mrs. Clinton to act as billing partner on the account because she helped him retain the business.

The following discussion sets forth Mrs. Clinton's statements regarding Madison's retention of Rose.

###    a.    Mrs. Clinton's Unsworn Statements.

Mrs. Clinton drafted her most detailed statement about Rose's retention by Madison Guaranty during the 1992 campaign.[1793] It read:

> Jim McDougal became a client of the Rose Law Firm in 1981. He engaged the firm for a matter ~~related to litigation~~ arising out of the decision to move the Bank of Kingston. At the conclusion of the representation 198_, Mr. McDougal disputed the amount of his final bill and refused to pay [in] the entire amount requested.

---

[1793] H. Clinton 1/26/96 GJ at 53-55.

In March or April of 1985, Rick Massey, an associate of the firm began talking with John Latham, the CEO of Madison Guaranty S & L, and a friend of Massey's, about some legal work Latham wanted Massey to do for Guaranty.  In April of 1985, Massey went to the partners in the securities section and asked if they would help him with the work Latham wanted him to do.  They advised him that the firm could not do any further work for McDougal until he paid the bill he owed for the previous work and that, even if he did, the firm could not permit Massey to do any work unless McDougal agreed to pay a monthly advance against which fees and expenses could be billed.

Massey also discussed the situation with one of the litigation partners who had worked on McDougal's previous work and who gave Massey the same advice.  Massey then came to see me because he knew that I knew McDougal; he explained his interest in working with Latham on the project and asked if I had any ideas about what he could do.  After talking with Massey, I told him I would talk with McDougal for him and see if McDougal would be willing to pay his past due bill and agree to stay current on any fees and expenses incurred for the new project.

On April 23, 1985, I called McDougal and asked if I could drop by to see him at his office.  When I visited him, I told him that I understood Latham wanted Massey to do some work for them, but that our firm would not let Massey proceed until the previous bill was paid.  McDougal called Latham into the meeting and asked Latham if he wanted Massey to do the work.  As I recall, Latham explained that he and Massey had met already to discuss the matter and he wanted to engage Massey.  After that explanation, McDougal told Latham he could proceed with Massey, and he told me that he would arrange to pay the past due bill.

I reported this conversation to my partners and Massey.  The securities partners who supervised Massey advised Massey that a two thousand dollar per month advance against fees and expenses would be appropriate.  They asked me to convey that to McDougal.  Massey and I called McDougal, but he was not in so we talked with Latham and another employee.  Latham told Massey and me he was sure that amount would be acceptable, but would have to chec[k] with McDougal to confirm.  Latham later advised me they agreed, but they would not make their first payment until May.  During the first week or so of Massey's work for Madison, he kept me advised because he wanted me to be aware of what he was doing in case he had any trouble being paid for his work.  On a few occasions he showed me drafts of documents he was preparing under the supervision of securities partners so that I would be prepared to intervene with McDougal if necessary on the issue of payment.  Since I had negotiated the firm's payment, I

429

91

also asked to send the bills to McDougal.

I also placed a call to the Securities Commissioner to ask for information; I do not recall talking to her (as she independently does not recall talking to me) but I may have called her or someone in her office, to ask the person to whom I spoke who in the office handled matters related to s&ls since I knew that the office had very little supervisory authority since most of their authority related to brokers.  I was advised to send anything to the Commissioner.  I relayed that information to Massey.

Massey has stated he does not know why he included my name in the letter to the Securities Commissioner, and I do not know either and do not recall ever seeing it before it was sent.  I also do not recall receiving the letter addressed to me from the Commissioner, because if I had seen it I would have immediately sent it to Massey.  Massey has said his secretary may have included my name in error; that is understandable since I was listed as the billing attorney because of my intervention with McDougal.  I realized no financial benefit from that listing; it was done as an accommodation to Massey and the firm.

In addition to the matter Massey did for Madison, the firm did two other matters that were unrelated to the state. [T]he [sic] total billed for all matters was 21,202.25.

As I have said repeatedly, I did not have any substantive involvement in the work our firm did for Madison that involved the Securities Commissioner.  I did not discuss the merits of the matter with the Commissioner or anyone in her office.  I can see how in retrospect I should not have become involved at all in helping Rick Massey work out the problems he encountered, but I knew I was not attempting to influence anyone other than McDougal whom we wanted to pay his bill.  I have practiced law in Arkansas for nineteen years and so far as I know this is the only question that has ever been raised about even the appearance of conflict between my practice and my husband's official positions.  I regret that this incident could be misconstrued by anyone and would only point to my record and to the results in this case in which clearly the Commissioner's actions do not suggest any influence or attempt to influence her by me or anyone in my firm.[1794]

---

[1794] H. Clinton Campaign Statement (1992) (Doc. Nos. DEK200962 through 200963) (strikethrough in original).  In July 1997, a copy of Mrs. Clinton's statement, among other things, was found in a brief case in the attic of Vince Foster's home.  The copy had numerous handwritten changes.  Mrs. Clinton testified that the writing on the document was Foster's and that he and she had worked together on the document.  H. Clinton 4/25/98 Depo. at 28-30.

430

92

In a press conference held April 22, 1994, Mrs. Clinton said the following:

There was a very bright, young associate in our law firm who had a relationship with one of the officers at Madison Guaranty, a young man whom he had known. They began talking . . . . Those two young men thought that it would be legal under Arkansas law for a savings and loan to issue preferred stock, but there was absolutely no law on that.  And so they couldn't be sure.  But they decided that what they wanted to do was to ask the person who regulated savings and loans whether it was legal, not if Madison Guaranty could do it . . . .

When they talked about doing that, the young attorney in question needed a partner to serve as his backstop, and that was one of the rules we had in our firm. He knew that I knew Jim McDougal.  He also knew that Jim had been a client of our firm in the past.  This was not a new representation.  So he came to me and asked me if I would talk with Jim to see whether or not Jim would let the lawyer and the officer go forward on this project.  I did that, and I arranged that the firm would be paid a $2,000 a month retainer.  And that was ordinary and customary. That would be billed against . . . . That was arranged.  The young attorney, the young bank officer did all the work, and the letter was sent.  But because I was what you call the billing attorney, in other words I had to send the bill to get the payment made, my name was put at the bottom of the letter.  It was not an area that I practiced in.  It was not an area that I really know anything to speak of about.[1795]

###  b.    Statements to Federal Investigators.

###  i.    Mrs. Clinton's April 1995 Deposition.

This Office deposed Mrs. Clinton at the White House, on April 22, 1995, which was

before the Office obtained her billing records in January 1996.  Mrs. Clinton gave the following

---

Investigators later discovered another document that was archived on Rose computer systems:  a draft, created by Vince Foster, that was Mrs. Clinton's statement with Foster's handwritten changes typed in.  In 1998, Mrs. Clinton acknowledged Foster's editing of her statement. H. Clinton 4/25/98 Depo. at 30-31.

[1795]  Statement of Hillary R. Clinton, Press Conference, Federal News Service (Apr. 22, 1994).

sworn testimony:

A.    At some point in 1985, in the spring, an associate with our firm by the name of Rick Massey made it known in the firm that he was interested in doing some work with Madison Guaranty, and particularly with a young man that he knew there named John Latham, who was an officer at Madison.

As I have tried to remember and reconstruct this, Rick Massey raised that with the partners in the securities department of our firm, and was told that Mr. McDougal who was at Madison Guaranty had an outstanding bill that he had not paid for previous legal work done by our firm on his behalf. And Mr. Massey consulted broadly with a number of partners, and was advised that he could not go forward unless the past due bill was paid.

At some point Mr. Massey came to see me because he knew that I knew Jim McDougal and asked if I had any ideas about how he could get the bill paid that was pending, so that he could then go forward to try to do this work on behalf of Madison Guaranty. I discussed it with several partners and they all said, well, if McDougal pays the bill, then we will consider letting Massey do the work.

At some point I talked with Jim McDougal and told him that Rick Massey had an interest in doing some work for Madison Guaranty with John Latham, but that the firm would not let Rick do it unless his previous bill was paid. And then at some point after that McDougal paid the money that he had owed the firm for a number of years. Massey then was told that he could proceed with the work.

Massey came to me and asked if I would be the billing partner since I had helped him by getting the past due bill paid, and I told him that I would.

But the firm decided, unlike most of our clients where we do not have any retainer arrangement, that because of the previous experience with Mr. McDougal, Madison Guaranty would be asked to pay in advance against fees and expenses of a monthly amount, and the firm decided $2,000 would be fair. Mr. McDougal was told that. He agreed. And so the $2,000 was deposited . . .

And then at some point Mr. Massey began work and the retainer was paid.

Q.    So, from your standpoint, whose idea was the figure of $2,000 a month?

432

94

Who came up with that figure?

A.    I don't have any idea.

Q.    Was it as betwixt McDougal and somebody in the Rose Law Firm?

A.    I don't have any idea.

Q.    When you say that Mr. Massey would have talked with partners, are you talking about partners in the securities section of your firm?

A.    I would assume, yes.

Q.    Can you recall here today any partner at the Rose Law Firm whose name you can give us that would confirm that?

A.    Well, I know that I talked with Vince Foster about it -- I cannot tell you who Rick Massey talked with -- because Mr. Foster had been one of the lawyers who had done the work that Mr. McDougal had not paid for.  And so before I did anything to help Rick Massey, I talked with Mr. Foster to be sure that he thought it was appropriate that we try to collect this past due bill, with the idea that if we did Mr. Massey would then be able to represent Madison.

. . . .

Q.    Let's go then to this matter of how it started.  Do you know any reason why Rick Massey would say that he does not think he brought any business into the Rose Law Firm like this?

A.    No, I do not.

Q.    Do you know whether or not the supposed back money that was owed was ever paid?

A.    I assume it was paid.  I can't tell you that for sure.  I don't know for sure, but I assume it was since that was the reason that Rick Massey came to me, and he was then permitted to go forward.

Q.    Did you ever see any back bill that supposedly he owed?

A.    No.

. . . .

433

95

Q.      And, again, I believe you stated the reason you were going to be the billing partner was because you knew Mr. McDougal?  Is that correct?

A.      Well, I knew him and I had been enlisted to try to help get the bill paid, to clear the way for Mr. Massey to represent Mr. McDougal.  And as an accommodation to Mr. Massey, I agreed to be the billing attorney on the matter that he was going to handle.

Q.      On the front end, were you to be anything other than the billing attorney?  In other words, were you supposed to do any legal work for Madison Guaranty yourself?

A.      Not that I can think of right now.  I was supposed to be the billing attorney because an associate could not represent a client without a partner as a billing attorney.

Q.      Would you say that normally on a securities matter the billing attorney would be a securities partner?

A.      Normally.  Not always however, because if another partner had a relationship with a client that it was thought to be useful or beneficial or requested that that partner be the billing attorney, even though the partner didn't do the work.  I had done that in the past and I had worked on cases where others outside of sections had done that.

. . . .

Q.      And did you go by Madison Guaranty to actually talk to Jim McDougal when this was set up?

A.      I think I did stop by to see him, to have the conversation about paying the past due bill so that Mr. Massey could do the work that he had discussed with Mr. Latham.

Q.      Can you tell us approximately how many times you ever went into Madison Guaranty?

A.      I think that was the only time.[1796]

―――――――――――――――

[1796] H. Clinton 4/22/95 Depo. at 8-16.  This statement was consistent with McDougal's statement that he only met in person with Mrs. Clinton once.  J. McDougal 8/96-6/97 Int. at 13.

434

96

Mrs. Clinton was then asked specifically about McDougal's version of events:

Q.      I want to hand you [a memorandum from Loretta Lynch to Bill Clinton,
        Hillary Clinton, Jim Lyons, and Bruce Lindsey], . . . And it sets forth a
        number of press either inquiries or reports.  And what I want to ask you
        about is this number one, Washington Times, [Jerry Seper] . . . .

        "He has contacted the campaign for a response to the story that BC
        requested that McD retain the Rose Firm/HRC and the timing and
        specifics of that retainer.  At various times I have spoken with Webb
        Hubbell about this retainer issue over the last three weeks "in part to solve
        the 'how did the Madison Guaranty business come in' question and in part
        to determine if McD's allegation that he put HRC on retainer was in fact
        accurate.  Both Jim McD (in Sam Heuer's office to Jim Blair and myself)
        and Susan McD (in the Post) have recounted that BC came into Jim's
        office in the summer of 1984; told him the Cs" "I assume the Clintons",
        "needed $ and asked him to hire HRC.  The same day HRC allegedly came
        by re: a retainer.  HRC was then hired in the summer of 1984.  Supposedly
        there were other witnesses. Note that we have heard generally that 'people'
        are talking about this story to a variety of press."

        Now, first I would ask you, in March of '92, do you recall this matter coming up?

A.      It may have.  I don't recall it specifically at this time as to when I first
        heard about this story.

Q.      Did you hear anything along these lines back in '84 or '85?

A.      No, I did not.

Q.      Did your husband ever say anything about talking to Jim McDougal about you and
        your husband needing money?

A.      No, he did not.

Q.      Do you know whether or not your husband ever did, in fact, jog by Madison
        Guaranty and go in and talk to Mr. McDougal?

435

97

A.      I do not know.[1797]

In 1995, prior to the Rose billing records being produced, Mrs. Clinton was asked specifically about her work for Madison Guaranty in the spring of 1985.  Mrs. Clinton said she "probably would have billed for every conversation I had about this matter, including the conversations with Rick Massey or whatever partners I talked to about paying back the past due bill.  I would have billed for going to see Jim McDougal.  But I can't be more specific than that."[1798]  The Rose billing records produced to the OIC in January 1996 show that in the first five months of Rose's representation, Mrs. Clinton billed for speaking to only two partners:  Watt Gregory on April 23, 1985,[1799] and Joe Giroir on June 5, 1985.[1800]

## ii.      May 1995 RTC Interrogatories.

The RTC served written interrogatories on the Clintons, which Mrs. Clinton answered in writing under oath, including information on Madison Guaranty's hiring of Rose:

Interrogatory No. 17:  With respect to the Rose Law Firm's representation of Madison Guaranty in 1985 and 1986:

(a)      Was Mrs. Clinton the lawyer responsible for obtaining this business for the Rose Law Firm?  If not, who was?

Mrs. Clinton answered in pertinent part:

To the best of my recollection, the president of Madison Guaranty, John Latham,

---

[1797] H. Clinton 4/22/95 Depo. at 17-19.

[1798] Id. at 40.

[1799] Rose Law Firm Billing Records (May 6, 1985) (Doc. No. DEK014947).

[1800] Rose Law Firm Billing Records (July 15, 1985) (Doc. No. DEK014972).  Giroir testified that he did not remember any discussion of payment of the old bill.  Giroir 7/18/96 GJ at 25-26.

who was a friend of an associate at the Rose Law Firm, Richard Massey, became interested in having Madison Guaranty issue some kind of preferred stock to raise capital.  Latham had spoken to Massey about doing the related legal work.  In the spring of 1985, Massey came to see me because he had learned that certain lawyers at the law firm were opposed to doing any more work for Jim McDougal or any of his companies until he paid his bill and then only if Madison Guaranty agreed to prepay a certain sum to the firm once a month to cover fees and expenses.  Under such an arrangement, the firm could be assured that Madison Guaranty was staying current with regard to paying for the new work that the firm might do for it.

I believe Massey approached me about presenting this proposal to Jim McDougal because he was aware that I knew him.  I agreed to go see McDougal.  I visited him at his office on April 23, 1985, and told him that I understood Latham wanted Massey to do some work for Madison Guaranty, but that our firm would not let Massey proceed until the previous bill was paid and some kind of prepayment arrangement was worked out for new work the firm might do.  As I recall, McDougal agreed that Massey could proceed with the work and informed me he would arrange to pay the past due bill. McDougal also indicated that he was agreeable to some kind of prepayment arrangement.[1801]

### iii.    February 1996 FDIC Interview.

On February 14, 1996, the FDIC interviewed Mrs. Clinton.  (The RTC merged into the FDIC on January 1, 1996, and the FDIC continued the RTC's investigation.)  This unsworn interview occurred following the public release of Mrs. Clinton's billing records, and after the public testimony of Rick Massey, and others, before the Senate Whitewater Committee.  Mrs. Clinton's colloquy with the attorney for the FDIC was as follows:

Q.    Here I'm paraphrasing -- I'm certainly not quoting -- but as I read [Massey's] testimony, he said that he had certainly talked with Mr. Latham about doing work for Madison, but it was not up to Mr. Latham to decide who would be hired.  Mr. Massey said he hadn't met Mr. McDougal ever, and that Mr. Massey further said that he did not discuss fees or any sort of retainer arrangement with anyone at Madison.  And further, it was his

---

[1801] H. Clinton 5/24/95 RTC Interrog. Resp. at 34-35.

437

99

recollection that he did not ask you to be billing partner, nor did he raise the subject of fees or retainer with other members of the firm. I'd like to ask you about your own recollection of how the client came in the door, how your recollections compare with those of Mr. Massey.

A.     Well, as I have said consistently since 1992 and again, in my answers to the RTC interrogatories, my recollection is that Mr. Massey wanted to do the work he had discussed with Mr. Latham, that some partners, I believed in the securities section, had advised Mr. Massey that they were not enthusiastic about undertaking representation on behalf of Jim McDougal and Madison because of some problems in having work paid for in the past, and that there were discussions among partners.

I believe it was Vince Foster who came to me, who said that Mr. Massey wanted to do this work, but the partners didn't want him to do it. We had a very high regard for Mr. Massey, who was quite an energetic and accomplished first-year associate, already teaching a securities course at the law school and attracting people who wanted his advice, like Mr. Latham.

And I was asked, as someone who knew McDougal, if I could intervene and perhaps set up an opportunity for Mr. Massey to do this work. I agreed to do that. Obviously now, 10, 11 years later, much to my regret because of all the confusion and concern that has been raised by it.

So I talked with Mr. Massey about that work. Mr. Massey told me, as his testimony relates, that he had a talk with Mr. Latham, but it wasn't up to Mr. Latham, and he wasn't getting any support from others within the firm, and I told him I would talk to Mr. McDougal, which I did.

And as I recall, Mr. McDougal said well, if Latham wants him to do the work, that's fine. And because of the request of other partners in the firm, I advised Mr. McDougal that the work that Mr. Latham wanted Mr. Massey to do could not be done unless Madison [Guaranty] entered into a retainer agreement with the Rose Firm that would be payment against which fees and expenses could be billed on a monthly basis. Mr. McDougal agreed to that. I informed Mr. Massey. Mr. Massey undertook the work.

But it would not surprise me that Mr. Massey, as a first-year associate would not have direct knowledge of conversations among partners and decisions concerning whether or not he could do the work under whatever

438

100

circumstances.

Q.     You said you were asked to approach Mr. McDougal about the things
       you've described.  Who asked you?

A.     I don't have a specific recollection.  I believe it was Vince Foster, but I'm
       not positive about that.[1802]

This statement by Mrs. Clinton's differs from her earlier statements.  She said that Vince

Foster rather than Rick Massey had approached her about Massey doing the work, and that she

discussed with Foster, not Massey, that Rose partners were unhappy about Madison Guaranty's

outstanding bill.

### iv.     Mrs. Clinton's 1998 Deposition.

In 1998, Mrs. Clinton was again deposed by this Office.  In light of evidence that had

emerged about Madison Guaranty's retainer of Rose -- including the billing records and Massey's

testimony since her 1995 deposition -- Mrs. Clinton was asked to review the matters again:

---

[1802] H. Clinton 2/14/96 RTC Int. at 27-30.  Mrs. Clinton's testimony was consistent with
representations made to Bruce Ericson, an attorney with the law firm of Pillsbury Madison &
Sutro, counsel to the RTC, by David Kendall, counsel to the Clintons.  Ericson's memorandum of
his conversation with Kendall noted that, according to Mrs. Clinton, the outstanding bill had
been paid in the spring of 1985:

> Kendall told me the following:  McDougal had complained about the bill and had
> refused to pay it.  The bill had remained unpaid until the spring of 1985, when it
> was paid.  The Rose Law Firm's trouble in collecting this receivable accounted for
> the firm's reluctance to accept new business from McDougal unless he paid for it
> in advance.  Hence the retainer. . . . Kendall does not think the bill was adjusted
> downward or otherwise compromised in an attempt to get McDougal to pay.
> Kendall also does not think that McDougal paid it in 1983.  Mrs. Clinton agrees.
> The bill probably remained unpaid until 1985.

Memo from Bruce Ericson, Pillsbury, Madison & Sutro attorney, counsel to the RTC, of
telephone conversation with David E. Kendall, personal attorney for the Clintons at 1-2 (July 25,

439

101

USCA Case #16-5366   Document #1668146      Filed: 03/28/2017   Page 105 of 421

Q.     All right.  Let me now go to the billing records.

. . . .

The first entry that appears here is 4/23/85, H. Clinton.  It records "Conference with J. McDougal and J. Latham; conference with [R.] Massey; conference with W. Gregory."  Can you tell us what prompted this representation, and what prompted this first conference with Mr. McDougal.

A.     Well, I can tell you what I remember, and I know this has been the subject of, you know, many discussions by many people.  But based on my best memory in 1992, when I first tried to respond to questions about this matter, I recalled that we had a young, very intelligent, aggressive associate by the name of Rick Massey, who was friends with a young man named John Latham, who was maybe the president, but certainly a high-ranking officer at Madison Guaranty.

And they had been talking about perhaps Mr. Massey doing some legal business for Mr. Latham in the securities area.  I think that Mr. Latham and Mr. Massey lunched together.  They had a number of conversations.  Mr. Massey was interested in doing this work.

But when he spoke with his securities partners about doing the work, he was discouraged from doing so because Mr. McDougal did not have a good reputation for paying his bills in the Rose Law Firm.  He had been represented by the Rose Firm some years earlier and had not paid his bill.  And so Mr. Massey was told that he should not get involved in representing a client, such as Mr. McDougal, for whom there would likely be payment problems.

Mr. Massey was discouraged by that, because he wanted to do the work.  He then began talking with people in the firm and learned that I knew Mr. McDougal, and came to me, explained the situation.  I had a high regard for Mr. Massey's legal skills and his go-getting attitude.

So, after talking with people in the firm, I asked if I were able to persuade Mr. McDougal to pay his bill and to promise to keep current with costs and expenses, if Mr. Massey could do the work.  Based on that understanding, I went and visited with Mr. McDougal and Mr. Latham,

1995).

440

102

and they said that they would pay a retainer on a monthly basis.

They never completely paid their last bill.  I think they ended up still owing nearly $900, but I later learned that they had paid the bulk of the bill that they hadn't paid for several years.

I also agreed, because of other partners' attitudes about Mr. McDougal, that I would serve as the billing partner and be responsible for making sure that Mr. Massey was paid for the work that he did.

That's my, that's my memory today.  That was my memory in 1992 of what happened to bring this business into the Rose Law Firm.[1803]

Mrs. Clinton was questioned about the 1992 draft press statement, which tracked the recently produced billing records by referring to an April 23, 1985 meeting with John Latham and Jim McDougal, and stated the total amount billed as $21,202.25.[1804]  Mrs. Clinton discussed the 1992 statement as follows:

Q.     Now, in 1992, when you prepared this statement, how did you go about that?

A.     Well, I thought a lot about this . . . because I've had to sort of reconstruct what probably happened, since I don't have any vivid memory of actually doing it.

I do know that this was typed on my daughter's home computer.  So, I obviously prepared and typed it myself at some point in February, March, April, I don't know when, in 1992, when I was home for those very brief visits, when I came home off the campaign trail.  You know, I went back and refreshed my memory about what was going on during that period, and from the New Hampshire primary of February 12th, 1992 until the California primary of June 2nd, there was, you know, all kinds of elections going on every week.  So, this was typed on our home computer by me.

_____

[1803] H. Clinton 4/25/98 Depo. at 22-24.

[1804] H. Clinton Draft Campaign Statement (1992) (Doc. Nos. DEK 200962 through 963).

441

103

Q.     And in typing that, did you have the billing records to assist you in putting the date down when you talked to McDougal and went by to see him at his office?  As you see in the billing records, it says you had a conference with Jim McDougal on April 23rd.  Did you have that when you came up with this 21,000 figure?

A.     I might have, or I might have gotten information from Vince Foster or Webb Hubbell, who I knew were reviewing the bills, since I've since learned that.  I don't -- I don't know whether I had them in front of me at that time, or whether I had looked at them and made observations about them.  But obviously I had the information that you refer to that was on the billing records.[1805]

Mrs. Clinton was asked about McDougal's outstanding bill paid by him in October 1984:

Q.     Now, I direct your attention to the billing records again.  It's the first page after the client billing and payment history.  This would be DEK014941.  This -- can you identify that document?

A      This is a Rose Law Firm bill.

Q.     Who is it to?

A.     It looks like it's to the Bank of Kingston.

Q.     . . . . The document there has a Paid stamp down there.  It says Bank of Kingston, date, 12/31/81.  Do you see that?

A.     Yes.

Q.     Then we went through this last time, but there was a note there.  It says, "HRC.  I believe there was a subsequent bill."  And that was Mr. Foster's handwriting, correct?

A.     Yes.

Q.     . . . . Now, you stated during your campaign statement, and then you stated to us in April of '95 that Massey came to you.  He wanted to do the work.  There was an old bill outstanding that was due and owing.  And you were

---

[1805] H. Clinton 4/25/98 Depo. at 26-27.

442

104

asked to intervene with McDougal to get the old bill, plus then arrange for this advance against fees or retainer.

Do you recall that's what you said on those occasions?

A.    Yes, I did.

Q.    Now, and I believe we asked you in April of '95, was the bill ever paid. And I believe your answer at that point was, I don't know. Now, is that your answer today?

A.    No. Since then, I have learned that $5,000 of the $5,900 bill had been paid at some point. I don't know when.[1806]

Mrs. Clinton was also asked about a recently produced chronology drafted by Foster

during the 1992 campaign:

Q.    This document was found in the briefcase of Mr. Foster and produced to the Independent Counsel's Office in late July 1997.

Can you read the entry there for 10/23/84?

A.    Yes. It says "$5,000 paid on Bank of Kingston bill."

Q.    All right. Did Mr. Foster tell you in 1992 that the old bill had been paid, or $5,000 had been paid on the old bill?

A.    No, he did not. And also when he edited my two-page statement, he didn't change my understanding which I typed about his not paying the bill. And also, as we can see with his writing on this copy of the bill, he said, "I believe there was a subsequent bill."

So, either he didn't think that the fact that $5,000 was paid on a $5,900 bill constituted full payment, or for some reason he didn't know. Or he neglected to tell me.

But, in any event, my understanding, which I believe I must have gotten from Mr. Foster since he had worked on the Bank of Kingston matter, was

_____

[1806] Id. at 31-32.

443

what I believed at the time.[1807]

Mrs. Clinton was asked about the old bill found in Foster's attic, marked "Paid" and dated October 23, 1984, in addition to documents related to the payment of the old bill, also found in Foster's attic, including:

- The minutes of the September 1984 Madison Bank board meeting at which Gary Bunch, president of the bank, was authorized to negotiate settlement of the outstanding Rose bill; [1808]

- The October 9, 1984 letter from Foster to Bunch demanding payment by October 22, 1984 and threatening to sue if payment was not received;[1809] the $5,000 check that Madison Bank & Trust sent to Rose on October 22;[1810]

- The minutes of the November 1984 Madison Bank board meeting, noting that earnings would be down because a legal bill had been paid.[1811]

Mrs. Clinton responded, "I don't know anything about the letter [from Foster to Bunch] or the agreement it refers to."[1812]

Mrs. Clinton was asked if she agreed that these documents established that the bill was paid in October 1984:

---

[1807] H. Clinton 4/25/98 Depo. at 32-33.

[1808] Minutes of the Madison Bank and Trust Board Meeting (Sept. 25, 1984) (Doc. Nos. MGSL-FR-00000062 through 63).

[1809] Letter from Vincent Foster Jr., Rose Law Firm attorney, to Gary Bunch, Madison Bank & Trust employee (Oct. 9, 1984).

[1810] Check from Madison Bank & Trust payable to Rose Law Firm for $5,000.00 (Oct. 22, 1984) (Doc. No. 2091-00010390).

[1811] Minutes of the Madison Bank and Trust Board Meeting (Nov. 1984) (Doc. Nos. MGSL-FR-00000064 through 66).

[1812] H. Clinton 4/25/98 Depo. at 41.

Q.      Taking that [letter from Foster to Bunch], with a copy of the old bill that
        we now have marked paid 10/23/84, does it appear to you that the old bill
        was paid in October of 1984?

A.      Well . . . again, I've never seen these before.  But my reading of Mr.
        Foster's letter is that the firm agreed to a $5,000 fee limitation.  But, of
        course, they would expect their expenses to be paid.  That would, that -- in
        the way that is written, that does not refer to costs and expenses.

        So, from my perspective, the bill, which was for $5,893.63, was not paid
        in full.  And, instead, the firm had to take a diminution of the fee and
        allocate money to the expenses.  And then, if I look back at the chronology
        you've provided me from Mr. Foster, as you identified it, it says that
        $5,000 paid on Bank of Kingston bill which, again, suggests to me that
        Mr. Foster at least did not consider this account to be paid in full.

        So, from my memory of what I knew at the time, at least in the minds of a
        number of lawyers in the Rose Law Firm, Mr. McDougal was a deadbeat
        who was a very difficult client to collect from, that you had to threaten to
        sue to get paid and then, even if you made an agreement with him of a
        $5,000 fee limitation, he didn't fulfill the agreement.

        Now, that's what this says to me, looking at it in a whole.

Q.      Now, we've heard from Mr. Bunch.  He said this was the final payment.  It
        was settled with Mr. Foster.  He was authorized to negotiate a settlement.
        He paid the $5,000.

        You're right, it diminished the fee allocation.  There was never anything
        else paid on this bill.  So, if you went over there to see Mr. McDougal to
        get the $893, do you remember talking to him, you need to pay the rest of
        the money?

A.      [M]y memory in 1992 was that in 1985, seven years earlier, Mr. Massey
        wanted to do work for Mr. Latham at Madison, and was being frustrated in
        doing so because members of our firm said that Mr. McDougal was not
        someone they wanted to do business for again because he didn't pay his
        bills, and that he hadn't paid everything that was owed to the firm.

        Now, that is my memory.  That was my memory in 1992.  It is my memory
        today.  I can't tell you anything other than that.

445

107

Q.     And you are saying --

A.     And also, I would add that the story that Mr. McDougal was telling at the time made no sense, because everyone who did any business with the Rose Law Firm knew that you didn't get credit for bringing in business.  You didn't get any extra money for bringing in new clients.  And so this, this whole matter just never, you know, rung true to me.

       And so my memory, to me, was much more reliable.

Q.     Mrs. Clinton, let me just ask you, was your stating that this came about through Massey, was it an effort to keep the media away from your husband perhaps requesting work for you from an S&L that was in trouble?

A.     Absolutely not . . . That never crossed my mind.  I told what my memory of what had happened, happened to be, and that's what I believe to this day.

Q.     Mr. Foster died on July the 20th, 1993, which was some two years before we interviewed you on the subject, when you talked about the old bill.  Is it your testimony he never told you that the $5,000 was paid?

A.     I have no memory of Mr. Foster telling me that.  I'm not going to tell you that he absolutely didn't, but I have no memory of that.[1813]

Finally, Mrs. Clinton was asked about her statement (in the 1992 press draft) that she

reported this April 23, 1985 meeting with McDougal to her partners:

Q.     You then state in your statement that you reported your meeting with Mr. McDougal to your partners.  This is the first sentence of the next paragraph.  Which partners did you report the meeting to?

A.     Again, I don't have any memory.  But if you will let me, I will do my best to put this in some context for that question.

       I believe I probably reported it to Watt Gregory, since I had a conference

_____

[1813] Id. at 42-45.

446

with him on that day, and Watt was a senior securities lawyer and would have, I believe, been responsible for working with Mr. Massey and supervising him.

I believe I also would have reported back to Vince Foster because I have a feeling that Vince Foster had hard feelings about Jim McDougal and about what McDougal had put him through, and about the insulting attitude about Carol Arnold, who was a particular associate in the firm that Mr. Foster did a lot of work with.  So, I think I would have had to go to some lengths to persuade Mr. Foster that it was a good idea for us to become involved with Mr. McDougal again.

Q.     Do you remember it being, so to speak, a tough sell to the partners?

A.     Not once we had the retainer.  I think once there was an agreement that Madison would pay a retainer that would be billed again -- it wasn't a retainer that we would keep; it would be an advance against fees and expenses -- then I think the partners felt that it was all right for Mr. Massey to go forward.  But they certainly wanted me to make sure that that retainer came in every month, and that there wasn't any slippage between the agreement that had been reached and what actually happened.

Q.     Were you always to be the billing partner?

A.     Well, my memory is that that was part of the arrangement, that since I had gone to Mr. McDougal and had actually gotten him to agree to a retainer, that I would be responsible for making sure that the bills for the work that was done would be paid completely, fees and expenses, without any question.

Q.     What was your understanding of the work that was going to be done?

A.     My understanding was that it was going to be securities work and that Mr. Massey would do it pursuant to his discussions with Mr. Latham.

Q.     What was your understanding as to Madison's financial health or Madison's financial condition at the time Rose undertook this representation?

A.     At that time, I don't think I had any knowledge of or information about Madison one way or the other.

447

109

Q.    Mr. Gregory has told us that there was a -- of course, he was a securities
      lawyer; you were not -- but that at that time it was well-known in the Little
      Rock community that Madison was not financially healthy in particular,
      and that savings and loans in general were not financially secure.

      Does that refresh your recollection at all?

A.    Well, I certainly knew that savings and loans were going through some
      financial difficulties.  I don't know that I knew that any particular one,
      specifically Madison, was.[1814]

Mrs. Clinton's statements and testimony about the Rose-Madison Guaranty retainer are

summarized as follows:

1)    Rick Massey was a friend of Latham, and Latham agreed to have Madison
      Guaranty hire Rose at Massey's request.

2)    Some Rose partners objected because McDougal had not paid a prior bill.

3)    Massey asked Mrs. Clinton to get McDougal to pay the old bill.

4)    Mrs. Clinton spoke with McDougal, who then paid the bill, and agreed to a
      "retainer" against future fees.

5)    Mrs. Clinton acted as billing partner because associate Massey could not, and
      because she had worked out the payment of the old bill.

Mrs. Clinton's testimony varied insofar as in 1996 she testified that a Rose partner,

probably Vince Foster, approached her about Massey getting the work, but there was an objection

because of the old bill, while her pre-1996 version was that Massey, not Foster, or another

partner, came to her.  In 1998, her testimony reverted to the Massey version.  Also in 1998, she

testified that the amount outstanding on the bill might have been the remaining $893, rather than

the entire amount.  Other evidence regarding the five aspects of Mrs. Clinton's statements is

448

110

discussed in the following sections.

### c.   Other Evidence Regarding Mrs. Clinton.

### i.   Whether Massey and Latham Arranged to Have Madison Guaranty Hire Rose.

**Rick Massey** -- After graduating from law school in May 1984, Massey started at Rose as a law clerk.[1815]  After passing the bar in August 1984, he became an associate assigned to the securities section.  Massey's mentor was partner David Knight.  Massey knew Madison Guaranty's president, John Latham, from college.[1816]  Massey and Knight had lunch with Latham and asked him to send some legal work to Rose.[1817]  Latham said he would like to, but that Jim

---

[1814] Id. at 50-53.

[1815] Massey 11/7/95 GJ at 5.

[1816] Massey 12/3/97 GJ at 24.

[1817] Id.; Senate Whitewater Comm. Hearing, supra note 147, at 45 (Jan. 11, 1996) (testimony of R. Massey).  ("I actually pitched the business to him.  I think the pitch was basically, gee, I'm . . . you're asking me all these questions.  Why don't you hire us and put us to work on some of these things").  Massey agreed that as an associate he could not bring in a new client without a partner as billing attorney.  Id. at 153.

It is unclear when this lunch occurred.  Massey thought that he taught a class on securities regulation with Knight in the fall of 1984, which Latham audited.  Massey 12/3/97 GJ at 24; Senate Whitewater Comm. Hearing, supra note 147, at 18, 23 (Jan. 11, 1996) (testimony of R. Massey); Massey 11/7/95 GJ at 21-23.  Massey testified that he became reacquainted with Latham, who frequently approached him after class to ask about securities issues.  Massey 11/7/95 GJ at 23.  Documents from UALR Law School indicate that Latham took securities regulation in the fall of 1983, and took corporations taught by David Knight in the spring of 1984.  Law School Transcript of John Latham (June 17, 1996) (Doc. Nos. 2031-00000027 through 29).

Massey thought that he pitched the business to Latham in early 1985.  Senate Whitewater Comm. Hearing, supra note 147, at 151 (Jan. 11, 1996) (testimony of R. Massey).  Latham's memory is also different from Massey's.  Latham testified that Massey's pitch about Rose came while he and Massey were studying for the bar examination in the summer of 1984.  Latham

449

111

McDougal hired the lawyers and McDougal was happy with Jim Guy Tucker's firm, Mitchell Williams.[1818]  Massey said it was "at least weeks later" when Rose was hired by Madison Guaranty on the preferred stock offering.[1819]  Massey testified that he did not think that he brought Madison Guaranty's business into Rose.[1820]  In his grand jury testimony, Massey said he "d[id] not know how Madison Guaranty came to be a client of the firm."[1821]  In his Senate testimony, Massey said that although he did not remember how the business came in, "I don't recall feeling like this was my . . . that I killed this deer . . . I didn't have a big part when they came in."[1822]  Massey said he would have remembered bringing in a client:

> Q.     Mr. Massey, let me say something to you.  First-year associate, you're there, if you had brought in this business, it would have been the first piece of business I think you testified that you brought into the firm; right?

---

5/15/96 Senate Whitewater Comm. Depo. at 7.

[1818]  Massey 12/3/97 GJ at 24-25; Massey 11/7/95 GJ at 45 ("And John said, 'Gee, it's….I don't remember the precise words.  Again, it's been 10 years.  But the general impression I got was, he'd like to do that but that his boss, I assume it was Mr. McDougal, was happy working with the Mitchell Firm, and that it was not up to him as to whether we could get any work").

[1819]  Senate Whitewater Comm. Hearing, supra note 147, at 152 (Jan. 11, 1996) (testimony of R. Massey) ("I pitched the business, I was told that it wasn't up to him.  Sometime later, months or weeks, I wish I could tell you, hours, days, I believe it was weeks, at least weeks, we got this piece -- the first piece of work for Madison [Guaranty], which was the preferred stock issue").

[1820]  Massey 11/7/95 GJ at 43 (Massey did not remember being a part of the process of arranging the retainer); Massey 12/3/97 GJ at 26 (confirming that he did not know how the business got to Rose).

[1821]  Massey 11/7/95 GJ at 21.  Massey also said, "My position has been that I'm not -- and it is today that I'm not aware of how -- what their motivation was for hiring us.  I have -- I had a relationship with their president, which might have been a factor.  But I don't -- you know, I don't know that I -- you know, I don't know.  You'd have to ask them why they came to us." Id. at 82.

[1822]  Senate Whitewater Comm. Hearing, supra note 147, at 78 (Jan. 11, 1996) (testimony of R. Massey).

450

A.      That's correct.

Q.      You would have remembered that?

A.      That's correct.

Q.      You don't remember bringing that business into the firm?

A.      No, sir, I do not.[1823]

But Massey stated that he did not have all the facts:[1824] "[I]t's outside my knowledge about whether I brought the Madison Guaranty matter in or not."[1825]  Consistent with his grand jury testimony, Massey said the reason he thought that Latham did not offer Madison Guaranty's work to him was because McDougal, not Latham, hired the attorneys:  "John told me it was up to his boss.  It was up to Mr. McDougal."[1826]

**David Knight** -- Knight remembered lunch with Latham and Massey:  "We took Mr. Latham to lunch, and I can't remember certainly the specific conversation but the gist of it was we told him a little bit about the types of work that Rick and I did.  Representative clients for the firm.  And then asked him for business."[1827]  Like Massey, Knight remembered Latham said

---

[1823] Id. at 232-33, 240-41 (testimony of Massey). By way of contrast, when he was later asked if he remembered the first client he brought in, Massey testified that he remembered bringing in his first client in 1988, shortly before he made partner. Massey 12/3/97 GJ at 64.

[1824] Senate Whitewater Comm. Hearing, supra note 147, at 77 (Jan. 11, 1996) (testimony of R. Massey).

[1825] Id. at 29 (testimony of Massey).

[1826] Id. at 26 (testimony of Massey).

[1827] Senate Whitewater Comm. Hearing, supra note 147, at 10 (May 16, 1996) (testimony of D. Knight).

McDougal decided which law firm to hire:  "My recollection is that he said that Mr. McDougal was really the one that made decisions about hiring lawyers . . . .  He also said that Madison Guaranty regularly used another law firm and that he thought they were satisfied with the services provided by the law firm."[1828]  Knight said he left the lunch with the impression Rose did not get the business.[1829]

**John Latham** -- Latham did not remember taking a class taught by Knight and Massey, nor did he remember lunch with them.[1830]  Latham remembered Massey expressing interest in Madison Guaranty's legal work:  "I do recall that Rick pitched the business in the sense that he wanted us to hire them to do legal work for us.  I do not remember the lunch."[1831]  Latham testified in the Senate that Massey approached him, but that he told Massey it was McDougal's decision whether to hire Rose:

> Rick Massey and I ran into each other when we were studying for the bar, and Rick went to work for the Rose Law Firm after that, and had talked with me about us using the Rose Law Firm.  And I think I probably mentioned that to McDougal at some point.  At some later point, Jim came back to me and said let's use the Rose Law Firm, and he wanted to put them on retainer . . . . I think he wanted to use them because he had friends over there, and one of those friends, of course, was Hillary.  He had used the Rose Law Firm there before.  What's open there, of course, is what prompted Jim to make that decision.  Was it a conversation with Hillary or was it just because I had suggested that at some point I would like to work with the Rose Firm at some point.  I don't know.[1832]

---

[1828] Id. (testimony of D. Knight).

[1829] Id. at 11, 13 (testimony of Knight).

[1830] Latham 5/15/96 Senate Whitewater Comm. Depo. at 10-11.  Latham remembered being taught a corporations course by Knight while in law school.  Id.

[1831] Senate Whitewater Comm. Hearing, supra note 147, at 35 (May 16, 1996) (testimony of J. Latham).

[1832] Latham 5/15/96 Senate Whitewater Comm. Depo. at 7-8.  Latham graduated from law

452

114

Latham said McDougal decided which law firm to hire.[1833]  When asked who hired Rose, Latham testified, "Jim McDougal did."[1834]  Latham did not remember any discussions about an unpaid bill.[1835]

**Webb Hubbell** -- Hubbell's earliest statements on Rose and Madison Guaranty were made during the 1992 presidential campaign.  Hubbell was the campaign contact on Rose issues.[1836]  Campaign staff member Loretta Lynch's notes show that a reporter called Hubbell on February 18, 1992, and asked how Rose was hired by Madison Guaranty.[1837]  Lynch's notes

---

school in May 1984, and studied for the bar the summer of 1984.  John Latham's UALR grade transcript (June 17, 1996) (Doc. No. 2031-00000027).  In a FDIC interview Latham said McDougal suggested that Madison Guaranty use Rose.  Latham 7/12/95 RTC Int. at 1 ("LATHAM said that at one time, date not recalled, JAMES MCDOUGAL suggested that Madison Guaranty use ROSE for some of the legal work at the institution.  LATHAM said that, 'MCDOUGAL had friends over there, he suggested we use them.'  LATHAM said when asked who the friends were that it was HILLARY RODHAM CLINTON and others").

[1833]  Latham 2/14/95 Int. at 1; Latham 5/15/96 Senate Banking Comm. Depo. at 12-15.

[1834]  Senate Whitewater Comm. Hearing, supra note 147, at 15 (May 16, 1996) (testimony of J. Latham).  When asked if it is "safe to say you personally did not hire the Rose Law Firm to work for Madison Guaranty," Latham responded, "Yes, in the sense . . . that I didn't make the decision to hire them and move that forward."  Latham 5/15/96 Senate Whitewater Comm. Depo. at 8-9.  Pat Heritage-Hays, an assistant to Latham, said when she learned Madison Guaranty was paying Rose $2,000 per month, she asked Latham about it, and he responded, "Oh, it's one of Jim's deals."  Heritage-Hays 1/6/95 Int. at 1.

[1835]  Latham 2/14/95 Int. at 2; see also Latham 5/15/96 Senate Whitewater Comm. Depo. at 22.

[1836]  Lynch 2/1/96 GJ at 9.

[1837]  See Memo (draft) from Loretta Lynch, Clinton Campaign Staff, to David Wilhelm, Clinton Campaign Manager, and Bruce Reed, Clinton Campaign Staff in charge of Issues at 5 (Feb. 18, 1992) (Doc. Nos. 263-00000348 through 360).

453

115

reflected Hubbell told her that "HRC brought [Madison Guaranty] to the firm."[1838]

Susan Thomases's notes reflect a conversation with Hubbell on February 24, 1992, where

Hubbell told Thomases:

> Massey had relationship w/ Latham & HC had relationship w/ MacD.  Rick will
> say he had rel[ationship] w/ Latham & had a lot to do w/ getting the client in.  She
> did all the billing.  According to time recs, HC had numerous conf[erences] with
> Latham, Massey, and McDougal on both transactions.  She reviewed some docs.
> She had one TC in 4-85 at the beginning of the deal w/ Bev. [Bassett].  Neither
> deal went through.  Broker/dealer was opposed by staff but approved by Bev
> under certain condition which they never met.  Preferred stock?!  But for Massey,
> it would not have been there.  But HC was billing partner and attended
> conferences.[1839]

Massey testified that during the 1992 campaign he never told Hubbell he would say he

brought in the business.[1840]  Massey testified that he never spoke with Hubbell about it.[1841]

Massey said he spoke to reporter Jeff Gerth, and told him he did not know why Rose was hired

and that Gerth should ask Jim McDougal.[1842]

Hubbell's February 1995 report of interview with this Office said:

> HUBBELL notes that Madison [Guaranty] was HILLARY's client, as she is the
> one who brought Madison [Guaranty] into the firm as a client, that is why she
> became the billing partner.[1843]

---

[1838]  See id.; see also Lynch 2/1/96 GJ at 10-11.

[1839]  Susan Thomases's notes of conversation with Webb Hubbell (Feb. 24, 1992) (Doc. No. 790-00000020) (emphasis added); see also Thomases 2/29/96 GJ at 45.

[1840]  Massey 12/3/97 GJ at 63 ("I can say with certainty that I would never tell Webb Hubbell or gave him the impression that I brought that business in").

[1841]  Id. at 37.

[1842]  Id. at 38.

[1843]  Hubbell 2/1/95 Int. at 7.

454

116

In December 1995, Hubbell was asked questions in the grand jury about this:

> Q.   I'm looking back over some notes of interviews with you, and I ask you, do you recall ever saying that Madison Guaranty was Hillary's client as she is the one who brought Madison Guaranty into the firm as a client, that is why she became the billing partner?  Do you ever remember making a statement to that effect?

> A.   I don't remember it.  I don't doubt that I could have, but I don't remember it.[1844]

Hubbell told the Senate in 1995 that "Massey was the one who wanted them as a client and that Mrs. Clinton was one of those who helped him accomplish that task."[1845]  Hubbell was read a March 12, 1992 article that said:  "Webster L. Hubbell, a partner and spokesman at Rose, said that nothing in the law firm's records indicates that Hillary Clinton brought in the Madison Guaranty business.  'That's a new one on me,' he said."  Asked whether the quote was accurate, Hubbell replied, "I don't know if I said that, but there is nothing in the records -- this is where lawyers are being lawyers . . . . There is nothing in the records of the firm that show that Hillary brought in the business."[1846]

Hubbell testified that he had no personal knowledge of the matter.[1847]  In testimony inconsistent with his denial, Hubbell had earlier testified that Massey approached him in 1984 and asked for help getting Madison Guaranty's business.[1848]  Hubbell testified that Massey had

---

[1844]  Hubbell 12/19/95 GJ at 187.

[1845]  Hubbell 10/26/95 Senate Whitewater Comm. Depo. at 122.

[1846]  Hubbell 12/19/95 GJ at 108.

[1847]  Hubbell 5/7/96 GJ at 74-75 ("I don't know for sure who brought it in. . . . I don't have personal knowledge, right").

[1848]  Hubbell 10/26/95 Senate Whitewater Comm. Depo. at 134.

spoken to John Latham, and felt Rose could get some of Madison Guaranty's work.[1849]  Hubbell

said he did not try to help Massey.[1850]

### ii.   Whether Rose Partners Objected to Madison Guaranty Becoming a Client.

**<u>Rick Massey</u>** -- Massey testified in 1995 that he did not remember discussing Madison

Guaranty billing matters with Rose partners:

> [D]o I remember going to the partners and saying, "We want to represent the "Madison [Guaranty]," and other partners saying, "You're not going to do that until they catch up on their bill, and maybe there ought to be a retainer."  I have read that [Joe] Giroir said that.  I don't recall Giroir ever having said that to me.  I don't remember me being in any of that discussion, and it frankly would not have been a matter in which I normally would be involved because I was a first year associate, and we didn't have much input on billing arrangements of that kind.  It's possible, however.  I just don't remember it.[1851]

Massey remembered no such discussion with either securities partners or Mrs. Clinton:

> Q.   Mr. Massey, do you remember anything about your going to the securities partners and saying, "I want to work on a case for Madison [Guaranty]," and they said, "We're not going to approve that until Madison [Guaranty] has paid us what they owe us on some other case"?
>
> A.   I don't -- no, sir.  I don't remember that.
>
> Q.   Either with any securities partners or with Mrs. Clinton?
>
> A.   I don't remember doing that with anybody.[1852]

---

[1849] <u>Id.</u> at 134-36.

[1850] <u>Id.</u> at 135.

[1851] Massey 11/7/95 GJ at 85.  Giroir testified that he did not remember Rose representing Madison Guaranty in 1985 and 1986 or any discussions in the firm about any representation. Giroir 7/18/96 GJ at 23-27.

[1852] Massey 11/7/95 GJ at 32.  Massey said that although he does not remember it, it is "possible" he told Knight he thought he was going to get Madison Guaranty as a client.  <u>Id.</u> at 84-

Massey testified that he knew his memory contradicted Mrs. Clinton's.[1853]

**David Knight** -- David Knight remembered "some discussion" about Madison Guaranty

not paying an old bill but could not remember the details.[1854]

**Webb Hubbell** -- Hubbell said he remembered Rose partners were reluctant to work for

Madison Guaranty because of previous payment problems:

> There was an issue in the fact that the firm had represented one of -- Mr.
> McDougal prior to this issue, before Madison Guaranty, and Mr. McDougal still
> owed the firm some money.  And several of the partners were not anxious for us
> to work for McDougal until that outstanding balance was still paid."[1855]

Hubbell said he did not remember if he was part of the discussions about the old bill, just

that he knew about them:

> Q.     You have told us about the talk within the firm that they've got to pay their
>        old bill first, and then some arrangement whereby there's going to be the
>        new.  But I take it you're telling us today you don't remember if you were
>        in on that or not?

---

85.  Before the Senate Whitewater Committee in 1996, Massey also testified that he did not
remember a discussion with any Rose partner about Madison Guaranty's outstanding bill or
partners objecting to bringing Madison Guaranty in again as a client because of the billing
problems:  "I've heard that there were discussions, that there was some disgruntlement.  And
discussions like this could have gone on.  I don't believe I was a party to them."  Senate
Whitewater Comm. Hearing, supra note 147, at 23-24 (Jan. 11, 1996) (testimony of R. Massey).

[1853] Massey 11/7/95 GJ at 84.

[1854] Knight 12/6/95 GJ at 15-16  ("That rings a bell.  I just recall some discussion about a
prior problem with Madison Guaranty or McDougal not paying a bill or, you know, some -- with
respect to some earlier representation.  But I don't remember it in the sense of kind of a formal
declaration or consideration -- you know, consideration of the thing.  I don't recall being involved
in any lengthy discussion or, you know, policy statement or anything like that about it.  I just do
generally recall that topic coming up").

[1855] Hubbell 12/19/95 GJ at 43-44.  When asked which partners he remembered being
upset about McDougal's past non-payment Hubbell identified Foster and Gregory.  Id. at 46.

457

119

A.    No, I don't.  I was aware of it, but I don't remember any specific, you
      know, "It's got to be paid," and things of that sort.  I mean, I was aware
      that there was a concern.[1856]

Hubbell said he did not remember talking to Mrs. Clinton about a retainer for Madison

Guaranty, but did remember talking to her about other firms' use of retainers.[1857]  Hubbell said he

spoke to Mrs. Clinton in the mid-1980s about Madison Guaranty's billing problems and the old

bill being paid before doing any more work:

A.    I know that I had conversations with her when we first took on the
      Madison Guaranty representation, that was in '84 or '85.

Q.    What do you recall about those conversations in '84-85 about the Madison
      Guaranty representation?

A.    The law firm did not want to -- some of the members of the law firm did
      not want to represent Madison Guaranty until Mr. McDougal had paid an
      old bill owing the firm.

Q.    And what was Mrs. Clinton's position with regard to whether the firm
      should represent McDougal?

A.    She thought that if he got right with the firm, that she didn't see any reason
      why we shouldn't represent him.

Q.    Did McDougal ever "get right with the firm"?

---

[1856]  Id. at 61-62.

[1857]  Id. at 67.  Mrs. Clinton said she did not remember any conversations with Hubbell
about Madison Guaranty's business or retainers.  H. Clinton 4/22/95 Depo. at 13-14 ("I don't
recall any [conversations with Hubbell], but I might very well have had conversations with
him"); see also Hubbell 2/1/95 Int. at 6 ("HUBBELL does not know if HILLARY CLINTON
talked to the firm regarding the MADISON retainer, nor does he have any memory of HILLARY
CLINTON talking to HUBBELL personally about the retainer").

458

120

A.    Yes, he did.[1858]

**Watt Gregory** -- Watt Gregory, a senior member of Rose's securities section, said he

remembered "some general discussion" about whether Rose should work for Madison

Guaranty.[1859]  Gregory remembered talking to Mrs. Clinton "about whether we should or

shouldn't [represent Madison Guaranty], or what some of the issues might be in connection with

the ability of the savings and loan to raise capital by that particular method."[1860]  Gregory testified

"that Mrs. Clinton was instrumental in introducing the client to the lawyers in the firm."[1861]

Gregory remembered two specific concerns about Madison Guaranty.[1862]  Gregory felt that

Rose, which had represented no savings and loans, did not have the expertise.[1863]  Gregory

thought the business potential was small and the risks were great; he understood that savings and

loans in general (and Madison Guaranty in particular) were having financial difficulties and he

"didn't perceive Madison [Guaranty] to have a particularly attractive risk/reward ratio for our

---

[1858]  Hubbell 10/26/95 Senate Whitewater Comm. Depo. at 131-32.

[1859]  Gregory 1/3/96 GJ at 7.  Gregory testified that although he remembers some discussion, he cannot remember "names, places, or dates."  Id.  Gregory remembered one party to the discussions was David Knight.  Gregory 5/24/95 Int. at 2.

[1860]  Gregory 1/3/96 GJ at 25-26.

[1861]  Id. at 6.  Gregory's 1995 OIC interview reads:  "RLF's opportunity to represent Madison Guaranty Savings & Loan (MGSL) came through Hillary Clinton in the mid 1980's."  Gregory 5/24/95 Int. at 2.

[1862]  Gregory 1/3/96 GJ at 13, 15-16 ("But I do know that there was an open discussion about the client, or the potential client, as well as the substantive issue, could a state-chartered, stock-owned savings & loan association have two classes of stock . . . But to my way of thinking, the discussions about, 'Should we be doing this,' took place before we undertook the particular project").

[1863]  Id. at 9-10

firm as a new client."[1864]  He was also concerned that "there was no bright-line, black-letter statement in the Arkansas statutes that would say you can have two classes of stock."[1865]  Gregory did not remember any discussion about Madison Guaranty's outstanding bill.[1866]  When asked about how Massey was assigned to the project, Gregory said, "I have some recollection that he, at one point, mentioned a friendship or an acquaintanceship with this John Latham."[1867]

Four other Rose partners -- William Kennedy, George Campbell, Joe Giroir, and Wilson Jones -- were asked about any discussions within the firm or with Mrs. Clinton about Madison Guaranty retaining Rose.  None of the four remembered any.[1868]

### iii.    Mrs. Clinton's Discussion with McDougal.

As previously discussed, in 1994, 1995, and 1998, Mrs. Clinton said Massey asked her help to resolve McDougal's old bill.  In contrast, Massey testified in 1995 that he did not remember speaking with Mrs. Clinton or any other Rose partners about the bill.[1869]  Massey told the Senate in 1996 that he did not remember approaching Mrs. Clinton about representing Madison Guaranty:

Q.    [A]m I correct that you did not go to Mrs. Clinton and say I have a proposal to do work, can you go to Mr. McDougal and get him to agree to prepay?

---

[1864]  Id. at 8-10.

[1865]  Id. at 13-14.

[1866]  Id. at 18.

[1867]  Id. at 29.

[1868]  Senate Whitewater Comm. Hearing, supra note 147, at 277 (Jan. 16, 1996) (testimony of W. Kennedy); Campbell 6/28/96 Int. at 2; Giroir 7/18/96 GJ at 24-26; Jones 6/27/96 Int. at 3.

[1869]  Massey 11/7/95 GJ at 33-34.

460

122

A.      Sir, I don't have a recollection of that.[1870]

When asked if he remembered approaching Mrs. Clinton about getting Madison Guaranty

as a client, Massey testified:

> It's possible that I had a casual conversation with her that I don't remember from
> 11 years ago, sir, but I don't recall a conversation in which I went to her and asked
> her to help me bring in the client.
> . . . .
>
> Now, it's possible -- and I think I knew at that time that Mrs. Clinton had some
> relationship with Mr. McDougal, and so it's possible that I could have had a casual
> conversation with her in a hallway and said gee, we'd really like to try to get these
> folks' business, and maybe you could have a word with Mr. McDougal.  It's very
> possible.
> . . . .
>
> It's possible that I had a conversation with her about gee, I think we might be able
> to get these folks' work, you know McDougal, maybe you could go talk to her.
>
> [D]id I talk to her with respect to how we were going to bill them, whether we get
> a retainer, did I have a specific engagement agreement of some kind.  Sir, I don't
> have any recollection of that happening.  I don't believe it happened that way.
> Could I have had a conversation with her, can you have a talk with Mr.
> McDougal, that's very possible.  I want to -- that's my testimony.[1871]

### iv.      Payment of McDougal's Old Bill.

The McDougal-controlled Madison Bank & Trust did at one time have a long-outstanding

old bill from Rose.  Rose billed Madison Bank in July 1982 for $5,000 in legal fees, and $893 in

---

[1870] Senate Whitewater Comm. Hearing, supra note 147, at 26, 135-36 (Jan. 11, 1996)
(testimony of R. Massey) ("I do not remember, as you said earlier, a proposal in hand to her and
discussing with her that there were partners in the firm that were dissatisfied with McDougal and
here is a proposal and let's work it out.  I have no recollection of that").

[1871] Id. at 20, 25, 136, 234 (testimony of Massey).

461

expenses.  Rose had lost the case it was billing for, and McDougal refused to pay.  The

Independent Counsel found several basic facts about this bill.

When the Madison Bank & Trust board of directors met on September 25, 1984, the old

bill was on the agenda.  Under the heading "Rose Law Firm," the meeting minutes recorded: "We

owe $5,000 for Huntsville move appeal, according to firm.  Mr. Vaughn moved, Mr. McDougal

seconded that Mr. [Gary] Bunch [president of Madison Bank] will negotiate settlement with

Rose Law Firm.  Approved unanimously."[1872]  On October 9, 1984, Vince Foster wrote to Bunch,

referring to their conversation the week before, saying Rose would sue if Madison Bank did not

pay its bill by October 22.[1873]  Madison Bank sent a $5,000 check to Rose on October 22, 1984,

and Rose endorsed it three days later.[1874]

On November 27, 1984, the Madison Bank and Trust board met again.  The minutes

reported earnings would be down because of "heavy accounting fees . . . and a payment of legal

fees."[1875]  Bunch said he understood the $5,000 payment settled the debt, even though the costs

portion had gone unpaid and Rose never sent another bill.[1876]

The evidence established that Mrs. Clinton was wrong when she said she met with Jim

McDougal on April 23, 1985 to discuss the old bill and that he thereafter paid that bill.

According to the chronology Vince Foster created during the 1992 campaign, $5,000 was paid on

---

[1872] Bunch 1/20/98 GJ at 16 (discussing minutes).

[1873] Id. at 23-24, 26 (discussing letter).

[1874] Id. at 26-27 (discussing check and endorsements).

[1875] Id. at 17.

[1876] Id. at 30.

462

124

the Bank of Kingston bill on October 23, 1984,[1877] and this was confirmed by the original copy of

the bill stamped "Paid" on October 23, 1984 found in 1997 in Foster's attic.  Mrs. Clinton

acknowledged in her 1998 testimony that her earlier testimony was not entirely accurate.  She

noted that even though $5,000 had been paid by the date of her meeting with McDougal, there

still was $893 outstanding.  Even if Mrs. Clinton was referring to this $893 difference when she

said she went to discuss an old bill with McDougal in April 1985, the evidence shows that the

balance was not expected to be paid and that payment of that portion the bill was not a

prerequisite to Rose representing Madison Guaranty.

### v.      Mrs. Clinton as Billing Partner.

In 1995, Massey testified that he did not ask Mrs. Clinton to become the billing partner:

> Q.      All right.  Mr. Massey, do you remember anything about you, Rick
> Massey, affirmatively going to Hillary Clinton and asking Hillary if she
> would become the billing partner?

> A.      No, I do not.[1878]

Massey testified, consistent with his prior testimony, before the Senate Whitewater

Committee:

> Q.      Did you approach Mrs. Clinton and ask her to be the billing attorney on
> the Madison Guaranty account?

> A.      Sir, I don't recall that.[1879]

---

[1877] Foster Chronology of the Rose Law Firm Representation of Madison Guaranty
Savings & Loan (Mar. 26, 1992) (Doc. Nos. 1180-00000236 through 240).

[1878] Massey 11/7/95 GJ at 95-96.

[1879] Senate Whitewater Comm. Hearing, _supra_ note 147, at 29 (Jan. 11, 1996) (testimony
of R. Massey).

Massey was asked whether he would have remembered asking Mrs. Clinton to be the

billing partner:

| | |
|---|---|
| Counsel. | And do you know how Mrs. Clinton came to be the billing partner? |
| Massey. | No. |
| Counsel. | You didn't ask her to be the billing partner? |
| Massey. | I don't recall asking her to be the billing partner. |
| Counsel. | And it's not the kind of thing -- |
| Chairman D'Amato. | Mr. Massey, . . . If you asked Mrs. Clinton to be the billing partner, wouldn't that be a thing -- notwithstanding that it was 10 or 11 years ago -- that you would recall? |
| Massey. | That's fair.<br>. . . . |
| Chairman D'Amato. | Did you ask her to be the billing partner? |
| Massey. | I don't think so. |
| Chairman D'Amato. | All right.  That's better than I don't recall. |
| Mr. Massey. | I should remember it.  It could have happened.  I don't think I did.  That's the best I can do. |
| Chairman D'Amato. | And you had to slip in it could have happened.  I mean, Mr. Massey, you get this matter.  Mrs. Clinton is not in your section.  Now you're going to bring me to develop how it is that that would not be consistent at all.  Mrs. Clinton is not in this section.  She doesn't do securities work.  She's not in the area, the general area of the firm that handles this work; is that correct? |
| Massey. | No, she was not.<br>. . . . |

464

126

| Chairman D'Amato. | Okay.  So consequently, if you were going to ask her, a partner outside of this area, to be the billing partner, wouldn't you recall that? |
|---|---|
| Massey. | Yes, sir, that's correct.[1880] |

### 4.    Analysis of the Rose Retainer.

Substantial evidence corroborated McDougal's version of events.  Mrs. Clinton's Rose

income had declined in the years prior to the alleged jogging incident -- a fact which McDougal

should not have known independently.  One witness, Bill Henley, partially corroborated

McDougal's testimony by relating McDougal's contemporaneous disclosure of his meeting with

Governor Clinton.  Similarly, Susan McDougal's unsworn press interviews also show McDougal

contemporaneously told her about the meeting.  President Clinton did not contradict McDougal,

merely saying he had no recollection one way or the other.[1881]

Nonetheless, McDougal's statements and testimony must be viewed with caution.

McDougal was a confessed perjurer, and no independent witness could entirely corroborate his

testimony.

Mrs. Clinton's various descriptions of events about the Rose retainer had substantial

inconsistencies.  Latham, Massey, and Knight disagreed with Mrs. Clinton's statement that

Massey brought in the business through Latham.  Latham, Massey, and Knight consistently said

that McDougal, not Latham, hired the lawyers.  Massey told the grand jury that he was not the

---

[1880]  Id. at 170-72 (testimony of Massey).

[1881]  This Office discounted the testimony of Moles as so at variance with other known facts as lacking in significant probative value.

source of the Madison Guaranty business.[1882]

Massey's testimony was corroborated by documents.  For example, Madison Guaranty's regular firm, Mitchell Williams, had already begun work on the broker-dealer and preferred stock matters prior to Rose's retention.[1883]  A Mitchell Williams attorney had already contacted the ASD about the matter before it was turned over to Rose -- a sequence of events unlikely for Latham to have caused.[1884]  John Selig, the Mitchell Williams partner who did Madison Guaranty's legal work was formerly head of the ASD.[1885]  Beverly Bassett, then the current ASD head, had been a lawyer at Mitchell Williams.[1886]  In addition, Jim Guy Tucker, the billing partner at Mitchell Williams, was a long-time friend and business partner of McDougal.[1887]  It seems unlikely that Latham sought to have a new associate at Rose represent Madison Guaranty before the ASD rather than Selig, a former head of the ASD for whom Bassett had previously worked

---

[1882]  Massey's testimony before the Senate Whitewater Committee was more equivocal, raising doubts about the accuracy of either statement.  The balance of the evidence (including the unlikelihood that Massey would forget his first client ever) supports the conclusion that Massey was not the source of Madison's business, though his confirmed lunch approach to Latham could have played some role in McDougal's decision to hire Rose.

[1883]  Letter from Mitchell, Williams, Selig, Jackson & Tucker Law Offices to Sarah Hawkins, Senior Vice-President, Madison Guaranty, enclosing a Preliminary Offering Circular (Dec. 3, 1985) (Doc. Nos. 155-00001504 through 1506).  More than one month later, Mitchell Williams opened another matter on Madison Guaranty's account, entitled "Broker-Dealer." (Doc. Nos. 155-00001507 through 1509).  The broker-dealer file was also empty. These were the ninth and tenth matters opened by Mitchell Williams for Madison Guaranty.

[1884]  Id.

[1885]  Selig 7/18/96 GJ at 3-4.

[1886]  Letter from Bill Clinton, Governor of Arkansas, to Beverly Bassett, Wright, Lindsey, and Jennings attorney (Jan. 22, 1985) (Doc. No. DEK219149).  The Governor's Office issued a press release announcing Bassett's appointment (Jan. 18, 1985) (Doc. No. 319-00028649).

466

simply as a favor to his friend Massey. McDougal offered a simpler and more direct explanation: He hired Rose because he thought the Governor's wife would have influence in front of a state agency.[1888]

Also significant is the documentary evidence showing that McDougal's "unpaid" bill had been paid and settled six months before Mrs. Clinton met with McDougal in April 1985. If Mrs. Clinton's testimony reflected her view that the entire bill was not paid, $5,000 had been paid. If Mrs. Clinton's account testimony reflected her view that only the unpaid $893 expense portion of the bill remained unpaid, that portion was never expected by Rose to be paid.

There is a plausible explanation for Mrs. Clinton's testimony. In late 1983, Mrs. Clinton was asked by her fellow partners at Rose to intercede with McDougal about payment of the Bank of Kingston bill.[1889] This earlier contact with McDougal may have been the contact Mrs. Clinton remembered, though she mistakenly confused it with the 1985 meeting she and McDougal agreed occurred. In the judgment of the Independent Counsel, this plausible explanation for Mrs. Clinton's confusion would create a reasonable doubt in a trier of fact's mind about the willfulness of Mrs. Clinton's factually inaccurate statements about going to see McDougal in April 1985 about a billing dispute that had long since been settled.

On balance, the weight of evidence supports McDougal's version of events. But in the judgment of the Independent Counsel, the weight of the evidence simply is not sufficient to

---

[1887] See Tucker 3/18/99 GJ at 21-23.

[1888] J. McDougal 8/1/96-6/1/97 Int. at 15.

[1889] See H. Clinton 4/25/98 Depo. at 23-24.

467

129

warrant prosecution of Mrs. Clinton.  Moreover, with McDougal's death in March 1998, the most important percipient witness became unavailable.  For these reasons and in the exercise of discretion, the Independent Counsel declined prosecution as to Mrs. Clinton's testimony and how Rose was hired by Madison Guaranty.

**B.    Mrs. Clinton's Madison Guaranty Work.**

The legal work that Rose and Mrs. Clinton did for Madison Guaranty was also scrutinized by federal investigators.  Rose's legal work for Madison Guaranty coincided with some of the most serious frauds perpetrated by the Madison Guaranty insiders, including the IDC/Castle Grande transactions, which eventually caused losses of more than $4 million to the institution.[1890]

**1.    Work Related to the IDC and Castle Grande Transactions**

Rose billing records sought for many years by this and other federal investigators were finally produced by Mrs. Clinton's attorneys in January, 1996.  These long sought records provided more detail about Mrs. Clinton's legal work for Madison Guaranty than was previously known.  The Rose billing records showed six separate "matters" worked on by its lawyers for Madison Guaranty.  Matter 5 was called "IDC," for Madison Financial's purchase, development, and resale of a 1,050-acre parcel of land from the Little Rock IDC.  The IDC property was developed under the name "Castle Grande."  As addressed in detail in Volume II, Part B, Chapter 1 of this Final Report, these transactions involved substantial misconduct, discovered by federal

_____

[1890]  Pillsbury Madison & Sutro LLP, A Report on Certain Real Estate Loans and Investments Made by Madison Guaranty Savings & Loan and Related Entities:  Prepared for

regulators in 1986.

The billing records showed that Mrs. Clinton billed Madison Guaranty for time working on various aspects of these transactions, such as billing for her conferences with Seth Ward, the admitted straw man for the original purchase of the IDC property who executed a series of "loans" compensating him for that criminal role, while disguising the payments as "loans" to deceive federal examiners auditing Madison Guaranty.

### 2. Mrs. Clinton's Work According to the Billing Records.

The billing records show Mrs. Clinton's legal work on the IDC transactions between November 14, 1985 and June 10, 1986.[1891]  Her greatest number of billing entries occurred between November 14, 1985 and January 7, 1986.[1892]  During that seven-week period, Mrs. Clinton billed Madison Guaranty for twelve conferences with Seth Ward on the IDC transaction.[1893]  She also billed for two conferences with Webb Hubbell in November 1985.[1894] The billing entries for these conferences do not say what was discussed.  Mrs. Clinton later said she did not remember the details of these conferences, though she thought they were related to

---

Resolution Trust Corporation 29 (Dec. 19, 1995).

[1891]  Rose Law Firm Billing Records (Jan. 1986 through June 1986) (Doc Nos. DEK015013 through 15019, 015021 through 15022, 015029 through 15032, 015038).

[1892]  Rose Law Firm Billing Records (Nov. 1985 through Jan. 1986) (Doc Nos. DEK014991, 015009, 015012, 015014, 015016 through 15019).

[1893]  Id.

[1894]  Rose Law Firm Billing Records (Jan. 1986) (Doc. Nos. DEK015014, 015008 through 15009).

469

131

legal research concerning Castle Grande's proposed brewery and the sewer and water utilities.[1895] Seth Ward testified that he did not remember having any discussions with Mrs. Clinton.[1896]

Before January 30, 1986, Mrs. Clinton charged Madison Guaranty for an additional 14.5 hours of legal work on the IDC matter that was otherwise unrecorded on Rose's other records. On January 30, 1986, Rose (by Mrs. Clinton as the billing partner) sent Madison Guaranty five bills for legal services -- one for each open matter.[1897]  The IDC draft bill computerized billing memorandum stated that Mrs. Clinton performed $912.50 worth of legal work on the IDC matter.[1898]  Mrs. Clinton made a handwritten change to the draft billing memorandum to increase billing for her work to $2,731.25.[1899]  Mrs. Clinton did not write down what additional work she had performed to justify this additional charge or when that work had been performed.  No supporting details for this increase were ever entered into the Rose billing computer and Mrs. Clinton's personal timesheets for 1985 to 1986 were never produced to this or any other investigation, though they were sought.[1900]

The additional work Mrs. Clinton might have performed could possibly be determined by comparing the computerized billing memorandum with the invoice Rose sent to Madison

----

[1895] H. Clinton 2/14/96 FDIC Int. at 72.

[1896] Ward 1/17/96 GJ at 62; Ward 2/12/96 Senate Whitewater Comm. Depo at 44.

[1897] Rose Law Firm Billing Records (Jan. 1986) (Doc. Nos. DEK015008, 015011, 015013, and 015016).

[1898] Rose Law Firm Billing Records (Jan. 1986) (Doc. No. DEK015017).

[1899] Id.

[1900] See Letter from Alden L. Atkins, attorney representing Rose to W. Hickman Ewing Jr., Deputy Independent Counsel (Feb. 9, 1996) (Doc. No. 105-00092699).

Guaranty.  The original draft billing memorandum entry for November 14, 1986 stated: "Conference with Seth Ward regarding purchase from Brick Lile."[1901]  That entry was initially billed to Matter #4 (General), but Mrs. Clinton edited the draft memorandum to move it to Matter 5 (IDC).[1902]  The final January 30, 1986 invoice for Matter #5 contained the description "Conference with Seth Ward regarding purchase from Brick Lile and proposed industrial development on site."  Some of the 14.5 missing hours of work could have been for the "proposed industrial development on site."  This Office was unable to determine the basis for the $1,818.75 increase in Mrs. Clinton's IDC billings for work performed through January 30, 1986.  It is possible that the billing records do not accurately reflect Mrs. Clinton's work.  Mrs. Clinton herself has said some of the entries were wrong.

This Office also examined whether Hubbell's IDC work was billed under Mrs. Clinton's name.  Hubbell had substantial contact with Ward on the IDC matter.  File storage records at Rose show Hubbell maintained a file entitled "IDC: UNION TOWNSHIP RESEARCH."[1903]  In his August 1996 testimony, Hubbell admitted advising Ward on most significant aspects of the IDC transaction.[1904]  Don Denton[1905] and Ward's accountant, Mike Schaufele, corroborated

---

[1901] Rose Law Firm Billing Records (Nov. 22, 1985) (Doc. No. DEK014991).

[1902] Id.

[1903] Rose Law Firm Computer Printout by file name and attorney name (undated) (Doc. No. RIC 1212395).

[1904] Hubbell and Ward discussed:  1) the initial IDC purchase, Hubbell  8/22/96 GJ at 24, 79; 2) letter agreements between Ward and McDougal, id. at 35-36, 41-43; 3) the brewery, id. at 59; 4) Ward's purchase of IDC property, id. at 49; 5) the sewer and water facilities, id. at 24, 60, 108; 6) payment of Ward's commissions and the mechanism for payment including the concept of set off loans, id. at 49-50, 67, 98; 7) tax consequences of Ward's relationship with Madison, id.

471

133

Hubbell's testimony.[1906]

Hubbell denied billing time or doing legal work for Madison Guaranty through another

attorney, such as Mrs. Clinton.

> Q.   Did you ever bill for any work for Madison Guaranty Savings & Loan or
>       Madison Financial in 1985 and 1986?
>
> A.   Not that I remember, and I haven't seen anything that shows that I did.  I
>       mean, I'm hesitant to be 100 percent sure of anything anymore, but if I
>       could [sic] 100 percent sure, I don't remember ever billing Madison.  I've
>       never seen anything or heard anybody say that I did.
>
> Q.   Would you ever have billed Madison -- and that would include Madison
>       Guaranty and Madison Financial Corporation -- indirectly, that is, through
>       someone else? That is, you do work and you put it under someone else's
>       name or in some other category on the bill, not under Web Hubbell legal
>       services?
>
> A.   No, I don't think I have.[1907]

**3.    Mrs. Clinton's Recollection of Madison Guaranty Work.**

Mrs. Clinton testified in 1995 that she remembered performing no legal work that she did

for Madison, other than before the ASD:

> Q.   [F]rom the time of the advance against fees or retainers started in May of
>       '85 until it was terminated in July of '86, do you recall today doing any
>       other work on anything other than the matter with the Arkansas Securities
>       Department?
>
> A.   I have a recollection of the firm during that time doing some other minor
>       matters for Madison [Guaranty], but I couldn't tell you what they were

---

at 57-59, 90; and 8) the option agreement.  Id. at 57-59, 93.

[1905]  Denton 8/20/96 GJ at 77.

[1906]  Schaufele 5/27/88 Depo. at 13, Ward v. Madison Guaranty, No. 87-7580, (E.D. Ark.).

[1907]  Hubbell 8/22/96 GJ at 27-28.

right now.[1908]

In 1993, Rose recreated the Madison Guaranty representation from fee allocation documents in the firm's files.[1909]  Mrs. Clinton was questioned using the recreated fee allocation. For January 1986, the allocation showed Mrs. Clinton was credited with earning a fee of $2,731.25 for Stock Offering & IDC and $802.50 for Stock Offering.[1910]  Mrs. Clinton was asked if she had worked on the stock offering matter, and she said:  "I must have done something or it could have gotten misallocated.  There was a -- I think IDC was something different from the stock offering, but I don't have any memory of that."[1911]  This exchange followed:

> Q.   I believe -- and I'm sorry that I don't have a copy, Mrs. Clinton, but the IDC, I think, had to do with Castle Grande.  And there was a memo in there or something on a wet/dry issue.
>
> A.   Uh-huh.
>
> Q.   And there is actually a memo from Rick Donovan to you.  Do you recall anything what that would be about.
>
> A.   I don't recall specifically, but there was some property that Madison either owned or was trying to develop that was partially in a township that was wet, or something like that.  That's all I remember right now.[1912]

---

[1908] H. Clinton 4/22/95 Depo. at 30.

[1909] R. Clark 12/5/95 GJ at 20-22.  Some of these documents had been removed in 1992 by Hubbell and Foster.  See Hubbell 5/7/96 GJ at 15, 18-19; Rose storage facility checkout log (Mar. 24, 1992) (Doc. No. 105-00054216).

[1910] Recap of fees from Madison Guaranty Savings & Loan Final Recap at 2 (for period 1983 through Sept. 1987) (Doc. No. 105-00083353 through 354).  H. Clinton 4/22/95 Depo. at 41. When discovered, the billing records listed that in fact the entire $2,731.25 was for the IDC matter.  Rose Law Firm Billing Records (Jan. 21, 1986) (Doc. No. DEK015017).

[1911] H. Clinton 4/22/95 Depo. at 41.

[1912] Id. at 42-43.

473

135

Mrs. Clinton was asked whether she thought the fees had been allocated to her because she had brought in the business, or because she had done the work.  She replied:  "Well, I did work.  I just can't remember 10 years from the work exactly what the work was."[1913]

### 4.   Denton's Explanation of His April 7, 1986 Phone Conversation with Mrs. Clinton

#### a.   The Billing Records and Denton's Testimony

The billing records showed that Mrs. Clinton billed Madison Guaranty for an April 7, 1986 telephone conversation with Don Denton.[1914]  That was the day that Madison Guaranty and Ward executed the second set of "cross notes" that deceived the federal examiners about Ward's compensation.[1915]  Mrs. Clinton's time was billed to the IDC matter.[1916]  In her 1996 RTC

---

[1913]  Id. at 43.  In Mrs. Clinton's FDIC interview on November 10, 1994, she was questioned about one of the few IDC bills investigators then had.  Mrs. Clinton said she did not remember the IDC matter, but presumed her name was listed on the bill as billing partner.  H. Clinton 11/10/94 FDIC Int. at 3.  The investigators asked Mrs. Clinton to give her answers under oath, which she declined.  Id. at 1.  The FDIC also asked Mrs. Clinton about a January 23, 1986 memo from Rick Donovan to her about the wet/dry township issue, and she said the matter was handled by Rick Donovan. H. Clinton 11/10/94 FDIC Int. at 3-4.

[1914]  Rose Law Firm Billing Records (May 13, 1986) (Doc. No. DEK015030).

[1915]  Denton 8/20/96 GJ at 64-65; Ward $300,000 "loan" to Madison Financial (Apr. 7, 1986) (Doc. No. 56-00126454); Ward $70,943.47 "loan" to Madison Financial (Apr. 7, 1986) (Doc. No. 396-00000525); Clark 7/26/97 Int. at 3-4; FDIC-OIG Supplemental Report on Rose Law Firm Conflicts of Interest, WA-94-0016 at ii-iii (Sept. 20, 1996).  In summary, on March 31, 1986, Ward was paid $400,00 by Madison Guaranty as compensation for Ward's role as straw man in the IDC purchase.  To conceal the true nature of the transaction from the examiners who were then auditing Madison Guaranty, two cross notes were prepared: one note purported to evidence a loan from Ward to Madison Financial for $400,000; the other purported to evidence a loan of $400,000 from Madison Guaranty to Ward.  On April 7, 1986, the cross loans were replaced with new notes.  The $400,000 loan note from Ward to Madison Financial was replaced with separate notes for $300,000 and $70,943.47.  The $300,000 note corresponded to the

474

136

interview, when asked what she knew of the cross notes, Mrs. Clinton testified: "I don't recall knowing anything about these loans."[1917] Don Denton said he received a telephone message on April 7, 1986, from Sandra Moody, Hillary Clinton's secretary, asking him to call Mrs. Clinton.[1918] Denton returned the call and spoke with Mrs. Clinton about Ward's loan to Madison Financial. On April 7, 1986, Mrs. Clinton billed the IDC matter for a telephone conference with Denton.[1919] Denton later said he vaguely remembered that Mrs. Clinton was preparing the note from Ward to Madison Financial and that she was calling for Hubbell.[1920] Denton said he told her the note had already been prepared and executed.[1921] Denton said Mrs. Clinton asked him to send her a copy of the note, or both notes, for her review.[1922] Denton said they may also have discussed Ward's cross loans -- the $300,000.00 and $70,000.00 loans to Madison Financial -- that replaced the $400,000.00 loan.[1923] Denton said he told Mrs. Clinton "there could be a problem with the notes as they constituted in effect a parent entity fulfilling the obligation of a

---

amount of Ward's supposed "commissions" -- his compensation for being straw man on the transaction -- and the $70,943.47 corresponded to the amount that remained outstanding from Ward's initial purchase of IDC.

[1916] Rose Law Firm Billing Records (Mar. 28, 1986) (Doc. No. DEK015022).

[1917] H. Clinton 2/14/96 FDIC Int. at 81.

[1918] Telephone message slip to Don Denton from Sandra Moody (Apr. 7, 1986) (Doc. No. DD00000241).

[1919] Rose Law Firm Billing Records (entry for Apr. 7, 1986) (Doc. No. DEK015030) (reflects 0.2 hours billed by Mrs. Clinton for "Telephone conference with Don Denton").

[1920] Denton 6/20/96 Int. at 5-6.

[1921] Denton 8/20/96 GJ at 64.

[1922] Id.

[1923] Id. at 65-66.

subsidiary." He said she "summarily dismissed" his concern in a way he understood meant that she wanted him to manage savings and loan matters, and leave legal matters to her.[1924]

Denton described their conversation as follows:

Q.   Tell the ladies and gentlemen of the grand jury what happened when you called Sandra in Hillary Clinton's office back.

A.   I returned the call and was immediately connected with Hillary Clinton. We exchanged a couple of hellos, how are you, The conversation was very short. I was told that she was working on a transaction involving Seth Ward and Madison Financial, and that she was . . . [seeking] information so she could document the obligation that Madison owed Seth. In other words, the $400,000 obligation. She understood that Seth had been loaned the 400 by Madison Guaranty Savings & Loan. And she was working on a transaction that would document Madison Financial's obligation to pay Seth his commissions, Seth Ward his commissions.

Q.   What type of document was she talking about?

A.   She was talking about a promissory note.

Q.   So what was your response to what she was saying?

A.   I cautioned her that the Madison Financial obligation was not a direct set-off or direct tie to Madison Guaranty's loan. I pointed out that Madison Guaranty had loaned Seth the money, but Seth was owed money by Madison Financial Corporation. She rather summarily dismissed my concerns and indicated that she'd take care of the lawyering.

Q.   What happened after that?

A.   I informed her that the $400,000 note from Madison Financial -- excuse me -- from Madison Financial to Seth had already been prepared. And she asked that we supply a copy of that note, which I did. I had an employee of Madison deliver that note.

Q.   To whom?

_____

[1924] Id. at 64.

476

138

A.      To the Rose Law Firm.

Q.      And then also the note that you had prepared, was it the first note on April -- pardon me -- on March 31st, or was it a note drafted on that day, April 7th?

A.      I don't recall which it would have been.  It was -- as I recall, it was the $400,000 note.  I'll note now that the replacement notes were also dated April 7th, so I don't recall specifically which ones were delivered.

. . . .

So I think on April 7th, two notes were replaced, the 300 plus the 70, to take care of the remaining $300,000 balance on the original note plus the $70,000 note.  And it more clearly identified them.  Rather than a total note for 400, it broke it down into two notes, with those specific amounts, the 300 and the 70,000 note.

Q.      Did you and Mrs. Clinton discuss that in your telephone call on April 7th?

A.      I don't recall whether we did or not.

Q.      Your memory is you just discussed the $400,000 note?

A.      That was the reason of her inquiry.  I may or may not have informed her that the 300 plus the 70 had already been done.  I just don't recall now.
. . . .

Q.      Who did you believe was Mr. Ward's attorney at that time?

A.      Webb Hubbell.

Q.      Who did you think that she represented at the time you received the phone call from her on April 7th?

A.      Seth Ward.[1925]

Denton did not remember this conversation until after the billing records had been found.

---

[1925] Id. at 63-67.

Prior to that time, Denton had said he remembered no conversations with Mrs. Clinton.[1926]  Mrs. Clinton's counsel, in his letter transmitting her affidavit to the Senate, criticized Denton's "sudden recollection of a twelve-minute phone call with Mrs. Clinton over ten years ago" rendering, he claimed, the memory "wholly unreliable."[1927]

### b.   Mrs. Clinton's Recollection of the Denton Conversation.

Mrs. Clinton addressed the Denton conversation through her attorney in a June 17, 1996 letter to the Senate Whitewater Special Committee after her attorney produced the billing records.  That letter said she thought the April 7 phone conversation related to another Madison Guaranty matter -- the Babcock matter.[1928]  The letter said the April 7 telephone conference was about Babcock because notes underneath the telephone message slip produced by Denton to the Senate were about Babcock.[1929]  Mrs. Clinton billed the Babcock file for 1.5 hours on April 9, 1986 for a conference with Don Denton.[1930]

In 1998, Mrs. Clinton testified about the Denton phone call:

Q.      . . . .  If you look at the record on page DEK015030, and I've actually marked this page separately, let me hand you this document.  There is an entry on the billing records on 4/7/86 for a telephone conference with Don Denton.  Can you tell us what that's about?

---

[1926]  Id. at 66.

[1927]  Letter from David Kendall, the Clintons' personal attorney, to the Senate Whitewater Special Committee at 2 (June 17, 1996).

[1928]  Id. at 4-5 (June 17, 1996).  The Babcock matter was a collections/loan workout -- unrelated to IDC -- that Mrs. Clinton worked on for Madison Guaranty with Don Denton's help.

[1929]  Id.

[1930]  Rose Law Firm Billing Records (May 13, 1986) (Doc. No. DEK015036).

478

A.   No, I can't.  From looking at the billing records, it merely states telephone conference with Don Denton.  I believe that it had to do with a matter referred to as Babcock in the billing records.

Q.   Would you agree that it's listed under the matter IDC?

A.   I would agree with that.

. . . .

Q.   Now, Mrs. Clinton . . . Mr. Denton has stated that on this call, that there was a phone message from you to him on that day and that you and he discussed certain loan documents flowing from Madison Financial to Seth Ward, and then a loan going back from Seth Ward to Madison.  Did you do that?

A.   I do not believe that happened in a 12-minute telephone conference on April the 7th, 1986.

Q.   Your counsel has publicly stated -- I don't know if he put this in any kind of written form, I think he did, I think I read that at some point -- perhaps to the Senate, that he believes that Mr. Denton was not truthful about that; in fact, that there was a message slip that Mr. Denton had but that it was laid on top of some Babcock documents.

Do you recall, did you participate in that response?

A.   I certainly approved of that response that my attorney sent, I think, to the Senate committee.

Q.   And is it your position that the message slip that he had was actually a copy and it was shown that it was on top of the Babcock documents, and therefore reinforced a belief that maybe he wasn't telling it like it was?

A.   Well, I don't want to draw any conclusions.  I can only say that based on the billing records, and based on the information I have seen, if you look at the 4/7/86 entry, which is the 12-minute telephone conference, and yes it was billed to IDC, but I don't think that was correct, because it was followed two days later by an hour and a half conference with Mr. Denton concerning the loan participations that Savers Savings and Loan had that Madison was interested in resolving.  And then all of the time on Babcock concerns those loans and Mr. Denton is one of the people that I spoke with

479

141

and had conferences with.

So, I believe, based on the evidence that I see and the fact that Mr. Denton was involved in this Babcock matter, that that is what that first telephone conference also pertained to.

Q.    Why wasn't it billed to number four, General, or some other matter?

A.    That's a good question, Mr. Ewing, and as I've looked at these billing records carefully, over the last days, there are a lot of questions I have about that.  There are a number of errors, and I attribute it to secretarial, clerical, accounting errors.  But I think that's where the telephone conference with Mr. Denton rightly belongs.[1931]

### c.    Other Evidence of Mrs. Clinton's Degree of Involvement with the IDC Transaction and Ward Loans.

One other document arguably shows Mrs. Clinton's knowledge of Ward's cross-loan agreement with Madison and his interest in Castle Grande - a page of notes written by Rick Donovan when he was first assigned the wet/dry research project by Mrs. Clinton.[1932]  The notes, however, are subject to more than one interpretation.  The undated notes list two research projects Mrs. Clinton assigned to him - an unrelated project on a writ of garnishment and:

2.    Seth Ward

property purchased in Big Rock Township

ABC says Union Township & that is dry . . .[1933]

The notes go on to discuss the project and how Donovan would decide what property was wet or

---

[1931]  H. Clinton 4/25/98 Depo. at 125-27.

[1932]  Donovan 12/6/95 GJ at 6-7.

[1933]  Donovan's handwritten notes (undated) (Doc. No. 105-00003697).

480

142

dry south of the Arkansas River.[1934]

The phrase "property purchased" could modify the heading "Seth Ward" -- in which case the notes would confirm that Mrs. Clinton knew Ward owned some of the property.  Another interpretation, though, is that "Seth Ward" refers generally to the source of Mrs. Clinton's information and her contact at Madison, perhaps to let Donovan know who to contact if he needed more information to complete his legal research.

### 5.    Mrs. Clinton's Statements about the May 1, 1986 Option Agreement.

#### a.    Background.

The FDIC concluded that the May 1, 1986 option agreement between Madison Financial and Seth Ward was intended by Ward and other insiders to deceive the examiners about the true nature of Ward's compensation, and that it accomplished its intended effect.[1935]  Investigators were particularly interested in evidence related to the option when the billing records showed that Mrs. Clinton billed Madison Guaranty for preparing the option.[1936]  On May 1, 1986, Mrs. Clinton billed Madison Guaranty on the IDC matter two hours for:

> conference with Seth Ward; telephone conference with Seth Ward; telephone conference with Mike Schaufele; prepare option.[1937]

Mrs. Clinton testified that it was not unusual for Ward to stop by Rose demanding legal

---

[1934] Id.

[1935] FDIC Supplemental Report at V.

[1936] Id. at IV.

[1937] Rose Law Firm Billing Records (May 13, 1986) (Doc. No. DEK015032).

481

143

work immediately.[1938]  It appears that after April 29 (Tuesday), when one of the federal examiners followed up on the option agreement that Denton had told the examiner was being prepared,[1939] Ward went to Rose Law Firm in person on May 1, 1986 (Thursday).  This is corroborated by Mrs. Clinton's two distinct billing references:  one for a "conference with Seth Ward," and the other for a "telephone conference with Seth Ward"[1940] -- the more explicit "telephone" reference in the second entry implying that the "conference" reflected in the first entry was in person.

Hubbell was out of town in an unrelated trial.[1941]  Ward may have asked Mrs. Clinton to draft the option simply because Hubbell was gone.  Billing records show that Mrs. Clinton may have drafted the option after making phone calls to both Ward and his accountant, Mike Schaufele.[1942]  The option was signed and notarized on May 5, 1986.[1943]  The option contained Mrs. Clinton's Rose word processing code.[1944]

---

[1938] H. Clinton 2/14/96 FDIC Int. at 13.

[1939] Denton 3/19/98 GJ at 21.

[1940] Rose Law Firm Billing Records (May 13, 1986) (Doc. No. DEK015032).

[1941] Tucker 3/18/98 GJ at 187.

[1942] Ward 1/17/96 GJ at 31-32.  Schaufele later testified that he did not remember his conversation with Mrs. Clinton but thought that the only topic he would have discussed with her was Ward's tax liability.  See Schaufele 1/30/96 GJ at 27-29.  Ward testified that he has no recollection of any conversation with Mrs. Clinton.  Ward 1/17/96 GJ at 82-83.

[1943] Option to Purchase Real Estate Agreement Version #1 (May 1986) (Doc. Nos. 99-00043196 through 43201); Option to Purchase Real Estate Agreement, Version #2 (May 1986) (Doc. Nos. 99-00043202 through 43208).

[1944] See Option to Purchase Real Estate (May 5, 1986) (Doc. No. 99-0043197).  In the bottom-right corner is the code "0190g," Mrs. Clinton's word processing code.

482

Denton gave a copy of the option to examiner Darlene Ford on May 7, 1986.[1945]  Ford

reviewed the legal description of the property and noticed it was wrong.[1946]  The option did not

refer to Holman Acres, but to property already purchased by Davis Fitzhugh on February 28,

1986.[1947]  Ford pointed out the error to Denton, who had the first two pages re-typed to describe

Holman Acres as the subject property.[1948]

This Office could not identify the source of the incorrect legal description.  Rose files that

might have shown how the error occurred were destroyed at Mrs. Clinton's direction in 1988, one

of which was titled "Ward Option."[1949]

### b.      Mrs. Clinton's Statements.

Mrs. Clinton was first questioned about the option agreement on December 21, 1995,

when the RTC sent her supplemental interrogatories.[1950]  The RTC learned on December 21 that

--------------------------------------------------

[1945]  Copy of option with Ford's handwritten notes (May 1, 1986) (Doc. No. 99-00043196).

[1946]  Ford 7/29/96 Int. at 3.

[1947]  This same property description appears on an attachment to a release deed given to Seth Ward by Madison Guaranty dated December 30, 1985.  Martha Patton, Webb Hubbell's secretary at the Rose Law Firm, said she typed the attachment.  Patton 9/25/96 Int. at 2.

[1948]  Ford's notes on her copy of the option she received from Denton state: "Talked to Don Denton.  He said that this land description goes with the Fitzhugh mortgage property and that this description is in error.  He said it should be the property known as Tract 27 and 28 of Holman Acres on which Ward [unintelligible]." Copy of Option with Ford's Handwritten Notes (May 1, 1986) (Doc. No. 99-00043196); see also Ford 7/29/96 Int.; Clark 7/26/96 Int.  Denton had the first two pages of the incorrect option re-typed.  Denton 6/26/96 Int. at 7.  Denton's corrected version is referenced as Doc. No. 99-00043202.

[1949]  Memo from Mary Russell, secretary to Mrs. Clinton, to Mrs. Clinton (July 21, 1988) with attached list of files destroyed (Doc. No. FDICHRC 0163).

[1950]  H. Clinton 1/20/96 RTC Interrog. Resp. at 2-3.

483

145

the Rose word processor identification code on the document ("190g") was hers.[1951]  Mrs. Clinton

answered the December 21, 1995 interrogatories on January 20, 1996, using information

contained in the recently produced billing records.  The interrogatories asked sixteen questions

about the option agreement, thirteen of which Mrs. Clinton responded to in one omnibus

response:

> I have reviewed document SW1-070 through SW1-074 (which appears to be an
> option agreement dated May 1, 1986, on a 6.6667 acre parcel of land in Pulaski
> County, Arkansas) and document SW1-063 through SW1-068 (which appears to
> be an option agreement dated May 1, 1986, on land described as "[p]art of Tracts
> 27 & 28, Holman Acres, Pulaski County, Arkansas").  I have no recollection of
> these documents or the transactions they reflect.  I do not recall what my word
> processing code was in 1986.  My time records reflect the following entry for May
> 1, 1986, representing two hours of work done for Madison Guaranty on the
> "General" account: "Conference with Seth Ward; telephone conference with Seth
> Ward concerning option; telephone conference with Mike Schauffler [sic];
> prepare option."  I know that Mike Schaufele is a CPA at L. Cotton Thomas &
> Company, and I believe he was Mr. Ward's CPA at one time.  Based upon the
> May 1, 1986, entry in my time records, I believe that I did some work on these
> documents.  The client was Madison Guaranty or Madison Financial, not Seth
> Ward.  I have no recollection of what this work was, who originally prepared the
> option documents, how many pages of the documents were typed at the Rose Law
> Firm, what the circumstances were which led to the drafting of these options, or
> whether either of the options was ever exercised.  I was in the litigation section of
> the Rose Law Firm.  Although I have no specific recollection of this matter, I do
> not believe I would have drafted such real estate documents from scratch,
> particularly in a two-hour period that also contained phone calls and conferences.
> I have no recollection of who may have asked me to prepare these documents, or,
> in particular, if Messrs. McDougal, Latham, Ward, or Hubbell asked me to
> prepare or work on these documents, although it is possible that one or more of
> them did so.  I have no recollection of discussing these documents prior to March
> 11, 1991, although I believe, based upon my time records, that I probably did in
> 1986 when the documents were apparently prepared.  I do not know what

---

[1951] Pillsbury Madison & Sutro LLP, A Supplemental Report on the Representation of
Madison Guaranty Savings & Loan by the Rose Law Firm:  Prepared for Federal Deposit
Insurance Corporation 125, n.308 (Feb. 25, 1996).

relationship there is, if any, between these two option agreements.[1952]

In her February 14, 1996 FDIC interview, Mrs. Clinton was asked about the option

agreement:

Q.    Let's talk for a minute about the option that was drafted on May 1, 1986 . . . . Now, the billing records and the word processing codes indicate that you have something to do with the drafting of this option.  But you're a litigator, as you've told us.  Had you had occasion before this to draft options for real estate purposes?

A.    No.  That was not part of my practice, and I have no recollection of doing this.  I can only go by what the billing records describe.  And I think it's unlikely that I would have drafted this option from scratch, that I would have had [a] conversation with Mr. Ward and Mr. Schaufele and a conference with Mr. Ward all within a two-hour period.

Q.    Mr. Hubbell suggested in testimony that the Rose Firm maintained form files that were available to people when they were drafting various kinds of legal documents and at least made the suggestion that this was something he or others might have used for a purpose like this. In your practice, would you on occasion, use these form files when you had to draft documents with which you were unfamiliar?

A.    I might have on occasion.  I don't have any recollection of having done it in this instance.  I don't know what had already been prepared.  I don't have any recollection of the two hours at all, other than what the time records say.

Q.    Mr. Donovan, in his testimony, said rather colorfully, for him, would have regarded drafting an option as malpractice waiting to happen.  And I wonder, is what you're saying that this is not something you would have been comfortable doing on your own?  You would have involved somebody else?

A.    I have no recollection of what occurred, Mr. Ericson.  It's also possible that since only two hours were recorded, that Mr. Ward had something that had already been prepared by somebody else and wanted my secretary to make

_____

[1952] H. Clinton 1/20/96 RTC Interrog. Resp. No. 33.

485

147

some changes on it.  That was not uncommon for Mr. Ward, and I would have talked to him about it and maybe he needed some piece of information from Mr. Schaufele.  I'm totally speculating now, but Mr. Ward often walked around our firm asking our people to help out on certain legal matters that were pressing, so far as he was concerned, and insofar as we were able we tried to accommodate him.

Q.      Do you have any recollection of ever talking to Mr. Schaufele about the IDC property or Mr. Ward's work with respect to it?

A.      I have no recollection.  All I can point to is the billing record that reflects a telephone conference with Mr. Schaufele.[1953]

Mrs. Clinton testified on the same subject at her 1998 deposition:

Q.      Mrs. Clinton, we -- the bank examiners were in the bank during this time.  There is evidence that there were these cross loans where Mr. Ward was advanced monies by Madison, but to cover the obligation, he then on paper loans money back to Madison, but it was not funded.  That later, on May 1st, '86, there was an option agreement put in place of this document.

Now, we know now that you apparently drafted the option agreement that took the place of this document here.

A.      I don't believe I drafted the option agreement, Mr. Ewing.

Q.      But you billed for it?

A.      It, it was billed for.  That is correct, along with several other activities in a two-hour period on May the 1st.

Q.      Did you actually bill the client and list on the records of your law firm, draft option agreement?

A.      Draft option agreement is what it says, that's right.  But I do not believe I drafted that option agreement from scratch.  That would not be something I would do.[1954]

---

[1953]  H. Clinton 2/14/96 FDIC Int. at 83-85.

[1954]  H. Clinton 4/25/98 Depo. at 129.

486

148

### 6.      Mrs. Clinton's Work for Ward.

The May 1 billing entry raised the issue of whom Mrs. Clinton represented in that

transaction.  The option agreement was between Ward and Madison Guaranty, and Mrs. Clinton's

billing entry showed she consulted only with Ward and Ward's personal accountant, Schaufele.

Investigators questioned whether Mrs. Clinton had breached legal conflict rules by representing

both sides of the option transaction.  Mrs. Clinton denied representing Ward in his individual

capacity.  In her 1996 answers to the RTC interrogatories, Mrs. Clinton said:

> To the best of my recollection, I don't believe that I have performed legal services
> for Seth Ward individually, although I did confer with him on certain matters, as
> described more fully herein, when he was working for Madison Financial
> Corporation, a wholly owned subsidiary of Madison Guaranty Savings & Loan.[1955]

In her 1996 FDIC interview, Mrs. Clinton addressed the potential conflict of interest.  She

said:

> Q.      The option is an agreement between Mr. Ward on the one hand and
> Madison Financial on the other, so there are two parties to it.  Yet, the
> time records indicate you talked to Mr. Ward.  They indicate you talked to
> Mr. Schaufele, who is Mr. Ward's accountant.  They don't indicate you
> talking to anyone other than Mr. Ward associated with Madison.
> In a matter such as this, where you're drafting something, an agreement --
> strike that.  Let me put it this way.  Your client was Madison, not Ward;
> right, and this is an agreement between Madison and Ward, yet so far as
> the billing records indicate, you talked only to Ward and to Ward's
> accountant.  Do you think you would have talked to someone at Madison
> to ascertain whether this is what they wanted to do?
>
> A.      Well, in most of my dealings in the last months preceding this on behalf of
> Madison, I dealt with Mr. Ward.  He was the person I dealt with on the
> brewery issue.  He was the person that we dealt with on the utility issue.

---

[1955] H. Clinton 1/20/96 RTC Interrog. Resp. at No. 32.

487

149

He was Madison so far as I was concerned.

Q. You dealt virtually exclusively with him as opposed to Latham or McDougal?

A. In the late 1985, 1986 period, that's correct.

Q. What I'm getting at is, what distinguishes this in my mind from that representation, here you have at least the possibility -- feel free to disagree with me -- of a conflict and yet this is a transaction between Ward and Madison. It's not Ward simply acting as agent of Madison, but you didn't speak to anyone at Madison?

A. I may have. I don't recollect that, and the time records don't reflect that, but I can't tell you, sitting here today, I did not speak to anyone at Madison.[1956]

Mrs. Clinton was also asked whether she in fact represented Ward as an individual, and she responded: "I do not recall thinking anyone was the client other than Madison Guaranty."[1957]

Webb Hubbell, Ward's usual Rose attorney, testified he understood Mrs. Clinton was representing both Madison Guaranty and Seth Ward on the option:

Mr. Chertoff. Can you help us to understand why it was Mr. Ward would have gone to Mrs. Clinton to help him draft an option rather than to you?

Mr. Hubbell. She was representing Madison.

Mr. Chertoff. Who was representing Ward with respect to the option?

Mr. Hubbell. Mrs. Clinton.

Mr. Chertoff. So Mrs. Clinton was representing both Madison and Ward?

---

[1956] H. Clinton 2/14/96 FDIC Int. at 85-87.

[1957] Id. at 48-49.

488

150

Mr. Hubbell.          That's my understanding.[1958]

### 7.      Analysis of Mrs. Clinton's Work on Castle Grande/IDC.

Substantial evidence supported the conclusion that Hillary Rodham Clinton did more than an insubstantial amount of legal work on the IDC matter for Madison Guaranty.  Significant evidence also supported the conclusion that Mrs. Clinton's testimony about that work was incomplete and factually inaccurate.  Nonetheless, insufficient evidence exists to prove beyond a reasonable doubt that Mrs. Clinton's inaccurate statements and testimony were knowingly false, and therefore given with the requisite criminal intent.

**Lack of Memory** -- This Office examined Mrs. Clinton's initial claim that she did not remember working on the IDC matter.  This Office concluded that certain evidence contradicted Mrs. Clinton's claim.

The billing records showed that Mrs. Clinton did more work on the IDC matter than on any other Madison Guaranty matter.  There is also evidence that Mrs. Clinton reviewed the billing records in 1992 showing this work.  Her fingerprints were on a copy of the billing records produced in 1996,[1959] and she later agreed that if she touched them it was in 1992 rather than 1994 or 1995.[1960]

When Mrs. Clinton said in 1995 that she could not remember what IDC was because the work had been done 10 years previously, it had only been three years since she reviewed the

---

[1958]  Senate Whitewater Comm. Hearing, <u>supra</u> note 147, at 7 (Feb. 7, 1996) (testimony of W. Hubbell).

[1959]  Federal Bureau of Investigation, Laboratory Report at 3 (Mar. 21, 1996).

489

151

billing records recording that work.  In 1994, when she told the FDIC investigators that she thought her name was on the IDC bill only as the billing partner, it had been two years since she had reviewed the billing records showing her work.  Nevertheless, this circumstantial evidence was, in the Independent Counsel's judgment, insufficient to obtain and sustain a conviction.

The billing records provided significant documentary evidence about Mrs. Clinton's connection to Seth Ward.  The records showed that at several times when Seth Ward was engaged in irregular activities, Mrs. Clinton was billing for legal services performed for Ward and Madison Guaranty.  For example, on April 7, 1986, when Don Denton and Seth Ward were executing the cross notes to conceal Ward's compensation from the regulators examining Madison Guaranty, Mrs. Clinton billed Madison Guaranty on the same IDC matter for a telephone conference with Denton.  Mrs. Clinton was also personally involved in preparing the May 1, 1986 option agreement used by Ward and Denton to deceive the federal examiners.  On February 28, 1986, a day that numerous fraudulent transactions were conducted on the eve of the federal examination,[1961] Mrs. Clinton billed Madison Guaranty for three-quarters of an hour for "Seth Ward."[1962]

Mrs. Clinton had three motives to minimize her role in the IDC/Castle Grande transactions:  First, there was the potential for political embarrassment because the press was closely scrutinizing the work she did for a corrupt thrift, some of which involved representing the

---

[1960]   H. Clinton 4/25/98 Depo. at 126.

[1961]   Denton 8/20/96 GJ at 48-50.

[1962]   Rose Law Firm Billing Records (Mar. 28, 1996) (Doc. No. DEK015022).

490

152

thrift before state agencies regulated under her husband's authority as Governor.  Second, there

was the potential for legal action by the FDIC and RTC against Rose for negligently facilitating

transactions that caused substantial losses to the institution.  Third, there was the possibility of

criminal liability resulting from frauds perpetrated by insiders and others associated with

Madison Guaranty.

As set forth in Chapter 2 of this Part, many events had happened following Mrs. Clinton's

termination of Madison as a client -- any of which, in this Office's judgment, could have

refreshed her recollection.  By 1990, for example, Mrs. Clinton must have known that John

Latham had pleaded guilty to criminal fraud in a Castle Grande transaction, and Jim McDougal

and Jim and David Henley had been indicted and acquitted on Castle Grande transactions.

Most significantly, in 1992, Mrs. Clinton's work for Madison Guaranty became a

campaign issue.  Mrs. Clinton, Webb Hubbell, and Vincent Foster focused significant attention

on the matter at that time.  Of particular significance is that Hubbell reviewed the billing records

during the campaign and discussed with Mrs. Clinton her numerous conferences with Seth

Ward.[1963]  Mrs. Clinton's fingerprints were found on the billing records produced from the White

House in 1996.  Mrs. Clinton explained her fingerprints on the records by testifying that she may

have looked at the records during the 1992 campaign, but not later when they had been

subpoenaed.[1964]

Balanced against this circumstantial evidence, however, is Mrs. Clinton's denial of any

---

[1963]  Hubbell 12/19/95 GJ at 177-78.

[1964]  H. Clinton 1/26/96 GJ at 28.

491

153

recollection.  As Mrs. Clinton frequently said, the length of time since her work for Madison

Guaranty was substantial, almost 8 years.  That passage of time could support a reasonable

inference that Mrs. Clinton could not remember what work she had done.  There is no direct

evidence to contradict Mrs. Clinton's claimed lack of memory.

The circumstantial evidence about Mrs. Clinton's lack of memory was inconclusive and,

therefore, insufficient to refute Mrs. Clinton's claimed lack of memory.  Considering the totality

of the evidence, it is the judgment of the Independent Counsel that Mrs. Clinton's statements and

testimony that she did not remember working on the IDC/Castle Grande transaction could not be

proven deliberately false beyond a reasonable doubt.

**April 7, 1986 Phone Call With Denton** -- This Office examined whether Mrs. Clinton

played any role in the creation of the Ward "cross notes" or concealed that role from federal

investigators.

It is indisputable that, on April 7, 1986, Mrs. Clinton had a telephone conversation with

Don Denton of Madison Guaranty.  Documentary evidence, in the form of a telephone message

slip and Mrs. Clinton's billing records, provided contemporaneous corroboration that the

telephone conversation occurred.  It is equally indisputable that on April 7, 1986, Madison

Guaranty and Ward executed two "cross notes" on Ward's "commissions" from the IDC/Castle

Grande transaction.  It is indisputable that Mrs. Clinton billed her telephone conference with

Denton to the IDC matter in the Rose billing system.  Significant evidence corroborated Denton's

claim that he and Mrs. Clinton discussed the Ward cross notes during the April 7 conversation.

Mrs. Clinton's contrary explanation -- that their conversation was about Babcock and not

492

154

the IDC matter -- is supported by less corroborative evidence.  There is also a substantial basis to challenge Denton's recollection of the conversation.  Denton offered a detailed recollection, but Denton was not an unbiased witness and his detailed recollection was not disclosed when he was first questioned on the subject.  The delay in recounting this conversation leaves his credibility subject to challenge.  And, of course, the only other participant in the conversation, Mrs. Clinton, denied Denton's version of events.

Thus, the testimony of a single witness whose credibility is subject to impeachment provided insufficient evidence to prove that Mrs. Clinton falsely denied that she had done work on the Ward cross notes.

**May 1, 1986 Option** -- This Office examined Mrs. Clinton's role in the drafting of the May 1, 1986 option agreement.  It is indisputable that Mrs. Clinton played a role in drafting the option agreement -- she billed for doing so, and the option agreement bears her word processing code.

However, the evidence was equally clear in supporting Mrs. Clinton's statement that she did not draft the option agreement from scratch.  As a litigator, Mrs. Clinton had little or no experience in real estate matters, and the option prepared by Mrs. Clinton erroneously described the property being optioned.  Thus, Hubbell's suggestion that Mrs. Clinton may have used Rose's form files in an effort to be responsive to Seth Ward seemed plausible.

Given that the evidence supports the conclusion that Mrs. Clinton worked on the option matter for two hours as an apparent accommodation to Ward and/or Hubbell, no basis exists to contradict Mrs. Clinton's claim that, when she prepared the option, she did not know the use to

493

155

which it would be put.  In particular, there is no direct evidence that Mrs. Clinton knew the option would be used to deceive federal regulators.  Though there is some circumstantial evidence to negate Mrs. Clinton's subsequent claim that she did not remember the option agreement, that evidence (as with other evidence of lack of recollection) is insufficient to sustain a prosecution.

**Representing Seth Ward** -- The RTC and FDIC examined whether Mrs. Clinton's work on the May 1, 1986 option agreement constituted a conflict of interest.  This Office examined whether Mrs. Clinton may have tried to conceal such a conflict from those agencies or other federal investigators.  On its face, the May 1, 1986 option agreement was a transaction between Ward and Madison Financial -- the subsidiary of Mrs. Clinton's client, Madison Guaranty.  Though Schaufele testified he had no memory of speaking with Mrs. Clinton about the option, he noted that the only subject he thought that he could have discussed would have been the tax implications of the option for his client, Ward.[1965]  Such a conversation would support the conclusion that Mrs. Clinton was working for Ward in his individual capacity when she drafted the option, and Hubbell stated that he understood that this was so and that he understood that Mrs. Clinton had represented both sides in the transaction.

Mrs. Clinton, however, denied that she represented Ward in his individual capacity.  This denial is corroborated by the documenting record -- her work on the option was billed to Madison Guaranty, not Seth Ward, and Madison Guaranty paid the bill.

In sum, given insufficient evidence, this Office determined that no prosecution was

494

156

appropriate for any of the statements made by Mrs. Clinton about her work on the IDC/Castle Grande transaction.

## III.  SUMMARY CONCLUSION

The foregoing Chapters have summarized the evidence about the interaction between Rose, Madison Guaranty Savings & Loan, Hillary Rodham Clinton, Jim McDougal, Webb Hubbell, and Seth Ward.  The evidence, as already noted, establishes indisputably that Jim McDougal and other Madison Guaranty insiders engaged in criminally fraudulent conduct through the operation of the institution.  The evidence also establishes that Mrs. Clinton's representation of Madison involved legal work that, ultimately, was used by McDougal and others to conceal unlawful activity.

In the end, however, the Independent Counsel concluded that there was no substantial evidence to support the conclusion that Mrs. Clinton was a knowing participant in the criminal conduct of McDougal or others.  The Independent Counsel also concluded that there was insufficient evidence to prove that any of Mrs. Clinton's subsequent statements about her representation (including her statements to the effect that she did not remember the details of that representation) were knowingly false.  Though in some instances her recollection proved to be factually inaccurate, the Independent Counsel ultimately determined that a trier of fact would not conclude, beyond a reasonable doubt, that Mrs. Clinton's recollection was knowingly false.  For this reason, prosecution of Mrs. Clinton regarding these allegations was declined, and the matter is now closed.

---

[1965]  Schaufele 1/30/96 GJ at 29.

# **EXHIBIT 3 (Part 1)**

to

Plaintiff's Response to Defendant's Statement of Material Facts
Not in Dispute and Statement of Undisputed Material Facts
in Support of Cross-Motion for Summary Judgment

**Memorandum**                                    Office of the Independent Counsel

To:          All OIC Attorneys                              Date: 4/22/98

From:        HRC Team

Subject:     Summary of Evidence ⬚
             Hillary Rodham Clinton and Webb Hubbell

This memorandum summarizes the evidence available to us which relates to the

⬚ Hillary Clinton and Webster Lee Hubbell. Section I contains a

detailed summary of the evidence broken down into the following subsections:

     1)   Castle Grande
     2)   Other Facts Relating to RLF Work for MGSL
     3)   1987-1992: RLF Conflicts/Ward v. Madison/U.S. v. McDougal          FOIA(b)6
     4)   1992 Campaign                                                      FOIA(b)7 - (C)
     5)   Foster Documents
     6)   The White House and RTC Contacts
     7)   Billing Records
     8)   Support for Webb Hubbell

Section II contains a chronological background and contextual summary of the investigation so

that the facts relating to possible obstruction can be placed in the context of the ongoing

investigation by OIC.

⬚ should be read in conjunction with our

introduction/outline memorandum of April 10th which, for convenience, is also included.[1]

---

[1]  In almost all instances our summary of the evidence is derivative of and relies upon
other, earlier work done by OIC attorneys. In those instances, as we did in our earlier
memorandum of April 10th, we refer you to the underlying memorandum for additional
background and information, should you wish to delve further into the evidence. [You received a
binder with copies of significant portions of these memorandum on Monday, the 20th].

1

The memo also reflects our best assessment of some of the contrary evidence and theories likely to be presented by the defendants in the event an indictment is returned and a trial takes place, as well as evidentiary considerations.

We recognize the task set for all attorneys by this memorandum. As Tom Dawson has said: "The strength of this case is its weakness, and vice versa." In other words, this would be a mostly (though not exclusively) circumstantial case which gains strength through the repeated concatenation of events and circumstances. But detailing each and every one of those, and linking them together would be a difficult, indeed daunting, task -- as an introduction it might be suitable to first reread the April 10th memorandum.

We also note at the outset that other options exist which might do justice to the evidence presented. As you all know, the Dreiband/Heaton/Myers team have drafted

based upon a small subset of this evidence.

I. Evidence

---

[2] Because this memorandum has been prepared by the HRC team, you will notice some stylistic differences in the various sections. We see these as evidence of the collaborative nature of our endeavor.

2

FOIA(b)6
FOIA(b)7 - (C)

160

Case 1:15-cv-01740-RBW   Document 12-3   Filed 03/11/16   Page 4 of 41
USCA Case #16-5366    Document #1668146        Filed: 03/28/2017   FOIA Page 164 of 421

FOIA(b)7 - (C)



The case would be the story of how

that happened. Here is a summary of the evidence developed by the investigation:

*1) Castle Grande* -- [The facts relating to the Castle Grande transaction are detailed in

Section IV of Bittman & O'Brien, "Clinton Finance," June 1997.]

Can we say that crimes were committed in connection with the Castle Grande

transactions? Yes.

Castle Grande refers to a 1,050 acre development south of Little Rock, Arkansas which

was purchased by Madison Financial Corporation (MFC) and Seth Ward from the Industrial

Development Corporation (IDC) on October 4, 1985. The statement that "Castle Grande was a

crime" is true in several respects. First, the initial sale of the property to MFC and Ward was

accomplished in a fraudulent way that violated federal law governing savings and loans as well

as Arkansas State law. Second, subsequent transactions involving parcels of the property during

the development of Castle Grande involved inflated appraisals and fraudulent financing and have

themselves resulted in multiple investigations, indictments, and convictions.

**a.    The initial purchase of the property by Seth Ward and MFC violated federal
and Arkansas state law.**

Seth Ward and Jim McDougal negotiated an arrangement whereby Ward agreed to act as

3

a "straw purchaser"[3] and take title to a portion of the IDC property Madison wanted to acquire.
Ward took title to the property to get around the 6% direct investment limitation, imposed by
Arkansas law, which limited the amount of money Madison Guaranty Savings & Loan
("MGSL") could invest in the developments of the service corporation, Madison Financial
Corporation ("MFC").[4] Jim McDougal confirmed this as early as December 11, 1986, when he
told Jeff Gerrish of Borod & Huggins that:

> the reason that Seth Ward was brought in to purchase the property north of 145th
> Street was simply because of the service corporation limitations would have been
> exceeded if the service corporation had bought the entire property. [5]

The 6% investment limitation restricted the amounts MGSL could loan its affiliate MFC,
it did not limit the amount MGSL could loan to a private party such as Ward.[6] To avoid the 6%
limitation, McDougal and Ward agreed that Ward would take title to all of the IDC property
north of 145th Street as a nominee purchaser for MFC.[7] Ward and McDougal agreed that
MGSL would loan Ward the entire amount of the purchase price on a nonrecourse basis.

---

[3]      FOIA(b)3 - Rule 3(e), Federal Rules of Criminal Procedure

[4]      At the time federal law applicable to federally chartered savings and loans had a
3% direct investment limitation. States were allowed greater latitude in the regulation of their
own institutions.

[5]      J. McDougal Interview, 12/11/86, Madison Guaranty Savings & Loan Association
Special Counsel Investigative Report as of January 1, 1987, Report Date March 3, 1987, Section
XV, at 84 (hereinafter " Borod & Huggins Report, 1/1/87").

[6]      There are, however, limitations on the amounts of loans an institution may make
to insiders. As an employee of MFC, Ward was considered an insider.

[7]      Memorandum from Jim McDougal to Seth Ward, September 3, 1985 (396-
00001130).

4

Nonrecourse means that MGSL could look only to the property for repayment. In the event the loan went into default, Ward had no personal liability for a deficiency if the proceeds from the sale of the land were insufficient to pay off the loan.

Ward also agreed to grant MFC an option on the entire parcel he was purchasing.[8] In this way, MFC could purchase portions of Ward's property as it needed to sell them to third parties. Ward assumed absolutely no risk in the deal. He did not invest any of his own money. He was not required to make any down payment. MFC agreed to reimburse him for any additional taxes he may have to pay by virtue of his holding the property. MFC also agreed to handle all of the administrative duties associated with the property such as collecting rents, and the like.[9] In return for his role in the transactions, Ward was to receive approximately $300,000 in "commissions" on the subsequent sales of the property to third parties -- even if he had nothing to do with arranging the sales.[10]

It is these terms -- under which Ward received significant compensation, but assumed no risk or responsibility -- that have led to Ward being characterized as a "straw man" or "nominee" purchaser. This characterization is supported by the fact that he did not have to do anything to earn his "commissions" and he had none of the traditional indicia of ownership of the property --

----

[8]     Memo from Jim McDougal to Seth Ward, September 3, 1985, (396-00001130); Letter from Seth Ward to Jim McDougal, September 23, 1985; Letter from Seth Ward to Jim McDougal, September 24, 1985 (99-00035000-1); Letter from Seth Ward to Jim McDougal, September 24, 1985 ( 105-00007181-83).

[9]     Id.; Schaufele deposition (Ward v. Madison), 5/27/88, at 9; [                    ]

[10]    Id.

5

163

such as responsibility for taxes and collecting rents. Moreover, unlike most owners, Ward's only

source of compensation was his "commission" -- he did not benefit directly from any

appreciation in the value of the property.[11]

This conclusion has been reached by numerous investigative bodies. The examiners at

MGSL in 1986 criticized Castle Grande. The May 8, 1986 interim report stated:

> Ward apparently warehoused this land to reduce Madison Financial's investment
> and the attendant borrowing from Madison Guaranty. In this way, limitations on
> Madison Guaranty's investment in its service corporation are avoided. By using
> this circuitous route, additional Madison Guaranty investment in Madison
> financial was disguised as a loan to Ward.

The report prepared for the RTC by Pillsbury, Madison & Sutro was also critical of Castle

Grande.

In addition, the FDIC Inspector General, after a lengthy and quite thorough investigation,

concluded that Ward was a straw purchaser. In its Supplemental Report on Rose Law Firm

Conflicts of Interest dated September 20, 1996 the FDIC Office of Inspector General stated:

> However, entries in the billing materials and other evidence suggest that former Rose Law Firm
> partners Hillary Rodham Clinton and Webster L. Hubbell performed work that appears to have
> facilitated the payment of substantial commissions to **Ward, who acted as a straw buyer for**
> **Madison Financial in the IDC transaction**. Ward is Hubbell's father-in-law. **The method of**
> **payment of the commissions evaded regulations designed to protect the safety and**
> **soundness of the institution, and violated the integrity of its books and records**. Further,
> Madison Guaranty used a document drafted by Clinton to deceive Federal Bank examiners as to

---

[11]     Some have argued that Ward earned his commissions, at least in part, by playing a
critical role in putting together the IDC deal because of his relationship with Everett Tucker and
officials of IDC's lenders, such as Bob Wilson of Union National Bank, who was a close friend
of Ward's. Contemporaneous documents, however, indicate that IDC was under severe financial
pressure from its lenders, and that this was "widely known around town". IDC's attorney, Darrell
Dover, left the impression during his interview that IDC would have entertained any serious offer
on the IDC property and that the final selling price of $1.75M would have been accepted from
any qualified buyer. Dover 302, 7/18/96.

6

164

the true nature of the payments to Ward.[12]

b.    **Not only was the initial transaction illegal, but the subsequent payment of Ward's commissions was also illegal.**

Ward was paid his commissions through a series of loans involving MFC and MGSL. When Ward demanded his commissions be paid in March 1986, MFC did not have the cash on hand. In order to satisfy Ward, the savings and loan, MGSL, made a $300,000 loan to Ward. MFC signed a loan note the same day stating that it owed Ward $300,000. Ward's obligation to repay the MGSL loan was thus "set-off" against the corresponding note from MFC to Ward. This transaction was illegal because 1) it further violated the 6% rule because MGSL was putting another $300,000 into MFC (by virtue of it paying MFC's commission to Ward); and 2) MGSL's accounting records and the corporate records of MFC never properly reflected the loans and their purposes. Moreover, when the bank examiners who were at the institution in March 1986 questioned the loans, Madison officials deceived the examiners about the true nature of the loans and their connection to the payment of Ward's commissions.

c.    **Transactions at Castle Grande have been the subject of criminal investigations, indictments and convictions.**

Transactions related to the Castle Grande development have been the subject of several criminal investigations by the FBI, RTC, FDIC, and OIC. These investigations resulted in the first McDougal criminal trial in 1990, and the recent trial of Jim and Susan McDougal and Jim Guy Tucker ("825 trial"), which resulted in all three defendants being convicted of various charges related to fraudulent loans made during the course of the Castle Grande project.

---

[12]    FDIC Office of Inspector General Supplemental Report on Rose Law Firm Conflicts of Interest September 20, 1996 at ii-iii (emphasis added).

7

165

### 1.  First McDougal case

According to the official FBI file, Special Agent Gary Aaron received information from a confidential source on January 9, 1987, which alluded to insider transactions and land flips involving Jim McDougal, Senator William Fulbright, and Jim Guy Tucker.[13] The information alleged, among other things, that Jim Guy Tucker had received an insider loan from MGSL for the Castle Grande project.[14] Special Agent In-Charge Don Pettus notified the United States Attorney for the Eastern District of Arkansas, George Proctor, of the opening of the case on January 23, 1987.[15]    On March 19, 1987, The FBI received a criminal referral from MGSL employee Sarah Hawkins[16] which attached a copy of the investigative report prepared by Borod & Huggins.[17] Hawkins sent the identical information to the FHLBB. At an April 1987 meeting, which included personnel from the FHLBB, federal investigators determined that the focus of the investigation would be the Castle Grande and Maple Creek Farms projects.[18]

In October 1987, investigators further narrowed the focus of the investigation, deciding to concentrate on transactions related to Robert Palmer, David Hale, Dean Paul, and Davis

---

[13]    FBI Madison case file, 29A-2459, Serial 1.

[14]    Id. at Serial 7.

[15]    Id. at Serial 2.

[16]    Id. at Serials 9 and 10.

[17]    105-00071012. The bates number on this document indicated it was produced pursuant to a subpoena served upon the Rose Law Firm.

[18]    FBI Madison case file, 29A-2459, Serial 13.

8

NW: 15416 DocId: 70001585 Page 46

Fitzhugh.[19]  By August 18, 1988, the agents and AUSAs Stoll and Cherry decided to focus the investigation on, among other things: falsification of Madison records (alluding to the alteration of MGSL board minutes with John Latham as the potential target); David Hale's loans with MGSL which were allegedly obtained with false information; 1308 Main Street land flip involving Jim Guy Tucker; and Castle Grande, to include Davis Fitzhugh's purchase of the Levi Strauss building, Jim Guy Tucker's purchase of 34 acres, Fulbright's purchase of property, and the acquisition of Castle Sewer and Water by Tucker, R.D. Randolph, Palmer, Hale and Dean Paul.[20]

On November 14, 1989, Latham agreed to plead guilty to one count of false entry in violation of 18 U.S.C. § 1006 based upon his falsification of board of director minutes.[21]  He was eventually sentenced to 2 ½ years probation and ordered to pay $10,000 in restitution.  Jim McDougal was indicted on or about November 20, 1989, along with Jim and Bill Henley (Susan McDougal's brothers), based upon their conduct surrounding the sale of the Levi Strauss building at Castle Grande to Davis Fitzhugh.

Jim McDougal was charged with two counts of misapplication (18 U.S.C. § 657), one count of false entry (18 U.S.C. § 1006), one count of bank fraud (18 U.S.C. § 1344), three counts of false statements (18 U.S.C. § 1014), and conspiracy to commit bank fraud and false statements (18 U.S.C. § 371).  McDougal and the Henleys was acquitted by a jury in June 1990.

---

[19]     FBI Madison case file, 29A-2459, Serial 52.

[20]     Id.

[21]     Id.

9

NW: 15416 DocId: 70001585 Page 47

2.     **825 case**

As a result of the $825,000 loan to Dean Paul Ltd., from Madison Guaranty, David Hale

netted approximately $500,000. As a part of the scheme between McDougal, Hale and Tucker,

David Hale, in turn, made 4 different loans to McDougal and his associates. One of those loans,

was $150,000 to Castle Sewer and Water which was a corporation which Jim Guy Tucker had an

interest in. Castle Sewer and Water used those proceed to make the down payment on the

purchase of the sewer and water utility from Madison Financial Corporation, who had received

the property in the purchase from Industrial Services Corporation. The balance of the purchase

price ($1.05 million) was funded directly in the form of two loans to Castle Sewer and Water

from Madison Guaranty.

Jim McDougal was charged in 19 of the 21 counts in the indictment. He was convicted

on 18 of the 19 counts for conspiracy, misapplication, false statement, false entry, bank fraud,

wire fraud, and mail fraud.

Susan McDougal was initially charged in 8 counts of the 21 count indictment. Four of

the counts were dismissed by Judge Howard. Susan McDougal was convicted on the four

remaining counts which related to the Master Marketing loan (misapplication, false entry, false

statement, and mail fraud). Susan McDougal was sentenced on August 20, 1996 and received 22

months.

Jim Guy Tucker was initially charged in 11 counts of the 21 count indictment. Four of

the counts were dismissed by Judge Howard. Tucker was convicted on 2 of the remaining seven

counts (conspiracy and mail fraud) related to the $150,000 loan from CMS. Tucker was

sentenced on August 19, 1996 and received a sentence of 18 months home detention (including

10

writing and speaking assignments on family and education), ordered to pay restitution of $150,000 to the SBA, and a fine of $25,000.

Possible Defenses --

**1.    Ward was not a straw man**

Even the Minority Report from the Senate Whitewater Committee did not conclude that Ward was not a straw man -- instead it focused on whether or not it could be proven that anyone at RLF was aware that he was a straw. (They conclude, of course that no one at RLF knew, with the possible exception of Hubbell, and even if he did know, there is no evidence he told anyone else.)

The only testimony the report cites for the proposition that Ward was not a nominee buyer is Ward's denial and some testimony from John Latham's Senate deposition. Latham testified that the IDC transaction was structured with Ward purchasing everything north of 145th street for two reasons: 1) MFC was up against its investment limitation and would have exceeded the limitation had it purchased the entire property; and 2) everyone viewed the transaction a as a good deal and Ward and McDougal both wanted to make as much money as possible so they decided to split it up.[22]  Even Ward, while denying that he was a straw man, admits to all the factual predicates that make him a straw -- non-recourse loan, no personal investment, no responsibility for taxes or collecting rents.[23]

**2.    "McDougal was acquitted in the first case, therefore Castle Grande was not a crime"**

---

[22]    John Latham, 5/15/96 Senate Deposition, at 36-37.

[23]    Seth Ward, 1/17/96 GJT, at **[page]**.

11

This is unpersuasive because the structure of the purchase from IDC and Ward's role in it were not issues in the first case against McDougal, and of course, McDougal was convicted in the second case (the 825 case).

Order of Proof

1. Jim Clark- re: 1986 examination of MGSL; loans to Ward; deceptive explanation; violation of 6% investment limitation and regulations regarding accuracy of the institutions books and records.

2. Fred Gibson - re: loans to Ward; deceptive explanation; violation of 6% investment limitation and regulations regarding accuracy of the institutions books and records.

3. Bill Black - expert testimony re: regulations applicable to MGSL and MFC and how sale to Ward and loans violated same.

4. Don Denton - circumstances surrounding initial purchase of IDC by MFC and Ward; purpose of cross loans was to pay Ward his commissions.

5. SA Gary Aaron - first investigation into Castle Grande and summary testimony re: charges and disposition of first McDougal case.

6. SA Mike Patkus/ Steve Irons - summary testimony re: 825 case: investigation, charges, and disposition.

* * * * *

2) *Other Facts Relating to RLF Work for MGSL* -- [The facts relating to RLF's retention by MGSL and work before the Arkansas Securities Department ("ASD") are detailed in Sections II and III of Bittman & O'Brien, "Clinton Finance," June 1997.]

The other significant area where it appears that proof exists of Hillary Clinton's false

12

170

statements to investigators lies in her statements regarding the manner in which Rose Law Firm
came to be hired by Madison Guaranty Savings & Loan. There are, in essence, two competing
versions. One is Mrs. Clinton's "unpaid bill" story (which she first made public during the 1992
campaign -- see the discussion below for how that came about). In essence she claims that John
Latham of MGSL and Rick Massey of Rose wanted to do business together, that her partners
would not accept MGSL as a client because of an unpaid bill and that she interceded with
McDougal to get the bill paid, at the request of Massey. The other version is Jim McDougal's
"jogging incident" story -- that Bill Clinton came by his office while jogging one morning, sat in
his new leather chair, staining it with sweat and asked McDougal to send some business to HRC
because she could use the work.

### 1.   Background of Madison's Legal Representation

It is important to understand the background of Madison's legal representation for
two reasons. First, Mrs. Clinton claims that in 1985 Rose partners conditioned Rose's agreement
to represent Madison on Madison's first paying an overdue bill owed by Madison's sister
institution, Madison Bank & Trust ("MB&T"). Unequivocal evidence shows, however, that the
old bill was paid in 1984 and thus could not have been a condition of the representation as Mrs.
Clinton claims. Second, Mrs. Clinton claims Madison's business was initially brought to Rose by
a young associate at Rose, Rick Massey. However, the evidence shows that Madison had long
and competently been represented by another firm and there was no reason -- other than perhaps
a personal favor for the Governor -- for Madison to switch counsel and have Rose represent it in
a matter where Rose had little expertise.

### a.   Bank of Kingston (Madison Bank & Trust)

13

Rose's first representation of a McDougal-controlled institution began in 1981 when it represented the Bank of Kingston ("BOK") in a single matter involving McDougal's moving the bank's principal office to a different city in Arkansas.[24]  MB&T lost the case in the trial court and approved an appeal.  Carol Arnold, a young associate at Rose, argued the case before the Arkansas Supreme Court,[25] which upheld the Chancery Court and ruled against BOK.[26]  Rose's fees for the appeal totaled $5,000 plus $893.63 in expenses, and on July 30, 1982, Giroir mailed McDougal Rose's bill, writing that the "statement is, of course, subject to your approval."[27]  McDougal wrote a note on the outside of the envelope: "Carla: DO NOT PAY.  KEEP IN FILE.  Jim."[28]

Rose's July 1982 bill remained outstanding for several years.  McDougal says he refused

---

[24]  The first aspect of the Rose's representation involved petitioning the Arkansas Bank Department to move BOK's principal office to Huntsville, Arkansas.  The First National Bank of Huntsville, a competing bank affiliated with the former owners of BOK, learned of BOK's proposal and objected to the move based on non-compete clause in BOK's purchase agreement.  In a letter to the president of First National Bank of Huntsville, Jim Guy Tucker, on behalf of BOK, threatened litigation: "As representatives of the minority stockholders in the Bank of Kingston, we are considering litigation to declare this non-competition provision void."  Letter to James Hargis, Chairman, Bank of Huntsville, from Jim Guy Tucker, Feb. 13, 1981 (RIC120734 to 735).  On August 4, 1981, First National Bank of Huntsville sued BOK to enforce the purchase agreement and enjoin BOK from moving to Huntsville.  RIC120653 to 656.  On August 21, 1981, Vincent Foster and Rose answered on behalf of BOK.  RIC120648 to 651.

[25]  See Letter to Steven Smith from Vincent Foster, Jul. 2, 1982, at 1 (Carol Arnold reports that [Justice] Steele Hays asked her a question at oral argument . . .") (GG-00000165 to 166).

[26]  Madison Bank & Trust v. First National Bank of Huntsville, 276 Ark. 405, 635 S.W.2d 268 (1982).

[27]  Letter to James B. McDougal from C.J. Giroir, Jul. 30, 1982.

[28]  Id. After the appeal, Rose did no additional legal work for MB&T.

14

to pay the bill because he was being "vastly overcharged"[29] in that Rose billed him for a senior

attorney like Vince Foster but sent a junior attorney to argue the appeal.[30] Giroir, who was the

billing partner on the BOK account, testified he believes he asked Mrs. Clinton to intercede to

get the bill paid because Mrs. Clinton knew McDougal and the former president of MB&T, Steve

Smith.[31] In late 1983, Mrs. Clinton spoke to McDougal in an attempt to get the bill paid.[32]

Following Mrs. Clinton's conversation with McDougal,[33] Giroir sent McDougal another copy of

the original bill on October 10, 1983.[34] Again, the bank did not pay.

After remaining outstanding for more than two years and almost a year after Giroir's

October 1983 letter requesting payment, the matter of the outstanding bill was brought to the

---

[29]    J. McDougal GJ, 4/2/97, at 77-78, 105-106.

[30]    McDougal 302, 2/19/97 (DRAFT), at 7; J. McDougal GJ, 4/2/97, at 114.  Board
Minutes from MB&T corroborate some discussion about a "new lawyer" who was assigned to the
appeal.  MB&T Board Minutes, Sep. 25, 1984, at 2 ("Board discussed the fact that new lawyer
sent to argue case.");  see also Letter to Gary Bunch (cc: James McDougal, Joe Giroir) from
Vincent Foster, Oct. 9, 1984 ("You [Bunch] mentioned something about a 'girl' lawyer doing the
work on appeal.").

[31]    Giroir GJ, 7/18/96, at 21-22.

[32]    Letter to James B. McDougal from C.J. Giroir, Oct. 10, 1983 ("Pursuant to
your discussion with Hillary Rodham Clinton, I am enclosing a copy of our firm statement, dated
December 23, 1981.") (56-00064693).  McDougal was shown a copy of Giroir's letter and has no
recollection of speaking to Mrs. Clinton about the outstanding bill.  J. McDougal 302, 2/19/97
(DRAFT), at 10;

[33]    Notes of John Podesta from May 18, 1994, indicate that Mrs. Clinton has "some
recollection" of talking to Giroir: "This is a 10 year letter.  She has some recollection of Giroir
talking to her about the unpaid bill and may have talked to McDougal about it." 2139-00000158.

[34]    Letter to James B. McDougal from C.J. Giroir, Oct. 10, 1983 (56-
00064693).

15

NW: 15416 DocId: 70001585 Page: 53  FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

173

attention of the MB&T Board in the fall of 1984.[35] Gary Bunch, then an officer at MB&T,

testified that McDougal asked him in a board meeting on September 25, 1984, to settle the

outstanding bill with Rose.[36] According to an October 9, 1984, letter, Foster had been in contact

with Bunch to pay the bill, and Rose was going to sue MB&T unless payment was received by

October 22, 1984:

> In accordance with our telephone conversation last week, I am enclosing another copy of the statement for our services rendered in connection with the appeal of the referenced litigation. As I mentioned to you the $5,000.00 fee limitation was established by agreement between Joe Giroir and Jim McDougal before we began work on the appeal. The agreement turned out to be to the benefit of the Bank since our actual time spent exceeded the amount charged.
>
> You mentioned something about a "girl" lawyer doing the work on appeal. I was assisted on the appeal briefs and abstracting of the record by Carol Arnold, then a 40 year old trial lawyer, who had already done some of the basic legal research for trial. According to our records approximately 75% of the attorney time on the appeal was spent by me.
>
> We are totally baffled by the continued delay in the payment of this statement, but are willing to allow you an extension until October 22 in which to satisfy this statement. Otherwise, I am directed by the Firm to file suit.[37]

Bunch does not know why the payment of the old bill came up in the fall of 1984 but

recalls that shortly thereafter Rose "agreed on a $5,000 *settlement*" and that MB&T paid the bill

in October 1984.[38] Indeed, records from MB&T show that on October 22, 1984, MB&T paid the

---

[35]   As discussed infra., this is just after McDougal says Bill Clinton jogged by Madison and complained about the Clintons' financial situation.

[36]   Bunch Senate Hearing, 5/16/96, at 17.

[37]   Letter to Gary Bunch (cc: James McDougal, Joe Giroir) from Vincent Foster, Oct. 9, 1984.

[38]   Bunch Senate Hearing, 5/16/96, at 39-40 (emphasis added). Bunch speculated that a reason why the matter of the old bill came up in September 1984 was because

16

bill by issuing a check to Rose in the amount of $5,000 for "Legal Fee." Statements from Rose

corroborate that Rose apparently settled for payment of $5,000 as full payment of the $5,893 bill:

Rose credited the attorneys who worked on MB&T's appeal $4,106.37, which equates to the

$5,000 MB&T paid less the expenses Rose incurred, $893.63.[39]

More significantly, the only known copy of the original bill from Rose to MB&T was

found, years later, in a brief case in Vince Foster's attic. The bill is annotated as "paid" and

contains hand-written notations which refigure the allocation of fees to Rose attorney's based

upon the $5,000 payment. Thus, the evidence is conclusive that long before April 1985, when

Hillary Clinton met Jim McDougal the "unpaid" bill had been paid. [And, indeed, if the

argument is that the $893.63 remained to be paid, the evidence is equally clear that these unpaid

---

MB&T "may have had a little more money at that time than we'd had previously." Id. at 58.
Bunch's testimony that the MB&T old bill was considered in September 1984 and paid in
October 1984 is corroborated by several documents. First, minutes from MB&T's board meeting
from September show that Bunch "will negotiate settlement" with Rose concerning the MB&T
bill. Minutes of the Madison Bank & Trust Board Meeting, Sep. 25, 1984, at 2 ("Rose Law Firm
-- We owe $5,000 for Huntsville move appeal, according to firm. Board discussed the fact that
new lawyer sent to argue case. Mr. Vaughn moved, Mr. McDougal seconded that Mr. Bunch will
negotiate settlement with Rose Firm. Approved unanimously."). Second, records from MB&T
show that on October 23, 1984, a debit of $5,000 was made from its general ledger for legal fees.
Third, records from Rose confirm a credit of $5,000 on MB&T's account one day later on
October 24, 1984. Letter to Hickman Ewing from Alden Atkins, Apr. 17, 1996 ("[Records from
Worthen Bank] show that Rose deposited a check for $5,000 on October 24, 1984. We are told
by the bank's representatives that the identification number for that check shows that it was
written on an account at Madison Bank & Trust in Kingston, Arkansas."). Fourth, minutes from
MB&T's November board meeting reflect that a reduction in earnings was due in part to "a
payment of legal fees from a 1983 lawsuit." Minutes of Madison Bank & Trust Board Meeting,
Nov.
27, 1984, at 1. The lawsuit actually ended in 1982, but Rose's last letter requesting payment was
sent in 1983.

[39]     Letter to Amy St. Eve from Ronald M. Clark, May 31, 1996. See also Letter to
Bruce A. Ericson from Alden L. Atkins, Oct. 31, 1995, at 6.

17

NW: 15416 DocId: 70001585 Page 55

expenses were never paid.]

### b. The Mitchell Firm

In 1982, the McDougals purchased Madison Guaranty Savings & Loan ("Madison").[40]

Beginning in 1982 and throughout McDougal's ownership, Madison's primary counsel and "lead

firm" was Mitchell, Williams, Selig, Jackson & Tucker (the "Mitchell" firm).[41] McDougal hired

the Mitchell firm because of his relationship with Jim Guy Tucker, with whom McDougal had

been friends and business partners for years.[42] In addition, Tucker had previously represented

McDougal in numerous matters.[43]

---

[40] McDougal purchased Woodruff County Savings and Loan on January 26,
1982 with Susan McDougal, Steve Smith, C.E. Ransom, and Julie Baldridge. 174-00012956. Its
name was changed to Madison Guaranty Savings & Loan within a few months of purchase.

[41]



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

[42] J. McDougal 302, 2/19/97 (DRAFT), at 6.

[43] In a deposition from the Bank of Kingston litigation, Tucker described his
professional relationship with McDougal: "Mr. McDougal and I have a continuing attorney-
client relationship because of various business ventures that he brings to me and I act on, some of
which reach fruition and some of which do not. . . . I have served as personal attorney for Mr.
McDougal since I entered private law practice on transactions ranging from timberland purchases

18

Throughout its existence, Madison relied almost exclusively on the Mitchell firm for legal advice. Mitchell provided a wide range of legal services to Madison, including extensive regulatory work before the Arkansas Securities Department, Arkansas Bank Department, Federal Home Loan Bank Board, and other agencies; litigation, including defending Madison in Seth Ward's breach of contract action against it; various real estate matters, including activities involving David Hale, Dean Paul, among others; and other general legal representation.[44]

While Tucker was the billing partner for the Madison account, John Selig, a former Commissioner of the Arkansas Securities Department, was the attorney at the Mitchell firm who primarily handled the Madison account. Other attorneys at Mitchell who did work for Madison included Beverly Bassett, who left the Mitchell firm in 1985 to become, with McDougal's recommendation, the Commissioner of the Arkansas Securities Department. There was no written retainer agreement between Madison and the Mitchell firm, and the fees were charged at the normal hourly billing rate.

According to records from the Mitchell firm, on February 6, 1985, Mitchell opened a new file on the Madison account, file number 5615-9.[45] The matter was described as "Sale of Stock," and the responsible attorney was listed as John Selig.[46] Almost two months later, on March 27,

---

and sales to condominium developments to examination of some of the various banks." Tucker Kingston Deposition, 9/23/81, at 13-14 (RIC120463 to 464). Tucker represented McDougal and his partners in the purchase of the Bank of Kingston in 1979. RIC120684.

[44]     Information concerning the scope of the Mitchell firm's representation of Madison is found in the voluminous billing records produced by Mitchell to the OIC under subpoena. See generally 155-0005700 et seq.

[45]     155-00001506.

[46]     Id.

19

1985, Mitchell opened another new file for Madison, file number 5615-10, entitled "Broker-Dealer" -- again the responsible attorney was Selig.[47] Both files are virtually empty, and it appears the firm did little, if any, work on either matter.[48] Although Mitchell did no work on these matters, someone at Madison apparently requested or anticipated that Mitchell, as its regular outside counsel, would do the work. As described below, it was these same matters that Rose worked on for Madison beginning in April 1985.

2. **Hiring of Rose in April 1985**

According to documents from Rose and Madison, Rose's representation of Madison Guaranty Savings & Loan began April 23, 1985, on two matters: the preferred stock offering and the limited partnership/broker-dealer matters.[50] The stock offering was an attempt by Madison,

---

[47]    155-00001508.

[48]    155-00001504 to 509.

[49]

[50]    As discussed *infra*, at the time of Rose's retention, Madison was under a Supervisory Agreement with the FHLBB restricting its loan practices and requiring Madison to increase its net worth.

20

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure
NW: 15416 DocId: 70001585 Page 58

apparently at the request of the ASD and the FHLBB, to raise capital and increase its net worth by issuing a new class of preferred stock.[51]  Madison needed approval from the ASD to issue a new class of stock, and Arkansas law was unclear as to whether a savings and loan could issue a non-voting, preferred class as Madison intended.  Rose was hired to secure approval from the ASD for this unprecedented request.  The limited partnership matter, also known as the broker-dealer matter, was an effort by Madison to establish a subsidiary investment broker-dealer through which Madison was to sell real estate limited partnerships.[52]  Both the preferred stock and the limited partnership/broker-dealer matters required regulatory approval from the ASD.

The Rose Law Firm billing records show that Mrs. Clinton met with Jim McDougal and John Latham on April 23, 1985.[53]  Mrs. Clinton's personal calendar from April 23 reflects the following entry: "9 - McDougal."[54]  The Rose billing records also reflect that Rose commenced legal work for Madison in earnest that day.[55]  On the next day, April 24, 1985, Rose continued its

---

[51]     Rose referenced the preferred stock matter on the Madison account as matter "1".

[52]     Rose referenced the limited partnership/broker-dealer matter on the Madison account as matter "2".

[53]     DEK014947.  The entry on the billing records reflect the following entry for Mrs. Clinton:  "4/23/85 -- Conference with J. McDougal and J. Latham."  Mrs. Clinton recalls meeting only with McDougal and says that it was at that meeting that they discussed Massey's and Latham's proposal that Rose do work for Madison.  McDougal does not recall the meeting but says that his last meeting with Mrs. Clinton was in the fall of 1984 when they set up the retainer.  J. McDougal 302, 2/19/97 (DRAFT), at 10.

[54]     319-00034730.  This notation appears to refer to 9:00 a.m., as it is from the morning portion of the calendar.

[55]     DEK014947.  Mrs. Clinton's billing entries for April 23, 1985, reflect that after her meeting with McDougal and Latham, she had a conference with Rick Massey, a young associate
in the securities section, and a conference with Watt Gregory, a senior partner in the securities section.  Massey's entries for April 23, 1985, show that he had a conference with Mrs. Clinton, a

21

work on the preferred stock offering.[56] Also on April 24, an internal Madison memorandum

from Latham to Greg Young, Madison's comptroller, announced Madison's retainer of Rose:

> Greg, we have retained the Rose law firm. We will be paying them retainer of $2,000 per month. Please go ahead and send the first $2,000 check to the firm, in care of Hillary Clinton.[57]

Madison issued its first retainer check to Rose on May 2, 1985, in the amount of $2,000.[58]

For the next fifteen months through August 1, 1986, Madison continued to send Rose monthly

"retainer" checks -- all but two in the amount of $2,000.[59] There was no written engagement

agreement between Madison and Rose.[60] Rose billed Madison its usual hourly rates and used the

monthly retainer as a prepayment against fees actually incurred by Rose.[61] Mrs. Clinton

---

conference with John Latham, a conference with Les Baledge, another associate in the securities section at Rose, and conducted research on "preferred stock offering." Id.

[56] DEK014947. Mrs. Clinton "review[ed] draft documents" and had "conferences" with Massey, Latham, and Davis Fitzhugh, an attorney at Madison. Massey and Sharon Grimes, a paralegal at Rose, conducted legal research and "draft[ed] documents." Id.

[57] 54-00266226.

[58] 54-002312771. McDougal says that he had never paid a retainer to a law firm before. McDougal 302, 2/19/97 (DRAFT), at 8. Latham says that Rose was the only law firm Madison ever had on retainer. Latham 302, 2/14/95, at 2.

[59] The second and third checks to Rose dated 5/17/85 and 7/22/85 were in the amounts of $2,018.00 and $3,023.20, respectively. 54-00231446, 54-00232199. The difference represents fees incurred in excess of the $2,000 retainer.

[60] As noted above, McDougal had a written retainer agreement with Rose for the representation in the Bank of Kingston matter. There was no policy at Rose in 1984 or 1985 requiring written retainer agreements; such decisions were left to the individual attorney. Letter to Bruce A. Ericson from Alden L. Atkins, Oct. 31, 1995, at 6 ("In 1985, Rose Law Firm did not have a policy regarding retention letters. We are unaware of any retention letter for Madison Guaranty.") (RIC120845);

[61] Internal Madison documents reference the monthly retainer payments to Rose as "prepaid legal fees." See, e.g., 54-00266225, 54-00264666 to 667, 54-00264669, 54-00260954,

22

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure
NW: 15416 DocId: 70001585 Page 60

described the agreement in a letter to McDougal and Latham dated July 14, 1986, as follows:

> [I]n April, 1985, I advised you that the firm would credit fees against a monthly retainer and then bill for whatever fees might be in excess of the retainer at the end of each month.[62]

Mrs. Clinton was the billing attorney on the Madison account, and almost all of the retainer checks were addressed to her attention.[63] Rose had no policy in 1985 with regard to retainers, and the decision whether to use a retainer was discretionary with the responsible attorney.[64]

As to the regularity of retainers at Rose, Ron Clark testified, "back in those days, it was a little bit unusual for Rose to get a retainer. Even to this day, except for large clients, it's unusual."[65] Webb Hubbell, chief operating officer at Rose from 1985 through 1988, testified that retainers were indeed unusual, and he could not remember any client at Rose other than Madison which was on retainer.[66] As to her understanding of the regularity of retainers, Mrs. Clinton

---

54-00260973, 54-00260956, 54-00282220.

[62]     54-00260979 to 980. Each cover letter transmitting Rose's bills acknowledges "receipt" of the previous month's "retainer" fee, e.g., 54-00266228 ("April Retainer Received ... April Fees ... Balance Due ...").

[63]     Thirteen of Madison's nineteen checks to Rose listed the payee as "Rose Law Firm, Attn: Hillary Clinton." See, e.g., 54-00231446, 54-00232199, 54-00232674, 54-00233116, 54-00233456, 54-0054-00234001, 54-00234265, 54-00212147, 54-00212393, 54-00214419, 54-00215014, 54-00216137. Rose deposited all Madison's checks into a trust account against which the actual fees were billed. See RIC120846.

[64]     Letter to Bruce A. Ericson from Alden L. Atkins, Oct. 31, 1995, at 6 ("In 1985, Rose Law Firm did not have any policy regarding retainers or client advances. The decision about whether a retainer or client advance would be requested was left to the discretion of each lawyer depending on the circumstances of the particular matter.").

[65]     Clark GJ, 3/30/94, at 58-59.

[66]     Hubbell GJ, 12/19/95, at 187-188.

23

NW: 15416 DocId: 70001585 Page 61

testified, however, that retainer agreements were not unusual:

> I can't call their name to you right now, but it was not unusual to ask a client, a
> new client or a client that perhaps there had been some billing problems with in
> the past, to make a deposit against fees and expenses.[67]

How Mrs. Clinton came to be the billing attorney on the Madison account is disputed.

According to Joe Giroir, former chief operating officer at Rose, the billing attorney is usually --

but not always -- the person who brought the client to the firm.[68] The billing attorney is

responsible for assigning and supervising the legal work in addition to reviewing and sending

bills to the client.[69] An internal Rose document entitled "The Daily Briefs" dated April 29, 1985,

announces Madison as a new client and identifies Mrs. Clinton as the "attorney" for the

account.[70] The purpose of "The Daily Briefs" is to announce new clients and determine whether

the firm has any conflicts.[71]

---

[67]     H. Clinton, OIC Deposition, 4/22/95, at 14.

[68]     Giroir GJ, 7/18/96, at 12.  Rose had a policy that first and second year associates
could not serve as a billing attorney.  Giroir GJ, 7/18/96, at 13;  Massey Senate Hearing, 1/11/96,
at 76.

[69]     Id. at 13.

[70]     105-00008011.  A second "The Daily Briefs" dated the next day announces the
second Madison matter -- the broker/dealer -- and Mrs. Clinton again as the attorney.  105-
00008012.

[71]     In February 1989, Vince Foster sent a ten-page proposal to the FDIC soliciting
legal work.  105-00003859 to 868.  Page eight of the letter addresses potential conflicts of
interest as follows: "[Rose] does not represent any savings and loan association in state or
federal regulatory matters.  From time to time we have provided specialized services to some
savings and loan associations in such areas as employment discrimination, work-out of
participation loans and bankruptcy.  We do not represent any of these clients on an ongoing basis
. . ."  105-00003866.  Notably
omitted from Foster's description are the services Rose provided for Madison between 1985 and
1987:  regulatory work before state agencies, capitalization, real-estate developments, etc.

24

### 3.    Evidence Supporting McDougal's Version

Obviously the disproof of Mrs. Clinton's "unpaid" bill story does not, necessarily require affirmative proof of McDougal's jogging version. Equally obviously, if the jury were to credit affirmative proof of the jogging incident, it would be significant and would greatly assist the prosecution. And, most obviously of all, with Jim McDougal's death the admissible evidence of the jogging incident is very limited. What follows below is a summary of the proof available without McDougal -- only a portion of which is admissible, but the full scope of which is useful in assessing McDougal's veracity.

Jim McDougal has identified several people who may have information confirming his version of the jogging incident. At least one of these witnesses, according to McDougal, was present during McDougal's meeting with Clinton. The other witnesses may have knowledge of the jogging incident because of contemporaneous statements made by McDougal about the circumstances of Rose's retention. In addition, one witness, Rae Ann Moles, who was not identified by McDougal, claims she overheard the meeting between McDougal and Clinton. These witnesses and other evidence pertaining to the jogging incident are outlined below.

### I.    Bill Clinton

Remarkably, Bill Clinton does not deny the jogging incident. Clinton testified he has been to Madison "[l]ess than 10 times, more than two, three"[72] and while jogging by Madison "once or twice actually went in."[73] When asked about the jogging incident, Clinton says he has

---

[72]    B. Clinton OIC Deposition, 4/22/95, at 66.

[73]    B. Clinton 825 Trial Testimony, 4/28/96, at 69-71.

25

"tried to remember" and is not accusing McDougal of lying,[74] but he does not remember anything like the jogging incident: "I don't recall that. I am aware that he has recounted a conversation about that. But I don't have any specific recollection of doing that."[75] Clinton said he does not recall any conversation where he asked McDougal to send legal work to Mrs. Clinton.[76] Clinton also said he does not recall ever complaining to McDougal about financial problems and telling McDougal that "Hillary and I need some money."[77]

### ii.    Bill Henley

---

[74]   B. Clinton OIC Deposition, 4/22/95, at 83:

Q .   Do you have any reason to believe that Jim McDougal is not being truthful --

A     No.

Q     -- about [the jogging incident]?

A     I have absolutely -- I have no reason to believe that. And I have really tried to search my memory to see if there was anything remotely similar to what he said. I mean, I really tried to remember the conversations that I've had with him to try to figure it out, because I am not accusing him of not telling the truth. I do not -- I simply do not remember the conversation he says occurred.

[75]   Id. at 67. Clinton also testified he does not recall whether he knew in 1985 that Mrs. Clinton was doing legal work for Madison. Id. 65-66 ("I don't recall that I did know [in 1985 that Hillary was doing some work for Madison]. Normally Hillary didn't discuss her legal work with me.").

[76]   Id. at 69.

[77]   Id. at 72. Clinton says he does not remember McDougal ever complaining that the Clintons were not putting their fair share into Whitewater: "I certainly don't remember any time when he complained about that. I can remember the occasions in which he said we had to put more money in, and when we did put more money in, and we did that." B. Clinton OIC Deposition, 4/22/95, at 83-84.

26

Jim McDougal says that Bill Henley, Susan McDougal's brother, was present during the meeting where Bill Clinton discussed sending legal work to Mrs. Clinton.[78] Henley says he was not present at such meeting but does remember seeing Clinton leave McDougal's office and McDougal complaining about Clinton's leaving a sweat stain on the chair.

Henley testified before the grand jury that one morning between 6:30 a.m. and 8:30 a.m. he went to Madison to meet with McDougal.[79] Henley said the door to McDougal's office was closed, so Henley waited a short period of time -- no more than 15 minutes. Henley thinks McDougal's secretary, Sue Strayhorn, was also present sitting at her desk outside McDougal's office.[80] When the meeting ended, Henley said Clinton, who was in jogging clothes and sweating, exited McDougal's office. Henley and Clinton exchanged pleasantries, and Clinton left the building. Henley testified that as soon as Clinton was out of earshot, McDougal commented, "I don't mind the son of a bitch coming by here and taking up my time, but I wish he wouldn't sweat through my chairs."[81] Henley said he and McDougal then entered McDougal's office and

---

[78]    J. McDougal 302, 6/22/95, at 6-7 ("McDougal advised that Bill Henley was present during this meeting."); J. McDougal 302, 2/19/97 (DRAFT), at 7 ("Bill Henley was also present in McDougal's office when Clinton came by in jogging attire.").

[79]    McDougal says Henley was at Madison to help with backed-up title work. Henley was a real estate salesman for Madison Financial Corporation, a subsidiary of Madison. B. Henley GJ, 6/18/96, at 7.

[80]    If Strayhorn had been present outside McDougal's office as Henley remembers, it would be inconsistent with McDougal's timing of the jogging incident because Sue Strayhorn began work at Madison in February 1985 -- well after McDougal says the jogging incident occurred. Strayhorn 302, 3/30/94, at 1. This testimony is also inconsistent with testimony from Rae Ann Moles. Moles testified she overheard Clinton and McDougal set up the retainer, but Moles left Madison before Strayhorn started work. See subsection "v." infra.

[81]    Henley GJ, 6/18/96, at 27, 50.

27

conducted their meeting. Henley testified that while he was in McDougal's office he noticed a

fresh sweat stain on one of the two chairs facing McDougal's desk.[82] Henley was only able to

date the event to sometime in 1984 or 1985.[83] The only conversation Henley has had with

McDougal about the jogging incident occurred during the 825 trial, sometime after the book

Blood Sport was published. Henley said McDougal corrected a quote in the book attributed to

McDougal apparently by Henley:[84] McDougal told Henley that he did not refer to Clinton as a

"son-of-a-bitch" as quoted in the book.

### iii.  Susan McDougal

Jim McDougal feels certain he discussed the jogging incident with Susan McDougal.[85]

---

[82]     Id. at 46-47.

[83]     Id. at 33. Henley testified at one point, however, that he believed the event may
have occurred in the "summertime." When asked why he thought it occurred in the summertime,
Henley's explanation was Clinton was sweating and it must have been hot. Id. at 33-34.

[84]     The relevant portion from Blood Sport reads as follows:

McDougal gently steered [Clinton] out of the office. Susan's brother Bill Henley
was standing nearby. With the governor safely out of earshot, McDougal turned
to Henley. "I don't mind the fat little son of a bitch coming by and taking up my
time. I just wish he wouldn't ruin my chair."

Stewart, Blood Sport (1996), at 124.

[85]     J. McDougal 302, 2/19/97 (DRAFT), at 8-9; J. McDougal GJ, 4/2/97, at 103-104:

Q.     Susan was also quoted in the Washington Post and other publications, I
think, saying, "Yes, I know about this." Do you recall talking to her about this?
Would that have been something you would have told her about?

A.     I'm sure I -- yes. It would have been something I would have told her within
the business day, I would think.

28

NW: 15416 DocId: 70001585 Page 66

Ms. McDougal refuses to give a statement to the OIC, but she has given statements to print and

television media consistent with Jim's recollection. Shortly after publication of Gerth's article on

March 9, 1992, The Washington Post quoted Susan in a follow-up piece as follows:

> Hillary came in one day and was telling us about the problem. The problem was
> finances, her finances. . . . She came to Jim's office. I remember Jim laughing and
> saying afterward, 'Well, one lawyer's as good as another, we might as well hire
> Hillary.' . . . She was on retainer. I remember everyone sitting around laughing
> and saying: 'We need to hire Hillary Clinton.'[86]

In an interview with Diane Sawyer on ABC's Prime Time Live, Ms. McDougal

corroborated that Jim told her contemporaneously about his discussion with Clinton. Ms

McDougal also said that she was at Madison the day of the jogging incident, saw Clinton jogging

and sweating, and saw that Jim and Clinton talked with each other:

> Sawyer: There are things that you can help clear up a little bit from -- for
> some of us. The decision to have Mrs. Clinton help with some of
> the legal affairs for Madison.
>
> McDougal: *I'll tell you what I know about it, as I wasn't present at the time.
> But I do know that Bill came by the bank one day. He was jogging
> -- and sweating. The famous story of the sweat in the chair -- I
> didn't see that. But I did see that he was running, and he was
> sweating. And he came by the bank. And he did talk with Jim.
> After that, Jim came to me and said, "I've just given Hillary some
> work from the bank. Is that alright with you?" I was at the bank
> that day. . . .*
>
> Sawyer: And did he say then that -- that Mr. Clinton had asked for her?
>
> McDougal: *What he said was, "She needs the work." And I said, "That's fine
> with me." Those were his exact words. At that time, at that day,*

---

[86] Maraniss and Weisskopf, Lawyer Will Review Arkansas Land Deal, Washington
Post, Mar. 12, 1992, at A1. In an interview with the OIC, Jim McDougal was read Susan's quote
from The Washington Post. McDougal agreed with Susan's statement but added that either Bill
Henley or he must have told Susan about the jogging incident. J. McDougal 302, 2/19/97
(DRAFT), at 8-9.

29

*"She needs the work." And I said, "That's fine, Jim."*

Sawyer:        Because, again, she has talked about the business coming in a
               different way -- coming through a connection between someone
               who was in her office and someone who knew your husband.

McDougal:      I don't know about that.

Sawyer:        *But this you do know?  It did take place?*

McDougal:      *Oh, yes.*[87]

On the eve of her jailing for contempt of Court, Ms. McDougal told Larry King she did

not witness the jogging incident and that her only knowledge of it comes from Jim McDougal:

> I only know that *Jim came to me and said, "They need the money. I'm going to
> give her the work. Is that alright with you?" And I said yes.* That's all I know
> about how that came to be.[88]

### iv.    Rae Ann Moles

Rae Ann Moles was hired by Madison in April 1983 to do miscellaneous clerical work.[89]

Moles remembers an event similar to the jogging incident described by McDougal.[90] Moles says

that late one afternoon in August or September 1984, Bill Clinton rushed past her into

McDougal's office wearing jogging clothes. Moles says she heard most of their conversation

---

[87]    Prime Time Live (ABC television, Sep. 4, 1996, out-takes, tape 2) (emphasis
added).

[88]    Larry King Live (CNN television broadcast, Sep. 6, 1996) (emphasis added).

[89]    Moles is writing a book on her experiences at Madison.
                              FOIA(b)7 - (C)

[90]    McDougal does not remember who his secretary was at the time of the jogging
incident. J. McDougal 302, 2/19/97 (DRAFT), at 9. Moles was McDougal's secretary until she
left in January 1985 and was later replaced by Sue Strayhorn.

30

because McDougal's office door was open.[91] Moles said McDougal complained to Clinton about

an outstanding Whitewater loan and urged the Clintons to pay their fair share.[92] According to

Moles, Clinton told McDougal that Webb Hubbell was encouraging Rose attorneys to get more

savings and loan business, and then Clinton asked McDougal to put Mrs. Clinton on a $2,000 per

month retainer.[93] McDougal told Clinton "he really didn't have anything for the Rose Law Firm

to do [and] that the Mitchell law firm was representing the institution and performing as he

expected."[94] Moles testified McDougal asked Clinton how the account would be shown as

coming in, and Clinton said Hubbell would take care of it and that more than likely a young

associate would be given credit for the account.[95]

Moles says Clinton and McDougal met for about an hour and a half to two hours and that

she left before the meeting ended to go home. When Moles came to work the next morning,

McDougal said, "Well, we've put Hillary on the payroll. Susan will be in shortly. She doesn't

know about it. When I tell her, she's going to be really upset. There may be quite an incident. If

---

[91]      Moles GJ, 10/19/95, at 18. But see Moles 302, 8/4/94 & 2/9/95, at 7 ("McDougal
had Moles into his office and he introduced her to Clinton.").

[92]      Moles 302, 8/4/94 & 2/9/95, at 7; Moles GJ, 10/19/95, at 19-20.

[93]      Moles GJ, 10/19/95, at 22 ("Mr. Clinton asked him to hire the Rose Law Firm.");
Moles 302, 8/4/94 & 2/9/95, at 7 ("CLINTON said that he and HILLARY CLINTON were in
need of some money and because he was a government servant, he only made so much.
CLINTON then asked McDOUGAL to have MGSL put HILLARY
RODHAM CLINTON of the ROSE LAW FIRM on a $2,000 per month retainer."). Bill Clinton
says he has "absolutely no recollection" of talking to Hubbell about Hillary and Rose being on
retainer and doing legal work for Madison. B. Clinton OIC Deposition, 4/22/95, at 72-73.

[94]      Moles GJ, 10/19/95, at 22.

[95]      Id. at 24.

31

you get uncomfortable, go downstairs."[96]  Moles said that after learning that Madison retained Rose, she asked McDougal if Madison was going to split the legal work between the Mitchell firm and Rose. McDougal responded, "You are to send the Rose Law Firm nothing."[97]  Moles resigned from Madison in January 1985.[98]

### v.   Hillary Clinton's Income

The Clintons' tax returns are consistent with McDougal's claim that in 1984 when the jogging incident occurred something was happening at the Rose Law Firm which reduced Mrs. Clinton's earnings.  The Clintons' tax returns for years 1983, 1984, and 1985, reflect that Mrs. Clinton's income from Rose decreased in each of those years as follows:

| Year | Wages from Rose |
|------|------|
| 1983 | $ 82,741[99] |
| 1984 | $ 72,989[100] |
| 1985 | $ 55,382[101] |

### 4.   Statements Relating to Hillary Clinton's Version

---

[96]    Id. at 26.

[97]    Id. at 27.

[98]    Moles 302, 8/4/94 & 2/9/95, at 10. Moles' testimony is corroborated by her sister, Sarah Handley, a former financial examiner for the Arkansas Securities Department. Handley testified that Moles told her while Moles was working at Madison that "Clinton had come by [Madison] and that at the conclusion of that visit . . . McDougal had retained Hillary, the Rose Law Firm." S. Handley GJ, 10/31/95, at 22.

[99]    DEK001329.

[100]    DEK000753.

[101]    DEK001371.

32

Upon graduation from law school in May 1984, Rick Massey began work for the Rose Law Firm as a law clerk.[102]  When he passed the bar examination in August 1984, he became an associate at Rose and was assigned to the securities section.  Massey's "mentor" in the securities section was David Knight, a partner.  Massey became involved with Rose's work for Madison at the very beginning of the representation and did most of the legal work on Madison's first two matters -- the preferred stock offering and the limited partnership/broker-dealer.

Mrs. Clinton's version of Madison's retainer of Rose puts Massey at the center of the origination.  To the general question of whether he brought the Madison business to Rose, Massey says that he "do[es] not know how Madison Guaranty came to be a client of the firm."[103]  However, Massey testified that while he does not remember how the business came in, he does not remember feeling he brought the client in:  "I don't recall feeling like this was my -- that I killed this deer . . . . I didn't have a big part when they came in."[104]  When pressed by Chairman D'Amato at the Senate Whitewater hearings, Massey conceded he would have remembered bringing in the client, but he does not remember bringing it in:

> Chairman D'Amato.  Mr. Massey, let me say something to you.  First-year associate, you're there, if you had brought in this business, it would have been the first piece of business I think you testified that you brought into the firm; right?

---

[102]     Massey is a republican.  Massey GJ, 11/7/95, at 88.  Massey testified before the Senate Committee that he has a "very good memory."  Massey Senate Hearing, 1/11/96, at 238.

[103]     Massey GJ, 11/7/95, at 21 ("My position has been that I'm not -- and it is today that *I'm not aware of how -- what their motivation was for hiring us*.  I have -- I had a relationship with their president, which might have been a factor.  But I don't -- you know, *I don't know* that I -- you know, *I don't know*.  You'd have to ask them why they came to us," id, at 82) (emphasis added).  See also Massey FDIC Interview, 10/4/94, at 1.

[104]     Massey Senate Hearing, 1/11/96, at 78.

33

Mr. Massey. That's correct.

Chairman D'Amato. You would have remembered that?
Mr. Massey. That's correct.

Chairman D'Amato. You don't remember bringing that business into the firm?

Mr. Massey. No, sir, I do not.

* * *

Chairman D'Amato. Same day, contemporaneously. If you had brought the client in, you would know that you brought the client in, we went over that. First-year associate, eight months, you would have known that, it would have been memorable, wouldn't it? Yes or no?

Mr. Massey. Yes.[105]

Despite this admission, Massey also maintained during the hearing, "I don't have all the facts . . . . it's outside my knowledge as to whether I brought the Madison matter in or not."[106] It is important to note a recurring theme in Massey's responses: Massey concedes that his memory differs from Mrs. Clinton's as to the facts of how the business came to Rose; as to the individual events, however, Massey does not unequivocally say that the event did not happen; he merely says that he does not remember that the event did happen.

David Knight remembers attending the lunch with Latham and Massey, and Knight's

---

[105]    Id. at 232-233, 240-241. Chairman D'Amato's point is a classic deductive syllogism: Massey says that, had the event happened, he would have remembered the event, and he does not
remember the event; therefore, the event did not happen.

[106]    Id. at 29, 77.

34

memory of it is consistent with Massey's.[107]  Knight testified the purpose of the lunch was to

solicit legal business from Latham: "We took Mr. Latham to lunch, and I can't remember

certainly the specific conversation but the gist of it was we told him a little bit about the types of

work that Rick and I did. Representative clients for the firm. And then asked him for

business."[108]  Knight testified that Latham said McDougal made the decision as to which law firm

to hire and that Madison was happy with the Mitchell law firm: "My recollection is that he said

that Mr. McDougal was really the one that made decisions about hiring lawyers . . . . He also said

that Madison regularly used another law firm and that he thought they were satisfied with the

services provided by the law firm."[109]  Knight further testified he left the lunch with the

impression that the matter was closed and that Rose was not going to get any business from

Madison.[110]

Latham says that he does not remember taking a class where Knight and Massey both

taught and does not remember a lunch with Massey and Knight.[111]  Latham testified he

---

[107]

[108]     Knight Senate Hearing, 5/16/96, at 10.  Knight testified that the lunch occurred
after the conclusion of the law school course which Massey helped him teach.

[109]     Id.

[110]     Id. at 11, 13.

[111]     Latham Senate Deposition, 5/15/96, at 10-11.  Latham remembered being taught a
corporations course by Knight while in law school.  Latham seemed to leave open the possibility
that he may have taken a course after law school that was taught by both Knight and Massey:
"Not unless -- well, I may have, if it was a continuing ed course, or maybe they were teaching a
course that I had an interest in and attended for a bit.  It would have been after law school, but I
don't remember it."  Id.

35

193

remembers Massey at some point expressing an interest in obtaining some of Madison's legal

work: "I do recall that Rick pitched the business in the sense that he wanted us to hire them to do

legal work for us. I do not remember the lunch."[112] In a deposition before the Senate Whitewater

Committee, Latham testified Massey did approach him, but told him the decision to hire Rose

was McDougal's:

> Rick Massey and I ran into each other when we were studying for the bar, and
> Rick went to work for the Rose Law Firm after that, and had talked with me about
> us using the Rose Law Firm. And I think I probably mentioned that to McDougal
> at some point. At some later point, Jim came back to me and said let's use the
> Rose Law Firm, and he wanted to put them on retainer. . . . I think he wanted to
> use them because he had friends over there, and one of those friends, of course,
> was Hillary. He had used the Rose Law Firm there before. What's open there, of
> course, is what prompted Jim to make that decision. Was it a conversation with
> Hillary or was it just because I had suggested that at some point I would like to
> work with the Rose Firm at some point. I don't know.[113]

In an interview with FDIC investigators, Latham said McDougal suggested that Madison

use Rose:

> LATHAM said that at one time, date not recalled, JAMES MCDOUGAL
> suggested that MADISON GUARANTY use ROSE for some of the legal work at
> the institution. LATHAM said that, "MCDOUGAL had friends over there, he
> suggested we use them." LATHAM said when asked who the friends were that it
> was HILLARY RODHAM CLINTON and others.[114]

Latham says McDougal made the decision which law firm to hire and that Latham did not

---

[112]   Latham Senate Hearing, 5/16/96, at 35.

[113]   Latham Senate Deposition, 5/15/96, at 7-8. Latham says the pitch from Massey
occurred while they studied for the bar examination and thus suggests that his conversation with
Massey occurred in the summer of 1984 -- roughly consistent with the timing of the jogging
incident alleged by McDougal. Latham graduated from law school in May 1984, so he would
have studied for the bar the summer of 1984.   2031-00000027.

[114]   Latham FDIC Interview, 7/12/95, at 1.

36

have that authority.[115]  When specifically asked who made the decision to hire Rose, Latham

testified, "Jim McDougal did."[116]  Latham does not remember any discussions about there being

an unpaid bill from the Bank of Kingston litigation[117] and says he is not aware of what legal issue

McDougal wanted Rose to work on, although he does remember discussions with McDougal

about acquiring a broker/dealer.[118]     Massey also says he does not remember a discussion with

any Rose partner about Madison's having an outstanding bill and partners objecting to bringing

Madison in again as a client because of the billing problems: "I've heard that there were

discussions, that there was some disgruntlement.  And discussions like this could have gone on.

I don't believe I was a party to them."[119]  Massey acknowledged that Mrs. Clinton's version of the

retainer "doesn't square" with his,[120] and he insists he has no memory of ever discussing Madison

---

[115]     Latham 302, 2/14/95, at 1; Latham Senate Deposition, 5/15/96, at 12-13; Latham
Senate Hearing, 5/16/96, at 14-15.

[116]     Latham Senate Hearing, 5/16/96, at 15.  When asked if it is "safe to say you
personally did not hire the Rose Law Firm to work for Madison," Latham responded, "Yes, in the
sense . . . that I didn't make the decision to hire them and move that forward."  Latham Senate
Deposition, 5/15/96, at 8-9.  Pat Heritage-Hays, an assistant to Latham, says that when she
learned Madison was paying Rose $2,000 per month, she asked Latham about it, and he
responded, "Oh, it's one of Jim's deals."  Heritage-Hays 302, 1/6/95, at 1.

[117]     Latham Senate Deposition, 5/15/96, at 20; Latham 302, 2/14/95, at 2.

[118]     Latham 302, 2/14/95, at 1, 3.  Latham told FDIC investigators, however, that
Massey worked on the preferred stock and broker/dealer issues because Latham specifically
asked him to.  Latham FDIC Interview, 7/12/95. at 1.

[119]     Massey Senate Hearing, 1/11/96, at 23-24; Massey GJ, 11/7/95, at 33, 86 ("I
wasn't usually consulted or involved in billing matters as a first year associate . . . . I didn't know
there had been a reduction in the bill.").

[120]     Massey GJ, 11/7/95, at 84 (In an exchange about Mrs. Clinton's allegation that
Massey went to some securities partners at Rose about bringing Madison in as a client, Massey
was told, "Mrs. Clinton's version doesn't square, of course, with your version," to which Massey

37

billing matters with any Rose partners:

> [D]o I remember going to the partners and saying, "We want to represent the --
> Madison," and other partners saying, "You're not going to do that until they catch
> up on their bill, and maybe there ought to be a retainer." I have read that Giroir
> said that. I don't recall Giroir ever having said that to me. I don't remember me
> being in any of that discussion, and it frankly would not have been a matter in
> which I normally would be involved because I was a first year associate, and we
> didn't have much input on billing arrangements of that kind. It's possible,
> however. I just don't remember it.[121]

Massey further testified to the grand jury that he remembers no such discussion with any

securities partners or Mrs. Clinton:

> Q.  Mr. Massey, do you remember anything about your going to the securities
> partners and saying, "I want to work on a case for Madison," and they said, "We're
> not going to approve that until Madison has paid us what they owe us on some
> other case"?
>
> A.  I don't -- no, sir. I don't remember that.
>
> Q.  Either with any securities partners or with Mrs. Clinton?
>
> A.  I don't remember doing that with anybody.[122]

c.  **Other Evidence**

   **I.  Webb Hubbell**

---

responded, "I understand.").

[121]  Massey GJ, 11/7/95, at 84-85. According to an article in The Los Angeles Times,
Giroir told Rose partners that he did not want Madison as a client again. Risen, White House
Woes: Documents Hint at More Help by Mrs. Clinton for S&L Owner, Los Angeles Times, May
31, 1994, at A5 ("McDougal had refused to pay Rose's bills, prompting the firm's managing
partner, Joseph Giroir, to declare that he did not want McDougal as a Rose client again in the
future, according to partners."). Giroir testified to the grand jury that he has no memory of Rose
representing Madison in 1985 and 1986 and no memory of any discussions in the firm about the
representation. Giroir GJ, 7/18/96, at 23-27.

[122]  Massey GJ, 11/7/95, at 32. Massey told the grand jury, however, that although he
does not remember doing so, it is "possible" he may have gone to Knight and told him he thought
he was going to get Madison as a client. Id. at 84-85.

38

Hubbell says that Massey approached him in 1984 and asked him for help in getting Madison's business.[123] Hubbell testified that Massey said he had been talking to John Latham and Massey felt that Rose had an opportunity to get some of Madison's work.[124] Hubbell says he did not do anything to assist Massey in getting the business.[125]

As to who actually brought the client to Rose, Hubbell says, "Massey was the one who wanted them as a client and that Mrs. Clinton was one of those who helped him accomplish that task."[126] In an interview with the OIC, however, Hubbell said Mrs. Clinton brought the Madison

---

[123]   Hubbell Senate Deposition, 10/26/95, at 134-136; Hubbell 302, 2/1/95, at 5. Hubbell left Rose from September 1984 through January 1, 1985, while he completed an unexpired term on the Arkansas Supreme Court.

[124]   Hubbell Senate Deposition, 10/26/95, at 134-136.

[125]   Id.

[126]   Id. at 122. Hubbell says he has no personal knowledge as to who brought the client in. Hubbell GJ, 5/7/96, at 74-75 ("I don't know for sure who brought it in . . . . I don't have personal knowledge, right."). In the grand jury, Hubbell was read a quote from a news article as follows: "Webster L. Hubbell, a partner and spokesman at Rose, said that nothing in the law firm's records indicates that Hillary Clinton brought in the Madison Guaranty business. 'That's a new one on me,' he said." When asked whether the quote was accurate, Hubbell responded, "I don't know if I said that, but there is nothing in the records -- this is where lawyers are being lawyers, Mr. Ewing. There is nothing in the records of the firm that show that Hillary brought in the business." Id. at 108.

According to notes of Susan Thomases from a conversation with Hubbell on February 24, 1992, Hubbell told Thomases that Massey will say he brought the business:

Massey had relationship w/ Latham & HC had relationship w/ MacD. *Rick will say he had rel[ationship] w/ Latham & had a lot to do w/ getting the client in.* She did all the billing. According to time recs, HC had numerous conf[erences] with Latham, Massey, and McDougal on both transactions. She reviewed some docs. She had one TC in 4-85 at the beginning of the deal w/ Bev. [Bassett]. Neither deal went through. Broker/dealer was opposed by staff approved by Bev under certain condition which they never met. Preferred stock? *But for Massey, it would not been there.* But HC was billing partner and attended conferences.

39

197

business to Rose: "HUBBELL notes that MADISON was HILLARY's client, as she is the one who brought MADISON into the firm as a client, that is why she became the billing partner."[127] Hubbell was asked about this statement in the grand jury:

### ii. Watt Gregory

Watt Gregory,[128] a senior member of the securities section at Rose, remembers that there was "some general discussion" within the firm about whether the firm should undertake representation of Madison.[129] Gregory remembers talking to Mrs. Clinton "about whether we should or shouldn't [represent Madison], or what some of the issues might be in connection with the ability of the savings and loan to raise capital by that particular method."[130] Gregory testified that "Mrs. Clinton was instrumental in *introducing* the client to the members of the firm. . ."[131]

---

790-00000020 (emphasis added).  See also Thomases GJ, 2/29/96, at 45.

[127]    Hubbell 302, 2/1/95, at 7.

[128]    Watt Gregory left Rose in 1989, and later formed the law firm of Giroir & Gregory with former Rose attorney Joe Giroir.  Gregory 302, 5/24/95, at 1.

[129]    Gregory GJ, 1/3/96, at 7.  Gregory testified that while he remembers some discussion, he cannot remember "names, places, or dates" of such discussions.  Id.  In an interview with the OIC in 1985, Gregory remembered that one party to the discussions was David Knight.  Gregory 302, 5/24/95, at 2.

[130]    Gregory GJ, 1/3/96, at 25-26.

[131]    Id. at 6-7 (emphasis added).  What Gregory meant by the term "introducing" is unclear.  His interview with the OIC in 1985 reads as follows: "RLF's opportunity to represent Madison Guaranty Savings & Loan (MGSL) came through Hillary Clinton in the mid 1980's."  Gregory 302, 5/24/95, at 2.

40

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

USCA Case #16-5366     Document #1668146     Filed: 03/28/2017     Page 202 of 421

## **EXHIBIT 3 (Part 2)**

to

Plaintiff's Response to Defendant's Statement of Material Facts
Not in Dispute and Statement of Undisputed Material Facts
in Support of Cross-Motion for Summary Judgment

[    ]32

Gregory remembers two specific concerns about representing Madison prior to its undertaking the representation.[133] The first concern was whether Rose should represent Madison at all: Gregory felt that Rose, which had not represented any savings and loans, did not have the expertise to handle such a representation; also, Gregory believed that the business potential representing Madison was small and the risks were great because he understood that savings and loans in general and Madison in particular were having financial difficulties, so he "didn't perceive Madison to have a particularly attractive risk/reward ratio for our firm as a new client."[134] The second concern was that what Madison wanted to do substantively was unprecedented and "there was no bright-line, black-letter statement in the Arkansas statutes that would say you can have two classes of stock."[135] Gregory has no memory of any discussion at the origination of the retainer about Madison having an outstanding bill.[136] When asked about how Massey came to be assigned the project, Gregory said, "I have some recollection that he, at one point, mentioned a friendship or an acquaintanceship with this John Latham."[137]

---

132    [                    ]

133    Id. at 13, 15-16 ("But I do know that there was an open discussion about the client, or the potential client, as well as the substantive issue, could a state-chartered, stock-owned savings & loan association have two classes of stock. . . . But to my way of thinking, the discussions about, 'Should we be doing this,' took place before we undertook the particular project.").

134    Id. at 8-10.

135    Id. at 13-14.

136    Id. at 18.

137    Id. at 29.

41

\* \* \* \* \*

3) *1987-1992*: *RLF Conflicts/Ward v. Madsion/U.S. v. McDougal* — [The RLF's

conflict of interest in representing the RTC in Madison v. Frost is detailed in Dreiband & Myers,

"Summary of Rose Conflicts," April 1998.]

Borod & Huggins Report

On July 11, 1986, the FHLBB ordered James McDougal and Madison President John

Latham removed from Madison Guaranty. Shortly thereafter, Madison's board hired the

Memphis law firm of Borod & Huggins to investigate Madison Guaranty. Borod & Huggins

issued a report on March 3, 1987, and that report discusses various matters related to

McDougal's use of Madison Guaranty to benefit himself and other insiders. The Borod &

Huggins Report also identified numerous persons -- including Seth Ward -- as having engaged in

"apparent criminal violations."

Madison sent a criminal referral to the United States Attorneys' office in Little Rock and

attached a copy of the Borod & Huggins Report. The Federal Bureau of Investigation

investigated the matter, and that investigation led to the indictment of McDougal, Latham, and

others in November 1989 for matters related to Castle Grande.[138]

Borod & Huggins issued a second supplemental report on August 31, 1988.

Coincidentally, August 31, 1988 is the same day the jury returned a verdict in Seth Ward's favor

in the *Ward* case.

---

[138]*See* FBI Madison case file, 29A-2459, Serials 1, 2, 7, 9, 10, 13, and 52; and 105-00071012
*et seq.* (which is a copy of the Borod & Huggins Report that Rose produced to the OIC).

42

NW: 15416 DocId: 70001585 Page 80

201

Rose Began Work For The FSLIC In December 1985.

In December of 1985, the Rose Law Firm began its representation of the government in connection with failed savings and loan institutions. It represented the Federal Home Loan Bank Board ("FHLBB") and its agent, the FSLIC, in the takeover of Guaranty Savings & Loan in Harrison, Arkansas. Vincent Foster served as billing partner and lead counsel for the FSLIC. The Guaranty matter proved quite lucrative for Rose, and Mr. Foster, Rose member Herb Rule, and other Rose attorneys made repeated efforts during 1986 and 1987 to obtain more FSLIC business. Hillary Clinton billed the FSLIC for work on the Guaranty matter. Webb Hubbell did not bill the FSLIC for matters related to Guaranty, but he did receive memoranda about Rose's representation of FSLIC.[139]

FirstSouth and C. Joseph Giroir

During the Fall of 1986, the FHLBB began to prepare for the imminent failure of an Arkansas savings and loan institution named FirstSouth, which Hubbell described as "the largest savings and loan in Arkansas."[140] The FHLBB began to negotiate with various law firms for work on the FirstSouth receivership, including the Rose Law Firm. The FHLBB learned that Rose had a serious conflict of interest with FirstSouth. The FHLBB threatened to sue Rose. The FHLBB also threatened to sever its relationship with Rose.

The conflict involved Joe Giroir, a senior Rose attorney, and Giroir's work with

---

[139]*See, e.g.*, a July 14, 1986 memorandum from Mr. Foster to Mrs. Clinton, Mr. Hubbell and others at Rose which attached copy of an appellate opinion in the Guaranty matter. 264-00022363-76.

[140]2625-00001113.

43

FirstSouth prior to its failure. Webb Hubbell negotiated and signed a $3 million settlement

agreement with the FHLBB/FSLIC, and Rose managed to salvage the business.

Mr. Foster, Mr. Hubbell, and Hillary Clinton began meeting in Mrs. Clinton's office

"almost daily."[141] Mr. Hubbell later wrote:

> Hillary was angry, too. She had participated in several of Vince's phone calls to
> the FSLIC assuring them that we had no conflict. She felt betrayed. She also
> worried that a $10 million claim would finally put the oldest law firm west of the
> Mississippi out of business. Years later, she would tell me that the years 1987-88
> were the two hardest years of her life.[142]

On November 10, 1994, Hillary Clinton told the FDIC-OIG when asked about FirstSouth

that "there were issues involving C. Joseph Giroir, a former Rose partner, but [she] *was unaware*

*of what those issues may have been.* She stated she had no involvement with the FSLIC and any

negotiations involving FirstSouth or Mr. Giroir."[143]

Additionally, Hubbell testified in 1996 that he "may have taken" his FirstSouth files from

Rose when he left Rose and came to Washington in January 1993.[144]

Seth Ward v. Madison Guaranty

In mid-1987, Seth Ward began to complain that Madison owed him "commissions" for

the sale of the IDC/Castle Grande land he warehoused for Madison Guaranty and Madison

Financial. On June 1, 1987, the FHLBB issued a subpoena to Ward as part of its investigation of

---

[141]*Friends*, at 132.

[142]*Friends*, at 132.

[143]H.R. Clinton FDIC-OIG Statement, 11/10/94, at 5 (emphasis added). As noted above, Mr.
Hubbell's book, *Friends*, suggests that Mrs. Clinton's statement-- that she was "unaware" of the
First South issues-- is false.

[144]Hubbell Senate Testimony, 2/7/96, at 158.

44

203

Madison Guaranty.[145] [                                    ][46] Shortly
thereafter, Ward decided to sue Madison Guaranty Savings & Loan and Madison Financial
Corporation.

Ward filed a lawsuit against Madison Guaranty and Madison Financial on September 2,
1987. Ward's complaint sought payment of "commissions" Ward claimed that Madison owed
him for his work on the IDC/Castle Grande matter. Ward's attorney for the initial part of the
case was Alston Jennings of Wright, Lindsey & Jennings.

Ward's various agreements with Madison Financial, his sham loans to and from Madison,
the May 1, 1986 option agreement drafted by Hillary Clinton, and the history of his dealings with
Madison were at issue in the case. The case was tried before a jury on August 30 and August 31,
1988, and the jury returned a verdict in Ward's favor. Hubbell attended at least portions of the
trial, allegedly because he wanted to hear Alston Jennings give his closing argument.

From September through November 1988, after the jury returned its verdict, Hubbell
served and filed a series of documents related to writs of garnishment on behalf of Skeeter Ward,
Skeeter's wife, and POM.[147] Skeeter Ward and POM had loans outstanding at Madison
Guaranty. By means of the writs of garnishment, Hubbell and the Wards sought to have the trial
court order Skeeter Ward and POM to pay Seth Ward the monies Skeeter and POM owed
Madison Guaranty. The writs eventually became moot as the parties entered into an escrow

---

[145]*See* Exs. 4 and 33 of the FDIC-OIG Supp. Rep., 9/20/96;

[146]

[147]RTC-OIG Rep., 8/3/95, Ex. 123



45

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure
NW: 15416 DocId: 70001585 Page 83

agreement while the case was on appeal.

In October of 1989, Hubbell learned that the state appellate court dismissed the appeal of Ward's case. Hubbell called Alston Jennings to relay the news of the dismissal, and Jennings then retrieved the escrowed money and gave it to Ward. The FDIC and RTC, however, removed the case to federal court -- Madison was in conservatorship -- and Wright, Lindsey & Jennings had to agree to indemnify the RTC for the escrowed money while the case was on appeal in the federal courts. Wright, Lindsey & Jennings withdrew from the case, but demanded that Ward agree to indemnify the firm. Ward agreed, and Hubbell negotiated an indemnification agreement between Ward and Wright, Lindsey & Jennings.

The case continued on appeal until 1993, when the parties settled the case. As part of the settlement, Ward returned the money he obtained as a result of the jury's verdict.[148] Hubbell advised Ward on the settlement (although Ward primarily used another lawyer, Thomas Ray).

Hubbell concealed his involvement in the *Ward* case from the FDIC and the RTC. Hubbell said that he "did not tell Breslaw about this representation because it was insignificant."[149]

Rose's Work For The FDIC

Rose began its work for the FDIC in approximately July 1987.[150] Vince Foster served as the billing partner and lead attorney on FSLIC matters, while Mr. Hubbell served in that function

---

[148] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[149]Hubbell FDIC-OIG Interview, 3/16/95, at 7.

[150]264-00009841-90.

NW: 15416 DocId: 70000 585 Page 84 FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

for FDIC matters. Mr. Hubbell worked with associate Rick Donovan on a case which involved professional liability matters related to Corning Bank. The Corning Bank matter came to Rose because the prior law firm, the Little Rock firm of Wright, Lindsey & Jennings, had a conflict of interest.[151]

By December of 1987, April Breslaw was the responsible FDIC attorney for the Corning Bank matter. Breslaw worked with Mr. Hubbell and Rose associate Rick Donovan on the matter.

November 1988: Rose Attempts To Qualify As FSLIC Fee Counsel

During October and November of 1988, Vince Foster and Rose attempted to qualify to act as fee counsel to the FSLIC for six Arkansas savings and loan institutions which were about to enter conservatorship or receivership. One of those institutions was Madison Guaranty.

On Monday, October 31, 1988, Foster received the conflicts check lists for the six Arkansas institutions.[152] The conflicts list for Madison Guaranty contained references to Jim and Susan McDougal, Frost partner James Alford, and Castle Grande. It listed law firms and lawyers which FSLIC knew had performed legal work for Madison Guaranty. Those firms included Little Rock's Mitchell, Williams, Selig & Tucker and the Memphis firm of Gerrish & McCreary (which was the successor to Borod & Huggins).[153] The Madison Guaranty conflicts list did not mention Rose.

The next day, Tuesday, November 1, 1988, Foster circulated a memorandum to all Rose

---

[151]Hubbell RTC-OIG Interview, 4/20/95, at 11-12.

[152]

[153]

47

attorneys which attached the conflicts check lists. Foster also sent Hindes a letter which

informed Hindes that Rose represented a party adverse to the FSLIC in a case called *Universal*

*Savings & Loan Association v. First Investment Securities.*[154]   Hindes called and asked about the

Universal Savings matter and "advised that the representation might constitute a conflict which

could disqualify [Rose] from being considered."[155] The next day, Hindes called again and

"advise[d] that this representation was deemed to be a conflict of such a nature to disqualify

[Rose] from being fee counsel on any new receivership."[156]

On Thursday, November 3, 1988, Foster circulated another memorandum to Rose

attorneys. That memorandum stated in relevant part:

> Stop the presses. Because the firm represents Defendants in an action by a
> savings and loan which is now in receivership by FSLIC (although it was not at
> the time we undertook the representation), under current FSLIC policy we are
> disqualified from receiving any new business while that case is pending.
> Accordingly, you should ignore the conflicts memorandum circulated earlier
> regarding Arkansas savings and loan institutions which are prospects for
> receivership. We should focus our efforts on trying to represent buyers instead of
> receivers."[157]

Foster persisted. On Tuesday, November 8, 1988, Foster sent FSLIC attorney James

Lantelme a letter



[158]   On Monday, February 21, 1988, Hindes sent Foster a letter which stated

---

[154]RTC-OIG Rep. 8/3/95, Vol. III, Ex. 96

[155]

[156]

[157]281-024945; RTC-OIG Rep., 8/3/95, Ex. 25.

[158]

48

FOIA(b)3 - Rule 6(e) - Federal Rules of Criminal Procedure

207

that

[¹¹59]

Foster's letters did not disclose the Rose Law Firm's prior work for Madison Guaranty, and no one has ever found any document which would indicate that FSLIC, the FDIC, or the RTC ever learned of Rose's prior work for Madison Guaranty before press reports of that work during the 1992 campaign, and then during the investigations which began in the fall of 1993. Foster's letters also did not disclose Hillary Clinton's business partnership with the McDougals, Rose's work on Castle Grande, or Rose's legal work for Jimmie Alford's company, Precision Industries.

In any case, a regulatory change occurred which required Rose to solicit the FDIC for that work.

On February 28, 1989, in response to the regulatory changes that occurred during January and February of 1989, Vince Foster sent solicitation letters to the FHLBB/FSLIC and the FDIC. He did not mention the Rose Law Firm's prior work for Madison Guaranty in those letters.[160]

On August 9, 1989, Congress and the President enacted the Financial Institution Reform, Recovery and Enforcement Act ("FIRREA").[161]  Among other things, FIRREA abolished the FSLIC, and created the RTC to manage failed savings and loan institutions.

Hubbell Began "Lawyering With A Vengeance" In Early 1989.

---

[159]

[160]281-00003361-3369; 264-00025765-81; 264-00025889-902; 281-00001578-86; 281-029581-89 (emphasis added).

[161]Pub. L. No. 101-73, 103 Stat. 364.

49

In January 1989, Rose members told Hubbell they "wanted [him] out of firm management altogether."[162]
_____ FOIA(b)6 _____ so Mr. Hubbell "resolved to build up [his] practice, increase [his] billings[, and] began lawyering with a vengeance."[163] Along with Vince Foster, Mr. Hubbell focused on obtaining more FSLIC and FDIC work, as he "was in the process of trying to dramatically increase [his] billings at the firm."[164] In short, his "judgment was clouded."[165]

## FDIC/RTC/Madison Guaranty v. Frost & Company

Mr. Hubbell accepted the *Madison Guaranty v. Frost* case at a time when "in the only measure that counted -- how much you were billing -- [he] was the low man on the totem pole."[166]

The *Frost* case, Hubbell wrote in 1997, has "become part of the industry known as Whitewater."[167] He predicted, ominously: "The way all of this keeps evolving, I expect *Madison v. Frost* to eventually be linked with Lee Harvey Oswald and Deep Throat."[168]

## The Origins Of *Madison v. Frost*

---

[162]*Friends,* at 145.

[163]*Id.* at 145.

[164]*Friend,* at 147.

[165]*Id.* at 147.

[166]*Friends*, at 145.

[167]*Friends,* at 148.

[168]*Friends*, at 149.

50

After the Borod & Huggins law firm issued its 1987 report, it concluded that Madison
Guaranty had a viable claim against Frost & Company, the accounting firm which performed
audits on Madison Guaranty for the years 1984 and 1985.  On February 29, 1988, Madison
Guaranty filed a complaint in Arkansas state court against Frost & Company, and other
individuals, including Jimmie D. Alford.  Mr. Alford was the Frost partner in charge of the 1984
and 1985 audits of Madison Guaranty.[169]  Madison Guaranty alleged that Frost was negligent
when it performed the 1984 and 1985 audits.

April Breslaw Decided To Hire Rose for the *Frost* Case.

On February 28, 1989, the FDIC was named conservator of Madison Guaranty.[170]  April
Breslaw, an FDIC attorney, became responsible for the *Frost* case.  Ms. Breslaw determined that
Borod & Huggins' successor, Gerrish & McCreary, had too many conflicts of interest.[171]  She
contacted Rick Donovan at Rose and asked if Rose could take the case.  Mr. Donovan directed
her to Mr. Hubbell.[172]

On March 21, 1989, Mr. Hubbell circulated to other Rose attorneys a memorandum about
conflicts of interest related to *Madison v. Frost*.[173]  Mr. Hubbell "was aware that Mrs. Clinton

---

[169]105-070547-52; 281-01612; Alford OIC-302, 2/6/98, at 1-2; Alford RTC-OIG
Statement, 9/7/94, at 1-2.

[170]*Cf.* 105-00022985 (3/2/89 letter to Beverly Bassett from a FHLBB/FSLIC representative).

[171]Breslaw Senate Banking Comm., 11/30/95, at 24-25; Breslaw Grand Jury Testimony,
6/16/94, at 7-10.

[172]Interview with Webster Hubbell by Jack Smith and John Downing, 1/11/94.

[173]Hubbell House Banking Comm., 8/10/95, at 47; House Banking Comm. Index, 8/10/95, at
242.

51

had been the billing attorney in 1985 and 1986 . . . [and] that for a period of time, we [Rose] had done some work for Madison."[174]   Mr. Hubbell admitted in testimony before the House Banking Committee that Rick Massey "disclosed that there had been prior work done at the Securities Department," either in the fall of 1988 or after Hubbell circulated his March 21, 1989 memorandum.  Hubbell did not disclose that information to April Breslaw.[175]   In testimony before the Senate, Mr. Hubbell admitted that he did not tell Ms. Breslaw any details about Rose's prior representation of Madison Guaranty:

| | |
|---|---|
| Mr. Chertoff. | Did you tell Ms. Breslaw, for example, that the Rose Law Firm had represented Madison Guaranty Savings in connection with the acquisition of some property in '85 and '86 known as the Arkansas Industrial Development Corporation property? |
| Mr. Hubbell. | No, I'm sure I did not in that specifics. |
| Mr. Chertoff. | Did you notify Ms. Breslaw that, in fact, the law firm had represented Madison Guaranty in trying to obtain approval from Beverly Bassett-Schaffer in order to issue preferred stock to raise the capital levels in the bank? |
| Mr. Hubbell. | No, I did not. |
| Mr. Chertoff. | Did you indicate that in connection with this same property, this Industrial Development Corporation property acquisition, that the Rose Law Firm had given regulatory advice to Madison Guaranty concerning certain regulations that governed water utilities and sewer utilities? |
| Mr. Hubbell. | No, I'm sure I did not. |

---

[174]Hubbell *House Banking Comm.*, 8/10/95, at 47.  *See also*

[175]Hubbell *House Banking Comm.*, 8/10/95, at 59.

52

NW: 154 Federal Rules of Criminal Procedure

211

Mr. Chertoff.     So what is it exactly you told Ms. Breslaw about the nature of your previous representation of Madison?

Mr. Hubbell.      As far as telling Ms. Breslaw, I believe the words were something to the effect that we didn't have any conflicts, we could take it on. There had been three matters that I had specifically addressed -- and this may have been less than a 30-second conversation -- the primary one being whether the firm would take on the litigation against Frost since we had other clients who were still being audited by Frost & Company.

Mr. Chertoff.     So in this 30-second conversation, you said that the firm had taken on three matters for Madison --

Mr. Hubbell.      No, no, I didn't say that, Mike.

Mr. Chertoff.     What did you say in the 30-second conversation?

Mr. Hubbell.      Mike, I'm trying to remember. What I'm trying to say, in a very short context, was that in my mind, there were three issues. One was my father-in-law, one was prior work for Madison and the primary one being the Frost issue itself. I knew that there had been a more complete disclosure concerning our representation of Madison to the FDIC. I probably improperly assumed that she knew about that.[176]

Mr. Chertoff.     Well, what did you tell Ms. Breslaw?

Mr. Hubbell.      I told her that we did not have any conflicts.

Mr. Chertoff.     Did you tell her that there had been earlier representations of Madison by the Rose Law Firm?

Mr. Hubbell.      Yes.

Mr. Chertoff.     Did you describe them?

---

[176]We have found absolutely no evidence which supports Mr. Hubbell's assertion that "there had been a more complete disclosure concerning our representation of Madison Guaranty to the FDIC."

53

212

| | |
|---|---|
| Mr. Hubbell. | I think I said we had done some minor lending work for Madison back in the early '80s. |
| Mr. Chertoff. | Minor -- what does "minor lending work" mean? |
| Mr. Hubbell. | There would be some loans that we would have been counsel to Madison on. |
| Mr. Chertoff. | You mean collecting loans? |
| Mr. Hubbell. | No, no, I meant like closing loans. |
| Mr. Chertoff. | And did you -- did she ask you for any details about that? |
| Mr. Hubbell. | No. |
| Mr. Chertoff. | Now, did you refer her to some prior conversation that someone from the firm had had about what these transactions were? |
| Mr. Hubbell. | No, I did not. |
| Mr. Chertoff. | Did you yourself give consideration to whether these transactions were conflicts? |
| Mr. Hubbell. | I looked at it in the context of the Frost litigation and whether there would be a conflict, and I did not see a conflict as to the prior representation since we were, to some extent, standing in the shoes of the institution. |
| Mr. Chertoff. | Well, let's get into the nature of the prior representations and analyze that for a second. Were you familiar with the fact that in 1986, the Federal Home Loan Bank Board, which was reviewing Madison Guaranty, had described the acquisition of this Industrial Development Corporation property as a fictitious -- involving a fictitious sale? |
| Mr. Hubbell. | Was I aware in '86 at the time I was talking to April? |
| Mr. Chertoff. | Yes, in '89. |
| Mr. Hubbell. | No, I was not aware of that in 1989. |

54

213

Mr. Chertoff.          Were you aware of the fact that the firm had represented
                       Madison Guaranty in connection with that acquisition?

Mr. Hubbell.           Yes, I was. I don't know that I had remembered it in '89,
                       but I do -- I was aware of it.[177]

Ms. Breslaw tells a slightly different story: "I have no recollection of ever being told by anyone at the Rose Law Firm that the Rose Law Firm had previously represented Madison before it closed."[178] Furthermore, she says, "[w]hen I retained the Rose Firm to work on Madison -- the Madison accounting case, it disclosed no conflicts of interest."[179]

Mr. Hubbell later admitted that he "exercised very poor judgment in taking on the [*Frost* case].[180] Mr. Hubbell decided to accept the *Frost* case even though some Rose partners objected on the grounds that Rose and Frost had common clients and did not believe Rose should sue a local accounting firm on behalf of the federal regulators.[181] Mr. Hubbell disregarded his partners' objections and accepted the case.

Mr. Hubbell later wrote: "I was angry because even though they wanted me to start billing, every time I came up with a case they found reasons for me not to do it -- reasons that were for their benefit, not mine. So I wasn't in an accommodating mood. I took on *Madison v.*

---

[177]Hubbell Senate Testimony, 12/1/95, at 98-102.

[178]Breslaw Senate Banking Committee Deposition, 7/28/94, at 26-29.

[179]Breslaw Senate Banking Comm., 11/30/95, at 25.

[180]*Friends*, at 146.

[181]*See, e.g., Friends*, at 147;

55

NW: 15416 DocId: 70001585 Page 93 Federal Rules of Criminal Procedure

214

*Frost.*"[182]

Madison Employees Complained About the Hubbell-Ward Relationship.

In June 1989, approximately three months after the FDIC hired Rose, a "noticeably agitated" Madison Guaranty employee, Sue Strayhorn, informed Paul Jeddeloh, Madison's intervention attorney, that Mr. Hubbell, Seth Ward, and Seth Ward II were in-laws.[183]

On June 8, 1989, Mr. Jeddeloh wrote a letter to Ms. Breslaw which highlighted Mr. Hubbell's in-law relationship with Seth Ward, and with Seth Ward II.[184] In his letter, Jeddeloh explained that both Seth Ward and Seth Ward II had lawsuits pending against the Madison Conservatorship.[185] Mr. Jeddeloh also explained that Hubbell "was present at the trial of the Seth Ward matter and appears to have been an interested (indirectly) participant in the Ward proceedings."[186]

Ms. Breslaw spoke with Rick Donovan about the Ward matter on June 20, 1989.[187] Ms. Breslaw asked Donovan if Hubbell was Ward's father-in-law, and Donovan confirmed that Breslaw and Hubbell were in-laws.[188] Shortly after her conversation with Donovan, Breslaw

---

[182]*Friends*, at 147.

[183]Breslaw House Testimony, 8/10/95, at 46; Ex. 15 to FDIC-OIG Rep., 7/28/95 (Jeddeloh FDIC-OIG Statement, 3/15/94).

[184]Ex. 99 to RTC-Rep., 8/3/95, vol. III.

[185]Ex. 99 to RTC-Rep., 8/3/95, vol. III.

[186]Ex. 99 to RTC-Rep., 8/3/95, vol. III.

[187]Donovan Little Rock G.J., 1/21/98, at 18-29; LR GJE 1651 (notes of Donovan's June 20, 1989 conversation with Breslaw).

[188]Donovan Little Rock G.J., 1/6/98, at 93-94.

56

spoke with Hubbell. She described her conversation with Hubbell as follows:

> [Mr. Hubbell] explained that he was not representing Seth Ward. He left me with the impression that he did not have a particularly close relationship with his father-in-law. I believe he suggested that his father-in-law was a relatively staunch Republican and Hubbell himself had been involved in Democratic politics for some time. I believe he was Mayor of Little Rock. So he has own Democratic political connections.
>
> And the way he represented it to me was he and his father-in-law had different political ideas. He went to some lengths to make me have the impression he was not particularly close to his father-in-law and that he was not representing his father-in-law and that he would not represent his father-in-law in the future. I said, please put that in writing. Confirm what you've just said in writing and send me a letter to that effect. And I believe he did that in June of 1989. Once he had, in my view, confirmed in writing that there was no conflict, in other words, that he was not representing Ward in any matter against us and had promised not to do so in the future, it seemed to me that there was no conflict of interest and I was not -- I did not conclude that it would be necessary to replace the Rose Law Firm simply because Hubbell was related by marriage to someone who was in unrelated litigation, who was involved in unrelated litigation.[189]

Ms. Breslaw "generally recall[s] being irritated that it [the Seth Ward potential conflict] had not been disclosed initially."[190] One of Ms. Breslaw's "considerations" for keeping the *Frost* case at the Rose Law Firm was the fact that Mr. Hubbell represented to her that Mr. Ward was

---

[189]Breslaw Senate Banking Committee Deposition, 6/6/95, at 23-24. *See also, e.g.*, Breslaw Senate Banking Comm. Dep., 10/23/95, at 246 (same).

[190]Breslaw Senate Banking Committee Dep., 10/23/95, at 40. Ms. Breslaw also testified that:

> [Paul] Jeddeloh informed me about this family relationship, and [] I contacted Hubbell to ask him about it. And at that point, he confirmed that he was related by marriage to the Ward family. But he told me that he did not represent Ward. And my recollection of the conversation is that he told me, not only that he did not represent Ward, but that he would not represent Ward in the future.

*Id.*

57

not a client of the firm.[191]

Mr. Hubbell concealed Rose's work on the IDC/Castle Grande matter from the FDIC and
the RTC.[192] Mr. Hubbell only denies, weakly, that he ever told April Breslaw that he and Seth
Ward were not close:

> Mr. Chertoff.    And did you indicate to Ms. Breslaw that your relationship
> with your father-in-law, Mr. Ward, [was] not a close one?
>
> Mr. Hubbell.    Not that I know of.
>
> *   *   *
>
> Mr. Chertoff.    And I want to read to you from line of the statement given
> by Ms. Breslaw on page 200.  "A few months after I had
> hired the Rose Firm, I learned that Seth Ward was Webster
> Hubbell's father-in-law and that Ward was in litigation with
> Madison.  Under the ethical rules, an adverse interest by an
> in-law is not imputed to a lawyer.  It is not a conflict of
> interest.  Nevertheless, I asked Mr. Hubbell about the Ward
> matter.  Mr. Hubbell told me that he was not representing
> Mr. Ward and that he would not do so in the future.  He
> also told me that his relationship with his father-in-law was
> not a close one.  I recall him saying that Mr. Ward was an
> ardent Republican and that he was an active Democrat." I
> want to ask you, did you tell Ms. Breslaw that your
> relationship with your father-in-law was not a close one?
>
> Mr. Hubbell.    I don't remember that, Mr. Chertoff.[193]

---

[191]Breslaw Senate Banking Comm. Dep., 10/23/95, at 249. *See also id.* ("I believe that if I
had understood in June of 1989 that Hubbell did represent Ward or Ward's interests, that I would
have taken that up with supervisors.  And I don't know what they would have advised me to
do.").

[192]Breslaw Senate Banking Comm., 11/30/95, at 36-37, 40, 42-43. *See also id.* at 32-45
for a fuller reading of Ms. Breslaw's Senate testimony in regard to Rose's work on Castle Grande
and Mr. Hubbell's nondisclosure of the Rose-Madison Guaranty relationship.

[193]Hubbell Senate Testimony, 2/7/96, at 14-17. *See also, e.g.,*

58

After Mr. Hubbell spoke with Ms. Breslaw, he directed Rick Donovan to draft a letter to David Paulson, who was then Madison Guaranty's managing agent. Mr. Donovan drafted the letter, then gave the draft to Mr. Hubbell.[194]

On June 23, 1989, Ms. Breslaw sent a letter to the managing agent of the Madison Conservatorship, David Paulson.[195] Ms. Breslaw explained that Hubbell did not represent Ward, that Hubbell had not submitted pleadings on Ward's behalf, and that Hubbell would not do so in the future.[196]

Mr. Hubbell apparently edited Donovan's draft and, on June 28, 1989 sent the letter to Mr. Paulson with a copy to April Breslaw and Rick Donovan. The June 28, 1989 letter states:

Dear Mr. Paulson:

At April Breslaw's request, I am writing this letter. This letter is to advise you that *I have not represented Mr. Seth Ward in connection with any issue or matter relating to his disputes with Madison Guaranty.* It is my understanding that Mr. Ward was represented by Wright, Lindsey & Jennings until recently. When the FDIC became managing agent for the FSLIC As Conservator for Madison Guaranty, Mr. Thomas Ray of the firm Shultz, Ray & Kurrus began representing Mr. Ward. In addition, *I do not represent Mr. Seth Ward, II, in regard to any disputes he may have with Madison Guaranty. I have no intention of representing Mr. Ward or his son in the future concerning any matter relating to Madison Guaranty.*

---

[194]Donovan Little Rock G.J., 1/21/98, at 20-24. *See also, e.g.*

[195]Ex. 100 to RTC-OIG Rep., 8/3/95.

[196]Ex. 100 to RTC-OIG Rep., 8/3/95.

59

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure
NW: 15416 DocId: 70001585 Page 97

Should you have any questions concerning this, please do not hesitate to call me.

/s/ Webb Hubbell

cc: April Breslaw
    Rick Donovan[197]

Mr. Hubbell did not tell Ms. Breslaw anything about his relationship with Seth Ward

other than that he and Ward were in-laws -- a fact contained in Mr. Jeddeloh's June 8, 1989

letter.[198]

In 1989, Hubbell read the 1986 FHLBB exam reports, and, in particular, he read the May

8, 1986 exam report which criticized Ward and the IDC/Castle Grande transaction.[199] Then in

1990, Hubbell read the Borod & Huggins Report. Hubbell learned that those reports described

---

[197]Little Rock G.J. Ex. 1653 (emphasis added). *See also, e.g.*, Hubbell Telephone Interview,
12/27/95, 39 ("April and I and Mr. Paulson had had some discussions about my father-in-law and
concerns being raised by some of the employees of Madison about the Frost litigation, and this is
the letter that they asked me to draft."). Rick Donovan testified that he knew nothing about
Rose's work for Madison Guaranty and Seth Ward on the IDC/Castle Grande matters when he
drafted the June 28 letter to Paulson. He also had no knowledge of Hubbell's involvement in the
*Ward* case. Donovan Little Rock G.J., 1/21/98, at 22-29.

Also on June 28, 1989, Chris Wade wrote to Hillary Clinton about matters related to the
Whitewater Development Corporation. H.R. Clinton, RTC Interrogs. Resp., 5/22/95, at 65 (and
accompanying exhibits). Mrs. Clinton apparently engaged in correspondence of various kinds
with Jim McDougal during this time period. *See id.* (indicating that Mr. Wade, Mrs. Clinton and
Mr. McDougal exchanged letters on June 22, 1989, June 28, 1989, September 5, 1989, and
September 20, 1989).

[198]Jeddeloh later recalled that "[d]uring my tenure as the managing attorney for Madison, I did
not come into information that would lead me to believe that Rose had represented Madison at
any time prior to its closing." Ex. 15 to FDIC-OIG Rep., 7/28/95 (Jeddeloh FDIC-OIG
Statement, 3/15/94). Jeddeloh also stated that if Rose "had represented Madison previously as its
general counsel or on operational matters (as opposed to general collection and foreclosure
work), it is likely that I would not have utilized the firm, or would have terminated the firm's
representation if subsequently discovered." *Id.*

[199]Hubbell Senate Testimony, 2/7/96, at 217-18.

60

219

Ward's dealings with Madison as involving fictitious sales, sham loans, and potential civil and

criminal liability.  Yet he never disclosed his, Hillary Clinton's, and Rose's involvement in the

IDC/Castle Grande matter to Ms. Breslaw.[200]

The evidence suggests the following:

1.    Webb Hubbell misled Breslaw about his relationship with Seth Ward in June of
      1989;

2.    Webb Hubbell then wrote David Paulson the June 28, 1989 letter, and that letter
      was misleading, false, and concealed material information about Hubbell's
      relationship with Ward and Madison;

3.    When the investigations started, Hubbell admitted to the OIC on February 1, 1995
      that the June 28 letter was "artfully crafted" and that Hubbell represented Ward
      and POM before, during, and after the *Frost* case;

4.    On March 16, 1995, Hubbell changed his story and told FDIC-OIG investigators
      that the June 28 letter was not "artfully" worded; and

5.    On April 20, 1995, Hubbell repeated to the RTC-OIG the story he told to the
      FDIC-OIG and falsely stated that the letter was not narrowly worded.

Gary Speed Discovered Rose's Work For Madison.

In late 1989 or early 1990, Rose attorney Gary Speed reviewed Frost audit workpapers

which related to Frost's Madison Guaranty audits.  As part of that review, Mr. Speed "came

across a standard audit response letter to Frost and Company from the Rose Law Firm."[201]   Mr.

Speed learned that Rose had performed legal work for Madison Guaranty.  He "wanted to find

---

[200]Hubbell Senate Testimony, 2/7/96, at 217; *see also id.* at 16-17 (indicating that Hubbell did
not disclose any of Rose's involvement in the IDC/Castle Grande-Seth Ward transactions to
April Breslaw); and *id.* at 233 ("[A]bout the same time I was reading exam reports and other
reports and I was concerned about the allegations that were being made.").

[201]Speed RTC-OIG Statement, 6/30/95, at 5.

61

out the nature of the work and to assure [himself] that there were no conflicts of interest."[202] Mr.

Speed went to Rose's accounting department and requested copies of the bills Rose previously

submitted to Madison Guaranty.[203] Mr. Speed reviewed the bills, then spoke with Rick Massey

about Rose's work for Madison Guaranty before the Arkansas Securities Department. Mr. Speed

then spoke to Mr. Hubbell because he (Hubbell) "was the lead attorney on the *Frost* case, was the

primary contact with FDIC, and was knowledgeable about the ethical rules concerning

conflicts."[204] Mr. Speed asked Mr. Hubbell if Mr. Hubbell was aware of Rose's prior work for

Madison Guaranty. Mr. Speed explained:

> [Mr. Hubbell] said he had been aware of some collection work. I showed him the
> bills I had retrieved concerning the ASD work. He said he would talk about it
> with April Breslaw. . . . *Within a day or so, Mr. Hubbell told me that he had*
> *spoken to Ms. Breslaw about the ASD work and that she agreed it was not a*
> *conflict. I recall that conversation clearly.* I do not believe that I ever spoke to
> Ms. Breslaw personally about the matter, and I do not believe I ever wrote
> anything about the matter.[205]

The evidence reveals that Mr. Hubbell did not disclose Rose's prior Madison Guaranty

work to April Breslaw, even though he learned that Rose had submitted a Frost audit to the ASD

during 1985.[206] Mr. Hubbell himself later admitted that he does not recall whether he discussed

the ASD work with April Breslaw, and he would not disagree with Ms. Breslaw if she stated (as

---

[202]Speed RTC-OIG Statement, 6/30/95, at 5.

[203]Speed RTC-OIG Statement, 6/30/95, at 5.

[204]Speed RTC-OIG Statement, 6/30/95, at 5.

[205]Speed RTC-OIG Statement, 6/30/95, at 5 (emphasis added).

[206]Hubbell House Banking Comm., 8/10/95, at 49 ("I became aware that the [Frost] audit
had been submitted to the Arkansas Securities Department at some point during the litigation
against the auditing firm.").

62

she did) that he had not told her of the ASD work.[207]

It appears that Mr. Hubbell lied to Gary Speed when Hubbell stated that he disclosed the
ASD work to April Breslaw.[208] Furthermore, as noted *supra*, Mr. Hubbell admitted in testimony
before the House Banking Committee that Rick Massey "disclosed that there had been prior
work done at the Securities Department."[209]

Rose Obtained A Copy Of The Borod & Huggins Report On February 2, 1990.

In January of 1990, someone at Rose -- probably Gary Speed -- requested a copy of the
Borod & Huggins Report.[210] Sue Strayhorn, a Madison Guarantee employee, objected to giving

---

[207]Hubbell Senate Testimony, 12/1/95, at 114-17 (I don't have any specific memory that I
did or that I didn't [discuss the ASD work with Ms. Breslaw]."); OIC-302, 2/1/95, at 19
("HUBBELL did not have any recollection of discussing the representation of MGS&L before
the Arkansas Securities Department with BRESLAW but DONOVAN may have discussed it
with her. HUBBELL did not ask DONOVAN to discuss the issue with BRESLAW.
Furthermore, HUBBELL did not recall ever writing about the issue to BRESLAW. PETER
KUMPE brought up the issue with HUBBELL. HUBBELL believed that KUMPE may have
brought the issue up by asking HUBBELL how he was going to get around the issue."); RTC-
OIG/OIC Hubbell Interview, 4/20/95, at 18-19 ("HUBBELL said that it is his opinion that the
matter should have been reported to BRESLAW, and as lead attorney the responsibility to do so
was his. HUBBELL said that although he had no specific recollection of discussing the matter
with BRESLAW, he believed that he did; although he said he would not disagree with
BRESLAW if her recollection was that he had not told her.").

[208]Breslaw Senate Banking Committee Testimony, 11/30/95, at 40-41.

[209]Hubbell House Banking Comm., 8/10/95, at 59. Hubbell thus admitted that he knew
about Rose's Arkansas Securities Department work at the time Rose accepted the *Frost* case, and
concealed that information from the FDIC and the RTC. *See also, e.g.*

[210]Also in January of 1990, perhaps coincidentally, Hubbell negotiated an indemnification
agreement between Ward and Ward's law firm (Wright, Lindsey & Jennings) in the case of
*Madison Guaranty v. Frost*. *See* Exs. 123-25 of the RTC-OIG Rep., 8/3/95, vol. III; Exs. 28-32,
FDIC-OIG Rep., 7/28/95, vol. 2. Hubbell concealed that information from the FDIC and the
RTC.

63

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

222

Rose a copy of the Borod & Huggins Report because Mr. Ward and Mr. Hubbell were in-laws.[211]

Breslaw disregarded Strayhorn's warning. Breslaw spoke with her supervisor, John Beaty, and he approved of her decision to forward the Borod & Huggins Report to Hubbell. Beaty told Breslaw that he had a favorable impression of Hubbell due to Hubbell's work on the FirstSouth matter, and Breslaw understood from her previous discussions with Hubbell that Hubbell and Ward had a distant relationship. Breslaw later explained of her decision to turn over the Borod & Huggins Report to Rose:

> I believe that since I had previously determined that the Ward and Hubbell relationship was not a conflict, and had made the assumption that Hubbell was trustworthy on this issue, I felt that there was no reason to prevent Rose from obtaining whatever information the firm felt was necessary to pursue the Frost suit. I believe that Beaty mentioned that Hubbell had responded to a conflict issue which arose in connection with the FirstSouth project in a very professional manner. I have the impression that Beaty had confidence that Hubbell would behave ethically.[212]

According to the *Frost* billing records, on February 1, 1990, Mr. Hubbell met with Gary Speed, and spoke with April Breslaw via telephone.[213] That same day, April Breslaw forwarded the Borod & Huggins Report to Gary Speed.[214] Ms. Breslaw wrote a note to Gary Speed. Her

---

[211]Ex. 97 to RTC-OIG Rep., 8/3/95, vol. III.

[212]Breslaw RTC-OIG Interview, 4/94, at 12.

[213]105-00083364; 264-00009458; 264-00009713; 105-00083622; 105-00083633; 264-00020682.

[214]Ex. 128 to RTC-OIG Report, vol. III. *See also* Breslaw RTC-OIG Interview, 4/94, at 12, 24; and Breslaw Senate Banking Committee Deposition, 6/6/95, at 24-25 ("[B]ased on the information that we had at the time -- again, I am sorry to repeat myself -- that Hubbell didn't represent Ward, and said he would not represent Ward, it seemed to us that there was no conflict and therefore our counsel should be allowed to see all material that was relevant to Madison to see if it would be of any use in the accounting case. So, despite the fact that Ms.

64

223

note indicates that Mr. Speed wanted the Borod & Huggins report to assist Rose in preparing interrogatory responses.[215]

The *Frost* billing records indicate that Mr. Hubbell and Gary Speed reviewed the Borod & Huggins Report on February 2, 1990.[216] Mr. Hubbell also billed the RTC for review of the Borod & Huggins Report on February 8, 1991 and February 12, 1991.[217]

During the 1993-96 investigations, Hubbell gave several different stories about his review of the Borod & Huggins Report. Hubbell initially denied that he ever saw the Borod & Huggins Report. Then, he claimed that his *Frost* co-counsel kept the report from him. Then, Hubbell said that maybe Rose delayed requesting the Borod & Huggins Report.[218]

Interview And Deposition Of Patricia Heritage.

On April 4, 1990, Gary Speed, Rick Donovan, and Jim Birch interviewed Patricia Heritage, who then was a newly hired Rose attorney, about her previous work at Madison

---

Strayhorn expressed some concern, we permitted the Rose firm to see Gerrish's report.").

[215]*See* Breslaw RTC-OIG Statement, 7/18/95, at 6-7. Breslaw's note states:"I've enclosed the Gerrish Firm's investigative report on Madison Guaranty loans. I understand that you're in desperate need of it in order to respond to opposing counsel's interrogatories." (emphasis added). Ex. 128 to RTC-OIG Report, vol. III.

[216]264-00014589; 105-00083364; 264-00009459; 105-00083622; 105-00083633; 264-00020682.

[217]105-00083548; 105-00083537; 105-00083558; 264-00020802-03; 105-00083531; 105-00083538; 105-00083550; 105-00083559; 264-00020802.

[218]Hubbell Grand Jury Testimony, 8/22/96, at 115-16; FDIC Interview with Webster Hubbell by Jack Smith and John Downing, 1/11/94; OIC-302, 2/1/95, at 21; Hubbell Senate Testimony, 2/7/96, at 232-34.

65

Guaranty.[219] The billing records reveal that Mr. Speed met with Mr. Hubbell on April 4, 1990.
The billing records do not reveal any call to Ms. Breslaw, but Gary Speed says that he and Mr.
Hubbell called Ms. Breslaw about the Pat Heritage matter.[220]

Ms. Breslaw denies that anyone informed her about Pat Heritage's previous Madison
Guaranty employment. Ms. Breslaw stated that she "learned in roughly January 1994 that she
had once worked at Madison and that Gerrish had accused her of editing minutes of
Madison board meetings."[221] Mr. Hubbell "said they did not discuss this matter with Breslaw
although they probably should have talked with her about it."[222]

The parties in the *Frost* case reached a tentative agreement to settle the *Frost* case
sometime in February 1991, and April Breslaw issued a detailed authority to settle memorandum
on February 26, 1991.[223] That memorandum recommended that the RTC settle the *Frost* case for
$1.025 million.[224]

---

[219]105-00083613; 264-00009497; 264-00020695. *See also* Speed RTC-OIG Statement,
6/30/95, at 7-10.

[220]Speed RTC-OIG Statement, 6/30/95, at 7-10.

[221]RTC Interview, 4/94, at 19-20. *See also, e.g.*, Breslaw RTC-OIG interview, 7/18/95,
at 7 ("I do not recall anyone from Rose discussing Patricia Heritage with me in any context
during the *Frost* litigation.").

[222]Hubbell FDIC-OIG Interview, 3/16/95, at 11-12. *See also, e.g.*, RTC-OIG/OIC
Hubbell Interview, 4/20/95, at 19-21 (which discusses the Patricia Heritage matter).

[223]Donovan Little Rock G.J., 1/21/98, at 44-46; LR GJE 1661; Breslaw RTC-OIG
Interview, 4/94, at 13.

[224]Donovan Little Rock G.J., 1/21/98, at 44-46; Little Rock G.J. Ex. 1661; Breslaw
Senate House Banking Comm. Dep., 10/23/95, at 239-44 (discussing Breslaw's February 26,
1991 authority to settle memorandum); Breslaw RTC-OIG Interview, 4/94, at 13.

66

225

The next day, February 27, 1991, as the parties in the *Frost* case continued to negotiate

the terms of the settlement agreement, attorneys for the defendants deposed Ms. Heritage.[225]

Rick Donovan attended the Pat Heritage deposition and billed the RTC on February 27, 1991 for

8.50 hours for "prepare for and attend deposition of officers/directors; correspondence with

witnesses."[226] At the deposition, Ms. Heritage testified that Seth Ward was "someone I wasn't

supposed to send past-due letters to" apparently because Mr. Ward was "one of the preferred

friends of Jim McDougal or John Latham.[227] Ms. Heritage testified that she had not done any

work on the *Frost* case while she was an attorney at Rose.[228] Ms. Heritage also testified about

the Borod & Huggins Report and about minutes she prepared at John Latham's direction which

purported to document nonexistent Madison Financial Corporation board meetings.[229]

Ms. Breslaw claims that no one from Rose told her about the Heritage deposition.[230]

---

[225]105-00083441; 105-00083566; 105-00083609.

[226]105-00083441; 105-00083566; 105-00083609.

[227]85-00045517.

[228]85-00045519.

[229]85-00045498-506.  Heritage also said of Don Denton that "I think Don had a good
background and knew what he was doing, yes." 85-00045518.

[230]Breslaw Senate Banking Committee Deposition, 6/6/95, at 28-30.  Ms. Breslaw did
have access to the Borod & Huggins Report during 1989, and that report discussed Ms.
Heritage's work at Madison Guaranty:

> I must have read the section that contains the allegations about Pat Heritage,
> however, because  at that time she was not employed at the Rose Law Firm,
> she did not, to my knowledge, ever work on the Frost  accounting  case, and I
> did not ever speak with her until after the  Frost case had been settled for
> several years. I did not make the connection when I spoke with her  in probably
> 1993, that is four years later, that allegations  had  been made against her in a

67

No one at Rose informed Ms. Breslaw of Pat Heritage's testimony as a deposition witness in the *Frost* case. Gary Speed did not,[231] and Mr. Hubbell "does not recall Heritage being deposed in the Frost case by the defense."[232]

[233]

## 1989 Indictment And 1990 Trial Of James B. McDougal

In November of 1989, a Little Rock Grand Jury indicted James B. McDougal, John Latham, and others for alleged crimes related to the IDC/Castle Grande transactions.[234] John Latham pleaded guilty. A jury acquitted McDougal after a trial which occurred in May and June of 1990. Rick Donovan and Gary Speed billed the RTC for attending McDougal's trial.[235]

---

report that I read in the spring of 1989.

*Id* *See also* RTC-OIG/OIC Hubbell Interview, 4/20/95, at 19-21 (discussing the Pat Heritage matter).

[231]Speed RTC-OIG Statement, 6/30/95, at 9-10.

[232]Hubbell FDIC-OIG Interview, 3/16/95, at 11-12.

[233]

[234]*See*

[235]105-00083618; 264-00020696; 264-01/1B-149/11; 264-02175; 105-00083510; 264-00020701.

68

No one ever deposed McDougal in the *Frost* case, but McDougal did meet with the

attorney for Frost, Peter Kumpe. Kumpe concluded that McDougal would be helpful to Frost's

defense.[237] According to Rick Donovan, Rose felt that "the other side would" depose McDougal

because "they wanted to paint McDougal as the criminal" and "we had nothing to gain and

everything to lose by that man being on the witness stand."[238] Gary Speed confirms Donovan's

story: "McDougal was not seen as helpful to the case because McDougal did not like the

government, McDougal had lost his savings and loan and his ability to deal, and [Rose] was

afraid of anything McDougal might say."[239]

Hubbell told the House Banking Committee -- wrongly -- that "it was back in the *mid-

1980's* that Mr. McDougal was tried and found innocent of any criminal activity at Madison."[240]

The Curious Matter of Sam Heuer

About three weeks before Jim McDougal's 1990 Castle Grande criminal trial, Sam

[236]

---

[237]Kumpe Little Rock G.J., 2/3/98, at 4-5.;

[238]Donovan Little Rock G.J., 1/6/98, at 98-99.

[239]Speed OIC-302, 1/30/98.

[240]Hubbell House Banking Comm., 8/10/95, at 64. Additionally, Mr. Hubbell never told
April Breslaw during the time he handled the *Frost* case that Rose had "represented Mr.
McDougal personally in any matters." Breslaw Senate Banking Comm. Dep., 10/23/95, at 54.

69

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure
NW: 15416 DocId: 70001585 Page 107

Heuer sent Hubbell a letter dated May 7, 1990. That letter warned Hubbell that Seth Ward "might have some type of criminal exposure under these broad bank fraud violations that the U.S. Attorney's Office seems so happy to use these days."[241]  Heuer wrote that he (Heuer) was "in a pretty tight situation on this McDougal case" and that "Seth Ward, who I understand to be your father-in-law, appears to be a pretty critical witness in this case."[242]  Heuer requested an interview of Ward.[243]  Hubbell did not respond to the letter.[244]

Rose attorneys Rick Donovan and Gary Speed billed the RTC for attending the first two days of McDougal's 1990 trial.[245]

During the summer of 1990, shortly after McDougal's June 1990 acquittal, Hillary Clinton and Webb Hubbell met with Heuer over lunch individually and on separate occasions.[246]

---

[241]212-011968.

[242]212-011968.

[243]212-011968.  Hubbell's co-counsel on the *Frost* case, Rick Donovan, first learned of Heuer's May 7, 1990 letter to Hubbell about Seth Ward's possible criminal exposure on January 6, 1998 when Donovan testified before the Little Rock Grand Jury.  Donovan Little Rock G.J., 1/6/98, at 99-100 ("This is the first I've ever heard of anything like that.").

[244]Heuer Little Rock G.J., 10/8/97, at 20-21. *See also* Heuer Little Rock G.J., 4/1/97, at 96 ("The letter went out.  Hubbell never got back to me.  If I called, he didn't call me back.  So we just went on to trial.").  *But see id.* at 97 ("After it [McDougal's 1990 criminal trial] was over, I talked to him.  But prior to that, he may have -- he may have called me back after I wrote the letter to ask what I -- where I could see potential criminal exposure and me explaining it to him and him communicating that he did not want me to talk to his father-in-law.  That very well may have happened.  I don't remember.").

[245]105-00083618; 264-00020696; 264-01/1B-149/11; 264-02175; 105-00083510; RJC 000442; 264-00020701.

[246]

70

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

229

[                                                    ] [247] Mrs. Clinton was

"knowledgeable" about McDougal's well publicized trial.[248]

[                                                                    ]

[                                                                    ]

The *Frost* billing records reveal that Hubbell billed the RTC for "conferences" with

---

[247]Heuer Little Rock Grand Jury, 4/1/97, at 26.  Heuer's lunch with Hillary Clinton came
after he wrote her a July 3, 1990 letter which suggested that the Whitewater Development
Corporation be dissolved. *Id.* at 22-26. [                                                ]
[                        ] Heuer and Hillary Clinton discussed Jim McDougal's trial and
Whitewater. *Id.* at 29.

[248] [                                        ] Heuer Little Rock Grand Jury, 4/1/97, at 102.

[249] [                                                                    ]

[25] [                                                                    ]
[                                            ] Governor Clinton also called Heuer "[i]mmediately
after McDougal's acquittal" to congratulate Heuer and McDougal. *Id.* at 20.

[25] [                                        ]

71

Heuer on at least four occasions "re: McDogal" [sic] from July 17, 1990 to September 5, 1990.[252]

The original trial date in *Frost* was set for late August 1990. Heuer testified before the Little

Rock Grand Jury that McDougal spoke with Frost's attorney, Peter Kumpe, about the case. One

of Frost's defenses to the RTC's accounting malpractice claim was that Madison's officers and

directors were corrupt, and that any losses to Madison Guaranty were the fault of the "crooks

running the institution."[253]

### Julie Baldridge Speed

During the *Frost* case, Gary Speed learned that his then wife, Julie Baldridge Speed,

previously had an ownership interest with James McDougal in the Bank of Kingston and in the

Woodruff County Savings and Loan (Madison Guaranty's predecessor). Speed told Hubbell

about the matter. As detailed in the Rose Law Firm conflicts memorandum, the following

happened:

1.   Gary Speed learned during the *Frost* case about his then wife's business
     relationship with James McDougal and Madison Guaranty;

2.   Gary Speed told Webb Hubbell about the Julie Baldridge Speed potential conflict;

3.   Webb Hubbell concealed the Julie Baldridge Speed potential conflict from April
     Breslaw;

---

[252]105-00083428; RIC 000360; 105-00083432; RIC 000364; 105-00083435-36; RIC
000367-68; 105-00083411; RIC 000343 .

[253]Donovan Little Rock G.J., 1/6/98, at 81-83.

[254]

72

231

4. Hubbell falsely stated to Gary Speed that Hubbell told Breslaw about the Julie Baldridge Speed potential conflict;

5. Hubbell falsely stated to the OIC that he did not discuss the Julie Baldridge Speed matter with Gary Speed after Speed disclosed the information to Hubbell;

6. Hubbell falsely stated to the FDIC-OIG of the Julie Baldridge Speed matter that "they decided it was not a conflict of interest."[255]

Jimmie Alford & Precision Industries

Jimmie Alford was the Frost & Company partner who had oversight responsibility for the 1984 and 1985 audits of Madison Guaranty. He left Frost in 1988 and went to work for Pace Industries and a division of Pace, Precision Industries. Mr. Alford owned stock in Pace/Precision, was a Pace vice president, and Precision's President. Mr. Alford was also a named defendant in the *Frost* case, and he was a Madison Guaranty borrower.[256]

[257] Hubbell learned about the matter, and the following occurred:

(1) Mr. Hubbell learned of a potential conflict of interest related to Jimmie Alford;

(2) Mr. Hubbell then met with two Rose attorneys, Tim Boe and Jim Birch, to discuss the matter;

(3) Mr. Hubbell agreed to notify the RTC about the Alford conflict;

(4) Mr. Hubbell concealed the matter from the RTC;

---

[255]Hubbell FDIC-OIG Interview, 3/16/95, at 2-3.

[256]*See* Alford OIC-302, 2/6/98; Alford FDIC/RTC-OIG Statement, 6/27/95; and Alford FDIC/RTC Statement, 9/7/94.

[257]

73

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure
NW: 15416 DocId: 70001585 Page 111

(5)   Mr. Hubbell then lied to Tim Boe and stated that he had disclosed the
matter to the RTC; and

(6)   Mr. Hubbell falsely stated to the investigators that he did not disclose the
Alford conflict to the RTC because he learned of the Alford conflict late in
the case, near settlement.

The evidence indicates that no Rose attorney disclosed the Alford matter to April Breslaw

or anyone else at the FDIC or the RTC.[258]

<u>Beverly Bassett Schaffer</u>

During July or August of 1990, Rose decided to depose Beverly Bassett Schaffer.[259]  Mr.

Hubbell called Ms. Bassett Schaffer, and she told him that she believed that Rose should not be

involved in the *Frost* case because of Rose's prior work for Madison Guaranty.[260]



[UNCODED][1] Ms. Bassett Schaffer was "angry with Webb Hubbell," so she called Frost's lawyer,

Peter Kumpe, and "told Peter . . . what Webb had done . . . and asked Peter if he was aware that

the Rose Law Firm had represented Madison before the [Arkansas Securities] department

throughout 1985, and that there were documents and files to that effect, numerous documents

---

[258]*See, e.g.*

; and Speed RTC-OIG Statement, 6/30/95 at 11 ("I do not recall disclosing
Rose's representation of Precision to the government. Because Mr. Alford was not our client and
there was no conflict, I do not believe we had a duty to disclose it.").

[259]On August 7, 1990, Mr. Hubbell billed the RTC for a "telephone conference with B.
Bassett." 105-00083422. Ms. Bassett testified that her conversations with Mr. Hubbell occurred
in "roughly July or August of 1990." Bassett Schaffer Little Rock G.J., 11/8/95, at 135.

[260]Bassett Schaffer Little Rock G.J., 11/8/95, at 131-32.

[261]

74

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

233

that would reflect that at the department."[262]  According to Ms. Bassett Schaffer, Kumpe told her

that he was not aware of the Rose Law Firm's prior work before the Arkansas Securities

Department.  Commissioner Bassett Schaffer then suggested that Kumpe serve her with a

subpoena, and she would produce all public records to Mr. Kumpe.

Mr. Kumpe subsequently issued a subpoena and obtained the records.[263]

[264]

Kumpe took the documents, copied them, and left.  Next, Ms. Bassett Schaffer received a

call from a Rose paralegal who informed her that the case settled.[265]

Hubbell does not dispute Bassett Schaffer's version of the story.[266]

There is no evidence that Mr. Hubbell informed Ms. Breslaw or anyone else at the FDIC

or the RTC about Beverly Bassett's comments to him.  Even Rick Donovan, for example, did not

know about Ms. Bassett's comments to Mr. Hubbell.[267]

---

[262]Bassett Schaffer Little Rock G.J., 11/8/95, at 133.

[263]Bassett Schaffer Little Rock G.J., 11/8/95, at 134.

[264]

[265]Bassett Schaffer Little Rock G.J., 11/8/95, at 135.

[266]Hubbell House Banking Comm., 8/10/95, at 51 (quoting Ms. Bassett Schaffer's
Inspector General statement).

[267]

75

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

234

Frost's Attorneys Learned Of Rose's ASD Work

As explained above, Frost's lead attorney, Peter Kumpe, learned of Rose's ASD work

from Beverly Bassett.

POM Work By Rose During The *Frost* Case

On May 4, 1990, Webb Hubbell and the Rose Law Firm filed a patent infringement and

anti-trust lawsuit on behalf of POM against Duncan Industries, a POM competitor.[269]

[70]  Webb Hubbell performed

[268]

[269]*See, e.g.,* RTC-OIG Records Examination, 6/21/94, which indicates that RTC-OIG
agents Philip L. Sprague and Patrick S. Durkin examined court records for the United States
District Court of the Eastern District of Arkansas, Western Division in the case of *POM, Inc. v.
Duncan Indus.*, No. LR-C-90-293 (E.D. Ark.); and DE-00000174-98, which are documents from
the *POM* case; Seth Ward II Little Rock G.J., 1/21/98, at 13-45; LR GJE 1669; LR GJE 1674.

[270]

76

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure
NW: 15416 DocId: 70001585 Page 114

legal work for POM before, during, and after the *Frost* case.

<u>"[T]he RTC is withholding specific loan files pertaining to loans made to Seth Ward."</u>

On January 31, 1991, the defendants in the *Frost* case filed a Motion To Compel Discovery or Exclude Testimony.[271] That motion claimed that "the RTC is withholding specific loan files pertaining to loans made to Seth Ward" and argued that "[t]he withholding of those files should not be permitted."[272] The Motion To Compel did not list any other loan files by name.[273]



<u>Other RTC Work Performed By Rose</u>

After the *Frost* case settled, Rose obtained more savings and loan work from the RTC. By 1991, the RTC had formalized its conflict of interest procedures. The RTC sent Rose conflicts lists which contained the names of individuals and entities that the RTC knew were in potential conflict with particular institutions. Hubbell received these lists, then signed written certifications which stated that Rose did not have any actual or potential conflict of interest. The RTC-OIG discovered, however, that the conflicts lists it sent Rose contained the names of Rose clients. The Rose Law Firm conflicts memorandum contains a more detailed discussion of the

271

[272]LR GJE 1656; Kumpe Little Rock G.J., 2/3/98, at 9.

273

274

77

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

236

RTC work Rose performed.

\* \* \* \* \*

*4)  1992 Campaign* -- [The facts relating to the Clinton campaign are detailed in Rosenzweig, "Clinton Campaign: February-March1992," January 1998 and Rosenzweig, "Hillary Clinton, Webb Hubbell and Vince Foster: What Did They Know?" January 1998.]

In February and March, 1992 the substantive outlines of the Clintons' "official" version of Whitewater-related events were first sketched.  In response to inquiries from the national press, the Clinton campaign developed a fairly detailed understanding of the role of Hillary Clinton and Bill Clinton in the Whitewater Development Corporation, the Rose Law Firm's representation of Madison Guaranty Savings & Loan, and related matters.

Most importantly, from our perspective, the February-March, 1992 time frame reflects a period of intense scrutiny of Whitewater  and Madison Guaranty issues by Clinton campaign members.  It is, therefore, a comparatively recent era in which dormant memories of events occurring in 1984-86 were actively revived and refreshed. Mrs. Clinton, Webb Hubbell, Vince Foster and other campaign workers learned information that was contrary to the information they contemporaneously reported to the public and, it appears, may be contrary to the information they provided official tribunals when Whitewater and Madison Guaranty questions became the subject of official inquiry.

A summary of the evidence to be presented, relating to the campaign, includes the following:

Loretta Lynch-- Lynch was responsible for developing information on Whitewater and on

78

who had advised Lynch that there had been at least 1 contact between BBS and HRC on Madison-related issues. Lynch GJ, 2/1/96, at 16-17. Lynch had also, by that date, gone to the Arkansas Securities Department and reviewed the microfiche records reflecting the exchange of letters between the RLF and BBS. Lynch GJ, 2/1/96, at 16.

On February 21st, Lynch spoke with Susan Thomases who had spoken to HRC on the issue. According to Thomases, HRC claimed that she was the billing partner because "McDougal insisted that she be the contact person." Lynch GJ, 2/1/96, at 18. Both Lynch and Thomases recognized that the RLF billing records would provide additional detail on HRC's activities and Lynch considered it a "hot topic." Lynch GJ, 2/1/96, at 16. She enlisted Thomases help in pressing WLH to do a more thorough review of the RLF records. Lynch GJ, 2/1/96, at 19-20. *See also*

On February 24th, Lynch met with WLH to discuss RLF's representation of MGSL for more than an hour. Lynch GJ, 2/1/96, at 40. She recorded her notes of that conversation in another, handwritten rolling memorandum. _____ In that discussion WLH disclosed to Lynch the earlier RLF representation of McDougal in 1981. He also advised Lynch that HRC was the billing attorney in 1985 and that "Rick [Massey] had a relationship with John Latham." Lynch GJ, 2/1/96, at 24. According to WLH, the RLF bill roughly 200 hours total and that "20 percent of HRC was allocated to McDougal." Lynch GJ, 2/1/96, at 24-25. From this Lynch

276

80

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

238

the Rose Law Firm's representation of Madison Guaranty Savings and Loan on behalf of the Clinton campaign. Her first awareness of the issue arose in early February 1992 when the campaign became aware that Jeff Gerth, of the New York Times, was researching an article on the topic.

Between the start of her assignment to the Whitewater issue and February 22nd, Lynch kept on computer a "rolling file " memorandum to herself, Lynch GJ, 2/1/96, at 12, of the results of her investigation. [                    ][275] As of February 18th, Lynch had identified 4 separate topics that Gerth was interested in: RLF's representation of MGSL; HRC's activity representing clients before state officials; RLF's subsequent work for the RTC in a suit against MGSL; and terms of the settlement entered into with the Frost accounting firm on behalf of the RTC.

In her rolling memorandum [              ] Lynch identified the parenthetical comments on these 4 issues as WLH's commentary on Gerth's questions. [                    ] On February 18, 1992 her understanding of the state of WLH's knowledge was:

- With regard to RLF's representation of MGSL, WLH understood that "HRC brought it to the firm." [              ]

- With regard to HRC's activity representing clients, WLH told Lynch that the file indicated that HRC had contact with BBS. [              ] and

- With regard to RLF's work for the RTC and the settlement, WLH told Lynch that the potential conflict had been disclosed, and that he had told Gerth that the settlement terms were confidential. [              ]

Prior to February 22nd, Lynch had also already spoken with Beverly Bassett Schaffer,

---

[275] Lynch's recollection was generally refreshed by her notes. [

FOIA(b)7 - (C)

]

79

realized that the Clinton campaign could not publicly maintain that HRC had done no work for MGSL or McDougal, as it would have liked to do. WLH expressly told Lynch he had reviewed the billing records. Lynch GJ, 2/1/96, at 73-74.[277]

On March 5th, Lynch spoke with WLH again regarding the RLF's representation of MGSL. She took contemporaneous notes of that conversation. ⬚ (DEK-008878). At that time WLH had, evidently, spoken with both Rick Massey and John Latham, neither of whom were reported to have any recollection of how MGSL came to hire RLF. Massey is quoted has having said: "I don't remember this matter. I don't remember who did what." Lynch GJ, 2/1/96, at 51-52.[278]

[Those same notes of a discussion with WLH also reflect his discussion with HRC and WJC. The entry for HRC is a cryptic "HRC -- ever conversed with Rose Law Firm/McDougal" which Lynch is confident could not have been "never." Lynch GJ, 2/1/96, at 52. The reference to WJC is clearer -- "he has no recollection" of having anything to do with RLF. Lynch GJ, 2/1/96, at 53.]

On March 5th and 6th, Lynch and Thomases met with Gerth for several hours in New York City. Lynch GJ, 2/1/96, at 41. Based on that conversation, Thomases reported to the

---

[277] Lynch, it should be noted, was not given access to the RLF files on MGSL; nor to her knowledge was any other campaign employee --⬚

[278] ⬚ FOIA(b)7 - (C) ⬚

81

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

240

campaign that she had bought some time -- enough to put the issue off past Super Tuesday on March 10th. Because it turned out she had not succeeded in buying the time, she fell somewhat out of favor and Jim Lyons took responsibility for much of WW work. Lynch GJ, 2/1/96, at 66.

On the night of March 7, 1992, just prior to the publication of Gerth's article on March 8th, there was a scramble at the Clinton campaign to respond to the anticipated allegations. Most of the scramble involved review of Whitewater-related documents that WLH had finally been persuaded to release to the campaign. Lynch was less concerned with the issue of HRC's representation of MGSL and her activity before the Arkansas Securities Department because she already knew that BBS would be in a position to provide an exculpatory statement. Lynch GJ, 2/1/96, at 37.

However, the picture Lynch paints is one of high-level activity. She had numerous discussions with Thomases, Jim Lyons at other staff. She went back to the RLF to review WW documents relating to the Clinton's WWDC losses. Lynch GJ, 2/1/96, at 45. She also contacted BBS and Sam Heuer to try and coordinate a response. Lynch GJ, 2/1/96, at 44. Lynch drafted the BBS statement. Lynch GJ, 2/1/96, at 37.

She also drafted the campaign response on WW which was released to the public on March 8th, after having cleared the statement with George Stephanopolous, Bruce Reed, HRC and WJC. [          ] Lynch GJ, 2/1/96, at 48-49. The campaign response affirmatively stated that Rick Massey brought in the MGSL business through his friend John Latham, notwithstanding Lynch's understanding from WLH that neither of those individuals had a recollection to that effect. According to Lynch that assertion was made at the direction of Susan Thomases, who Lynch questioned on the matter and who instructed Lynch that the statement

82

should be made.  Lynch GJ, 2/1/96, at 55-56.

On March 16, 1992 HRC made the public claim that she had done no work before state agencies and received no compensation based upon work RLF did before state agencies.

On March 22 the campaign received a list of questions from the Washington Post that it wished to have answered by HRC. [                    ] These, along with questions from other Post reporters were all answered by Lynch.  On March 24, 1992 she prepared  a draft of responses to follow-up questions on WW posed by the Washington Post.

The campaign statement carefully stated that "Hillary Clinton knows of no instance in which she ever represented anyone before a state agency."

83

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

NW: 15416 DocId: 70001585 Page 121

<u>Susan Thomases</u> -- Susan Thomases, an attorney in New York City, played a role in the
early development of the Clinton campaign response to the inquiries from Jeff Gerth.

[279]

As of February 20th, Thomases role was to respond to additional inquiries being made by
Gerth. Thomases GJ, 2/29/96, at 22-23. She had this role notwithstanding her location in New
York and Gerth's location in Washington, D.C.

[279]

84

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

The next day, February 21st, Thomases called Gerth. [ ] One of the issues
Gerth inquired about was the relationship between RLF and MGSL and "how it came about."
Thomases GJ, 2/29/96, at 34. Subsequently Thomases annotated her notes of the conversation
with Gerth with the answers she had been able to find. Thomases came to understand from HRC
that the RLF-MGSL connection was made by Rick Massey who was a friend of John Latham.
Thomases GJ, 2/29/96, at 36.

280

In a further effort to gather information, Thomases spoke with WLH directly on February
24th. Her notes of that conversation reflect information WLH gave her on that day. Thomases
GJ, 2/29/96, at 44. [ ] According to those notes WLH told Thomases that HRC
had a relationship with McDougal and that "Rick will say" he had a relationship with Latham

280

FOIA(b)7 - (C)

85

that figured in RLF getting the MGSL business. Thomases GJ, 2/29/96, at 45. According to WLH, HRC's role involved reviewing some documents and conducting one phone call with BBS in April 1985. This discussion of HRC's role is annotated "acc. to time rec." reflecting her understanding that WLH was relying on time records to provide her this information. Thomases GJ, 2/29/96, at 47. Thomases, however, is not certain he had the records in his possession at that time. Senate Banking Com., 12/18/95, at 53. Her notes also reflect her desire to have an accounting of the relative number of hours Massey and HRC spent on MGSL matters -- a question to which she never got an answer. Senate Banking Com.., 12/18/95, at 68, 71.

On March 5, 1992 Thomases had another phone conversation with Jeff Gerth. [          ] In that conversation Gerth posed additional questions for the Clinton campaign to answer. Senate Banking Com.., 12/18/95, at 92. When Gerth inquired whether HRC had spoken with McDougal about MGSL hiring RLF, Thomases, on behalf of the campaign, told him that HRC believed that Latham had brought the business to Rick Massey. She made this representation based on information she had from HRC and WLH, though she never spoke directly with Massey. Thomases GJ, 2/29/96, at 49. Gerth also asked Thomases to confirm McDougal's recollection that he spoke with WJC about the hiring of BBS. Thomases GJ, 2/29/96, at 56. Thomases notes reflect that she spoke with WJC on this issue, [          ] and he had no recollection of the discussion. Thomases GJ, 2/29/96, at 60.

Gerth also posed certain questions that he wanted HRC to answer. [          ] He asked whether HRC ever spoke directly with McDougal regarding MGSL and RLF. Thomases annotated this question with her answer "Introduce J McDougal to Rick Massey with John Latham" but she does not recall whether this answer was, in fact, provided to her by HRC.

86

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

245

USCA Case #16-5366   Document #1668146   Filed: 03/28/2017   Page 249 of 421

**<u>EXHIBIT 3 (Part 3)</u>**

to

Plaintiff's Response to Defendant's Statement of Material Facts
Not in Dispute and Statement of Undisputed Material Facts
in Support of Cross-Motion for Summary Judgment

Thomases GJ, 2/29/96, at 57-58; Senate Banking Com.., 12/18/95, at 93. To the contrary, her recollection is that the Massey/Latham relationship cemented the client relationship. Senate Banking Com.., 12/18/95, at 91. However, Thomases has acknowledged that there is no other person besides HRC whom she is likely to have asked for this information. Senate Banking Com.., 12/18/95, at 94.

Thomases notes do, however, reflect that on March 6th she spoke with HRC. Those notes reflect HRC's opinion that "This [i.e. the Whitewater investment] is the only stupid dumb thing we ever did" and that they would not do it again if they could. Thomases GJ, 2/29/96, at 62-63.

On March 7th Later that day Thomases spoke directly with WJC who said he lost money and would not make the investment if he had to do it over again, at least in part to avoid the appearance of a conflict of interest. Thomases GJ, 2/29/96, at 53.

On March 10th, Thomases notes reflect a conversation with an unknown individual, that for the first time recount the full story that Latham came to Massey and Massey went to the securities lawyers who said that the firm would decline MGSL's business because it had a delinquent bill. The notes also reflect an emendation of WLH's earlier acknowledgment that HRC had a conversation with BBS and instead contend that HRC never

87

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

247

called BBS, but made only one ministerial call to her office. Thomases GJ, 2/29/96, at 67-68.

On March 11th, Thomases participated in a conversation with Jim Hamilton, which is reflected in Hamilton's notes of that discussion. [                    ] Hamilton contends his notes reflect information provided to him by Thomases. Those notes reflect that Thomases told Hamilton that HRC took Massey to meet McDougal. [                    ]

88

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

NW: 15416 DocId: 70001585 Page 126

Rick Massey and the Documentary Record at the Rose Law Firm -- After Rick Massey

learned of newspaper articles that were critical of the RLF representation of MGSL he ordered

his personal work file from remote storage. Documents reflect that his secretary Vera Hitt got

the files from storage on March 24, 1992. RIC 121384-92; Massey GJ, 12/3/97, at 34-35.[281]

Shortly after the files were ordered, Vince Foster asked Massey for his files. Massey gave Foster

copies and retained the files from storage.   Massey GJ, 12/3/97, at 40; Sen. Banking Com.,

1/11/96, at 35. The files he gave Foster were approximately 1 ½ inches thick. Sen. Banking

Com., 1/11/96 at 191. His understanding was that Foster was collecting the files on behalf of the

firm, not the Clinton campaign. Sen. Banking Com., 1/11/96, at 202.[282]  Indeed, it appears that

during this week Vince Foster was actively involved in developing an understanding of RLF's

representation of MGSL.

On March 26 Massey signed a memorandum regarding his activity in connection with

RLF's representation of MGSL before the ASD.

The memorandum

---

[281] On March 25th files labeled "HRC Time Sheets" were checked out by "Millie." RIC 121481. Millie Alston does not recall checking out any of Mrs. Clinton's time sheets. Hubbell has testified that he obtained some time sheets from the 1987-89 time frame during the campaign and has since produced these to OIC. Mrs. Clinton's time sheets from 1985-86 cannot be found. Colloton & Azar Memo, at 10.

[282] The files later provide by Williams and Connolly to OIC appear to be Massey's files. Sen. Banking Com., 1/11/96 at 208.

89

was not prepared by Massey, but rather by either Vince Foster or Loretta Lynch.  Massey GJ,

12/3/97, at 56.[283]  At the time it was prepared Massey had reviewed his own files.  Massey GJ,

12/3/97, at 59.

The relevant portion of Massey's statement reads as follows:

I performed substantially all legal service on behalf of my firm . . . . My work was
performed under the supervision of senior members of the Securities Section of this firm.
To my knowledge, Ms. Clinton had no contact, either in person, telephonically or
otherwise, with any ASD staff member in respect of [these] matter[s].  [I.e. the stock
offering and the broker/dealer application.]  Further, I do not believe that any
involvement by her in connection with this matter meaningfully influenced the ASD's
ultimate determination with respect to this matter.

[                    ] At the time he signed this statement Massey had not reviewed the billing

records.  He would not have made the same statements had the billing records been available for

his review.  Massey GJ, 12/3/97, at 60.

This summary conflicts with Hubbell's recollection and also with information Hubbell

personally gave to Mrs. Clinton in late March or early April, 1992.  According to Hubbell, within

one month after the Gerth article was published, he had one conversation with Mrs. Clinton

relating to her phone call with Bassett.  Mrs. Clinton said she just didn't remember the call, and

Hubbell told her: "Well, it's in the bills and Rick does remember that it was in your office."

Hubbell GJ, 12/19/95, at 178.  Besides again establishing Mrs. Clinton's awareness of the

---

[283]  It is very unlikely that Lynch was involved in the preparation of Massey's statement.
First, Lynch has no contemporaneous notes of her involvement in the preparation of this
document and she was a "religious" note-taker.  Second, the document was found in Vince
Foster's briefcase, and no copy of it was ever produced to OIC by the Clinton campaign,
suggesting that the campaign did not have a copy of it.  Third, had the document been available
to the campaign it would likely have been released to the press during this time period -- and it
was not.  Indeed, this statement may be the memo that Hubbell says he and Foster prepared after
they interviewed Massey.  Hubbell GJ, 12/19/95, at 91.

90

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

information contained in the billing records, it suggests that whoever drafted Massey's statement was either unaware of this fact or deliberately omitted it.

Also by March 26th, Foster had prepared a chronology on his computer, entitled "Re: Madison Representation." [                    ] The document was found in Foster's briefcase in July 1997 and subsequently has been identified as originating on Foster's computer at RLF. Clark GJ, 12/2/97, at 136. This document is notable for two reasons.

First, it reflects the state of Foster's knowledge of the Madison representation issue as of March 26th. It contains the following entries:

- 07/30/82    Final bill of Rose Law Firm to Bank of Kingston (a/k/a Madison Bank & Trust) of $5,000 fees and $893 in costs (contains not in Giroir's hand: "Have Hillary bill with letter to McDougal -- will pay.")

- 1983    Bank of Kingston final bill written off

- 10/23/84    $5,000 paid on Bank of Kingston bill

- 04/85    Latham, as Madison's CEO, hired the Rose Law Firm to request an interpretive ruling of the S&L statutes from the S&L Administrator.

[            ] The chronology is silent on the "Massey generated the business" issue and on the call to Bassett and appears to rebut the "unpaid bill" assertion.[284]

The other significance of Foster's chronology lies not in its substance but in the "computer card" name associated with the document on the RLF computers. This document,

---

[284] One possible benign explanation for Mrs. Clinton's recollection of an unpaid bill lies in the apparent effort by Giroir to have Mrs. Clinton get payment of the final bill originally. This suggests that RLF anticipated problems at the time of the final billing and that Giroir was relying on Mrs. Clinton's friendship with McDougal to assist collection. Mrs. Clinton might contend that she has simply confused this event in 1982, with the subsequent representation of MGSL in 1985.

91

251

when discovered on RLF computers in December 1997, was entitled "Clinton campaign document II." Clark GJ, 12/2/97, at 138. Knowledge of its existence allowed RLF to de-archive another document entitled, "Clinton campaign document I," Clark GJ, 12/2/97, at 139; LR GJ Ex. 1601. As an analytical matter, it is a fair inference that document "I" was prepared prior to document "II." Since we know that, at the latest, "document II," the chronology, was prepared on March 26, 1992, we may reasonably infer that "document I" was prepared before that date.[285]

Clinton campaign document I, LR GJ Ex. 1601, from Foster's computer, is an *edited copy of the draft campaign statement prepared by Mrs. Clinton.*[286] OIC had earlier been provided with a copy of Mrs. Clinton's draft statement that had handwritten changes in what may be her handwriting (though perhaps it is Foster's, which is similar). ⬚

⬚ The version on Foster's computer contains Mrs. Clinton's statement, as amended by the handwritten changes.

As modified on Foster's computer, Mrs. Clinton recalls:

- "[Massey] was told that the Firm could not do any work for McDougal or his businesses until the bill owed the Firm for the previous work was paid."

- "When I visited [McDougal] I told him that I understood Latham wanted Massey to do some work for them . . . McDougal called Latham into the meeting . . . McDougal told Latham he could proceed with Massey, and he told me that he would arrange to pay the past due bill."

---

[285] ⬚

FOIA(b)7 - (C)

[286] Mrs. Clinton has stated that her purpose in writing the statement "as best I can recall" was to put down her memory of what happened at the time Madison was represented by Rose. H. Clinton GJ, 1/26/96, at 54. She was unable, at that time, to identify when, during the campaign, she drafted the document. H. Clinton GJ, 1/26/96, at 54.

92

- "[After discussing this with my partners] Massey and I called McDougal [to tell him a $2,000 retainer was required] but he was not in so we talked with Latham and another employee."[287]

- "I recall some uncertainty by Massey about who within the Commissioner's office would handle the issue raised by Madison Guaranty. . . . I have no recollection of ever discussing Madison Guaranty with the Securities Commissioner, although I may have made a procedural inquiry of her or her staff on this issue."

- "In addition to the matter Massey did for Madison Guaranty, the Firm was requested to handle two other legal matters that were unrelated to the State."

This document therefore establishes that: Prior to March 26th, Mrs. Clinton and Foster were in direct contact regarding her recollection of RLF's representation of MGSL; and At the time he reviewed Mrs. Clinton's draft statement Foster was in possession of information that contradicted the assertions she was making, in the form of his chronology, as well as the paid Bank of Kingston bill and the MGSL billing records.

The precise nature of Foster's interaction with Mrs. Clinton in drafting this document remains an open question. However, contemporaneous evidence establishes that it was a collaborative effort and that Diane Blair and Webb Hubbell were aware of Foster and Mrs. Clinton's work together. On March 23rd Diane Blair[288] faxed "5" pages (including cover sheet) to Mr. Hubbell, of which only the first two pages have been produced to OIC. DEK 535791-92. The second page has Diane Blair's handwritten note: "Webb -- Vince + Hillary are drafting her

---

[287] I am not aware that either Latham or Massey has ever been asked about this assertion.

[288] Blair has not been questioned about this document. Presumably she will acknowledge her own hand-writing and provide the evidentiary predicate for its admissibility.

93

answers on law practice. Ignore marginal notes. D" DEK 53592.[289]

In this collaboration, Mr. Foster may not have told Mrs. Clinton that her statement was at odds with information in his possession. The alternative, however, is to believe that he deliberately concealed his information from her.

FOIA(b)7 - (C)

This evidence strongly indicates that HRC fully and completely immersed herself in a review of her billing records and her work for MGSL. From this one can infer a review of HRC's role in Castle Grande, which was not a prominent campaign issue. The evidence more strongly suggests that HRC had knowledge of evidence contradicting her public statement (and subsequent statements to federal investigators) of the manner by which MGSL came to retain RLF.

Potential Defenses -- We anticipate that certain evidentiary questions, outlined above, will be raised by the defendants and will have to be overcome. It is not anticipated that the factual events outlined above will be contested.

* * * * *

---

[289] Internal evidence of the note ("ignore marginal notes") and the known length of Mrs. Clinton's statement (2-4 pages, depending on font and spacing) suggest that the missing pages which were not produced were an earlier draft of Mrs. Clinton's statement sent to Mr. Hubbell for his editorial review. Moreover, since the fax originated at Clinton for President headquarters, it suggests that Foster and Mrs. Clinton began work on her statement outside of RLF and Foster subsequently had the document transcribed on his own computer.

94

254

*5) Foster Documents* -- [The facts relating to the handling of the documents in Vince Foster's office are detailed in Colloton & Kavanaugh, "Foster Docuements Memorandum," August 1996.]

On Tuesday, July 20, 1993 Vincent Foster, Jr., Deputy White House Counsel, and former partner of HRC and WLH at the RLF, committed suicide. At the time of his death, Foster had "Personal" Whitewater-related documents in his office in the West Wing of the White House.

The U.S. Park Police, who were charged with investigating Foster's death because his body was found on federal park property, wished to review the material in Foster's office for evidence that would shed light on his state of mind. Some evidence exists that documents were removed from Foster's office on the night of July 20th, before the office could be examined.

More significantly, on July 21st, concerned that the Park Police might examine sensitive Executive Branch documents White House Counsel Bernard Nussbaum initially agreed to allow the examination to be conducted by two career prosecutors from the Department of Justice, rather than by the Park Police. However, on the evening of the 21st and the morning of the 22nd a series of calls occurred between HRC, her chief of staff Maggie Williams, her close friend Susan Thomases and Nussbaum. Following these calls (and we submit, inferentially, as a result of those calls) Nussbaum changed his position and refused to allow the Department of Justice attorneys to review the Foster office documents. Instead, he conducted the review in their presence and separated the documents into categories, including certain official documents and

95

other "personal" documents.[290]

Later on the 22nd, Maggie Williams moved the personal documents to the third floor of the East Wing of the White House where they were stored in a closet in HRC's office, Room 323 which is the room immediately adjacent to the Book Room, Room 319A, where the billing records were eventually found 2 years later.

Gail Kennedy -- Gail Kennedy, the wife of William Kennedy, Associate White House Counsel and former RLF partner, went with her husband to the home of Vince Foster on the night Foster's suicide. While at Foster's house she overheard a conversation between WLH, Bill Kennedy and possibly David Watkins and Marsha Scott to the effect that "there was some concern of what was in Vince's office . . . to the extent that there might be something harmful or embarrassing to Vince or the Clintons." G. Kennedy, GJ, 1/24/95 at 14. She is not aware of concern about particular documents, but rather of a "general concern from my perception." Id. at 16.[291]

Officer Henry O'Neill -- Officer O'Neill is a uniformed Secret Service officer. He was present in the White House on the evening of July 20th. He has testified on numerous occasions that he saw Maggie Williams, HRC's Chief of Staff, leave Foster's office that evening carrying

---

[290] Nussbaum denies that any agreement was reached and also denies that any discussion of personal documents occurred. He is supported in the former assertion by an Associate White House Counsel. He is supported in the later assertion by Williams, Thomases and HRC who have varying recollections of the phone calls but are clear that no discussion of personal documents occurred.

[291] The others named by Mrs. Kennedy say they do not remember any such conversation and have denied it in their grand jury testimony.

96

folders or files of that sort, in the company of another woman.[292]

O'Neill has, unfortunately, been interviewed, deposed or called to testify on 9 separate occasions -- beginning in April 1994 and ending in July 1995. Though his testimony has never varied in his assertion that Maggie Williams was observed carrying documents from Foster's office, e.g. O'Neill, GJ, 6/6/95, it has varied in many other respects -- as would be expected for a witness called upon to testify on so many occasions. For example, O'Neill has identified the woman accompanying Williams in three different ways -- as Patsy Thomasson, as Susan Thomases, and as Evelyn Liebermann. He has also described what Williams was carrying, variously, as "files and folders" and "folders and a cardboard box [like] a small hat box." Thus, while unvarying on the central fact of his testimony -- that Williams took material from Foster's office on the night of the 20th -- O'Neill brings some inconsistency's to any potential testimony. See Colloton & Kavanaugh, "Foster Memorandum," at 55-68.

David Margolis/Roger Adams/Phillip Heymann -- Margolis and Adams are career prosecutors in the Criminal Division at the Department of Justice. On July 21, in response to a request from the Park Police to examine Foster's office, Nussbaum called Phil Heymann (then Deputy Attorney General) to request that DOJ coordinate the investigation. Heymann GJ, 6/13/95 at 6. Margolis and Adams arrived at the White House around 4 PM to meet with Nussbaum and two other Associate White House Counsel, Steve Neuwirth and Cliff Sloan.[293]

---

[292] Williams to an FBI polygraph and denied taking documents from Foster's office on the night of the 20th. The FBI examiner concluded that she was "truthful" in making this denial. FBI Polygraph Report of Margaret Williams, 9/16/94, at 3-4.

[293] Nussbaum denies that any agreement was reached. Nussbaum GJ, 6/13/95/ at 176. He is supported in this by Neuwirth. Neuwirth GJ, 2/28/95, at 100. Sloan, however, has no clear recollection either way. Sloan GJ, 4/4/95/ at 61.

97

According to Margolis prior to the meeting Heymann had reached a tentative agreement with Nussbaum that Margolis and Adams would review each document. Margolis, Senate Hearing, 8/10/95, at 178. He also testified that at the meeting on the 21st he and Nussbaum concluded an agreement that they would review each document during a search of Foster's office. One reason Margolis recalls that event clearly is because at the end of the meeting, Neuwirth exactly misstated the agreement, saying that Nussbaum would review the documents and that Margolis corrected Neuwirth and Nussbaum assented to Margolis' correction. Margolis GJ, 6/14/95, at 11.

Adams corroborates Margolis recollection on the substance of the agreement. Adams GJ, 5/9/95, at 12. He says that it was intended that he and Margolis do a "summary" review of each documents. This understanding is reflected in notes Adams wrote within 7 days of the meeting. Adams also recalls in the same fashion the anecdote about Neuwirth's misstatement of the agreement. Adams, Senate Hearing, 7/27/95, at 96.[294]

However, on the morning of July 22nd, when Margolis and Adams arrived at the White House, they say that Nussbaum changed the search procedure they had agreed upon. According to Adams, Nussbaum definitely knew that he had changed the plans. Adams GJ, 5/9/95, at 20. Margolis agrees. Margolis, Senate Hearing, 8/10/95, at 182-83. Margolis called Heymann to complain and Heymann had a "heated" conversation with Nussbaum, explaining to him that Nussbaum would look foolish. Heymann GJ, 61/3/95, at 14. Heymann's assistant Cynthia

---

[294] Margolis' recollection and that of Adams is also supported by the contemporaneous "teletype" report prepared by FBI Supervisory Special Agent John Dana. FBI teletype, 175B-WF-187743-1 (July 23, 1993). One other FBI agent present says he was not aware of the nature of any arrangement between the DOJ attorneys and Nussbaum. Salter Deposition, 6/30/95, at 54.

98

Monaco, dictated notes in July 1993 which recorded the conversation from Heymann's end and which corroborate Heymann's description of his exchange with Nussbaum. Monaco Deposition, 7/6/95, at 26-27 (Bates# 70-149).

As a result of Nussbaum's decision, the search was conducted by Nussbaum in the early afternoon. Nussbaum reviewed each document and separated out the material into 3 piles: files the investigators wanted to see; personal papers of Fosters and miscellaneous documents. Heymann was furious at the manner in which the search was conducted. Heymann Deposition, 7/21/95, at 92 ("Bernie, are you hiding something?"). Cliff Sloan took notes and his penultimate entry is "get Maggie -- go thru office -- get HRC, WJC stuff."

Telephone Toll Records/WAVES data -- Telephone records reflect the following calls on July 21-22, 1993:

July 21st --

| 5:00 PM | Meeting between Nussbaum, Neuwirth, Sloan, Margolis and Adams ends |
| 7:45 PM | 12 minute call from Rodham residence in Arkansas to Bruce Lindsey's office |
| 9:11 PM | Thomases exits White House |
| 9:23 PM | 2 minute call from Thomases' cell phone to Maggie Williams home |
| 11:00 PM | 1 minute call charged to Thomases' calling card from Thomases' guest house to Rodham residence |

July 22nd --

| 7:43 AM | Nussbaum arrives at White House compound |
| 7:44 AM | 7 minute call from Williams home to Rodham residence |

99

| | |
|---|---|
| 7:57 AM | 3 minute call from Rodham residence to Thomases guest house in DC[295]. |
| 8:01 AM | Page for Nussbaum: "pls call Susan Thomases at 202-659-8787"[296] |
| 8:25 AM | 4 minute call charged to Thomases from Thomases' guest house to Rodham residence |
| 9:00 AM | message for Williams from Thomases "call when you get in the office" |
| 10:48 AM | 3 minute call from Thomases secretary extension at Willkie Farr to White House Chief of Staff office |
| 11:04 AM | 6 minute call from Thomases extension at Willkie Farr to First Lady's office[297] |
| 11:11 AM | 3 minute call from Thomases extension at Willkie Farr to Chief of Staff office |
| 11:16 AM | 1 minute call from Thomases extension at Willkie Farr to Chief of Staff office |
| 11:37 AM | 11 minute call from Thomases extension at Willkie Farr to First Lady's office |
| 11:50 AM | 4 minute call from Thomases extension at Willkie Farr to First Lady's office[298] |

---

[295] Thomases says she may not have received this call and it is mere coincidence that she immediately after called the White House. Thomases Senate Hearing, 12/18/95, at 84-87.

[296] Thomases has testified that she did speak with Nussbaum that morning before the search but that Nussbaum raised the topic of the search procedures, not her. Thomases Interview, 9/9/94, at 54-59. Nussbaum disagrees and says that Thomases expressed a generalized privacy concern to him that was not tied either to specific documents or to concerns held by HRC or President Clinton. Nussbaum Deposition, 7/12/95, at 139-46.

[297] Sometime during the morning Nussbaum had further discussions with McLarty, Quinn, Lindsey, Neuwirth and Burton regarding the search of Foster's office. Williams may also have participated. Nussbaum was, apparently, including others in the deliberative process on how the search should be conducted.

[298] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Generally, the witnesses say they were calling to console one another -- which may lead one to ask: How come the widow is not in the circle of grief? No know phone calls to Lisa Foster are evidenced during this time period.

100

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure
NW: 15416 DocId: 70001585 Page 138

2:50 PM    Search of Foster's office ends

3:05 PM    Telephone message for Williams to call Chief of Staff office

3:08 PM    10 minute call from Thomases cell phone to First Lady office.

3:25 PM    Telephone message for Williams from Neuwirth

5:13 PM    10 minute call from Thomases law office in New York [she had returned to New

York that afternoon] to First Lady's office

Steve Neuwirth -- Though Neuwirth is a witness supporting Nussbaum's version of the

"agreement" with DOJ he has important other evidence to provide. He has testified that on the

22nd, prior to the search of Foster's office, he "had the impression that Susan Thomases had told

Bernie [Nussbaum] that the First Lady had been concerned about unfettered access to Vince

Foster office being granted." Neuwirth GJ, 2/28/95, at 97.[299] While he cannot recall exactly

what Nussbaum said to create that impression he has acknowledged that the impression reflects

the substance of what Nussbaum had said. Neuwirth GJ, 4/2/96, at 57-58.[300]

Carolyn Huber -- Huber was contacted by Maggie Williams between 4 and 6 PM on the

22nd. Williams said that HRC had asked her to call Huber and arrange for storage of a box in a

closet on the third floor.[301] Huber met Williams and Castleton on the third floor at approximately

---

[299] Thomases is "absolutely firm" in her denial that the First Lady ever discussed documents in Foster's office with her during this time period. Thomases, Senate Hearing, 8/8/95, at 69.

[300] In his Senate testimony, Neuwirth did not specify how he got this impression and waffled on whether it occurred before or after the July 22nd search. Neuwirth Senate Deposition, 7/10/95, at 111.

[301] Williams own testimony confirms that she made a call to HRC who said she should put the personal files in the closed on the third floor to use to store them. Williams Interview, 10/24/94, at 22-25.

101

7:30 PM that evening and escorted them to the closet in Room 323, which she unlocked with a key kept in the desk in HRC's office.

Thomas Castleton -- Castleton was an intern in the White House Counsel's office. He was asked to help carry a box up to the third floor with Maggie Williams on July 22. He understood that the box contained documents that belonged to the Clintons. Castleton 302, 6/9/94 at 2. He also understood, from someone that HRC and possibly President Clinton would review the documents and make a determination as to what would be done with them. Castleton 302, 9/15/94, at 6; Castleton GJ, 4/4/95, at 60. While initially uncertain as to who the source of this information was, he has since stated that Maggie Williams was either the "person who originally told me about moving the boxes . . . or she just further clarified once we picked them up . . . that the President or the First Lady had to review the contents of the boxes to determine what was in them." Castleton Senate Deposition, 6/27/95, at 139-41; Castleton Senate Hearing, 8/3/95, at 13-14.

Gary Williams -- Williams, a Plumbing Foreman at the White House, says he saw a box labeled "Vincent Foster" in the closet of Room 323 on August 25, 1993 and again, probably, on November 2, 1993. He was in the closet on both occasions to work on a shower in Room 324B, whose plumbing is accessible in the closet. G. Williams 302, 2/23/96.[302]

Potential Defenses -- Plainly the most significant defense is that this aspect of the case is wholly circumstantial. The pattern of phone calls is clear -- but the content of the phone calls is

---

[302] There is some uncertainty as to whether Castleton took one box or two boxes up to the closet. Nussbaum and Deborah Gorham believe two boxes were moved. Castleton is reasonably sure one box was removed but acknowledges that it might have been two. Only one box was given to Williams and Connolly on July 27th. The box Williams saw would, presumably, be the second box.

102

not know and/or denied by the participants. Thus, the only direct evidence of concern relating to the documents in Foster's office comes from the testimony of Gail Kennedy.

* * * * *

*6) The White House and RTC Contacts* -- [The facts relating to contacts between the White House and the Treasury in late 1993/early 1994 are detailed in Bates & Azar, "White House-Treasury Contacts Investigation," September 1996.]

In September 1993 several referrals went from he RTC to the Department of Justice containing additional criminal allegations relating to Madison Guaranty. In particular the referrals identified in several instances Hillary Clinton as a witness because of her legal work for Madison. They also identified the Bill Clinton political campaign committee as a potential criminal subject.

**1.     The October 14 Meeting At The White House.**

In early October, the New York Times began investigating the handling of these referrals. As a result, on October 14, 1993, a meeting took place at 3:30 p.m. in Nussbaum's West Wing office involving Bernie Nussbaum (White House Counsel), Cliff Sloan, and Neil Eggleston (Associate Counsel), Bruce Lindsey, Dave Gearan, Jean Hanson, DeVore, and Jonathan Steiner (Treasury officials) apparently so that DeVore could inform the White House of the press inquiries he had been receiving regarding the referrals and how he intended to respond to those inquiries.

According to testimony by Lindsey and the notes he took at the meeting, 008-DC-00000079, DeVore ran the meeting. DeVore explained that he had convened the meeting

103

FOIA(b)7 - (C)

because he wanted to discuss several inquiries he had received. Lindsey has testified that his

notes reflect information that DeVore was relating from these press inquiries. DeVore next

stated that the press was claiming that the normal procedure was for a referral to be sent from the

field office of the RTC (Kansas City) to the relevant United States Attorney's office but that

these referrals had been sent to the RTC in Washington and the week before had been sent to

Little Rock. The press was asking why the procedure deviated on these referrals. DeVore then

said that Sue Schmidt was asking about the Rose Law Firm's involvement with Madison in 1985.

There then was some speculation that [                    ] who used to work at the RTC, had some

continuing contacts there and might be the source for the press information on these referrals.

   In a memorandum to file dated October 20, 1993, Lindsey described the October

14 meeting. 008-DC-00000083. The memorandum is generally consistent with his testimony

and notes from the meeting. The memo does include the additional information that, according to

Gerth, Clinton was not a target of the referrals, although Tucker might be.[303] One point of

controversy has been the fact that the memorandum has a "cc" indicated to Williams, Kennedy,

and Gearan. [                                                                                      ]

---

303. The memorandum also contains a parenthetical notation stating that "[a] check of our
campaign records turned up three cashiers [sic] checks for $3,000 each from J.W. Fulbright, Ken
Peacock, and Dean Landrum, and a personal check for $3,000 from Jim McDougal, signed by
Susan McDougal." According to Lindsey, he checked with the person who runs Clinton's Little
Rock office and who has access to the gubernatorial campaign records (an individual we have
identified as Susan Whiteacre). She was able to find the deposit slip with copies of the checks
attached and then faxed this material to Lindsey. 226-DC-00000005.

104

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

FOIA(b)3 – Rule 6(e), Federal Rules of Criminal Procedure

a copy of this memorandum was found in Kennedy's files, 011-DC-00000606, and Gearan's files, 004-DC-00000014. The

The meeting is significant on two fronts. First it is the single most detailed instance in which RTC officials appear to have given the White House a substantive heads-up regarding the Whitewater referrals. Second, it is a substantive meeting that, seemingly, was concealed from Senatorial inquiry in February 1994.

The question whether Altman knew of the October 14 meeting, either before it took place or after the fact, was central to our investigation. The three Treasury participants at the meeting, Hanson, Steiner, and DeVore, all testified that to their knowledge Altman was not aware of the meeting.

**2.    February 1: Altman Considers His Possible Recusal From Madison Matters.**

On February 1, Altman went through what, by all accounts, was a rather tortured process of discussing his possible recusal with senior Treasury and RTC officials and soliciting their advice. The evidence indicates that at least Hanson and Kulka informally advised Altman that he was not legally required to recuse on the basis of his friendship with the Clintons but that, as a political matter, he should recuse because he already said he intended to follow Kulka's recommendation and his failure to recuse would only put him in a "no win" situation politically.[304]

_____

304. Dennis Foreman, the Deputy General Counsel of the Treasury and Designated Agency Ethics Official, testified that prior to February 2, Hanson asked him for his quick reaction to the question whether Altman should recuse himself, and Foreman responded that he thought Altman should do so. Hanson said that she agreed with Foreman. According to Foreman, Hanson

105

265

Subsequently, Altman arranged a meeting at the White House to discuss both the statute

of limitations issue -- which was then slated to run on February 28th -- and his recusal.

**3.    Hanson Prepares Talking Points For The February 2 Meeting.**

To assist Altman, a non-lawyer, in providing a briefing to the White House,

Hanson assembled a one-page sheet of talking points for Altman's use.  001-DC-00000231.  The

talking points explained the request of the Republican Senators to seek tolling agreements, the

retroactive extension of the statute of limitations for certain types of claims, and the fact that the

statute would expire on February 28.  The talking points also detailed the three choices available

to the RTC if any claim existed:  allow the claim to lapse, commence litigation to preserve it, or

enter into a tolling agreement.  They also explained the limitations on these options, that tolling

agreements must be consented to by the relevant parties, and that a protective lawsuit must not be

frivolous or the attorney could be sanctioned.  The talking points noted that the RTC

investigation was being supervised by Kulka and Ryan, and, significantly, they state that, "It is

not certain when the analysis will be completed, but it will be before February 28."

The twelfth and final talking point states that Altman will recuse himself from the

case:  "I have decided that I will recuse myself from the decision making process, as interim

C.E.O. of the RTC, because of my relationship with the President and Mrs. Clinton."

Hanson testified that she provided Altman with a copy of these talking points in

advance of the meeting.  Before heading over to the meeting on February 2, Hanson claims she

asked Altman whether he had read the last talking point (announcing his recusal) and asked

---

returned to him some short time later and said that she had been talking with Altman, told him
her view on recusal, and that Altman was leaning towards recusal.

106

NW: 15416 DocId: 70001585 Page 144

whether he was inclined to "move off" that point (i.e., change his mind on recusal) because if he was, she would change the last point. According to Hanson, Altman said that the talking point was fine. Hanson testified that she was concerned about the accuracy of the talking point both because she wanted it to be accurate and because, if Altman did end up changing his mind on recusal (he had been going back and forth on the issue), she would not want it to appear that Altman changed his mind on recusal because of the White House meeting.

Altman claims that he first saw the talking points on the way over to the White House meeting, but he does not recall discussing them with Hanson.[305] Altman testified that he believes Hanson added the last point about recusal on her own initiative in order to prod Altman into announcing his recusal because she had been advising him to recuse.

**4.    The February 2 White House Meeting.**

The testimony about the February 2 meeting is relatively consistent and for the most part does not merit a recitation of the individualized recollections of each participant. (Obviously each witness remembers different details about the meeting, but only significant conflicting recollections are presented here.)

The meeting took place at approximately 5:00 p.m. in McLarty's office in the West Wing. Altman, Hanson, Ickes, Williams, Nussbaum, and Eggleston attended. Although he was scheduled to attend the meeting, McLarty was not able to be present because of a conflicting engagement in the Roosevelt Room.

The evidence indicates that Altman started the meeting by basically going through

---

305.    FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

107

the substance of the talking points prepared by Hanson.[306] As a result, this part of the meeting was by all accounts rather formal and stilted. As he was going through the discussion on the statute of limitations issue (the first eleven talking points), Hanson may have made some clarifying comments to correct some misstatements by Altman.

During this discussion, Hanson remembers Williams asking whether Altman was saying that if the investigation could not be concluded by the end of February, the RTC would have to secure tolling agreements from the potential defendants. Altman responded that he thought that was the case. According to Hanson, Altman did, however, make clear the eleventh talking point, to the effect that the RTC would under all circumstances complete its analysis by February 28.

The testimony of Ickes was somewhat different. Ickes stated that Altman said that it was not clear whether or not the RTC's investigation would be fully completed prior to the expiration of the statute of limitations. Importantly though, he did not understand Altman to be saying that the RTC would thereby be forced either to pass on otherwise meritorious claims or to seek tolling agreements. What Ickes claims Altman was saying was that while the RTC would not be able to complete a thorough and final factual investigation and analysis of claims prior to the deadline, the RTC would be able by the February 28 deadline to make an assessment of whether potential claims existed and, if necessary, file civil suits that would preserve those non-frivolous claims, even if after further study the RTC later decided to amend those complaints or

---

306. Nussbaum alone remembers that Altman opened the meeting by stating that the RTC had already provided a similar briefing about the statute of limitations issue to members of Congress.

108

NW: 15416 DocId: 70001585 Page 146

drop the cases.[307] Thus, Ickes testified that he understood that the RTC had three options. First, the RTC could decide not to file any claims. Second, the RTC could seek tolling agreements from potential defendants. Third, the RTC would be in a position to decide by February 28 whether to file protective lawsuits to toll the statute of limitations. As fully explained by Ickes, his recollection is not terribly inconsistent either with the talking points, the recollections of the other participants, or the information Altman had received in his briefing from Kulka (that while the investigation would not be as complete as one might like, the RTC would be in a position by February 28 to make a rational decision as to whether claims should be filed).

The notes Ickes took at the February 2 meeting are generally consistent with his testimony. 006-DC-00000005. They show Altman saying that February 28 is the last date for the RTC to reach a conclusion:

  a) any claim for potential misconduct -- or fraud re any of the parties or

  b) commence litigation to preserve claim -- or

  c) tolling agreement

006-DC-00000005. They seem to indicate that the RTC would, by February 28, have to file a claim, file protective lawsuits to preserve potential claims, or secure tolling agreements.

Ickes also testified that as Altman went through the statute of limitations discussion, several questions were posed to him by others at the meeting. In particular, Ickes remembers asking Altman when the original statute had expired, how it had been extended, and

---

307. Altman remembers some sense of surprise from the White House when he stated that one of the options was for the RTC to file a protective claim in court to toll the statute of limitations.

109

NW: 15416 DocId: 70001585 Page 147

what Altman's view was of the timing of the report by the RTC general counsel.

The evidence also indicates that at some point during the meeting, Williams asked if private counsel for the parties would be contacted and receive a similar briefing on the RTC's procedures and the statute of limitations issues. Altman apparently responded that he assumed so, but was not sure. For her part, Williams does not remember asking this question but says it is possible she did so.

The tenth talking point states that Kulka and Ryan were supervising the RTC's investigation of Madison. The evidence indicates that either at this point or during Altman's later recusal discussion Nussbaum stated that he and his firm had gone up against Kulka in the Kaye, Scholer case and that she was a tough litigator. It was clear from his remarks about Kulka that he did not hold her or her judgment in high esteem. Nussbaum also asked what Ryan's background was and was informed that Ryan had, like Kulka, come from the Office of Thrift Supervision.

According to Altman and Hanson, Altman then announced his recusal, either stating that he had decided to recuse himself (Hanson's recollection is that he read the beginning of the twelfth talking point, which is worded in this manner) or that he intended to recuse himself (Altman's recollection) because of his friendship with Clinton.[308] Nussbaum testified that Altman said either that he intended to recuse himself or that he was considering recusal. Eggleston and Ickes testified that Altman simply stated that he was considering whether to recuse

308.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

110

himself, and Williams stated that Altman simply said hypothetically that if he were to recuse himself, Ryan would be the one to decide on the Madison case.

At some point, Hanson interjected that she had advised Altman to recuse and that Bentsen had concurred in that advice. Nussbaum testified that Altman stated that he had not received any opinion that he was legally or ethically required to recuse.

Altman's announcement apparently took the White House participants by surprise and caused the discussion to become more lively. By almost all accounts, Nussbaum was at this point "agitated," "displeased," "pugnacious," and "intense." Altman also remembers Williams shaking her head in exasperation. As Altman described it, he was then subjected to questioning by Nussbaum, in particular, that made him feel defensive (even flustered) about his announcement.

Hanson testified that Nussbaum asked whether Altman's recusal would mean that Kulka and Ryan would be the decisionmakers on the Madison case. It is possible that it was at this point that Nussbaum expressed his views about Kulka and asked for background information on Ryan. Hanson remembers Altman stating at this point that he had complete confidence in Kulka. The evidence indicates that Altman emphasized that he would follow Kulka's recommendation even if he did not recuse, and thus did not feel that his participation added much. Altman testified that Nussbaum became particularly agitated and the discussion rather heated when he made this point. Altman remembers Nussbaum questioning him as to why he felt he should recuse himself.

According to Nussbaum he told Altman that if there was any legal or ethical reason to do so, he should recuse immediately. (Eggleston believes Nussbaum also suggested

111

that Altman get a formal ethics opinion on the issue.) He then stated that if Altman did not have

a legal or ethical obligation to recuse, even if he intended to follow the staff recommendation, the

mere fact that he would be reviewing the recommendation would provide additional discipline

and assurance of thoroughness and fairness by staff. Finally, Nussbaum stressed that it was

Altman's decision to make.

According to Altman, he felt like he was "under pressure" from Nussbaum at this

point. Altman testified that he believed the White House participants were taking his decision to

recuse personally, as if his recusal was an insult to the White House or the cowardly act of a rat

jumping off a sinking ship.

Williams alone recalls that she gave Altman what she calls "advice" on recusal.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

and that she was tired of people of integrity in the government saying they could not

participate in anything.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Ickes remembers asking Altman why he thought he should recuse since there was

no matter yet before him and questioning whether friendship with Clinton was an adequate basis

for recusal. Ickes believes he told Altman that in his opinion both reasons indicated he should

112

not recuse. But, according to Ickes, he emphasized it was Altman's decision.

The evidence indicates that at some point Ickes said that if Altman were going to recuse, it was better to do so sooner rather than later. The meeting apparently ended with Altman stating that he would sleep on the question whether he would recuse himself and Nussbaum responding that that was all the White House could ask for.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

**5.      Altman Discusses The February 2 Meeting With Steiner:  The Issue Of Steiner's Diary.**

The evidence indicates that Altman met with Steiner when he returned from the White House and told Steiner what had taken place at the meeting. According to Altman, he may have given Steiner a blow-by-blow description of the meeting. Altman told Steiner that he had no idea why the White House officials would be bothered by his recusal since he had told them that Kulka was going to be making the decision in any event. Altman testified that he told Steiner the White House officials were "disquieted" and that their concern was stupid because they knew he would not be making the decision under any circumstances. Altman even asked Steiner, "What do they care?" Altman claims he cannot recall precisely what he said to Steiner about Nussbaum's conduct, but he probably said, in recounting the conversation, "Bernie is jumping up and down." Altman also believes he may have mimicked or imitated Nussbaum

113

speaking on the recusal issue.[309]

According to Steiner, Altman told him that the White House had not fully understood the statute of limitations issue and the fact that the deadline was fast approaching. Altman also reported that the White House was unhappy about Altman's decision to recuse himself and that Nussbaum had made some forceful arguments against recusal. Nussbaum had apparently stated that Altman's recusal would set a dangerous precedent of recusing in the face of political pressure. Nussbaum also had made the point that the RTC had a reputation for being a very partisan institution and that if Altman recused, the investigation might be carried out in a partisan fashion. Altman told Steiner that he planned to sleep on his decision whether to recuse. Steiner testified that his impression was that Altman felt pressured by the White House not to recuse.

In a February 12 diary entry, covering the period January 24 through February 12, Steiner recorded his impressions at the time, including what he had learned from Altman of the February 2 meeting:

> 1/24-2/12/94: Two extremes: In DC spent long hours w/ RA going over how he should handle the RTC's investigation of Whitewater. The statute of limitations on Madison Guaranty cases was supposed to expire 2/28. Should RA recuse himself or should he stay involved. The hurdle was so high (fraud) that it seemed unlikely the RTC would bring suit or seek a tolling agreement from BC/HRC, but the chance existed. *RA originally decided to recuse himself but under intense pressure from the White House, he said he would make the final determination based on a recommendation from Ellen Kulka,* the GC. The GOP through D'Amato began a countdown to the 28th which was particularly ironic

---

309. Nye similarly testified that soon after the February 2 meeting Altman told him that the White House was disinclined towards his recusal. Nye remembers Altman saying that the White House made the point that by remaining on the case, the staff would do a more thorough job before making a recommendation.

114

> since he had voted against extending the statute during the RTC reauthorization
> period. As it turns out, RA's problem will probably pass when the Congress
> decides to extend the statute once again. Pressure on RA will certainly mount
> next week when Congress holds hearings on the RTC given that Ricki Tiegert
> [sic] the FDIC nominee declared that she would recuse herself from all Madison
> related issues due to her friendship w/ the Clintons. The WSJ also go into the act
> w/ a scathing attack on RA and Gene Ludwig.

010-DC-00000014 (emphasis added). In a February 27 entry covering the period February 13

through February 27, Steiner again addressed the issue of the February 2 meeting:

> 2/13-2/27/94:  Every now and again you watch a disaster unfold and seem
> powerless to stop it. For weeks we have been battling over how RA should
> handle the RTC investigation of Madison Guaranty S&L. Initially, we all felt that
> he should recuse himself to prevent even the appearance of a conflict. *At a fateful
> WH mtg w/ Nussbaum, Ickes and Williams, however, the WH staff told RA that it
> was unacceptable.* RA had gone to brief them on the impending statute of
> limitations deadline and also to tell them of his recusal decision. *They reacted
> very negatively to the recusal and RA backed down the next day and agreed to a
> defacto recusal* where the RTC would handle this case like any other and RA
> would have no involvement.

010-DC-00000014 (emphases added).



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

115

that the fact that the terminology in both entries is different reflects his practice of recording his feelings at the precise moment he is writing each entry.

As to the diary statement that Altman came under "intense pressure" not to recuse, Steiner attempted to explain that Altman did not use those words with him during their February 2 meeting, nor did Steiner necessarily believe on February 2 that Altman was under "intense pressure." Rather, Steiner claims that this description reflects his impression ten days later, when writing the diary entry, of Altman's state on February 2. Steiner testified that if he had to describe today what he learned from Altman on February 2, he would say that Altman was under "pressure" from the White House not to recuse. According to Steiner, Altman "did not come under intense pressure." Nussbaum had made powerful arguments, and it is possible Altman felt pressure, but Steiner refuses to describe the level of pressure Altman felt.

Steiner used the same excuse to distance himself from his February 27 entry that the White House had told Altman that his decision to recuse was "unacceptable." According to Steiner, that word described only what Steiner's impression was from what Altman had told him 25 days before about the February 2 meeting, and that he does not believe the use of that word was accurate. By "the White House staff" Steiner says he meant Nussbaum, as he was only aware of Nussbaum having offered his views on recusal. Steiner says he uses the term "unacceptable" in conversation quite often, and imprecisely. Steiner testified that to his knowledge, at no point did Nussbaum say to Altman, "You may not do that." Again the "they" who "reacted very negatively" was actually just Nussbaum, who was strongly opposed to Altman's recusal, according to Steiner. By "backed down," Steiner meant to say that Altman changed his mind and that Steiner at the time felt that this decision was a mistake.

116

Altman testified that he does not remember telling Steiner he had come under "intense pressure" from the White House. He was not under intense pressure from the White House not to recuse. Altman was quite adamant that the White House did not tell him that his recusal would be "unacceptable."

**6.     February 3:  Altman Decides Not To Recuse Himself.**

Altman testified that after sleeping on the issue, he decided that he would not recuse himself, at least for the time being. His rationale was that recusal was not required, he would follow Kulka's recommendation in any event, and he did not want the White House to take his decision as a personal rebuke.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

The evidence indicates that during this conversation, Altman told her that he had decided not to recuse himself for the time being. Altman said that his decision did not matter since he would follow Kulka's recommendation, but that the decision made "them" (meaning the White House officials) happy.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Altman also said that the White House had one request, that Kendall be contacted so that he would be aware of the timing and the legal issues on the statute of limitations.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

117

NW: 15416 DocId: 70001585 Page 155

277

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Altman asked Hanson to check with Kulka on that point. That morning, Hanson called Kulka, and Kulka said that private counsel (including Kendall) would be contacted in due course, but that it was premature to do so at that point. Altman had no objections when Hanson later reported this information back to him.[310]

Hanson testified that at some point she told Altman that she assumed he would get rid of his copy of the talking points. She did so because she did not want a version of the talking points lying around that stated that Altman had decided to recuse himself prior to changing his mind as a result of the White House meeting.[311] Altman claims not to remember this conversation.

### 7. February 3: Altman Announces His Recusal Decision To The White House.

The evidence indicates that sometime after a conversation with Bentsen, Altman called over to the White House to arrange to meet with some of the same White House officials he had met with the day before. The testimony about how this meeting was set up, what time of day it took place, and what occurred at the meeting is widely varied.

In short, the evidence shows that Altman set up a meeting (on short notice) in Williams' office for the purpose of announcing that he had decided not to recuse himself for the time being. He arranged the meeting by calling either Williams or Ickes, and Williams, Ickes, Eggleston, Nussbaum, and Stephanopoulos may have been in attendance. Hanson was late,

---

310.

311. Hanson testified that she had another similar conversation with Altman where she said to him that she assumed he had gotten rid of his talking points.

118

arriving only after Altman had already made his announcement and departed. She then had a discussion about Altman's recusal decision with possibly Williams, Ickes, and Eggleston present. The best evidence indicates that these meetings took place as an independently-scheduled event around the lunch hour on February 3, although there is some testimony that the meeting was simply a precursor to a regularly scheduled health care meeting in Williams' office around 6:00 p.m. that evening.[312]

Altman testified that he called Ickes on the afternoon of February 3 and said that he wanted to stop by and see him for a minute. Altman cannot recall, but he thinks it is possible he told Ickes he would like to talk to him prior to that evening's 6:00 p.m. health care meeting that both would be attending in Williams' office in the West Wing. Altman does not remember asking that anyone else be present for the conversation with Ickes.

According to Altman, he went over to Williams' office at the White House to meet with Ickes. Hanson was late arriving. As he and Ickes stood just inside Williams' doorway, Altman told Ickes that for the time being he was not going to recuse himself. Ickes either said "good" or simply acknowledged what Altman was saying. At some point, Stephanopoulos came in and sat down on the couch, but Altman had already told Ickes about his recusal. Altman is not sure whether Eggleston was present for this discussion and does not believe Williams was even present.

According to Altman, he learned later that evening from Hanson that

312. When the meeting took place, and hence whether it was simply a precursor to another regularly scheduled meeting at the White House on an unrelated topic, was a significant question for our investigation because the meeting seems a more significant contact if it was a separately-scheduled event rather than a casual add-on to another meeting.

119

she had shown up just after he had left the meeting.

To the contrary, Williams testified that Altman called her at about noon a day or two after the February 2 meeting. Altman told her that he had decided not to recuse himself, and he said he wanted to tell people at the White House of his decision prior to going to a meeting he had scheduled on Capitol Hill. (Altman's calendar confirms that he was due for a meeting on the Hill at 1:15 p.m. on February 3. 001-DC-00000487.) Williams thinks Altman asked if she could get Ickes and Stephanopoulos together so that he could tell them that he had decided not to recuse himself. Williams told Altman she would try to get them together in her office in the West Wing in five minutes. According to Williams, Ickes showed up, but Stephanopoulos walked in late. She also remembers that someone from the Counsel's office was there, either Eggleston or Nussbaum. Altman then came into her office and said that he had decided not to recuse himself. Ickes may have asked Altman if he was comfortable with his decision.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Ickes initially testified in the grand jury that Altman called him on the phone or told him in the White House within a day or two of the February 2 meeting that he would not recuse himself. When he later testified in the grand jury, Ickes testified that he remembers meeting with Altman *and* Williams in the doorway to her office. Altman said that he was not going to recuse. According to Ickes, this meeting took place before a 6:00 p.m. health care meeting in Williams' office. Ickes' phone log for February 3 shows an entry stating, "Roger Altman needs another meeting today," 006-DC-00000206, but Ickes is not sure whether that

120

refers to the meeting regarding Altman's recusal decision.

Eggleston testified that he was in Williams' office on February 3 with Williams and Ickes for some unknown reason. Eggleston is not sure whether he knew Altman would be coming over, but at some point Altman stuck his head in the office. Altman said that he had decided not to recuse for the time being and left.[313]

Stephanopoulos recalls being in a health care meeting in Williams' office that was about to start, and Altman walked in and announced that he had decided not to recuse.

According to Hanson, she was having lunch on February 3

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Hanson testified that when she arrived, Eggleston, Ickes, and Williams were

---

313. Nussbaum initially testified that he remembers running into Ickes or Altman in the hallway in the West Wing within a few days after February 2 and being informed that Altman was leaning against recusing himself. In his second grand jury appearance, Nussbaum was more confident he had this conversation with Altman on February 3 and believed he may have also had the same discussion with Ickes.

314. Hanson's schedule card confirms that she had a 12:00 p.m. lunch date scheduled at the Old Ebbitt Grill on February 3. 329-DC-00000116.

315. Both Hanson's secretary and Gross corroborate Hanson's version of these events, further supporting the view that the February 3 meeting took place around the lunch hour.

121

standing in Williams' office, and they told her that Altman had just left. Hanson testified that

Ickes asked her who else was aware that she had recommended to Altman that he recuse himself.

Hanson remembers giving Ickes three names, Ben Nye (Altman's special assistant), Michael

Levy (the Assistant Secretary for Legislative Affairs), and one other person whose name she does

not now recall. Hanson testified that Ickes said that that was good because if that fact got out, it

would not look good in light of Altman's decision not to recuse. Hanson responded by saying

that she would have recused had she been in Altman's position, and Ickes again stated that it

would be better if her advice did not get out. Hanson replied that she would say what she

advised Altman if asked.



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Eggleston remembers telling Hanson that Altman had just left and that Altman had told

them he would not recuse. Ickes then asked Hanson how many other people knew that she

recommended Altman recuse himself. Hanson responded with a list of names sufficiently long

that Ickes became uncomfortable. The list included Steiner, Levy, and possibly several others.

Ickes testified that he saw Hanson on the second floor of the West Wing within a

day or two of the February 2 meeting, but claims not to recall any discussion about Altman's

122

NW: 15416 DocId: 70001585 Page 160

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

recusal.

**8.    Ickes Discusses The Madison Civil Investigation With The President And Mrs. Clinton.**

A critical issue for the investigation was whether anyone present at the February 2 meeting discussed with the Clintons (or anyone else who might have communicated with the Clintons or their counsel) either the fact of the meeting or the substance of the information that had been conveyed during the February 2 meeting regarding the RTC's handling of the statute of limitations issue or Altman's recusal. All of the participants except Ickes denied having passed on this information to the Clintons or their agents.

Ickes testified that he told Clinton the gist of what the February 2 meeting had been about, but Ickes claims not to be able to recall when or where he did so or exactly what was said other than that he recounted what had transpired in the meeting, including both the statute of limitations and recusal discussions. Ickes believes he probably told Clinton about the February 3 follow-up meeting with Altman during this same discussion. Ickes does doubt that this conversation would have taken place, however, after the February 12 enactment of the extension of the statute of limitations.[316] Ickes does not recall but believes it is possible he told Clinton that the RTC would not have time to decide whether it had claims that it intended to pursue with full force. Ickes testified that he never discussed with Clinton whether Clinton should sign a tolling agreement.

--------

316. One possibility we explored was whether Ickes' conversations with the Clintons may have taken place after the controversy had erupted regarding the February 2 meeting. While Ickes was not positive, he thought, however, that the discussions took place before February 12 and before Altman disclosed the February 2 meeting in his February 24 testimony.

123

283

Ickes remembers having essentially an identical but separate conversation with Mrs. Clinton. He similarly does not remember the circumstances of that discussion, except that, like the conversation with Clinton, it probably occurred before February 12.

During the course of the summer 1994 investigations, Ickes' private counsel, Amy Sabrin, had a conversation with Jane Sherburne and Sheila Cheston, both of the White House Counsel's Office. Sherburne and Cheston took notes during this discussion, in which Sabrin apparently conveyed her client's confidences to the White House. Portions of these notes were produced to the OIC. Both sets of notes reveal that Ickes may have also had separate conversations with each of the Clintons regarding Altman's decision not to. Sherburne's notes read:

> HI Recalls informing both WJC and HRC (meets with them several times/wk) separately that Altman not going to recuse.

442-DC-00006538, at 6538-6539. Cheston's notes similarly state (to the best they can be deciphered in her handwriting):

> Informed HRC + BC individually that RA w/d not recuse self, mtg w/ each [at least] 1/day and this time. Told between 2/3-24.

442-DC-00006542. These notes are at least generally consistent with Ickes' testimony that he believes he likely told both Clintons about the February 3 meeting with Altman (at which Altman announced he would not recuse himself).

Mrs. Clinton testified that she did not learn of the February 2 meeting until around the time Altman announced his recusal (February 25). Moreover, she denied having any discussions with Ickes prior to Altman's testimony on February 24 regarding the RTC's civil investigation of Madison. She specifically claims not to recall Ickes having briefed her on the

124

options the RTC had in light of the statute of limitations -- filing suit, not filing suit, or seeking

tolling agreements. Nor does she remember Ickes discussing with her prior to February 24,

Altman's possible recusal.

Clinton testified that he did not learn of the February 2 meeting until it was

disclosed in the newspapers. He testified that he learned basically what had appeared in the

press, that Altman had briefed the White House on procedural issues relating to the RTC's

investigation; he did not learn that recusal had been discussed. Clinton further testified that the

first he learned that Altman was considering recusal was only when he did recuse on February

25. Similarly, he does not believe he was aware prior to public reports that Altman had

discussed his possible recusal with the White House.[317]

**9.    The February 24 Senate Banking Committee Hearing.**

During the hearing on February 24, Senator Gramm first raised the issue of

communications by the RTC or Treasury with the White House regarding Madison or

Whitewater. The following exchange ensued:

> Q.    . . . Mr. Altman, I want to ask you first.
>
>      Have you or any member of your staff had any communication with the
>      President, the First Lady, or any of their representatives, including their
>      legal counsel, or any member of their White House staff, concerning
>      Whitewater or the Madison Savings & Loan?
>
> A.    I have had one substantive contact with White House staff, and I want to
>      tell you about it.
>
> Q.    Let me, if I may, just given that "yes," I would like to know what the

---

317.  Fiske did not question Clinton about his conversations with Ickes, and we never had the
opportunity to question Clinton on this issue.

125

substance of the communication was, when it occurred, who initiated it, and what you were asked to do.

A.     First of all, I initiated it.

About three weeks ago, Jean Hansen [sic], who is Treasury's General Counsel, and I requested a meeting with Mr. Nussbaum -- he is the White House Counsel.

The purpose of that meeting was to describe the procedural reasons for the -- the procedural reasons for the then-impending -- then-impending -- February 28th deadline as far as the then-statute of limitations was concerned.

I am sure you know that that statute of limitations has subsequently been retroactively reinstated for certain types of civil claims.

And we explained the process which the RTC would follow in reaching a decision before that February 8 [sic] deadline; that it would be exactly identical to procedures used in any other case, any other PLS case, and that the RTC fundamentally would come to a conclusion as to whether or not there existed the basis for a claim, or whether there did not.

In the event a basis for a claim existed, then it would pursue either a tolling agreement -- which is the equivalent of a voluntary extension of the statute of limitations from the parties at interest -- or it would file that claim in court.

That was the whole conversation.  I was asked one question.  That question was whether we intended to provide the same briefing to attorneys for the parties at interest.

I said, I assume so.

I went back.  Jean Hansen [sic] checked with the RTC General Counsel. The answer was:  In due course.

I said, fine, that was it.

I have not had any contact with the President of the United States or the First Lady on any matter like this.

126

Altman, Senate Hearing, Feb. 24, 1994, at 55-56.[318]

Hanson testified that she noticed right away that Altman had not mentioned the recusal discussion in describing the February 2 meeting. Indeed, he had missed the entire paragraph on his prepared Q&A that included the sentence on recusal. Gross, who was sitting right behind Hanson, tapped Hanson on the shoulder and said that Altman had left out recusal, and Hanson responded that she knew.[319] According to Hanson, she immediately considered handing Altman a note to remind him of the recusal discussion, but then Altman stated that, "That was the whole conversation," and she believed the opportunity had passed for correcting his testimony.

Hanson also testified that she was not concerned about Altman's failure to mention the February 3 follow-up meeting, because she actually had been under the impression that he had mentioned it; she claims it was not until she later reviewed the transcript that she realized he had failed to include this information.

Eggleston, who attended the hearing for the White House, testified that he was immediately concerned that Altman had failed to mention the recusal discussion that had taken place at the February 2 meeting. He telephoned Podesta from the hearing to tell him that Altman had failed to mention recusal. (Podesta does not remember speaking with Eggleston while

---

318. The excerpts from Altman's February 24 testimony are taken from the final printed hearing transcript. *The Semiannual Report of the Resolution Trust Corporation Thrift Depositor Protection Oversight Board -- 1994: Hearing before the Committee on Banking, Housing, and Urban Affairs*, 103d Cong., 2d Sess. (1994). That transcript reflects several minor typographical corrections that were made to the preliminary hearing transcript. None of the changes appears to be material to the investigation.

319. Gross stated that she does not recall this incident.

127

Eggleston was at the hearing. He also does not remember the issue of Altman's failing to mention the recusal discussion coming up this soon.) Stern does remember receiving a call from Eggleston as the hearing ended, in which Eggleston reported that the recusal issue had not come up during the hearing.[320]

Altman testified that he used the word "substantive" to mean "relating to the substance of the case," "the facts of the case," "the merits of the case," "the status of the case," "or where the case is going." Altman also testified that by "substantive" he meant "about the case, about the procedures applying to the case." He explained that he did not consider a discussion regarding his possible recusal a "substantive" discussion; he never associated himself with the substance of the case since in any event he was de facto recused and thus did not view his recusal as relating to the procedures (and in his terminology "substance") of the case. Altman testified that when he used the word substantive he was not thinking of other meetings that would be excluded by using that word (other than the February 3 meeting, obviously).

Altman testified that he did not intentionally leave out the prepared sentence on recusal and that he now wishes he had read it out loud. He admits that his answer as given is "susceptible to misinterpretation" and that the distinction he drew between the substance of the case and his recusal was "stupid" in retrospect given that few agreed with the distinction. Indeed, when looking at the transcript of his testimony, Altman stated that he knows people must think he was trying to hide the recusal discussion.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

---

320. It had also been expected that Altman would be asked more generally why he had failed to recuse himself from the Madison matter.

128

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Altman testified that when he said, "That was the whole conversation," he meant that was the whole conversation regarding the "substance" of the case. He also explained that he was referring to what he thought was the purpose of the meeting, which was to discuss the statute of limitations procedures; the recusal discussion was a "by the way" type of remark. He claims he made no attempt to conceal the recusal discussion. As he asked the grand jury, "I mean, if I had had an intent, would I have sat around the night before with all these people, with the line 'recusal' in there? -- I mean, 10 or 12 people -- if I'd intended to conceal it? . . . and would I have gone over to the White House and talked -- with our general counsel, taking with me, and four White House staff members, if I intended to conceal it?" Altman testified that he did not have any fear that disclosing the recusal discussion would create more controversy. (He also claims that in the preparation sessions nobody ever said that the recusal discussion was in any way an explosive or particularly embarrassing fact.)

Altman explained his statement that he was asked only one question during the February 2 meeting as relating to the procedural discussion part of the case, the "substantive" portion of the meeting. "One question about the substance, that's what I meant." According to Altman, that is why he did not disclose the questions he admits being asked during the recusal discussion.

According to Altman, he did understand that Senator Gramm's question required him to answer for himself and his staff -- whether either had any contacts with the White House regarding Madison.

A short while later, Senator D'Amato again raised the issue of contacts:

129

Q.   Mr. Chairman, I have to say to Mr. Altman that I would like to go back to a question that Senator Gramm brought up as it relates to any meetings with White House Staff or counsel.

Mr. Altman, I think you said that you and an official from Treasury sought out Mr. Nussbaum? Is that correct?

A.   Yes, I did.

Q.   Could you tell us why? In other words, I have difficulty understanding why it is you felt compelled to seek out the White House counsel.

A.   Solely to ensure --

Q.   Solely to?

A.   Solely to be sure that he understood the legal and procedural framework within which the RTC was working.

If you recall, as I said, at that time there was a February 28, 1994 date which was the subject of major attention in the Congress and in the press. It is not uncommon of meetings of that type to take place. And I describe it as a "heads-up" and a very stiff conversation.

Q.   A heads-up? In what connection would that heads-up be? Do you mean that the statute of limitations was running?

A.   No, that they should be aware of the internal processes and the types of criteria which the RTC was going to be following in order to reach a decision by February 28, 1994.

Q.   Were any representatives of the President or Mrs. Clinton, or any legal counsel, which I think would be appropriate, speaking to the counsel for the RTC, or people handling this particular matter? I mean, was there any legal representation going on? Was this you just called them? Did they have any representatives, or any counsel who may have been meeting with staff people, or talking to staff people?

A.   I was accompanied by our General Counsel, Treasury General Counsel.

Mr. Nussbaum had his assistant with him. And Mr. Ickes and Margaret Williams were both at the --

130

**EXHIBIT 3 (Part 4)**

to

Plaintiff's Response to Defendant's Statement of Material Facts
Not in Dispute and Statement of Undisputed Material Facts
in Support of Cross-Motion for Summary Judgment

Q.   Oh? Ickes is in it, huh?

Let me ask you this. Prior to this meeting, was there any representation, was there any counsel, that was representing the President's interests or Mrs. Clinton's interests, or anyone else that you were aware of, as it relates to the matter that you went to brief them on?

A.   No. Not to my knowledge. Nor were there any substantive conversations -- subsequent conversations.

Q.   Did anyone request this meeting?

A.   I requested the meeting.

Q.   Was there any other meeting that may have been requested?

A.   No.

Q.   There was no other meeting that you were aware of that the White House counsel requested?

A.   No.

Q.   Or anyone else from the White House?

A.   No.

Q.   Mr. Ickes?

A.   I had no subsequent -- I received no subsequent requests for meetings.

Q.   What about private counsel? Did private counsel -- I find it hard to believe that there was no private counsel. Are you saying to me that there was not even private counsel meeting with staff lawyers at some level?

A.   Not to my knowledge, Senator.

Altman, Senate Hearing, Feb. 24, 1994, at 63-64.

Altman testified that he meant to say that there were no subsequent, substantive

conversations with the White House. Altman claims that he did not intentionally leave out his

131

request for the February 3 meeting with Ickes because as he understood the question, D'Amato

was asking whether *the White House* had requested any other meetings. Again Altman claims

that while he may have misinterpreted the question, he did not intentionally conceal the February

3 meeting; his defense is that had he intended to conceal the meeting, he would not have had the

meeting described in his Q&A briefing books access to which as many as a dozen people at

Treasury and the RTC had.

Senator Bond then asked Altman questions regarding the criminal referrals:

Q.   Next, when did you become aware of the RTC recommendations that
     further criminal prosecution be taken against Madison?

A.   Last fall. I was advised that the question of a referral to the Justice
     Department was under consideration at the RTC. And as other members
     of the RTC staff will attest, I said that normal procedures with no
     deviations whatsoever should be pursued, including chain of command
     procedures, in terms of reaching that conclusion.

     I might tell you that typically decisions like that are made at the Regional
     Office level, and it was in this case.

Q.   Were you aware that the Regional Office had asked the National Office to
     make a determination as to whether the Clintons' name should be in the
     new expanded referral?

A.   - No.

Q.   You did not know they were asking for the National Office to make a
     determination?

A.   No. I was simply informed that this issue was on the table, and my
     reaction was -- and I had only one conversation about it -- that normal
     procedure should be followed. That is the way we are going to handle this
     thing from beginning to end.

Q.   How was the White House notified of the referral?

A.   They were not notified by the RTC, to the best of my knowledge.

132

NW: 15416 DocId: 70001585 Page 170

Q.     Nobody in your agency, to your knowledge, advised the White House staff
       that this was going to be a major -- this could be a major source of
       concern?

A.     Not to my knowledge.

Altman, Senate Hearing, Feb. 24, 1994, at 69.

As soon as Altman provided this last response, he turned back to Hanson (who was sitting behind him) and asked her a question. Hanson testified that Altman asked her, in substance, whether his answer was correct, and Hanson responded that she thought it was. Hanson then spoke with Kulka, who was seated next to her, and asked her if she was aware whether the RTC had notified the White House of the referrals, and she said, "No." She remembers that when Bond asked his question she had a vague recollection of having spoken with Nussbaum, but she recalled no other details of the conversation at that time other than that the conversation obviously related to the criminal referrals in some way.[321] Hanson testified that she does not recall if she had her "flash" of recollection about the Nussbaum conversation before Altman turned to her or afterwards.[322] When she did recall this information, she did not believe Altman had to correct his testimony because she understood the questions as asking simply whether *the RTC* had notified the White House, not the Treasury. Hanson also remembers having thought at the time that Treasury had not prepared a Q&A about the fall contacts for

---

321. Hanson testified that she did not recall at the time the October 14 meeting.

322. According to Hanson, she did not mention her conversation with Nussbaum to Altman after the hearing.

133

Altman.[323]

According to Altman, as soon as Bond finished with him, Altman turned to

Hanson, who was seated just behind him, to double-check his response. Altman testified that he

said to Hanson, "They didn't, did they?" and Hanson responded, "No."

We had lip reading experts from the FBI examine the videotape of this incident.

Because of the camera angles, they were not able to provide a definitive analysis of exactly what

Altman said to Hanson. They did conclude that the videotape is consistent with the versions

given by both Altman and Hanson, that Altman asked Hanson a negative question along the lines

of, "We didn't do that, did we?" and Hanson responded in the negative by shaking her head side

to side to confirm Altman's recollection.

Senator Domenici concluded the questioning on contacts:

Q.    Mr. Altman, you spoke a while ago of your one contact with the White
      House regarding this, and you and your counsel went up to talk to the
      White House counsel.

A.    One substantive contact.

Q.    Please?

A.    One substantive or meaningful contact.

Q.    Well, I assume we are not arguing there that you had -- you are not
      suggesting you had more than one are you?

A.    No. I am just saying that if you, you know, you run into someone in the
      hall, if you see that thing in the paper this morning, I am not including

---

323. Eggleston testified that he did not have immediate concerns with Altman's response to
Bond about the White House being notified about the criminal referrals. He believes he may
have temporarily forgotten about the fall contacts or simply not had concern for whatever
unidentified reason.

134

295

that.

Q.    You said you were there to give a heads-up.

What I understand the situation to be on average folks, like a couple of folks in my State that were bordering up alongside of a statute of limitations becoming a defense, was that they were presented with a tolling agreement. If they did not sign it, the suit was filed so as to toll the statute.

Is that a rather fair assessment of the way business is done?

A.    I think I would have to know the details of the matter, Senator.

Q.    I guess what I am wondering is are we getting the right perspective of why you did this?

Did you go there because you wanted them to know that, clearly, they might be asked to sign a tolling agreement?

Or, to know that the normal process was that the statute is going to toll. If there were reasonable grounds to suspect something, they might expect a lawsuit?

Why else would you give them a heads-up?

A.    The difference between this and a matter like the one you referred to is I had been receiving -- I had begun to receive a lot of inquiries, including inquiries in writing, from Congress as to what procedures the RTC was going to follow.

I wanted to give them the same sense of those procedures that I was giving Members of Congress. I said to them nothing different than I have said to Members of Congress.

Q.    I understand that, but I guess what I am getting at is there must have been a reason for telling them that.

Congress was just saying "the statute is going to run, what are you going to do." So, you went over there to tell them we are going to apply the same thing we do in any other case?

That is the "heads-up" that you were giving them?

135

A.    That is right.

Q.    Was it serious enough that you wanted them to know because there might be something that they would be confronted with that was untoward as you applied your rules like asking for a tolling agreement, or filing a lawsuit?

A.    Again, the essence of what we said was that the statute of limitations which then applied was scheduled to expire on February 28, 1994.

      The RTC was going to make every effort to make a decision by that date.

      It could fundamentally reach only one of two decisions:

      That there was the basis for a claim, or that there was not.

      If there was a basis for a claim, then we would either seek a tolling agreement to permit more discovery and more preparation, or we would file that claim in court.

Q.    Well, the passage of the statute of limitations extension eliminates that problem, as you have already indicated.

      I guess, Mr. Chairman, I am having a little difficulty with the explanation. One way of looking at it was that it was not a very meaningful or important meeting; that he was just doing this so that he would be able to tell Congress he had told them he is going to treat them the same way as others.

      I do not think a man -- I know you fairly well. I do not think you would be going over there to just be able to send this letter to Senator D'Amato that says I have told the White House that they are going to be treated the same way as other people.

A.    Senator, I did not know whether they knew of such procedures which, as I say, I was then communicating to Members of Congress. It just seemed to me a little odd to explain to a Member of Congress that we are going to follow X, Y, Z procedures and not have them ever be made aware of what those were.

Q.    . . . .

      My last observation would be that it is inconceivable to me, Mr. Altman,

136

NW: 15416 DocId: 70001585 Page 174

that you would really be concerned that people involved in the investigation, whomever they are, whether it be people in Arkansas, whether it be confidants of the President, or whomever, that they would not know that the statute of limitations was going to toll, and that that presented a situation where you had to advise somebody. I just do not think anybody involved in this would not have known that.

A.   Well, Senator, I also -- I would agree with you. I cannot say for sure. I cannot say what was in their minds. I doubt very much that they did not know about the statute of limitations.

Q.   Right.

A.   What I was saying was not that. What I was saying is I did not know if they knew, and, frankly, my impression is, as a result of that meeting, that they had not previously known what procedures the RTC would be following.

By that I mean that you have to choose between -- you have to reach a conclusion as to whether there is a claim or there is not, and then determine what you have to do if you reach a conclusion that there is.

Altman, Senate Hearing, Feb. 24, 1994, at 70-72.

Altman testified that he emphasized to Domenici that he was referring to one "substantive or meaningful contact" to stress again that he was only talking about meetings regarding the substance of the case, and that he did not associate himself and his recusal with any aspect of the case. Altman claims that while he was sitting there testifying he did not think about his conversation with McLarty and his February 3 meeting with Ickes and decide that they were not substantive. Rather, he thought the Senators were asking about only contacts with the White House *about the case*. According to Altman his staff had already prepared a Q&A about the Ickes meeting stating that the contact was not substantive, but was rather "incidental."[324]. He

---

324. As discussed above, Altman consistently defends his testimony on the grounds that he did not prepare the contacts Q&A and that his staff chose the descriptive terms "substantive" and

137

claims he excluded his telephone conversation with McLarty because he viewed it as even less than "incidental." In further defining what an "incidental" contact would be -- a hallway conversation about what had appeared in the press that morning -- Altman explained that he might have chosen a bad example, but that he was simply meaning to say he was not talking about incidental contacts.

Steiner recorded in his diary entry dated February 27, 1994 (covering the period February 13 through February 27):

> At the hearing, the recusal amazingly did not come up. The GOP did hammer away at whether RA had had any mtgs. w/ the WH. He admitted to having had one to brief them on the statute deadline. They also asked if staff had met, but RA gracefully ducked the question and did not refer to phone calls he had had.

010-DC-00000014. Steiner testified that his "gracefully ducked" language was "an unfortunate choice of words." Steiner said that when he wrote "ducked," he was referring to his own conversation with Stephanopoulos on February 16. Steiner remembered having told Altman about his conversation with Stephanopoulos, so either Altman had forgotten about it or he had "gracefully ducked" the question by defining "meetings" such that he need not disclose this or other contacts. Steiner assumed it was the latter.[325] Steiner testified that as he left the hearing he was concerned only about Altman's use of the term "heads-up" and Altman's failure to mention Steiner's February 16 meeting with Stephanopoulos.

The evidence does not indicate that anyone expressed to Altman immediately

_____

"incidental."

325. Steiner testified that when he wrote this entry he still had no recollection of the October 14 meeting.

138

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

after his testimony any concerns about the accuracy or completeness of that testimony.

**10.    Altman Recuses On February 25.**

On February 25, *The New York Times* published a front page article about Altman's testimony that was highly critical of the fact that the February 2 meeting had taken place, implying that the White House had received an update on the underlying facts in the case. Altman testified that he was shaken by the story and its allegations of impropriety and had decided by 10:00 a.m. that he would recuse himself to limit any appearance of a conflict of interest. [                                        ] When he got to work, he did have several conversations with DeVore (who had since retired and was working in Texas) to get his advice on how to make the recusal announcement in a way that would minimize further negative press stories. DeVore's advice was to stay flexible on the issue so as not to "pour kerosene on the fire," possibly waiting a couple days before making the announcement.

Altman testified that he had a statement prepared announcing his recusal. At some point in the mid- to late-afternoon, Altman spoke with Howell Raines, editorial page editor of *The New York Times*, who told Altman that he was writing a very harsh editorial about the February 2 meeting [                                        ] Altman attempted to explain what had taken place at the meeting, but Raines apparently had already made up his mind on the editorial. At some point in the conversation, Altman told Raines that he had decided to recuse himself. Within minutes after the call, Altman had the Treasury public affairs office release the recusal statement that had already been drafted announcing Altman's recusal.

Steiner's diary dated February 27, 1994 (covering the period February 13 through

139

February 27) records:

> The next day, the NYT ran a front page story on the mtg. The heat was on. We spent a tortured day trying to decide if he should recuse himself. I spoke w/ Podesta to let him know of our deliberations. Very frustrating that he was the chosen point of contact since he clearly was not in the complete confidence of George and Harold. After Howell Rains [sic] from the NYT called to say that they were going to write a brutal editorial, RA decided to recuse himself.



010-DC-00000014.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

It was only during his telephone call with Raines that Altman decided and announced that he would in fact

recuse. Immediately after Altman got off the phone with Raines, Steiner called Podesta to let

him know of Altman's announcement.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Podesta believes he

then told Stephanopoulos and Ickes.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Stern remembers a similar conversation with Steiner on February 25. He testified

that Steiner called him to say that Altman was seriously considering recusing himself from

140

Madison but would not be consulting with the White House on the issue.

According to Altman, he was unaware of any effort by anyone at the Treasury to inform the White House that he was again considering recusal. As Altman put it, if such efforts took place, they were not very effective given the angry call he received soon after his announcement from Ickes and Stephanopoulos.

**11. Eggleston's February 28 Memorandum Regarding The Madison Civil Investigation.**

On February 28, 1994, Eggleston sent Ickes a memorandum regarding "Whitewater -- FDIC and RTC Rose Law Firm Issues." 006-DC-00000014. The memorandum discussed issues raised by the FDIC and RTC reports addressing the question of possible conflicts of interest by the Rose Law firm in its representation of Madison. In the memorandum, Eggleston discussed the findings of both the FDIC and the RTC in their reports and noted that at the February 24 hearing, the Chairman of the FDIC and Altman had both agreed to have the FDIC and RTC Inspectors General review the conflicts issue. Eggleston then reviewed the sanctions that could be imposed by the FDIC or the RTC if they determined the Rose Law Firm had a conflict of interest. Next, he explained the status of the RTC's Madison civil investigation and provided some background information on Ryan and Kulka, as the RTC decisionmakers in light of Altman's recusal. The FDIC and RTC reports were attached to the memorandum.

A March 1, 1994 memorandum addressed from Ickes to Mrs. Clinton with the February 28 Eggleston memorandum attached was produced to the OIC. 006-DC-00000013. Ickes' memorandum stated:

> Attached is a copy of W. Neil Eggleston's 28 February 1994 memorandum to me regarding certain issues involving the RTC and the Rose Law Firm ("Rose"). Attached to that memo are copies of the FDIC report, dated 17

141

February 1994, concerning possible conflicts of interest regarding Rose's representation of the FDIC against Madison Guaranty, and the RTC's 8 February 1994 report concerning the same subject.

It is my understanding that shortly after Roger Altman met with Bernie Nussbaum, me and others concerning the RTC statute of limitations, he received an opinion from an ethics officer of the Treasury Department that he, as the acting head of RTC, did not have to recuse himself from matters involving Rose/Madison Guaranty. I will confirm this situation.

Please let me know if you want to discuss the attached.

006-DC-00000013.

Eggleston testified that Ickes called him and asked him to draft a memorandum giving a report on where things stood with respect to the conflicts issue, whether there was a conflict, who was investigating what on the question, and what could happen if the FDIC found a conflict. Eggleston wrote this memorandum to Ickes, and only later learned (in the course of the public hearings) that Ickes had forwarded it to Mrs. Clinton.

Ickes testified that the format of his March 1 cover note to Mrs. Clinton -- the fact that it was not on letterhead stationary and not initialed by Ickes -- indicates that it may not have been sent to Mrs. Clinton, but he is not positive. Ickes claims he does not recall asking Eggleston to prepare the February 28 memorandum, but he is certain that he did. There had been considerable discussion about the Rose Law Firm's possible conflict of interest in representing Madison, and Ickes asked Eggleston to write up a discussion of the intricate issues that were involved in that question, and Ickes believes the February 28 memorandum may be that memorandum.

According to Mrs. Clinton, she has a vague memory of Ickes' asking her if she wanted to know more about the RTC and the Rose Law Firm, and she said she did not. He may

142

303

have either had this memorandum with him or tried to hand it to her, and she was not interested in it. She does not believe she looked through this memorandum until she was later prepared for questioning by the OIC.

Ickes testified that he does not remember handing Mrs. Clinton this document, asking her if she wanted to learn more about the Rose Law Firm/RTC issues, and her responding that she did not want to do so.

As discussed above, the White House has produced notes taken by Sherburne and Cheston in the summer of 1994 of a conversation they had with Ickes' private counsel, Amy Sabrin. These notes suggest that Sabrin conveyed to the White House Counsel additional information that she had received from Ickes regarding the preparation of both the February 28 and the March 1 memoranda. Sherburne's notes state (with modest expansions of abbreviations):

> Late Feb (2/26 or 27), HI has conversation w/ WJC in which WJC asks lots of Q's re RTC procedures, whether [in margins: whether Rose cld be held liable] & HRC & WJC exposed.   HI asked NE to draft memo which NE did in 12 hours. HI minor revisions. Sends to HRC 3/1. DR discussing.

> HRC asked HI a few questions. Think > received memo.

442-DC-00006540-6541. Cheston's notes similarly read (again with modest expansions of abbreviations):

> 2/27-3/1 Memos.

> Late Feb, 2/26 or 27 prob'ly, HI -- conv w/ Pres -- had read WSJ article, -- asks sever qs re procedure RTC; can Rose, HRC, BC be held liable => HI asked NE to write memo.

> Did w/in 12 hrs.

> HI asked NE couple q's, follow up pts.

143

3/1 -> HRC only. No recall disc'g w/ her [in margins: other than her asking cple qs. Bef? Aft? Assume aft.] or sending to Pres.

442-DC-00006543.

These notes provide a level of detail surrounding the preparation and dissemination of the February 28 and March 1 memoranda that Ickes never provided in his sworn testimony. When confronted with these notes, Ickes testified that while he remembers having spoken with the President and Mrs. Clinton about the statute of limitations issue (as discussed above), he does not recall having the conversation with Clinton that is recounted in these notes regarding the potential liability of the President and Mrs. Clinton or the Rose Law Firm. The notes did prompt him to reveal some further information surrounding the preparation of Eggleston's memorandum, however. Ickes testified that the FDIC and RTC had issued reports dealing with the possible conflict of interest with the Rose Law Firm and Madison and that there had been an article or an editorial in the *Wall Street Journal* some time later in February that Ickes read. Ickes acknowledged that Clinton may have read the same article or editorial and may have asked Ickes some questions about it, but Ickes claims not to recall. Ickes did testify quite firmly that "based on those reports and that either editorial or newspaper article, I had asked Mr. Eggleston to write a memo." Ickes, Senate Hearing, Feb. 22, 1996, at 180.

As to the preparation of Eggleston's memorandum, Ickes testified that he does not recall if Eggleston wrote the memorandum in twelve hours, as described in these notes. He also testified that he does not recall making any revisions to Eggleston's memorandum, although he may well have. On the question whether he sent his own March 1 memorandum to Mrs. Clinton (with the Eggleston memorandum attached), Ickes again testified that he may well have done so,

144

but he does not recall. Contrary to the White House Counsel's notes, Ickes also claims he does not recall Mrs. Clinton's asking questions about the memorandum.

Ickes' only explanation of the discrepancies between his testimony and the Sherburne and Cheston notes is that he was not present for the Sabrin conversation and has no way of knowing what was said, whether what Sabrin said was accurate, and whether Sherburne and Cheston accurately transcribed what Sabrin said. Sherburne similarly stated to the Senate Special Committee that she had reason to believe that in the interview Sabrin was providing information she had collected from a variety of sources, and that she does not know the source of Sabrin's information on these points. Ickes, Senate Hearing, Feb. 22, 1996, at 187 (statement of Sherburne).

After Sherburne's and Cheston's conversation with Sabrin, they interviewed Ickes personally. Ickes, Senate Hearing, Feb. 22, 1996, at 186 (statement by Sherburne). Pursuant to our arrangement with the White House, portions of the notes of both Sherburne and Cheston from this interview were read to OIC attorneys. The portions relating to the February 28 and March 1 memoranda were not read because -- prior to the disclosure of the notes of the Sabrin conversation -- those issues were not a central focus of the investigation. Depending on the outcome of the OIC's litigation against the White House in the Eastern District of Arkansas, the OIC should consider pursuing the notes of Sherburne and Cheston from their interview with Ickes. Those notes will help in determining whether the statements attributed to Sabrin in the Sherburne and Cheston notes accurately reflect what Ickes may have been confiding to his

145

306

private counsel and the White House Counsel's Office in the summer of 1994.[326]

* * * * *

7) **Billing Records** -- [The facts relating to the discovery of the billing records in the White House are detailed in Colloton & Azar, "Rose Law Firm billing records," September 1996.]

The basic facts and circumstances surrounding the disclosure in January of 1996, that Rose Law Firm billing records were in the residence portion of the White House, are well known and ably set forth in the Colloton/Azar memo of September 1996. Also well known is the conclusion which Steve and Alex come to that

FOIA(b)7 - (C)

, they doubt that "the admissible evidence probably is sufficient to establish guilt by proof beyond a reasonable doubt before an unbiased jury." (Colloton & Azar, at 32-33).

Initially, we point out two important factors, or series of factors, not considered in September of 1996:

1.

FOIA(b)7 - (C)

2.

326. In addition, the OIC should consider questioning Sabrin, Sherburne, and Cheston about their conversation. The OIC's position would be that Sabrin waived her private attorney-client privilege by communicating with Sherburne and Cheston and that, in any event, any official or private privileges were waived by the White House's disclosure of the notes of Sherburne and Cheston.

146

3.



FOIA(b)7 - (C)

FOIA(b)7 - (C)

Carolyn Huber, Hillary Clinton's personal executive assistant says that the billing records were first found on a table in the Book Room, Room 319A, just outside of Hillary Clinton's office in August 1995. According to Ms. Huber, she did not recognize what they were, boxed them up and put them away and did not "re-discover" them and recognize their significance until

147

NW: 15416 DocId: 70001585 Page 185

January 1996. In January 4, 1996, her office was being rearranged and the table covering the box was moved. When she emptied the box, Ms. Huber says she discovered the records and immediately called her attorney, Henry Schuelke.

FOIA(b)7. - (C)

She is the only individual in the White House who had a significant interest in them and she is one of only 3 people known to have had them in her possession since their creation in February 1992 (the other two were Vince Foster, who was dead at the time of the records discovery, and Hubbell, who was in jail). Moreover, in the late July/early August time-period, Mrs. Clinton had reason to review the records. Relevant events at that time include: an OIC interview on July 22, 1995; release of RTC and FDIC-OIG reports on RLF and MGSL on July 28 and August 3, 1995; and public testimony by the FDIC, RTC and Hubbell before Congress on August 10, 1995. Immediately thereafter the Clintons left on their August vacation in Wyoming.

In addition there is some slight direct evidence that Hillary Clinton possessed the billing records. Three individuals (two construction workers                    have all testified that they observed Hillary Clinton carrying a cardboard box in the Residence on or about July 8-9, 1995.                    has also testified that the box contained documents that looked like "technical documents" or "blueprint schematics" of the same size and shape as the billing records. He could not, however, conclusively identify the billing records as the documents he saw, but when shown a copy of the billing records he said they were consistent with the documents he saw in Mrs. Clinton's possession.

Finally, we have comprehensively interviewed almost every other individual who had access to Room 319A in August 1995. None appear to have any motive to have placed the

148

FOIA(b)7 - (D)

309

billing records there and none recalls having seen the billing records in the room. We might reasonably anticipate the possibility of bringing each witness in to the trial for brief questioning; the effect would certainly be compelling.[327]

FOIA(b)7 - (C)

Also significant as pointed out in the Azar/Colloton memo is the fact that Vince's handwriting as well as fingerprints appear on the billing records. His handwriting says in various places, HRC and circles various entries in the billing records. It is clear that the handwritten notations are directing HRC to various events in the billing records. The billing records were under subpoena since June of 1994.[328]

---

[327]

FOIA(b)7 - (C)

[328] We have been asked our view on how the billing records came into Mrs. Clinton's possession. The Azar/Colloton memo offers a couple of theories as to how HRC came into possession of the billing records.

FOIA(b)7 - (C)

149

NW: 15416 DocId: 70001585 Page 187

| FOIA(b)7 - (C) | At

the time they were discovered, Associate White House Counsel Jane Sherburne raised the

forensic question of fingerprints with Mrs. Clinton's attorney, David Kendall, and Mrs. Huber's

attorney, Henry Schuelke. Kendall cavalierly dismissed the concerns and has since said he just

didn't consider it a forensic issue. Sherburne and Huber then took the billing records to a color

copier in the White House and made 2 copies -- Sherburne kept one and Kendall to the other

copy and the originals to his law firm.

At the law firm, Kendall gave the original and the copies to a paralegal named Mark

Rolfe and directed him not to let the records out of his sight because they were highly

confidential. He did not ask Rolfe to take any special forensic precautions (i.e. wear gloves).

Rolfe affixed Bates numbers to the original and the copy and then compared the two sets of

documents to insure that the copies were complete. In several instances he determined they were

not complete (as the Post-It notes had not been copied) and he recopied the original. Most

remarkable, after completing the comparison, Rolfe made additional copies from the first copy

(principally for distribution to the Senate Whitewater Committee) but when the copies were

incomplete he went back to the original to make copies -- thus the original documents were

handled extensively before they were turned over to OIC.

FOIA(b)7 - (C)

For example, in September of 1996, Messrs Colloton and Azar speak of the information

contained in the records which show or indicates "Mrs. Clinton's role in suspicious transactions",

i.e. Castle Grande. We now have retained a expert in the operation of regulatory agencies, who

150

will testify that the events surrounding Castle Grande, such as the cross loans, were criminal acts.

FOIA(b)7 - (C)

FOIA(b)7 - (C)

FOIA(b)7 - (C)

151



FOIA(b)7 - (C)

FOIA(b)7 - (C)

152

FOIA(b)7 - (C)

FOIA(b)7 - (D)



153

NW: 15416 DocId: 70001585 Page 191



FOIA(b)7 - (C)

\* \* \* \* \*

### 8) *Support for Webb Hubbell* --

I. <u>BACKGROUND</u>

On March 14, 1994, Webster L. Hubbell announced his resignation from his position as

Associate Attorney General, the number three position in the Department of Justice. Hubbell's

resignation was effective approximately three weeks later. His last day at DOJ was April 8,

1994. The stated reason for Mr. Hubbell's resignation was that he needed to devote time to

resolve a billing dispute with his former employer, the Rose Law Firm in Little Rock, Arkansas.

At the time of his resignation, it had been reported in the press that Hubbell's billing dispute was

a subject being examined by Special Prosecutor Robert Fiske (title as reported by the press).

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

154

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

During the April through November, 1994, time frame, Hubbell was retained as a consultant by 17 different persons/entities. Hubbell collected $450,010.00 from "consulting" work in 1994. Hubbell collected $91,750.00 in consulting fees in calendar year 1995 (not including $37,500.30 in publishing income from William Morris in 1995).

On December 6, 1994, Hubbell pled guilty to two felonies - Mail Fraud and Tax Evasion based on $482,000.00 in improperly billed fees and expenses associated with his representation of Rose Law Firm clients. As part of his plea agreement, Hubbell agreed to cooperate with the OIC, and to provide complete and truthful information.

Hubbell was sentenced by U.S. District Court Judge George Howard on June 29, 1995. Hubbell received a sentence of incarceration of 21 months. He was designated to serve this sentence at the Federal Correctional Institution at Cumberland, Maryland. Hubbell reported to that institution on August 7, 1995. He was released from FCI Cumberland to a halfway house in Washington, D.C. in November, 1996. He completed his sentence in February, 1997.

II. EFFORTS TO ASSIST HUBBELL

On March 13, 1994, the day prior to Hubbell's announcement of his resignation from DOJ, there were at least two meetings held at the White House to discuss Whitewater related matters. According to the grand jury testimony of then White House Chief of Staff Thomas "Mack" McLarty, there was a meeting scheduled in the residence of the White House to discuss with the President and First Lady an organizational structure to deal with Whitewater related matters. Prior to that meeting, there was a "pre-meeting", at approximately 8:00 a.m., attended

155

316

by McLarty, Harold Ickes, David Kendall and Bob Barnett.[330] According to McLarty, during this pre-meeting, McLarty, Ickes, Kendall and Barnett discussed the agenda for the upcoming meeting in the residence. At approximately 8:30 or 9:00 a.m., the full meeting was held in the residence with McLarty, Ickes, Mrs. Clinton, President Clinton, Maggie Williams, Kendall and Barnett.[331] Following the completion of the agenda items (reflected in McLarty's notes that were produced to OIC on May 7, 1997), there was a conversation of approximately 10 minutes with the entire group that dealt with Hubbell. McLarty testified that:

> another matter that was topical and pressing in nature was raised at this meeting. And that's how I remember the Webb Hubbell resignation situation or possible resignation being raised at this meeting.[332]

McLarty refused to say who said what during the discussion (based upon his instructions to assert executive privilege) -- but did say that they discussed the facts surrounding Hubbell's resignation. McLarty made the general statement that:

> given the fact that there had been apparently discussions with him [Hubbell] by Blair and Kantor...it seemed to be a growing possibility that he would not be able to continue to effectively serve as Associate Attorney General. That's how I remember the matter coming up and generally what the tone of the discussion was.[333]
>
> ....
>
> at least the feeling that I had, and I think it was shared certainly by others, that Mr. Hubbell would have to resign...closure was not reached on whether or not Mr. Hubbell would be asked to resign [but Hubbell had informed McLarty that he would be willing to

---

[330]   McLarty, 4/17/97 GJT, at 114-117.

[331]   Id at 12-37; 114-117.

[332]   Id at 32.

[333]   Id at 31.

156

resign] if the President felt it was necessary.[334]

According to McLarty, as the meeting was breaking up, he initiated a comment to the First Lady and told her: "We're going to be supportive of Webb. And her response to me, as I remember it, was, "Thank You Mack. I appreciate that very much."[335]

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Following this meeting, McLarty spoke to Truman Arnold and Vernon Jordan about assisting Hubbell in finding clients. In addition to hiring Hubbell himself, Truman Arnold recommended Hubbell to at least four others that eventually hired him: John Moores, Wayne Reaud, Bernard Rapoport, and C.W. Conn. Vernon Jordan recommended Hubbell to at least one entity, McAndrews and Forbes (Revlon), that eventually hired him.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Within the first couple weeks of Hubbell's announced resignation, Bill Burton, McLarty's staff director, telephoned Brad Keithley of the Jones, Day law firm in Dallas, TX on Hubbell's behalf. Burton called Keithley at McLarty's direction or on his own initiative following a discussion with McLarty about Hubbell. A short time later, Burton reported back to McLarty that Keithley had been courteous, but had indicated that "it would not work out for Hubbell at

---

[334]  Id at 32.

[335]  Id at 35.

[336]  Id at 37.

157

Jones, Day, or other traditional law firms for that matter, as long as this billing dispute was outstanding with Rose Law Firm."[337]

Erskine Bowles, then the head of the Small Business Association, received a telephone call from Mickey Kantor around the time that Hubbell announced his resignation. Kantor was a good friend of Bowles. Kantor said that he was concerned about the plight of Hubbell's family and especially the Hubbell children. Although Kantor did not ask him to do anything and he was not personally a close friend of Hubbell's, Bowles decided to try to help Hubbell because he was a guy who was down



Bowles telephoned Hubbell and offered to help him by calling a few friends with contacts in Washington. Hubbell indicated to Bowles that he was interested in remaining in Washington, D.C.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

---

[337]   Id at 50-52.

[338]   FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

158

NW: 15416 DocId: 70001585 Page 196

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

### III. HUBBELL'S CLIENTS

The following is a description of several of Hubbell's consulting clients which fall most strongly within the hushmoney allegation. The clients are discussed in the chronological order in which they hired Hubbell.

#### 1) Truman Arnold

Arnold paid Hubbell $18,000.00 on April 20, 1994. The $18,000.00 represented a six month contract at $3,000.00 per month. Arnold has testified before the grand jury that he received a call from Mack McLarty in late March or early April, 1994, requesting Arnold keep an eye out for opportunities for Mr. Hubbell and to spread the word among his business associates that Hubbell was available for work in Washington, D.C



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

159

NW: 15416 DocId: 70001585 Page 197



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Arnold further testified that when the six month contract expired in

October, 1994, he did not renew the contract because he was "disappointed" with Hubbell's

performance. Hubbell had not approached him with any investment ideas or opportunities during

the six months he was on retainer. Arnold told the grand jury that if he had known the true



340

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

341

160

nature of Hubbell's situation and the fact that he would later plead guilty to the two felony

counts, he never would have hired Hubbell and would not have recommended him to his friends

and associates (Bernard Rapoport, John Moores, Wayne Reaud, and C.W. Conn).

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

## 2) McAndrews and Forbes/Revlon

Prior to Hubbell's resignation from DOJ, on March 12, 1994, Vernon Jordan met with

Webb Hubbell at 8:00 a.m., in the Melrose room at the Park Hyatt Hotel in Washington, D.C.

Hubbell had called Jordan for breakfast. Jordan has testified that Hubbell said in effect that he

was leaving DOJ and:

> I would like a life after that, and will you be helpful to me? And I said, I am happy to be
> helpful to you...Hubbell said he would like to continue doing what he was doing before
> he came into government. That was to practice law, to have clients. And I said, I'll do
> what I can...I said, Webb, I'd like to help you and I will think about it and I will be back
> in touch.[343]

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

<hr/>

[342] FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

[343]    Jordan, House Testimony 7/24/97, at 29-34.

161

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Jordan says its "entirely conceivable" that McLarty called him about Hubbell and that Jordan told McLarty that he was trying to help Hubbell but, "I do not recollect that." [345]

McAndrews and Forbes is a holding company established to maintain and operate the personal investment holdings of Ronald Perelman. The General Counsel of McAndrews and Forbes is Barry Schwartz. Schwartz testified that in April, 1994, he received a recommendation from Vernon Jordan that Webb Hubbell was available for work in Washington, D.C. Schwartz testified that he spoke with two other employees of McAndrews and Forbes, Howard Gittes and Richard Halperin about the possibility of hiring Hubbell. Shortly after this first telephone call with Vernon Jordan, Jordan brought Hubbell by the New York offices of McAndrews and Forbes to introduce Hubbell.

This is consistent with Jordan's testimony in which he has stated that "I think at some point after that we went to New York and I took him to a client of mine and introduced him." Jordan says he introduced Hubbell to Howard Gittes, vice chairman of McAndrews & Forbes and others on April 6, 1994 3:30 p.m.

> What I did was to make introductions. Introductions to introduce Hubbell to Howard Gittes. I'm a member of the Revlon Inc. board. I am one of many counsel to Revlon and to McAndrews & Forbes. I've had a long relationship there. Howard is a friend of mine. Webb is a friend of mine. I introduced them and left them to talk.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

[345]     Jordan, House Testimony 7/24/97, at 42.

162

323

Jordan says he had no discussions with Hubbell about any post-employment restrictions he may have been under:

> I did not ask questions about the appropriateness of this or the appropriateness of that. He was a friend in trouble. I could be of some help to him, and I did it. Proudly.

Jordan knows nothing about the details of Hubbell's retainer with M&F. Jordan believes that, at some point, he spoke to Perelman regarding Hubbell being hired. Jordan first said he was certain Perelman had stopped by that initial meeting with Hubbell -- Jordan then backed off and said that it was "entirely possible" that Perelman stopped in.[346]

Jordan further testified that he told the President that he was helping Hubbell. "I told the President in an informal setting that I'm doing what I can for Webb Hubbell. The President said, "Thanks." End of conversation." "It was sometime in the spring I'm sure, and my suspicion is that the forum was the golf course."[347]

Eventually, Schwartz scheduled an interview with Hubbell for April 29, 1994. During that meeting, Hubbell assured Schwartz that there was nothing about his personal situation that would become embarrassing for McAndrews and Forbes in the future. Following the meeting, Schwartz retained Hubbell at the rate of $25,000.00 per quarter.

During his grand jury testimony Schwartz could not describe with any particularity the types of items he anticipated that Hubbell might work on. Hubbell was paid $25,000.00 in April 1994 and a second $25,000.00 in July, 1994.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

---

[346]   Id at 35-38.

[347]   Id at 46.

163

NW: 15416 DocId: 70001585 Page 201

Case 1:15-cv-01740-RBW   Document 12-6   Filed 03/11/16   Page 35 of 42
USCA Case #16-5366       Document #1668146       Filed: 03/28/2017       Page 328 of 421
FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

[ ] Telephone messages indicate that Hubbell had a series of conversations, and at least one meeting with Schwartz, in late October and early November, 1994. Schwartz testified that it was during this period that Hubbell was consulted on one legal matter involving McAndrews and Forbes. Schwartz refused to answer questions about the substance of the matter based on attorney/client privilege. Hubbell never produced any written work product during this consultation.

Eventually, Hubbell was paid an additional $12,775.00 in December, 1994. Schwartz testified that on approximately December 2, 1994, Hubbell called to inform that he was pleading guilty. Schwartz testified that he was surprised by this phone call and that up until that time he had no idea that Hubbell was facing criminal charges. Schwartz terminated Hubbell in a letter dated December 12, 1994, in which he indicated that given Hubbell's decision to plead guilty, it was "obvious" that Hubbell would no longer be able to work for McAndrews and Forbes. The final $12,775.00 payment represented a pro rata payment from the invoice date of October 28, 1994, until December 2, 1994, when McAndrews and Forbes was notified by Hubbell that he would be pleading guilty.

**3) American Income Life**

American Income Life is a life insurance company owned by Bernard Rapoport in Waco, Texas. Rapoport is a major Democratic contributor and supporter of President Clinton. Rapoport received a telephone call from Truman Arnold in April or early May, 1994. [

]

164

325

Case 1:15-cv-01740-RBW Document 12-6 Filed 03/11/16 Page 36 of 42
USCA Case #16-5366 Document #1668146 Filed: 03/28/2017 Page 329 of 421
FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Arnold indicated that he had hired him for $18,000.00 - $3,000.00 a month

for six months. Rapoport indicated he would do the same thing.

American Income Life paid Hubbell $18,000.00 over six months beginning May 23,

1994.

Rapoport was not

aware of any particular work that Hubbell did. Rapoport testified that if had been aware of

Hubbell's criminal activity he would never had hired him. Upon expiration of the six month

period, Rapoport did not renew the contract but later did contribute $6,000.00 to the Hubbell

Children Education Trust Fund.

### 4) Hong Kong China Limited (Lippo/Riady's)

On June 27, 1994, $100,000.00 was wired into the account of Webster Hubbell from a

Lippo/Riady controlled entity, Hong Kong China Limited. Hong Kong China Limited is a

foreign corporation based in Hong Kong. We have been unable to interview anyone from that

corporation or anyone that works for the Riady's.

According to documents produced by Hubbell, it appears he was hired as a consultant to

Hong Kong China Limited. In a June 27, 1994, letter to the Director of Hong Kong China

Limited, Mr. David T. Yeh, Hubbell stated:

> I am pleased to provide my consultant services to your company. As you know, I provide
> a broad range of consultant services including extensive expertise in capital markets, U.S.
> placements, A.D.R. and investments. From our previous dealing, you are also aware that
> I have extensive legal experience in banking, insurance, corporate organizations and
> securities.
>
> I am pleased to confirm that I will be providing the full range of my services for a fee of

165

$100,000.00 per year payable in quarterly installments beginning on July 1, 1994...

The retention of Mr. Hubbell by Hong Kong China Limited followed a series of visits to the White House by James Riady and John Huang during the week of June 20, 1994.

| | |
|---|---|
| **May 19, 1994** | Hubbell writes a letter to John Huang at Lippo Bank in Los Angeles, CA : "It was good to see you last evening. I apologize that I did not have any business cards with me. I am enclosing one and hope you will call if I can be of service or you would just like to visit. Please give James my best and tell him I would love to see him when he comes to Washington in June." |

**June 21, 1994**

| | |
|---|---|
| 2:27 p.m. | telephone call charged to Hubbell's calling card from the White House |
| 4:45 p.m. | James Riady and John Huang enter West Wing according to WAVES records |
| 4:51 p.m. | Mickey Kantor enters White House complex according to EPASS records |
| 6:30 p.m. | Mack McLarty receives telephone message from Marsha Scott: "Tomorrow is fine. Seeing President at 7 o'clock and Webb this evening, so we'll have more to report" |
| 6:50 p.m. | James Riady, John Huang, James Lewin (Sprint), Bernard Rapoport, and Wayne Reaud visit POTUS on South Lawn according to WAVES records |
| 7:00 p.m. | Hubbell calendar lists appointment "Marsha Scott" |

**June 22, 1994**

| | |
|---|---|
| 2:57 p.m. | James Riady and John Huang visit Mark Middleton in West Wing |
| 3:27 p.m. | Mickey Kantor enters White House complex according to EPASS records |

166

| | |
|---|---|
| 4:33 p.m. | Kantor exits White House complex according to EPASS records |

**June 23, 1994**

| | |
|---|---|
| 7:30 a.m. | Hubbell calendar shows appointment with "J. Riady" |
| 7:51 a.m. | Kantor exits White House complex according to EPASS records (no record of entry) |
| 10:27 a.m. | John Huang visits Alexis Herman in the West Wing according to WAVES records |
| 12:00 p.m. | Hubbell calendar lists appointment with "J. Riady - Hay Adams" |
| 2:35 p.m. | Mickey Kantor enters White House complex according to EPASS records |
| 3:44 p.m. | Kanotr exits White House complex according to EPASS records |

**June 24, 1994**

| | |
|---|---|
| ??? | Kantor leaves telephone message for Hubbell at his GW Miller office |
| 12:05 p.m. | John Huang visits Middleton in West Wing according to WAVES records |
| 12:56 p.m. | James Riady visits Middleton in West Wing according to WAVES records |
| 5:00 p.m. | Hubbell calendar shows appointment with "J. Riady" |

**June 27, 1994**

Hubbell writes letter to David Yeh, Director, Hong Kong China Ltd. "...I am pleased to confirm that I will be providing the full range of my services for a fee of $100,000 per year payable in quarterly installments beginning on July 1, 1994..."

167

NW: 15416 DocId: 70001585 Page 205

> $100,000 (the entire year's amount) is wired from Hong
> Kong China Ltd to Hubbell's NationsBank account in
> Washington, D.C. through Bank of New York

As for any work that Hubbell did for Hong Kong China Limited, the documents provided by Mr. Hubbell indicate that his only contact with Mr. Yeh was the June 27, 1994, retention letter and subsequent letter acknowledging the lump sum payment of $100,000.00. Hubbell's documents do show contact with other employees of Lippo entities, mainly related to Hubbell assisting them with getting hotel rooms and travel arrangements. Other than assisting with some travel arrangements, there are no documents that indicate any substantive work that Hubbell performed for any of the Lippo entities.

Webb and Suzy Hubbell discussed Lippo in a September 6, 1996 telephone call from FCI Cumberland. Webb describes how the WallStreet Journal is after him again. It ran an article referring to his book and the Jane Sherburne memo refering to monitoring Hubbell cooperation. Webb then says that in addition, the Journal article also "bring[s] out Riady again..."

Webb: And said the Senate was unable to find out what I did for 'em. Hello?

Suzy: Yeah, 'cause you didn't do anything for 'em.

Webb: Yeah. Alright.

In March 1995 (after Hubbell's guilty plea), Hubbell had dinner with Bernard Rapoport and Mark Middleton, a former aide to Mack McLarty. Hubbell asked Middleton if the Riadys intended to continue to pay him. Middleton responded that he didn't know and that Hubbell should talk to John Huang or the Riady's directly.

### 5) SunAmerica Corporation

168

SunAmerica Inc. is an insurance and investment company based in Los Angeles, California, owned and controlled by Eli Broad. Broad has known Hubbell since the mid-1980s when he was introduced to Hubbell and the Rose Law Firm by Mickey Kantor. Hubbell did legal work in Little Rock, AR for SunAmerica in 1985 and 1986. Since that time, Broad has maintained periodic personal and telephonic contact with Hubbell. Broad did not recall any contact with Hubbell during the period when Hubbell was at the Department of Justice.

Broad became aware that Hubbell was doing consulting work on or about April 14, 1994, while attending a donor reception dinner at the home of Peter Norton. Hillary Clinton was the guest of honor and there were approximately 150 guests. After the dinner, Mrs. Clinton was "table hopping" shaking hands with all the guests. During the short time Broad spoke with Mrs. Clinton, Broad inquired about how Hubbell was doing. Mrs. Clinton informed Broad that Hubbell was doing consulting work in the Washington area. Broad says he has no clear recollection, but during this brief conversation, Broad either told Mrs. Clinton he was going to give Hubbell a telephone call or Mrs. Clinton suggested that Broad give Hubbell a call.

Broad subsequently did telephone Hubbell at Hubbell's Washington office. Over the next few months, Broad and Hubbell discussed SunAmerica and its interest in a National Savings policy.

Such a policy would likely include certain incentives such as tax deferment, to encourage people to save more money. SunAmerica planned to offer financial products that took advantage of the plan. On May 25, 1994, Broad retained Hubbell at a rate of $5,000.00 per month. Broad has told investigators that he hired Hubbell to assist SunAmerica in promoting a National Savings policy that would be supported by the administration and as an advocate to get

169

something moving regarding this issue. Broad also expected Hubbell to remain alert and advise

SunAmerica of anything going on in political circles regarding a National Savings policy. It

should be noted that Broad is a personal friend of President Clinton and has access directly to

him.

On September 19, 1994, Hubbell sent Broad a letter outlining a number of specific efforts

he would make on behalf of SunAmerica. These included making certain presentations and

contacts with specific members of the Clinton Administration, including the President. There is

no evidence that Hubbell completed any of these items.

SunAmerica paid Hubbell a total of $35,000.00 in 1994. Hubbell was terminated shortly

after pleading guilty to the criminal charges on December 6, 1994. Broad felt that after his guilty

plea, Hubbell was no longer of value to SunAmerica. Employees of the company, including a

former General Counsel, Karen Hedlund, and Loren Fife, current Co-General Counsel with

Susan Harris, have stated that they felt that Hubbell had been paid an appropriate amount and

that SunAmerica had received the fair value of his services up until the time he plead guilty in

December, 1994.

**6) John Moores (JMI Inc., Sugarland, Texas)**

John Moores is an entrepreneur and major Democratic donor who made his fortune in

computer software. Moores testified that he hired Hubbell in July, 1994, upon the

recommendation of Truman Arnold. Moores paid Hubbell $18,000.00 in a lump sum which he

said represented a six month contract at $3,000.00 per month. Moores testified that his primary

focus in retaining Hubbell was to have him work on an airplane hangar project he was trying to

develop in Carmel, California. Moores wanted Hubbell to make contact with the FAA about

170

getting approval for his project. Moores also indicated that he later contemplated having Hubbell work on a real estate project in which he was attempting to purchase some property which was held by the RTC. Moores is not aware of any contacts that Hubbell made at the FAA or RTC. Moores did not renew his contract after the six month period expired and indicated that if he had known about Hubbell's criminal problem beforehand, he never would have hired Hubbell.

### 7) C.W. Conn (Conn Appliance, Beaumont, Texas)

C.W. Conn is the founder of Conn Appliance Corporation and is a multi-millionaire and major Democratic donor. Conn hired Hubbell upon the recommendation of Truman Arnold. Conn first met Hubbell and retained him during a July 28, 1994, meeting in Washington, D.C. at Hubbell's office. Also in attendance at the meeting were Truman Arnold, Wayne Reaud, Bernard Rapoport, John Moores and Gil Morgan (a law partner of Wayne Reaud). The meeting was arranged by Truman Arnold to discuss the possibility of Hubbell looking for joint investment opportunities for the group.

Conn paid Hubbell $18,000.00 on July 28, 1994 in a lump sum representing a six month contract at $3,000.00 per month. Conn's primary interest was in securing a presidential appointment as an ambassador. Hubbell indicated that he could help him in that process.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Conn has no evidence that Hubbell did anything to help him get an ambassadorship. Conn is not an

171

## **EXHIBIT 3 (Part 5)**

to

Plaintiff's Response to Defendant's Statement of Material Facts
Not in Dispute and Statement of Undisputed Material Facts
in Support of Cross-Motion for Summary Judgment

ambassador today. Conn has stated that if he had known of the true nature of Hubbell's personal problems, he would never have hired him.

### 8) Wayne Reaud

Wayne Reaud is a plaintiffs class action attorney in Beaumont, Texas. Reaud retained Hubbell July 28, 1994, at the meeting in Hubbell's office in Washington, D.C. Reaud paid Hubbell $18,000.00 in a lump sum check dated July 28, 1994. Reaud has not yet been to the grand jury. Reaud was interested in looking for joint investment opportunities for the group at the July 28, 1994, meeting and/or possibility of establishing a Washington office with Hubbell.

### IV. PRISON TAPES

On various occasions, Hubbell spoke from prison with his wife Suzanna. While a large volume of the tapes provides moderately useful evidence, it is appropriate to end the evidentiary presentation with the two most telling excerpts.

The first call occurred on March 25, 1996. The context is that Hubbell believes he will be sued by the Rose Law Firm civilly to recoup its damages from his bill padding. Hubbell is considering a counter-suit which would, it seems, allege like billing practices by his Rose partners. His wife has been talking about Hubbell's plan with Marsha Scott, who is a employee at the White House and a close personal confidant of the Clintons. She relays Scott's concern with Webb's plan:

SWH:

WLH:                          FOIA(b)7 - (C)

SWH:

172

334

FOIA(b)7 - (C)

And she said that one of the biggest sticking points is that you never apologized, that there has been no expression of remorse whatsoever on your part, and that by suing, it is only made it look like you really don't give a shit. And that, it's, that you are opening Hillary up to all of this.

WLH:    Well, honey, I keep telling you, sometimes you have to fight battles alone. You know, you just can't worry about other people. I know what I'm doing, OK? Now, if you don't want me to I won't.

SWH:    No, I want you to, I just want, I'm the one that bears the brunt of this stuff up here. I'm the one that has to try and talk to people. I'm the one that has to try and explain to Marsha. I'm saying, "Marsha." She said, "You're not going to get any public support for this pursuit if you open up Hillary. Well, by public support, I know exactly what she means. I'm not stupid.

WLH:    And I sat there and spent Saturday with you saying I would not do that. I won't, if I raised those allegations, it might open it up to Hillary. And you know that. We talked about that.

SWH:    Yes, but then, I get all this back from Marsha, who's racheting it up and making it sound like, you know, if Webb goes ahead and sues the firm back, then any support I have at the White House is gone.

WLH:    Well.

SWH:    I mean, that's what I'm hearing. I'm hearing the squeeze play.

WLH:    So, I need to roll over one more time.[348]

FOIA(b)7 - (C)

---

[348] Tape #27.a, March 25, 1996, 18:39 (emphasis supplied).

173



FOIA(b)7 - (C)

In short, many of the people and entities that hired Hubbell following his resignation

form DOJ can be traced to high administration officials or advisors. Mack McLarty and former

DNC Chairman Truman Arnold were responsible for five of Hubbell's seventeen clients. Vernon

Jordan was responsible for at least one client. The First Lady was the direct impetus for at least

---

349  FOIA(b)7 - (C)    (emphasis supplied).

174

one client, SunAmerica insurance company. Then SBA Chairman Erskine Bowles and United States Trade Representative Mickey Kantor also made efforts on behalf of Hubbell following his resignation. All this took place at a time where there was widespread public knowledge of a criminal investigation into Hubbell's billing practices while at the Rose Law Firm.

* * * * *

## II.    Chronological Background and Context

On January 12, 1994, President William Jefferson Clinton asked Attorney General Reno to appoint a Special Counsel to takeover the so-called Whitewater and Madison investigation. The U.S. attorney in Little Rock had recused herself on November 3, 1993, and the prosecution of David Hale, the investigation of Madison, and the investigation of the 10 RTC criminal referrals had been turned over to Don MacKay, a career Justice Department prosecutor.

Attorney General Reno appointed Bob Fiske as the Special Counsel on January 20, 1994. On June 30, 1994, the President signed into law the reauthorized Independent Counsel Act. The Special Division appointed Ken Starr as the Independent Counsel on August 5, 1994.

This Office was given jurisdiction to investigate whether any individuals or entities violated any criminal law, "relating in any way to James B. McDougal's, President William Jefferson Clinton's, and Mrs. Hillary Rodham Clinton's relationships with Madison Guaranty Savings & Loan association, Whitewater Development Corporation, or Capital Management Services, Inc.

Bob Fiske and his staff had been investigating these matters prior to the appointment of Judge Starr under the Independent Counsel Act.

Within the scope of the investigation, it was important to determine what the relationship

175

337

was of the Clintons and the McDougals, and the relationship of both President Clinton and Mrs. Clinton with each of the three named entities within the jurisdictional grant.

Two grand juries have been utilized by the Office of the Independent Counsel in the Eastern District of Arkansas. The first grand jury was empaneled in March, 1994 and expired on March 23, 1996. Another grand jury was empaneled in Little Rock on May 7, 1996, and its term expires on May 6, 1998.

In addition to the investigation by the Independent counsel's Office, the FBI, the IRS, and the Little Rock and Washington grand juries, investigations have been conducted by criminal investigators from both he FDIC and the RTC. Civil investigations have taken place by RTC's outside counsel, Pillsbury, Madison & Sutro. Also, the House of Representatives and the U.S. Senate have conducted investigations.

Each of these investigations was entitled under the law to conduct their respective investigations free from activities which would fall into the general category of "obstruction of the due administration of justice."

Indeed, in the jurisdictional grant this Independent Counsel, "shall also have jurisdiction to investigate any . . . obstruction of the due administration of justice, or any material false testimony or statement in violation of Federal criminal law, in connection with any investigation of the matters [within its jurisdiction] described above."

[See the Introduction to the Clinton-Finance memorandum of June 1997, pages 1-10].

In order to understand how there may have been obstruction of justice, false testimony, and false statements, which may have affected the Independent Counsel's investigation, and the investigation by other duly authorized investigators, it is important to understand the chronology

176

338

of events involved in the different investigations. It is also important to understand the relationships between the Clintons and the McDougals and the institutions within our jurisdictional grant.

    A.    <u>Madison Guaranty</u>

Mrs. Clinton, and the Rose Firm , represented Madison Guaranty Savings & Loan (MGSL) during the last 15 months of Jim McDougal's stewardship of that savings and loan association. It was during this April 1985 - July 1986 time frame that a number of questionable and criminal transactions took place, (a number of which were in the RTC criminal referrals); those which have been the subject of our investigations and our prosecution of <u>US v. Jim McDougal, Jim Guy Tucker, and Susan McDougal</u>.

Madison had regulatory net worth problems from the time McDougal acquired it in January 1982 through the time he was ousted in July 1986. Both federal and state regulators monitored the condition of MGSL and were concerned about it. Savings and loans associations were required under federal regulation to have a 3% net worth; that is, the assets of the institution had to exceed the liabilities by at least 3%.

The institution was required to make regular reports, often monthly, to the Federal Home Loan Bank Board, with a copy going to the state regulators. [FBI Financial analyst⬚ ⬚ was tasked with compiling documentation related to MGSL's net worth of the years 1982 - 1988 so as to demonstrate MGSL compliance or non-compliance with the FHLBB's 3% regulatory net worth requirement. A net worth schedule for these years has been prepared.]

In January, 1982, when the McDougals purchased the Woodruff County S&L, it had assets of $3,899,434 and liabilities of $3,817,955 for a net worth of 2.09%. McDougal "grew the

FOIA(b)7 - (C)          177

NW: 15416 DocId: 70001585 Page 215

institution" at a very fast rate. By the end of December, 1984, it had assets of $48.5 million and liabilities of $47.9 million, with a net worth of 1.25%.

As a result of a federal examination in 1984, Madison was placed under a supervisory agreement by the Federal Home Loan Bank Board in July 1984. By April, 1985, MGSL had assets of $67.1 million and liabilities of $66.2 million, with a net worth of 1.32%.

Bill Black, a former FHLBB official, who has testified as an expert witness before in high profile cases, has consulted with this office. He has reviewed the various records of MGSL. In his opinion, it was absolutely essential that McDougal, "goose up the net worth" of the institution prior to the next federal examination if he wanted the institution to survive.

Beginning in early 1983, Madison had utilized the law firm of Mitchell, Selig, Williams & Tucker. Jim Guy Tucker was a long-time political friend of Jim McDougal's, and John Selig was the former Arkansas Securities Commissioner, who specialized in securities law and banking matters.

The Mitchell, Williams Firm, where Beverly Bassett was employed as an associate in the early 1980's, opened and handled a number of "matters" for MGSL. In February, 1985, the Firm opened "matter no.9," entitled, "sale of stock." "Matter no. 10," at the Firm was entitled, "broker/dealer."

It was MGSL's plan in the spring of 1985 to issue preferred stock in the amount of $3 million in order to raise capital and help it comply with the Federal requirements concerning net worth. On April 3, 1985, Charles Handley, a career employee of the Arkansas Securities Department (ASD), advised Davis Fitzhugh, an MGSL employee, that he did not think that there was any authority under Arkansas law for a savings and loan association to issue preferred stock,

178

as proposed by MGSL.

On the next day, April 4, 1985, Jim McDougal held a fund raiser at MGSL to help retire the campaign debt of Governor Clinton, incurred in the Governor's race from the fall before. Some $33,000 was raised to retire that debt, primarily in the form of contributions from insiders and persons affiliated with MGSL.

On April 23, 1985, the Rose Law Firm opened its first ever matter for MGSL. "MGSL Matter no. 1" of the Rose Law Firm was styled, "stock offering." On April 29, 1985, Mrs. Clinton had a telephone conference with Beverly Bassett, the new Arkansas Securities Commissioner, who had been appointed some three months previously by her husband, Governor Clinton, partially upon the recommendation of Jim McDougal.

On the next day, April 30, 1985, the Rose Law Firm sent a letter to the ASD on the question of whether an S&L could issue preferred stock. This letter indicated that the ASD was to contact Hillary Clinton or Rick Massey if there were any questions. On May 14, 1985, Beverly Bassett wrote a letter beginning, "Dear Hillary," agreeing with the Rose Law Firm proposal. On May 23, 1985, Mrs. Clinton sent a copy of Bassett's letter to Jim McDougal, adding that, "we look forward to working with you on your plans for growth."

President and Mrs. Clinton had a personal and business relationship with Jim McDougal and his wife Susan dating back to the 1970's. They were joint participants in the Whitewater development beginning in 1978, and were joint participants in the Whitewater corporation beginning in 1979. Jim McDougal served in Bill Clinton's first gubernatorial administration in 1979 and part of 1980. He assisted the governor with his legislative program in 1983.

Thereafter, the Rose Law Firm opened five other "matters" for MGSL over the next 15

179

341

months. The Firm received a $2,000 a month "retainer," more accurately described as an "advance against fees." Mrs. Clinton was the "billing attorney" or the responsible attorney for this client. In that capacity, she would have reviewed all of the work done by attorneys at the Rose Law Firm in representing MGSL prior to any invoice or statement going out to the client. She normally would write a cover letter transmitting the RLF invoice to MGSL. The backup data for the information contained in the actual bill to MGSL was contained on a computer generated "billing memorandum," which in turn, had come from the "time sheet" entries for each attorney working on that representation.

"Matter no. 2," opened by the Rose Law Firm, dealt with the matter of "limited partnerships" and broker-dealer licenses, which MGSL wanted to be involved in as a way to raise capital. Rick Massey, who was a young associate in the Firm, in the securities department, worked on this with other securities partners, but Mrs. Clinton remained the responsible attorney to review all of the work and sent the bill to the client.

The preferred stock was never issued, although MGSL had been given until the end of December 1985 in which to accomplish this. Instead MGSL got involved in a land transaction south of Little Rock, which generated nearly $3 million in profits, which would have "goosed their net worth," prior to the next federal examination.

"Matter no. 4," was labeled "general." The first entry on that matter being on June 19, 1985, wherein Massey recorded a conference with John Latham, president of MGSL, regarding "capital plans." Massey recorded time on July 11 and 12, 1985 for telephone conferences with Sarah Hawkins of MGSL regarding MGSL's "business plan," and the proposed conference with the FHLBB supervisor. Mrs. Clinton was the billing attorney on matter no. 4 and also recorded

180

time on that matter beginning on September 4, 1985.

    B.    The IDC/Castle Grande Matter

"Matter no. 5," for MGSL at the Rose Law Firm was entitled, "IDC." According to the internal records of the Rose Law Firm, this matter was opened on August 4, 1985, not by Mrs. Clinton, but by Webb Hubbell. Mrs. Clinton, however, was the billing attorney on this matter as she had been on the others. Rose attorney, Tom Thrash, has time sheets and billing entries to MGSL in early-August through the first part of October 1985 for multiple meetings and conferences with Seth Ward and others involved in the acquisition of the 1,100-acre IDC property, and the sewer and water utility of it's subsidiary, ISC, from the Industrial Development Corporation of Little Rock. [Section II.1 and II.2 of this memo, give more detail concerning the matters occurring before the Arkansas Securities Department, and the acquisition of the IDC property, which was renamed Castle Grande by MGSL.]

The IDC property originally was to be acquired in total by Madison Financial Corporation, the subsidiary of MGSL. All of the resolutions drawn up by Rose attorney Thrash indicate this. However, shortly before the closing, it was determined that MFC could not acquire the entire property because it would be in violation of an Arkansas state regulation which would not allow a savings and loan association to invest more than 6% of its investments in its subsidiary.

Therefore, Seth Ward, an employee of MFC, agreed to have certain of the property placed in his name. There is much evidence and testimony that Ward was a "nominee" or "straw man" on this transaction. He was at "no risk" and had put up none of his own money. The entire purchase price was financed by MGSL. Ward is the father-in-law of Webb Hubbell, Mrs.

181

Clinton's Rose Law Firm partner.

In summary, the IDC property, with its associated utility, was purchased by MFC and Ward for $1.75 million. By February 28, 1986, the property and the associated utility, had been sold to third parties (most of whom were insiders or affiliated persons) for in excess of $4 million. These purchases involved, in most instances, "inflated appraisals" by Robert Palmer and

FOIA(b)7 - (C)

On February 17, 1986, Sarah Hawkins of MGSL learned that the federal examination was going to begin on or about Monday, March 3, 1986, and would examine all transactions through Friday, February 28, 1986.

On February 28, 1986, a number of transactions "closed." MFC, to which Ward had transferred most of the property held in his name, sold a large tract to former U.S. Senator William Fulbright, who was a mentor for Jim McDougal.

MFC, upon transfer from Ward, sold the assets of the sewer and water utility to a recently formed corporation, Castle Sewer & Water, which was controlled by Jim Guy Tucker. The utility had been purchased for $400,000 in the name of Seth Ward on October 4, 1985, and was resold to Castle Sewer & Water for $1.2 million.

MGSL loaned Castle Sewer & Water $1.05 million on a non-recourse basis, with the $150,000 down payment coming from David Hale's company, Capital Management Services.

In addition, on that day, MGSL loaned Dean Paul, a nominee for David Hale, $825,000. This money was used to purchase three tracts of land from Hale, which generated roughly a $500,000 profit for Hale, which he then injected into his small business investment company. The SBA then matched this investment on a 3-1 basis.

182

344

According to Hale, in return for this loan, he then funded loans through CMS for designees of Jim McDougal: 1) Larry Kuca (a lawyer with whom McDougal was a silent partner); 2) Steve Smith, d/b/a/ The Communications Company (the funds being used to pay off a debt owed by Smith, Tucker and McDougal); 3) the down payment for the Castle Sewer & Water purchase of the utility; and 4) the $300,000 CMS loan to Susan McDougal, d/b/a/ Master Marketing. [These transactions were the essence of the US v. McDougal, Tucker and McDougal trial.)

The examiners came to the institution on or about March 3, 1986. Within a short time, they focused on the transactions involving the purchase of the IDC property and subsequent re-sales within a rather short period of time. Both the examiners, and later, an outside law firm brought into the institution to examine the transactions, determined that there were possibly fraudulent practices. Ultimately, there is evidence to show that indeed, crimes were being committed relative to this property.

Prior to the sale in 1986 of what was originally the IDC property, Mrs. Clinton had many conferences and telephone conferences with Seth Ward.

Mrs. Clinton, for example, billed for conferences with Seth Ward on November 20 and November 26, 1985, and also then had a conference with Webb Hubbell. A month earlier, on October 18, 1985, associate Davis Thomas of the Firm, indicated that he spent 3.5 hours researching what approvals, permits, etc., were necessary to operate sewer and water facilities, having multiple telephone conferences with state agencies. Thomas indicates that he wrote a memo not to Mrs. Clinton, but to Webb Hubbell.

Mrs. Clinton billed Madison for some 14 conferences or telephone conferences with Seth

183

Ward. Some of it appears to have been in connection with a proposed brewery to be located on

the property, and other entries seem to pertain to research on the sewer and water utility.

However, some of the entries do not appear to be connected to either of these projects.

C.    The Federal Exam - March 1986

During the federal examination, which began in early March 1986, Seth Ward became

worried about receiving "commissions" that were owed to him for his role as a nominee. Ward

threatened to sue MGSL. To stave this off, Ward received $400,000 in the form of a loan from

MGSL, and executed a document back to MGSL which indicated that he had loaned money to

MFC although he had not. These "cross loans" are discussed in more detail in Section II.1 this

memo.

The examiners questioned these "cross loans," and were told that they were not connected

to each other. On or about May 1, 1986, an "option agreement" was prepared and put in place of

the non-funded loan from Ward to MFC. The bank examiners would later testify that based on

this option agreement, they stopped their pursuit of what appeared to them to be possible

fraudulent activity.

The federal exam turned up many problems, and on June 19, 1986, the FHLBB wrote the

MGSL Board of Directors directing them to cease and desist from certain practices until there

could be a meeting in Dallas. Beverly Bassett, the Securities Commissioner, who also served as

the Savings & Loan Supervisor, advised the Governor's office, attaching a copy of the FHLBB

letter.

The meeting took place on Friday, July 11, 1986, in Dallas, at the conclusion of which,

the Board was directed that Jim McDougal had to be out of any kind of control and/or

184

NW: 15416 DocId: 70001585 Page 222

management at MGSL or MFC, and John Latham, who had served as president of MGSL, had to be out.

Governor and Mrs. Clinton apparently were in Miami over the weekend of July 12-13, 1986 attending Mrs. Clinton's brother's wedding.

On the next business day, Monday, July 14, 1986, Betsey Wright, the Governor's Chief of Staff, and main political advisor, sent the Governor a hand written note: "Whitewater stock (McDougal's company). Do you still have? (pursuant to Jim's current problems). If so, I'm worried about it."

On that same day, Mrs. Clinton and Seth Ward both attended a meeting of the Little Rock Municipal Airport Commission. Ward was a Commissioner, and Mrs. Clinton was the attorney for the Airport Commission.

On that same day, Ward came into Madison, displaying an unsigned document, representing that this was the agreement he had with Jim McDougal concerning the payment of commissions to him. It appears that this document was backdated, and was prepared by Webb Hubbell's secretary, Martha Patton. Patton has testified that she never prepared any documents handed directly to her by Seth Ward, but would have only done so only if Webb Hubbell gave it to her.

On that same Monday, July 14, 1986, Mrs. Clinton signed a letter to Jim McDougal and John Latham, which indicates it was hand-delivered, returning the retainer money the Firm had accumulated, and indicating that the Rose representation had not been "continuous or significant."

Within a few days, McDougal himself was in the hospital with a stroke. The MGSL

185

347

Board brought in an outside accounting firm and an outside law firm from Memphis to do an investigation within the institution. The law firm of Borod & Huggins, principally in the person of Jeff Gerrish, issued its report on or about March 1, 1987, concluding that the McDougals had run MGSL for the benefit of family and friends. They listed a number of suspect transactions, which not only would be actionable from a civil standpoint, but also would constitute possible crimes.

On March 19, 1987, the MGSL Board forwarded the Borod & Huggins report to the FBI and US Attorney's office, and the criminal investigation involving Jim McDougal and Madison began in earnest.

McDougal was ultimately indicted in 1989 and acquitted at a trial in June 1990. Much came out about his bad stewardship of MGSL during the course of the investigation and his trial. Public reports appeared in the Arkansas media, including references to Castle Grande.

Further, in 1987, the FHLBB was taking its own action. In response to a subpoena from the FHLBB, Seth Ward filed a lawsuit against MGSL claiming that he had not been paid the commissions owed him, even though he had received the "$400,000 loan." MGSL was represented by Tucker's firm at the trial in late August 1988, and the jury returned a verdict in favor of Ward. It was later settled after removal to federal court, with Ward relinquishing his judgement completely.

MGSL was put into a conservatorship by the federal regulators on February 28, 1989. Prior to that time, Gerrish's law firm had filed a lawsuit against the Frost accounting firm, alleging accounting malpractice. The FDIC Legal Division determined that the Gerrish firm had a conflict, and requested the Rose Law Firm represent the interests of the Government and

186

348

Madison against Frost. The principal attorney at the Rose Law Firm handling this was Webb Hubbell. It is now clear that he did not reveal a number of things which potentially would have disqualified the Rose Firm from representing the Government. [See Section II.3].

     D.    1992 Campaign

The Clintons' relationship with Whitewater and Madison, including Mrs. Clinton's roll, and that of the Rose Law Firm in the representation of Madison, was raised in February 1992 during the Presidential campaign. It came at a time shortly after there had been much media coverage about then Governor Clinton's alleged womanizing and his actions regarding the draft during the Vietnam War. The Whitewater-Madison allegations were a serious problem. It was important to the campaign that the best possible "spin" be put on their involvement with the McDougals, Whitewater, and Madison. [See Section II.4].

Prior to February 11, 1992, Jim McDougal, had talked to a reporter about the Whitewater investment, and Hillary Clinton's representation of Madison in the mid-80's. McDougal told the reporter that the representation originally came about as a result of a conversation he had with Governor Clinton when he jogged by Madison. On February 11, overt inquiries began concerning Mrs. Clinton's having represented Madison before the Arkansas Securities Department, a state agency headed by Clinton's then recent appointee Beverly Bassett.

A story in the New York Times on March 8, 1992, featured the failure of Madison, the business relationship of the Clintons and McDougals, and Mrs. Clinton's having represented Madison before the Securities Commissioner, who answered to Governor Clinton.

This article did not mention the role of Governor Clinton in getting the Madison business for Mrs. Clinton and Rose in part because there were no public, or other documents reflecting

<div align="center">187</div>

<div align="center">349</div>

Bill Clinton's allegedly having asked McDougal to hire Mrs. Clinton. The Clinton campaign responded "no" in writing to the reporter's question, "Did you discuss with Jim McDougal in 1984 or 1985 the hiring of her [Hillary] and the firm by Madison Guaranty?".

There were some subsequent stories after the New York Times broke the story initially. A little over a week later, in a debate, Jerry Brown, another candidate for the Democratic presidential nomination, referring to a news article, accused Clinton of "funneling money to his wife's law firm." Clinton strongly defended Mrs. Clinton, stating, "You ought to be ashamed for jumping on my wife. You're not worth being on the same platform with my wife."

The next day, March 16, 1992, Mrs. Clinton stated that "you can't be a lawyer if you don't represent banks", and made her widely publicized "I suppose I could have stayed home and baked cookies and had teas" comment. Clinton won several key primaries that week; and for the most part the stories and inquiries about Whitewater and Madison faded away.

Actions were taken within the campaign and Rose Law Firm later in 1992, including during the transition period after the President was elected, bearing on "the Rose Law Firm/Mrs. Clinton representation of Madison" issue. This included the comprehensive review and removal of certain Rose Law Firm files, and involved Webster Hubbell and Vincent Foster, Jr. Foster joined the President's administration as Deputy White House Counsel. Hubbell was assigned to the Department of Justice. He began with the title of Special Assistant to the Attorney General. He then was nominated by President Clinton and confirmed as Associate Attorney General.

E.    RTC Criminal Referrals

The RTC sent criminal investigators to Little Rock in April 1992, and on or about September 1, 1992, the RTC sent to the FBI and the U.S. Attorney in Little Rock a criminal

188

referral relating to Madison, naming Jim and McDougal as a suspects, and the Clintons as

witnesses. This referral, designated C-0004, primarily focused on overdrafts on the Whitewater

Development bank account at Madison, and the utilization of various other McDougal-controlled

accounts at Madison to replenish the Whitewater account. [This referral, designated C-0004,

languished until September 1993. The handling of this and later referrals was the subject of our

"DOJ Handling of Referrals" investigation.]

In late September 1993 the RTC's Kansas City office sent nine additional criminal

referrals concerning Madison to the RTC in Washington. [Jean Lewis and other investigators

had begun work on these in Arkansas in late May, 1993]. After scrutiny by the Washington

RTC, these 9 referrals were sent to the U.S. Attorney and FBI in Little Rock on October 8, 1993.

All of the nine new referrals involved Madison Guaranty and named Jim McDougal as a

suspect. Four of these criminal referrals related to the Castle Grande/IDC property and related

loans and selloffs, or made reference to Governor Clinton:

| | |
|---|---|
| . CR-0190 | $260,000 loan to Jim Guy Tucker on 10-25-85 [34 acres acquired from IDC by MFC]. |
| . CR-0192 | $30,000 Whitewater check to McDougal on 4-19-85, endorsed to Earth Movers, Inc., whose principal was J.W. Fulbright; with MFC resolution to pay McDougal a $30,000 bonus. [Both Bill and Hillary Clinton are listed as witnesses in this referral]; and another check for $20,000 on 5-20-85 to J.W. Fulbright. |
| . CR-0195 | Madison Financial Corporation |
| . CR-0196 | Loan to Peacock; Bill Clinton Political Committee Fund |

The other referrals related to McDougal, but not directly to the Castle Grande/IDC

property. There were media inquiries relative to the referrals beginning in late September, and

during all of October 1993. The first public story on these referrals appeared in the Washington

Post on Sunday, October 31, 1993.

189

F.   RTC Referral CR-0196

One of the RTC criminal referrals (CR-0196) [dated August 18, 1993; and signed out of the RTC in Kansas City on 9-24-93] named as suspects Jim McDougal, Charles Peacock III, and the Bill Clinton Political Committee Fund.

This referral contains reference to Madison having made two loans to Charles Peacock III, a Madison director. The referral stated that part of the proceeds of these loans were diverted to the benefit of McDougal - some for a down payment on the 145th Street property [IDC/Castle Grande], and some for the Clinton campaign.

The narrative of the suspected violation discusses the April 4, 1985 fundraiser for Governor Clinton held at Madison Guaranty, where a number of persons inside and affiliated with Madison contributed money to help the governor retire his 1984 campaign debt. It focused on $12,000 in contributions made by McDougal, or others, at or about the time loans from MGSL or other transactions involving MGSL took place. [The total amount raised for the campaign as a result of this fundraiser was approximately $33,000.]

Referral CR-0196 made reference to the Whitewater Development Company account at Madison, identifying Whitewater as "a partnership consisting of Jim & Susan McDougal, and Bill and Hillary Rodham Clinton." (pp.7-8). It also referred back to criminal referral C-0004 submitted a year earlier involving the Whitewater Development Company, which had not been acted on.

This referral also stated that during the same April 1985 time frame in which the fund raiser was held, Hillary Clinton of the Rose Law Firm was acting as counsel to Madison in representations to the AR Securities Department. According to the referral, "Ms. Clinton was

190

soliciting approval for the thrift to authorize and issue a class of preferred stock, which would provide badly needed capital for the thrift. . . The thrift was significantly below the required FHLBB capitalization limits."

The referral states that this was not the only time that McDougal or John Latham requested Ms. Clinton's specific legal assistance in addressing sensitive thrift issues (attaching exhibits), rather than utilizing John Selig of the Mitchell firm, who served as general counsel to MGS&L.

The referral pointed out and attached certain documents relative to communications between Hillary Clinton and Beverly Bassett. It pointed out that Ms. Bassett had previously been with the Mitchell firm and had done a memo to Jim Guy Tucker of that firm on Madison issues.

This referral contained a chronology of events, including the 4-4-85 fundraiser, a 4-30-85 letter from Hillary Clinton to Bassett, a 5-14-85 letter from Bassett to Mrs. Clinton, a 5-23-85 letter from Mrs. Clinton to McDougal, and two August 85 Madison memos mentioning Mrs. Clinton and moving the home office of Madison. Among the suggested investigative steps in this criminal referral were:

> . further investigation into the alleged diversion of the Peacock down payment to Jim McDougal for use in the Castle Grande transaction
> . a review of the source of deposits and account activity in the Bill Clinton Political Committee Account records at the Bank of Cherry Valley
> . further investigation into the possible conflict of interest regarding Hillary Clinton representing her business partner's thrift before another state agency whose department supervisor was a political appointee, designated by her husband.

Witnesses listed in this referral are: Ken Peacock, J.W. Fulbright, Patricia Heritage, Beverly Bassett Schaffer, and Hillary Rodham Clinton.

191

NW: 15416 DocId: 70001585 Page 229

Investigations, both ours and those of Congress, have disclosed that persons at the

Treasury Department alerted persons at the White House about the RTC criminal referrals shortly

after they were received in Washington in late September 1993. The Clintons' friend Roger

Altman was the Assistant Secretary of the Treasury, and acting head of the RTC. Altman

ultimately recused himself, in February 1994, after much scrutiny and Administration efforts to

"keep him" as head of the RTC.

[The extensive investigation done by the Starr OIC is summarized in the "White House-

Treasury Contacts Memorandum" and in Part II.6. The Fiske regulatory IC also conducted

extensive investigation of this matter.]

G.   Events leading to Appointment of Independent Counsel

On July 20, 1993, the FBI obtained a search warrant for the office of David Hale to seize

certain records of CMS. The search was executed on July 21, 1993. Foster committed suicide

on the afternoon of July 20, 1993.

The federal grand jury in Little Rock indicted David Hale on September 23, 1993. On the

day of the indictment Hale made public statements that he had issued one loan from his Small

Business Investment Company, Capital Management Services, to Susan McDougal at the behest

of then Governor Clinton.

On or about November 3, 1993, in the wake of the publicity about the RTC criminal

referrals, the U.S. Attorney in Little Rock formally recused herself from the Hale prosecution,

the investigation of the RTC Referrals on MGSL, and other matters related to Madison and

Capital Management Services.

[The Little Rock FBI had already identified as matters worthy of investigation to the U.S.

192

Attorney's Office an $825,000 loan from Madison to Dean Paul, and related loans from David

Hale's company to others, including Susan McDougal's Master Marketing loan. The "825 loan"

from MGSL to Paul was not in the 10 RTC criminal referrals on MGSL].

Donald Mackay, of the Fraud Section of the Department of Justice, a career prosecutor,

was assigned responsibility for the pending Hale prosecution, and the investigation of Madison

and McDougal, including the RTC referrals.

In December 1993 and early January 1994, there were calls for an Independent Counsel.

Between Christmas and New Years, the Clintons attended a Razorback basketball game in

Fayetteville with Hubbell, Bruce Lindsey, Jim Blair and others.

On January 11, 1994, over 30 subpoenas were issued to persons and entities by Mackay

for the Little Rock grand jury. Subpoena to the Rose Law Firm and Rick Massey (of the Firm)

were served on January 12, 1994.

On that same day, the President (who was on a trip in Russia) announced through a

spokesman that he was asking Attorney General Reno to appoint a special prosecutor. The Rose

Law Firm subpoenas were withdrawn late that day.

On January 20, 1994, the Attorney General appointed Bob Fiske as the regulatory

Independent Counsel. He was tasked with investigating whether any criminal violations had

occurred relating to the relationships of President and Mrs. Clinton and Jim McDougal with the

Whitewater Development Company, Madison Guaranty, and Capital Management Services. He

thus took over the prosecution of David Hale, the investigation of the specific RTC criminal

referrals, and other Madison-related allegations.

H.    The Fiske Investigation

193

Shortly after the arrival of Bob Fiske in Little Rock there were reports in the media of the shredding of documents at the Rose Law Firm. Thus, the first grand jury work by the Fiske investigation was relative to the shredding allegations. In March 1994, an additional Grand Jury (dedicated solely to Fiske's investigation) was empaneled to consider all matters within the jurisdiction of Mr. Fiske.

Mr. Fiske took over the prosecution of Hale, and began investigating the other allegations and referrals. Just prior to his scheduled trial, Hale pled guilty in March 1994, repeating his allegations concerning President Clinton, and implicating Jim McDougal, Susan McDougal, then Governor Jim Guy Tucker, and others in transactions involving CMS and Madison.

Arising out of the shredding investigation, the OIC learned of, and began investigating, possible crimes committed by then Associate Attorney General Webster Hubbell, a former Rose Law Firm partner of Mrs. Clinton.

Other matters "arose out of" the investigation of the "core matters" including: the allegations against Jim Guy Tucker and his business partners; Chris Wade; and The Perry County Bank.

The Fiske team also investigated the death of Deputy White House Counsel Vincent Foster Jr., and the possible removal of Whitewater and Madison-related documents from his office in the wake of his death on July 20, 1993. [See Section II.5]

The relationship of the Clintons with Madison, including Mrs. Clinton's representation of Madison, was one of the subjects of the Fiske investigation. In furtherance of the investigation Fiske issued grand jury subpoenas to President and Mrs. Clinton in May 1994 to produce in June 1994 any and all documents in their possession or control related to Whitewater, Madison,

194

Capital Management Services, and other named entities. The Rose Law Firm was subpoenaed to produce many documents including any and all documents related to the representation of Madison by the Rose Law Firm and/or Hillary Clinton.

Mrs. Clinton held a televised news conference on April 22, 1994, answering questions on a number of issues, and giving her explanation of how the Rose Law Firm came to be retained by Madison, and her role in the representation. She minimized her role in the MGSL representation, making statements which were not accurate .

By June 1994 Hubbell, through his attorney, declined to produce further records.

I.      The Starr Investigation Begins

After Ken Starr's appointment on August 5, 1994, he built on the work of the Fiske team. A team of 2 agents, 6 financial analysts, and an attorney was in place and investigating Hubbell. They became very familiar with the inner workings of the Rose Law Firm and with some of its key attorneys and staff. Hubbell pled guilty in December 1994 to one count of mail fraud and one count of tax evasion, relative to his billing and expense practices at the Firm.

Certain of the Starr team previously dedicated to the investigation and prosecution of Hubbell for his criminal acts involving the Rose Law Firm, and its clients, then began looking at Mrs. Clinton's role in the Rose representation of Madison; as well as the allegations that the business had first come to Rose through Governor Clinton's asking Jim McDougal to hire Hillary and her Firm. Rick Massey, John Latham and others were interviewed in Feb-March 1995, prior to Mrs. Clinton's interview on that subject on April 22, 1995.

Hubbell, who had agreed to cooperate, was questioned about a number or issues, including the

195

Rose Law Firm's representation of Madison Guaranty, and the role of Mrs. Clinton in obtaining the business and what work she performed for Madison.

During the OIC investigation the Rose Law Firm, through its attorneys and managing partner Ron Clark, responded to subpoenas, including records reflecting what work Rose and Mrs. Clinton performed for Madison in 1985 and 1986.  Clark produced some files,

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

The only document relating to how much work any Rose attorney performed for Madison was a 2-page fee allocation recapitulation (and related fee allocation documents).

J.        The FDIC/RTC-OIG Investigations

In addition to the OIC investigation, both the FDIC and RTC conducted separate audits and investigations related to the Rose Law Firm in the 1993-1996 time period.  Both the RTC and FDIC conducted audits of the Rose Law Firm relating to fees and expenses billed to those agencies, for work Rose did in representing the interests of the government in civil actions involving S&L's placed into conservatorships.

Both the RTC and the FDIC also conducted investigations into possible conflicts of interest of the Rose Law Firm in representing the interests of the government beginning in March 1989 in Madison v. Frost.  The reports of the initial investigations by the FDIC Legal Division and the RTC-OCOCS were released in February 1994.  They were publicized and received a lot of criticism.  The names of Webb Hubbell, Seth Ward, and Mrs. Clinton were prominently mentioned in most of the media accounts.  Webb Hubbell was interviewed by the FDIC Legal

196

Division on January 11, 1994, lying about the 85-86 RLF representation of MGSL.

As a result of Congressional criticism, the Inspector Generals of the FDIC and the RTC conducted more thorough investigations into the Rose Law Firm conflicts allegations beginning in late February/early March 1994.

The FDIC Inspector General obtained from Mrs. Clinton an affidavit in September, 1994 concerning in part her role in representing Madison. She was also interviewed by two special agents of the FDIC OIG in November 1994.

Webb Hubbell was interviewed by the FDIC & RTC OIG agents on March 16, 1995 and April 20, 1995. Two days after Hubbell's RTC OIG interviews, Mrs. Clinton was interviewed in an under oath deposition by the OIC at the White House on April 22, 1995. At the time the OIC did not have copies of the Rose Law Firm bills to Madison, the backup billing memoranda, or any of Mrs. Clinton's time sheets for work performed for Madison. This deposition was conducted with an agreement that it would be read to the Little Rock grand jury, and it was so read to the grand jury in May 1995.

On that same day the President was also deposed. He said that he could not remember talking with Jim McDougal about Madison hiring Hillary Clinton and the Rose Firm. [The campaign in 1992 had replied "no" to the question about whether Bill Clinton had visited Madison and asked McDougal to have Hillary represent the Rose Law Firm.] He said that he was not disputing Jim McDougal's account; he just couldn't remember.

A month later, in May 1995, both President and Mrs. Clinton provided written answers under oath to certain RTC Interrogatories related to Whitewater and Madison. Included were answers to questions about Mrs. Clinton's representation of Madison Guaranty.

197

359

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

K.    Little Rock Grand Jury - Oct., Nov., Dec., 1995

Beginning in October, 1995, a number of present and former Rose Law Firm attorneys and support personnel, as well as Arkansas Securities Department personnel, including Beverly Bassett Schaffer, were questioned before the Little Rock grand jury. Additionally key persons connected to the 1992 Clinton campaign were subpoenaed, including Jim Blair and Susan Thomases.

In mid-November 1995 an agent assigned to the OIC located the Madison copies of certain Rose Law Firm billing statements to Madison from the 1985-86 time frame. Prior to that time, the OIC had questioned Rose attorneys (including Mrs. Clinton) advising them that no billing documents were available except the 2-page fee recap. Several Rose attorneys(Clark, Donovan⬛⬛⬛) were questioned before the grand jury in early December 1995 and were shown copies of some Rose bills to Madison. The Vinson & Elkins attorney representing the Rose Firm stated that it was obvious the OIC now had billing records and requested that the OIC furnish the Firm with a copy of same, since the Firm had no copies of any billing records in its possession. The OIC declined to do so.

The Senate Whitewater Committee began focusing on Mrs. Clinton's representation of Madison on December 1, 1995. Hubbell testified before the Committee on that date, and on December 18, 1995, Susan Thomases was questioned about what the 1992 campaign learned about HRC and MGSL.

In early December 1995 the OIC also focused on the Firm's prior representation of the McDougal-controlled Bank of Kingston (renamed Madison Bank & Trust) during the early 1980's and litigation handled by the Rose Firm. That prior representation, and the failure of

198

McDougal to pay the outstanding "old bill", was relevant in determining the accuracy of what Mrs. Clinton had said about how the Rose Firm came to represent Madison Guaranty.

On December 19, 1995, Webb Hubbell testified before the Little Rock grand jury, primarily about the work of Hillary Rodham Clinton for MGSL, and the actions during the 1992 campaign to accumulate and review all the RLF-MGSL records.

On December 21, 1995, the attorneys representing the RTC in its civil investigation sent to David Kendall, the Clintons' attorney, Supplemental Interrogatories concerning her work for Madison. This included questions about Seth Ward, the cross loans, and the "option agreement." The RTC had just learned from Rose that the computer code on the "option agreement" was that of HRC.

### L.  The RLF Billing Records are Produced

On January 5, 1996, David Kendall, counsel for President and Mrs. Clinton , notified the OIC that certain Rose Law Firm billing records, responsive to an earlier grand jury subpoena, had been found at the White House by Carolyn Huber. He produced same, releasing copies to the media on that same day. He stated words to the effect that the records backed up what Mrs. Clinton had said all along about her role in the Madison representation. There is strong disagreement with that characterization.

These records reflected that much more work was billed to Madison by Mrs. Clinton than was previously stated by her. For the first time the details of what she worked on and what she billed Madison for in 1985 and 1986 was made know.

FOIA(b)7 - (C)

199

These Rose billing records disclosed work billed by her to Madison on the IDC matter during a period of fraudulent activity at the institution. Especially revealing were her 14 entries mentioning Seth Ward, including her work on issues relating to the utility IDC sold to Ward and which was later sold to Jim Guy Tucker and Castle Sewer & Water; and preparation of the May 1, 1986 option agreement, which regulators would say misled them during their 1986 examination of Madison.

These particular records were covered by and should have been produced pursuant to the Fiske grand jury subpoena in June 1994. In light of the 18 month+ delay in production, and in light of all the facts and circumstances, an investigation was conducted by this office as to the RLF billing records. There were interviews of almost all persons who were in the White House residence during relevant periods.

Mrs. Huber, a long time friend of the Clintons, had served in Arkansas as Governor's Mansion administrator and also as office manager of the Rose Law Firm. She said that in August 1995 she found the records in the book room on the 3rd floor of the White House residence. This was adjacent to a room being utilized as an office by Mrs. Clinton in part to write her book. Huber has testified that she removed these to her White House office not realizing what they were until January 1996. [See the memo on the "Rose Law Firm billing records" investigation, and Section II.7.]

The book room where Huber says she found the billing records was a short distance away from a closet, where documents found in Vince Foster's office on July 22, 1993, had been placed pending transfer to the Clintons' personal attorney. This, of course, raised the question of whether the "missing billing records" had been in Foster's office at the time of his death in July

200

362

20, 1993 and removed by White House employees. The fingerprints of Mrs. Clinton, Vince

Foster, and others were found on the set of billing records found in the White House and

produced to the OIC in January 1996.

[The "Foster Documents" memo covers the events of the night of Foster's death on July

20 including: the possible removal of records that night and the next morning, the "search" by

Bernard Nussbaum on July 22; the taking of "Whitewater" documents to the residence, etc.]

Mrs. Clinton was questioned before the Washington grand jury on January 26, 1996 on

the subject of how the Rose billing records came to be located in the White House. She testified

that she did not know how the records got there. She acknowledged that the records were

responsive to the prior OIC subpoena issued some 18 months previously. She was not

questioned that day on her substantive work for Madison. She did identify a 2-page statement

prepared at her direction during the 1992 campaign on the subject of her's and Rose's

representation of Madison in 1985 and 1986.

Within a month of her grand jury appearance she was questioned about the substance of

her work for Madison. On February 14, 1996, she answered the questions of the RTC's outside

counsel in a transcribed interview, which was not under oath.

M.    The McDougals's and Tucker

The McDougals and Jim Guy Tucker were indicted in Little Rock on August 17, 1995.

They were charged primarily with events relating to both Madison and CMS loans occurring in

the October 1985 - April 1986 time frame. They were convicted on May 28, 1996. The sale of

the sewer and water system at IDC/Castle Grande to Tucker's company on February 28, 1986

was the subject of some of the charges that were tried. The evidence aduced included: Madison

loans on February 28, 1986 to Dean Paul and Castle Sewer & Water; CMS loans to Castle Sewer

& Water, and Susan McDougal d/b/a/ Master Marketing, and others.

President Clinton testified as a defense witness at the trial. On cross examination he

stated that he could not remember whether he talked to Jim McDougal about Madison hiring

Mrs. Clinton and the Rose Law Firm.

Jim McDougal entered a cooperation agreement with the OIC in August 1996. At the

outset McDougal stated that some of the testimony of the President at his trial was at variance

with the truth. In addition to shedding light on the President's role with Madison, Whitewater,

and David Hale's loan to Susan McDougal, Jim McDougal told of Hillary Clinton's hiring at the

Governor's behest, and the work she did for Madison. He also shed light on the role of Webb

Hubbell and his father in law Seth Ward, as it related to the Rose work for Madison.

Susan McDougal refused to cooperate, and defied a September 1996 Court Order to give

testimony to the grand jury. She was jailed for civil contempt September 1996 - March 1998.

N.   Obstruction of the Due Administration of Justice, False Statements and
     Testimony

Most of the Arkansas substantive events occurred over 10 years ago. For example, Jim

McDougal was out of the Madison management as of July 15, 1986. He was indicted as a result

of this investigation on August 17, 1995, at a time when the statute of limitations had not yet run

on his acts in late 1985, and in 1986. He began cooperating in August 1996, at a time when

most, if not all, of the possible substantive criminal violations involving Madison were over 10

years old.

Bob Fiske was appointed on January 20, 1994, at a time when there appeared to be time

202

to fully investigate possible criminal violations occurring in Arkansas, especially during the 1985-86 time period. But delays in finding the truth, be that from recalcitrant or perjurious witnesses, concealment or destruction of documents, and the time it took to develop cooperating witnesses, has caused the statute of limitations to run on the underlying transactions in 1985 and 1986.

O.     The Little Rock Grand Jury Empaneled May 1996

The first Whitewater-dedicated grand jury in Little Rock expired on march 23, 1996, during the US v. McDougal, Tucker, and McDougal trial. Another grand jury (solely dedicated to Whitewater-Madison) was empaneled in Little Rock on May 7, 1996. Supervisory Special Agent Steve Irons was the first witness before them summarizing the investigation from its inception to that point.

In its early months, the grand jury heard from witnesses regarding matters related to the Clintons on the Whitewater investment and matters related to the "825 trial." This included viewing the videotape of the President's trial testimony given at the White House on April 28, 1996, and played by the defense at trial in May, 1996.

Beginning in late 1996 and early 1997 it heard extensive testimony regarding what was publicly characterized as possible "hush money" paid to Webb Hubbell - at a time he was under investigation in Little Rock and later while he was allegedly fully cooperating with the OIC. Most of the persons involved in the payments to Hubbell (which were in excess of $400,000 occurred between May and December 1994) were questioned before the Little Rock grand jury. [See Section II.8]

203

365

The grand jury heard testimony from Jim McDougal on April 23, 1997 including

evidence about the Madison land deals, Ward, and Mrs. Clinton.

In late July 1997, Jim Hamilton, the attorney for Lisa Foster (Moody), contacted the OIC

stating that Vince Foster's widow had recently discovered in the attic of her residence in Little

Rock documents which were responsive to previous grand jury subpoenas. This call from

Hamilton came shortly after the OIC had issued its long awaited report on the death of Vince

Foster, concluding that he died as a result of suicide in Ft. Marcy Park.

These documents were discovered by Foster's daughter in a briefcase of Vince Foster's in

the Little Rock residence. They were delivered to the OIC after the attorney for the Rose Law

Firm, and the attorney for the Clintons were allowed to examine the documents for possible

privilege claims. The documents all appear to have been compiled in the 1992 Presidential

campaign. Among the more significant documents were:

- Another full set of the Rose Law Firm - Madison billing records. This was the only other set of these records ever found or produced during the course of the OIC investigation.

- A copy of the "old bill," from the Rose Law Firm to the Bank of Kingston marked "paid 10/23/84." This document was included in the set of the RLF - MGSL billing records. The "old bill" was not contained in the set produced by the attorney for Mrs. Clinton.

- A Memorandum prepared for Rick Massey dated in late March 1992. It set forth work done by Massey for the ASD, but did not discuss how the MGSL business got to the Rose Law Firm.

- A number of documents relative to work done by Mrs. Clinton or the Rose Law Firm on behalf of Arkansas state agencies.

[See the discussion of the "1992 Campaign" and the obtaining of the work by the Rose Firm,

Section II.4.]

Beginning in mid to late 1997, the grand jury heard extensive testimony concerning the

204

Rose Law Firm conflicts referrals from the FDIC and RTC. A number of Rose attorneys testified before the grand jury, including those with knowledge about HRC's work for MGSL.

As in any criminal investigation any document concealed, or any misleading or false statement, had the potential to delay, hinder, impede, and obstruct our investigation. Such appears to have actually happened in this investigation.

There is, of course, a five year statute of limitations on perjury, false statements, and obstruction of justice. Thus, as of April 1998, any such statement or actions occurring since April 1993 would still be actionable.

Even though the substantive statute of limitations may have run, the underlying events occurring in 1985-1986 and before are still highly probative and relevant in determining whether there has been actionable obstruction, perjury, or false statements. Thus, understanding and analyzing the events in Arkansas in that time period has been a continuous focus of the investigation.



FOIA(b)7 - (C)

205

```
                            FOIA(b)7 - (C)
```

* * * * *

*Conclusion* -- We look forward to our discussion on Monday, April 27th.

206

368

*Judicial Watch v. Nat'l Archives & Records Admin.*
No. 1:15-cv-01740-RBW

Defendant's Combined Reply in Support of Its Motion for Summary Judgment and Opposition to Plaintiff's Cross Motion for Summary Judgment

Ex. A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,                    )
                                         )
     Plaintiff,                          )
                                         )
          v.                             )     Civ. A. No. 15-CV-1740 (RBW)
                                         )
NATIONAL ARCHIVES AND                    )
RECORDS ADMINISTRATION,                  )
                                         )
     Defendant.                          )
_____)

## SECOND DECLARATION OF MARTHA WAGNER MURPHY

I, Martha Wagner Murphy, hereby declare as follows:

1.     This is my second declaration in the above-referenced case.  I have reviewed and have become familiar with Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment ("Plaintiff's Memo").  I submit this second declaration to supplement my February 1, 2016 Declaration, and to strengthen my explanation of the analytical process that the National Archives and Records Administration ("NARA") engaged in when it reviewed the requested documents in accordance with the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

2.     The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

3.     When my staff receives a valid, perfected third-party FOIA request for access to a box of records that a prior Independent Counsel ("IC") has marked as containing grand jury

material, NARA examines each individual record in the box to determine whether each

document should be withheld pursuant to Exemption 3 (Fed. R. Crim. P. 6(e)). Thus, although

the IC markings on boxes serve as a guide, they are not dispositive, and my staff does conduct an

independent review in order to make its own determinations as to whether the material does

constitute grand jury information. For instance, in response to a 2005 FOIA request (not from

Plaintiff) for access to a memorandum dated April 22, 1998 from "HRC Team" to "All OIC

Attorneys" ("Evidence Memorandum"), NARA examined that document and compared it to the

publicly released "Final Report of the Independent Counsel, *In re Madison Guaranty Savings

and Loan Association*" of January 5, 2001 ("Final Report"). When NARA examined the

Evidence Memorandum for possible release in response to that 2005 FOIA request, we

understood that it may contain non-grand jury material. Our examination, which included an

analysis of the factual and stylistic presentment in both documents, enabled us to draw important

distinctions between information in the Evidence Memorandum that had already been released to

the public in the Final Report, and that information in the Evidence Memorandum that was

considered grand jury information and should continue to be withheld. That approach was fully

consistent with NARA's long-standing practice of taking into consideration the overall context

of the material being requested, and in this example, resulted in a partial release of the Evidence

Memorandum with redactions for grand jury material (as well as other redactions).

    4.      Similarly, NARA followed the same approach when it responded to Plaintiff's

March 9, 2015 FOIA request for "[a]ll versions of indictments against Hillary Rodham Clinton

…" Again, we took into account the Final Report, and the redacted Evidence Memorandum

(which we had also released to Plaintiff a year earlier in partial response to their June 2014 FOIA

request). The Evidence Memorandum presented the IC's "best assessment of some of the

contrary evidence and theories likely to be presented by the defendants in the event an indictment is returned and a trial takes place, as well as evidentiary considerations." Plaintiff's Memo, Exhibit 3 (Part 1), p. 3. We also took into account the fact that when the IC issued the mandatory Final Report to the public, no draft indictments were included.

5.      Both the partially-released Evidence Memorandum and the fully-released Final Report contrast with the drafts of the indictment at issue in this litigation in both purpose and form. Any indictment is a written accusation of a crime and is crafted for the specific purpose of persuading a grand jury to formally charge one or more individuals. These draft indictments reflect the net result of all of the evidence gathered throughout the grand jury investigatory process; they represent a compilation and distillation of all of the evidence gathered and presented before the grand jury up until the time the draft indictments were prepared. As a result, they are inextricably intertwined with the grand jury process and are not subject to segregation. NARA's practice is therefore to withhold, in its entirety, any draft indictment of a living person if no indictment is ever formally issued by the grand jury against that person.

6.      If we are able to ascertain that an indictment has been issued by a grand jury, our practice is to release both the issued indictment as well as any of the underlying drafts, or at least those portions of drafts that are relevant to any charges that are ultimately brought. Our practice is also to release drafts, or portions thereof, if they contain information obtained separate and apart from the grand jury process, such as a separate prosecutorial investigation. Neither of those scenarios exists in this case for at least two reasons. First, as is evident in the Final Report, the Whitewater grand jury was never presented with an indictment of Secretary Clinton. Second, none of the drafts that we reviewed contained information that we determined had been obtained separate from the grand jury process. As a result, we withheld all the drafts of the indictments.

-3-

372

Accompanying fax cover pages, notes, and/or memoranda played no role in our decision to withhold the draft indictments in full; we consider these accompanying documents to be non-substantive, but withheld them since they were physically attached to – and an integral part of – the drafts.

7. Because a draft indictment is inextricably tied to the Grand Jury process, the development of the indictment, illuminated as each draft carefully refines the argument for charging the accused individuals, provides a roadmap to that process. Unlike the Evidence Memorandum, which NARA released in part, draft indictments that do not result in any further prosecutorial action are not capable of a similar segregability analysis without revealing the workings of the Grand Jury. Again, this has been NARA's practice reaching back many years, starting with indictments drafted by the Watergate Special Prosecution Force during Watergate.

8. With respect to the significant privacy interests at stake in these documents, as noted in ¶ 34 of my February 1, 2016 Declaration, individuals who are never indicted, charged and convicted of any criminal wrongdoing retain a significant personal privacy interest with respect to draft indictments that were contemplated by the IC, discussed internally among IC staff, but ultimately never issued. Protecting against the disclosure of allegations of illegality that do not result in an indictment against a living person is among the most sensitive of privacy interests that NARA protects. NARA holds approximately 76,898 cubic feet of U.S. Department of Justice records, including those of the U.S. Attorneys' offices, and, approximately 17,537 cubic feet of Federal Bureau of Investigation records. NARA staff routinely examines these records when access is requested to ensure that unsubstantiated and unproven allegations of criminal wrongdoing regarding living persons are not disclosed to the public.

373

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed this   18th day of April, 2016.

MARTHA WAGNER MURPHY
Chief, Special Access and FOIA Branch
Research Services Division
National Archives and Records Administration
College Park, Maryland

USCA Case #16-5366     Document #1668146     Filed: 03/28/2017     Page 378 of 421

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| | ) | **No. 1:15-cv-01740-RBW** |
| **JUDICIAL WATCH, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **NATIONAL ARCHIVES AND** | ) | |
| **RECORDS ADMINISTRATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT UNDER LCvR 7(h)

Defendant, the National Archives and Records Administration (NARA), hereby submits the following as its response to the numbered paragraphs of the statement under LCvR 7(h) filed by plaintiff, Judicial Watch, as part of ECF No. 12:

1-6.   These paragraphs quote or paraphrase the *Final Report of the Independent Counsel In re Madison Guaranty Savings and Loan Association* (Jan. 5, 2001) (Final Report).  These paragraphs are undisputed insofar as they quote or paraphrase the Final Report accurately.

7.   Disputed.  Five final reports were published by the independent counsel.

8.   This paragraph is plaintiff's counsel's subjective characterization of the final reports. *See* Decl. of Paul J. Orfanedes (Mar. 11, 2016) (Orfanedes Decl.), ECF No. 12-1, ¶ 2.  This paragraph is therefore disputed.

9.   Undisputed that the final reports are available on the website of the Government Publishing Office.  Plaintiff cites no authority other than the declaration of plaintiff's counsel for the proposition that each of the final reports was approved for publication by the D.C. Circuit. The declaration of plaintiff's counsel states that each report "appears" to have been approved for

USCA Case #16-5366      Document #1668146      Filed: 03/28/2017      Page 379 of 421

publication by the D.C. Circuit.  Orfanedes Decl. ¶ 2.  The above proposition is therefore disputed.

10-25.    These paragraphs describe or quote the Final Report.  The paragraphs are undisputed insofar as they describe or quote the Final Report accurately.

26-28.  Undisputed.

29-30.  These paragraphs are plaintiff's counsel's subjective characterization of the memorandum dated April 22, 1998, from "HRC Team" to "All OIC Attorneys" captioned "Summary of Evidence [redacted] Hillary Rodham Clinton and Webb Hubbell" (Evidence Mem.), ECF Nos. 12-3 to 12-7.  *See* Orfanedes Decl. ¶ 7.  These paragraphs are therefore disputed.

31.  This paragraph describes the Evidence Memorandum.  The paragraph is undisputed insofar as it describes the Evidence Memorandum accurately.

32.  The statement that the Evidence Memorandum is "largely unredacted" is plaintiff's counsel's subjective characterization of the Evidence Memorandum.  *See* Orfanedes Decl. ¶ 8.  That statement is therefore disputed.  It is undisputed that records purporting to be the records described in this paragraph are posted on plaintiff's website.

33.  Undisputed that plaintiff did not pursue an administrative appeal.  NARA cannot confirm the accuracy of the remainder of this paragraph.

34-35.  Undisputed.

36.  Disputed.  A Google search on April 12, 2016, using the term "Starr Report" yielded 75,200 results.

37.  Disputed.  A Google search on April 12, 2016, using the term "Hillary Clinton draft indictment" yielded 433,000 results.

38.  This paragraph characterizes certain press reports.  *See* ECF No. 12-1 ¶ 11.  The

paragraph is undisputed insofar as it characterizes the press reports accurately.

<div style="margin-left: 40%;">

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

CHANNING D. PHILIPS
United States Attorney

ELIZABETH J. SHAPIRO
Deputy Director

s/ *David M. Glass*
DAVID M. GLASS, DC Bar 544549
Senior Trial Counsel
Department of Justice, Civil Division
20 Massachusetts Ave., N.W., Room 7200
Washington, D.C.  20530-0001
Tel: (202) 514-4469/Fax: (202) 616-8470
E-mail: david.glass@usdoj.gov
Attorneys for Defendant

</div>

Dated: April 18, 2016

# **EXHIBIT 1**

to

Plaintiff's Reply to Defendant's Opposition to Plaintiff's
Cross-Motion for Summary Judgment

USCA Case #16-5366   Document #1668146   Filed: 03/28/2017   Page 382 of 421

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.  15-cv-1740 (RBW) |
| v. | ) | |
| | ) | |
| NATIONAL ARCHIVES AND | ) | |
| RECORDS ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## SECOND DECLARATION OF PAUL J. ORFANEDES

I, Paul J. Orfanedes, hereby declare as follows:

1.       This is my second declaration in the above-captioned matter.  I submit this second declaration to supplement my March 11, 2016 declaration and to provide further analysis of Chapter 3, Volume II, Part B of the January 5, 2001 Final Report of the Independent Counsel in *In re Madison Guaranty Savings and Loan Association* ("the Report") and the 206-page memorandum, dated April 22, 1998, to "All OIC Attorneys," from the "HRC Team" and bearing the subject line "Summary of Evidence:  Hillary Rodham Clinton and Webb Hubbell" ("Evidence Memorandum").  A true and correct copy of Chapter 3 of the Report is attached as Exhibit 2 to Plaintiff's Response to Defendant's Statement of Material Facts Not in Dispute and Statement of Undisputed Material Facts in Support of Cross-Motion for Summary Judgment.  A true and correct copy of the Evidence Memorandum is attached as Exhibit 3 to that same document.

2.       In submitting my March 11, 2016 declaration, I prepared two charts identifying the various sources of information relied on, cited, and quoted in the Report and the Evidence

379

Memorandum, respectively.  A true and correct copy of the chart I created for the Report is attached to my March 11, 2016 declaration as Exhibit A.  A true and correct copy of the chart I created for the Evidence Memorandum is attached to my March 11, 2016 declaration as Exhibit B.

3.      I subsequently compared the grand jury sources of information identified on the two charts to determine whether the Evidence Memorandum included grand jury testimony not included in the Report.  Specifically, I identified those witnesses whose grand jury testimony was included in both the Report and the Evidence Memorandum – ten witnesses in total.  (Two witnesses, Webster Hubbell and Rick Massey, had appeared before the grand jury on at least two occasions, and both the Report and the Evidence Memorandum included grand jury testimony from these different appearances.)  For each grand jury witness's testimony identified on both charts, I reviewed the pages of the Report and the pages of the Evidence Memorandum on which the witness's grand jury testimony were included and noted the page numbers of the witness's grand jury testimony.  I then prepared a third chart, a true and correct copy of which is attached hereto as Exhibit C, comparing the page numbers of the witness's grand jury testimony included in both the Report and Evidence Memorandum.  The page numbers of each witness's grand jury testimony that are included in the Evidence Memorandum, but are not included in the Report are bolded and italicized.  For example, pages 12, 13, and 21-22 of Mr. Joe Giroir's July 18, 1996 grand jury testimony are included in the Evidence Memorandum, but are not included in the Report; pages 115-16 of Webster Hubbell's August 22, 1996 grand jury testimony are included in the Evidence Memorandum, but are not included in the Report; pages 77-78, 105-06, and 114 of James McDougal's April 2, 1997 grand jury testimony are included in the Evidence

USCA Case #16-5366   Document #1668146   Filed: 03/28/2017   Page 384 of 421

Memorandum, but are not included in the Report, etc.  The results of my analysis are set forth fully in Exhibit C.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 2, 2016 in Washington, D.C.

Paul J. Orfanedes

# **EXHIBIT C**

to

Second Declaration of Paul J. Orfanedes

# COMPARISON OF APRIL 22, 1998 SUMMARY OF EVIDENCE MEMORANDUM AND JANUARY 5, 2001 FINAL REPORT – ADDITIONAL GRAND JURY MATERIAL DISCLOSED IN THE EVIDENCE MEMORANDUM

Page numbers of grand jury testimony made public by disclosure of the Summary of Evidence Memorandum and not previously made public by the Final Report, are bolded and italicized.

1.  Joe Giroir – July 18, 1996 Grand Jury Testimony

    Memo:         Page Nos. *12, 13, 21-22*, and 23-27.

    Report:       Page Nos. 23-27.

2.  Sarah Handley – October 31, 1995 Grand Jury Testimony

    Memo:         Page No. 22.

    Report:       Page No. 22.

3.  William Henley – June 18, 1996 Grand Jury Testimony

    Memo:         Page Nos. *7*, 27, and 50.

    Report:       Page Nos. 24, 27, 30, 33-34, 46-47, and 50-51.

4.  Webster Hubbell – December 19, 1995 Grand Jury Testimony

    Memo:         Page Nos. *91* and *187-88*.

    Report:       Page Nos. 43-44, 46, 61-62, 67, and 177-78.

5.  Webster Hubbell – August 22, 1996 Grand Jury Testimony

    Memo:         Page Nos. *115-16*.

    Report:       Page Nos. 24, 35-36, 41-43, 49-50, 57-59, 60, 67, 79, 90, 93,

                  98, and 108

6.     Loretta Lynch – February 1, 1996 Grand Jury Testimony

Memo:          Page Nos. *12, 16-17, 18, 19-20, 24-25, 37, 40, 41, 44, 45, 48-49,*

*51-52, 53, 55-56, 66*, and *73-74.*

Report:        Page Nos. 9 and 10-11.

7.     Rick Massey – November 7, 1995 Grand Jury Testimony

Memo:          Page Nos. 21, 32, 33, 82, 84-85, *86*, and *88.*

Report:        Page Nos. 5, 21-23, 32, 33-34, 43, 45, 82, 84-85, and 95-96.

8.     Rick Massey – December 3, 1997 Grand Jury Testimony

Memo:          Page Nos. *34-35, 40, 56, 59*, and *60.*

Report:        Page Nos. 24, 25, 37-38, and 63-64.

9.     James McDougal – April 2, 1997 Grand Jury Testimony

Memo:          Page Nos. *77-78, 105-06*, and *114.*

Report:        Page Nos. 97, 98, 99, 100, 103-04, and 108-09.

10.    Rae Ann Moles – October 19, 1995 Grand Jury Testimony

Memo:          Page Nos. 18, *19-20*, 22, and 24.

Report:        Page Nos. 18, 22, 24, and 26-27.

11.    Susan Thomases – February 29, 1996 Grand Jury Testimony

Memo:          Page Nos. *22-23, 34, 36, 44*, 45, *47, 49, 53 56, 57-58, 60, 62-63*,

and *67-68.*

Report:        Page Nos. 45.

12.   Seth Ward – January 17, 1996 Grand Jury Testimony

Memo:        No page numbers identified, but, based on the material cited (Ward's admissions of "all the factual predicates that make him a staw[man buyer]"), it appears to relate to a different subject matter than the materials cited in the Report.

Report:        Page Nos. 31-32, 62, and 82-83.

USCA Case #16-5366   Document #1668146   Filed: 03/28/2017   Page 389 of 421

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
_____
                                )
JUDICIAL WATCH, INC.,           )
                                )
            Plaintiff,          )
                                )
      v.                        )        Civil Action No. 15-1740 (RBW)
                                )
NATIONAL ARCHIVES AND           )
RECORDS ADMINISTRATION,         )
                                )
            Defendant.          )
_____)
```

## ORDER

In accordance with the Memorandum Opinion, issued on this same date, it is hereby

**ORDERED** that the defendant National Archives and Records Administration's Motion

for Summary Judgment is **GRANTED**. It is further

**ORDERED** that the plaintiff Judicial Watch, Inc.'s Cross-Motion for Summary

Judgment is **DENIED**. It is further

**ORDERED** that this case is **CLOSED**.

**SO ORDERED** this 4th day of October, 2016.

REGGIE B. WALTON
United States District Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                    )
JUDICIAL WATCH, INC.,               )
                                    )
            Plaintiff,              )
                                    )
      v.                            )        Civil Action No. 15-1740 (RBW)
                                    )
NATIONAL ARCHIVES AND               )
RECORDS ADMINISTRATION,             )
                                    )
            Defendant.              )
_____)

## MEMORANDUM OPINION

The plaintiff, Judicial Watch, Inc., filed this civil case, alleging that the defendant, the

National Archives and Records Administration ("Archives"), violated the Freedom of

Information Act ("FOIA"), 5 U.S.C. § 552 (2012), by improperly withholding records subject to

disclosure under the FOIA. Complaint ("Compl.") ¶¶ 10-12. Currently before the Court are the

Defendant's Motion for Summary Judgment ("Def.'s Mot."), ECF No. 10, and the Plaintiff's

Cross-Motion for Summary Judgment ("Pl.'s Mot."), ECF No. 13. After carefully considering

all of the relevant submissions by the parties, the Court concludes for the following reasons that

it must grant the defendant's motion for summary judgment and deny the plaintiff's cross-motion

for summary judgment.[1]

_____

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its
decision: (1) the defendant's Memorandum in Support of Defendant's Motion for Summary Judgment ("Def.'s
Mem."); (2) the Defendant's Statement Under LCvR 7(h)(1) ("Def.'s Facts"); (3) the Plaintiff's Opposition to
Defendant's Motion for Summary Judgment and Cross-Motion for Summary Judgment ("Pl.'s Opp'n"); (4) the
Plaintiff's Response to Defendant's Statement of Material Facts Not in Dispute and Statement of Undisputed
Material Facts in Support of Cross-motion for Summary Judgment ("Pl.'s Facts"); (5) the Defendant's Combined
Reply in Support of its Motion for Summary Judgment and Opposition to Plaintiff's Cross-Motion for Summary
Judgment ("Def.'s Resp."); and (6) the Plaintiff's Reply to Defendant's Opposition to Plaintiff's Cross-Motion for
Summary Judgment ("Pl.'s Reply").

## I.   BACKGROUND

In January 1994, Robert B. Fiske, Jr. was appointed as independent counsel by United States Attorney General Janet Reno, "to investigate allegations of criminal activity in connection with a defunct Arkansas thrift institution, the Madison Guaranty Savings & Loan Association ("Madison Guaranty")." Pl.'s Facts ¶ 1. Among other matters, the independent counsel was tasked with investigating Hillary Clinton's involvement with Madison Guaranty, as well as an Arkansas real estate venture named "Whitewater Development Company, Inc.," and an investment company named "Capital Management Services." Id. ¶ 4. In August of 1994, Kenneth Starr replaced Mr. Fiske as independent counsel. Id. ¶ 6. Five reports detailing the investigation were ultimately prepared by the independent counsel, id. ¶ 7, and are currently publicly available on the United States Government Publishing Office's website, id. ¶ 9. Included in the reports is information gathered from numerous sources, including but not limited to, interviews, deposition testimony, grand jury testimony from twenty-one witnesses, and interrogatory responses. Id. ¶¶ 23-25.

Specifically, one of the reports describes Mrs. Clinton's legal representation of Madison Guaranty regarding "numerous criminal and other fraudulent acts" between April 1985 and July 1986. Id. ¶¶ 10-13. During the course of the independent counsel's investigation, Mrs. Clinton "made numerous statements and gave sworn testimony regarding her representation of Madison Guaranty," id. ¶ 20, and the independent counsel investigated whether Mrs. Clinton "had committed perjury, made false statements, or obstructed justice during those investigations," id. ¶ 21, ultimately concluding that "there was insufficient evidence to prove beyond a reasonable doubt that Mrs. Clinton had committed any federal criminal offense," id. ¶ 22. Upon termination of the investigation by the independent counsel, federal law mandates that custody of the records

USCA Case #16-5366   Document #1668146   Filed: 03/28/2017   Page 392 of 421

compiled by the independent counsel be transferred to the Archives, see 28 U.S.C. § 594(k)(1)

(2000), which now maintains custody of the records of the "independent counsels who served

under Title VI of the Ethics in Government Act of 1978," Def.'s Facts ¶ 1, ECF No. 10-4.

Included in the records are "drafts of a proposed indictment of Hillary Rodham Clinton." Id. ¶ 4.

By letter dated March 9, 2015, the plaintiff submitted a request to the Archives under the

FOIA for the following records:

> All versions of indictments against Hillary Rodham Clinton, including, but not
> limited to, Versions 1, 2, and 3 in box 2250 of the Hickman Ewing[2] Attorney
> Files, the "HRC/_Draft Indictment" in box 2256 of the Hickman Ewing Attorney
> Files, as well as any [and] all versions written by Deputy Independent Counsel
> Hickman Ewing, Jr. prior to September of 1996.

Id. ¶ 8. The Archives "responded to [the] plaintiff's request by locating the two boxes of records

of Mr. Starr and his successors," both which contain drafts of proposed indictments of Mrs.

Clinton, but no other responsive documents. Def.'s Mem. at 3. By letter dated March 19, 2015,

the Archives advised the plaintiff that it "ha[d] examined the folders from Hickman Ewing's

attorney files that [the plaintiff] requested" and was withholding the folders entitled "Draft

Indictment" from box 2250 and "Hillary Rodham Clinton/Webster L. Hubbell Draft Indictment"

from box 2256 in full pursuant to Exemption (7)(C). Def.'s Mot., Exhibit ("Ex.") C at 1.

By letter dated May 14, 2015, the plaintiff appealed administratively the withholding of

the above referenced records, see Compl. ¶ 7, and on October 20, 2015, the plaintiff commenced

this action, requesting that the Court compel the Archives to comply with the FOIA and refrain

from unlawfully withholding documents responsive to its FOIA request, see id. ¶ 11. The

defendant now moves for summary judgment, asserting that it is entitled to judgment as a matter

of law because the drafts of the proposed indictments are protected from disclosure under several

---

[2] Hickman Ewing was a lawyer who worked as Kenneth Starr's deputy in Little Rock, Arkansas. Def.'s Facts ¶ 9.

FOIA exemptions and Rule (6)(e) of the Federal Rules of Criminal Procedure ("Rule 6(e)"). Def.'s Mem. at 1. In addition to opposing the defendant's motion for summary judgment, the plaintiff also cross moves for summary judgment, arguing that the defendant has not satisfied its burden of proving that FOIA exemptions are applicable to the withheld responsive documents and that Rule 6(e) does not apply to the Archives. Pl.'s Opp'n at 1, 9.

## II.   STANDARD OF REVIEW

The Court must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000)). The Court must therefore draw "all justifiable inferences" in the non-moving party's favor and accept the non-moving party's evidence as true. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The non-moving party, however, cannot rely on "mere allegations or denials." Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting Anderson, 477 U.S. at 248). Thus, "[c]onclusory allegations unsupported by factual data will not create a triable issue of fact." Pub. Citizen Health Research Grp. v. Food & Drug Admin., 185 F.3d 898, 908 (D.C. Cir. 1999) (alteration in original) (quoting Exxon Corp. v. Fed. Trade Comm'n, 663 F.2d 120, 126-27 (D.C. Cir. 1980)). If the Court concludes that "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then the moving party is entitled to summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). However, at bottom, "in ruling on cross-motions for summary judgment, the [C]ourt shall grant summary judgment only if one of the moving parties is entitled to

judgment as a matter of law upon material facts that are not genuinely disputed." <u>Shays v. Fed.</u> <u>Election Comm'n</u>, 424 F. Supp. 2d 100, 109 (D.D.C. 2006) (citation omitted).

FOIA cases are typically resolved on motions for summary judgment. <u>Ortiz v. U.S.</u> <u>Dep't of Justice</u>, 67 F. Supp. 3d 109, 116 (D.D.C. 2014); <u>Defenders of Wildlife v. U.S. Border</u> <u>Patrol</u>, 623 F. Supp. 2d 83, 87 (D.D.C. 2009). "[The] FOIA requires federal agencies to disclose, upon request, broad classes of agency records unless the records are covered by the statute's exemptions." <u>Students Against Genocide v. Dep't of State</u>, 257 F.3d 828, 833 (D.C. Cir. 2001) (citation omitted). In a FOIA action, the defendant agency has "[the] burden of demonstrating that the withheld documents [requested by the FOIA requester] are exempt from disclosure." <u>Boyd v. Dep't of Justice</u>, 475 F.3d 381, 385 (D.C. Cir. 2007) (citation omitted). The Court will grant summary judgment to the government in a FOIA case only if the agency can prove "that it has fully discharged its obligations under the FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." <u>Friends</u> <u>of Blackwater v. Dep't of Interior</u>, 391 F. Supp. 2d 115, 119 (D.D.C. 2005) (quoting <u>Greenberg</u> <u>v. U.S. Dep't of Treasury</u>, 10 F. Supp. 2d 3, 11 (D.D.C. 1998)). Thus, in a lawsuit brought to compel the production of documents under the FOIA, "an agency is entitled to summary judgment if no material facts are in dispute and if it demonstrates 'that each document that falls within the class requested either has been produced . . . or is wholly[, or partially,] exempt [from disclosure].'" <u>Students Against Genocide</u>, 257 F.3d at 833 (quoting <u>Goland v. Cent. Intelligence</u> <u>Agency</u>, 607 F.2d 339, 352 (D.C. Cir. 1978)).

## III.   ANALYSIS

The issue before the Court in this case is whether the defendant properly withheld the draft indictments pursuant to Exemptions 3, 6 and 7(C) of the FOIA and Rule 6(e). Congress

amended the FOIA resulting in its current content in 1966, with the objective of promoting "full agency disclosure." See U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 754 (1989). When an agency receives a request for records that reasonably describe such records, the agency must make those records available to the requester. See id. at 754-55. While there are nine expressly delineated exemptions from compelled disclosure, the dominant objective of the act is disclosure, not secrecy. See Dep't of Air Force v. Rose, 425 U.S. 352, 360-61 (1976). The Supreme Court has explained this basic purpose as providing a way for citizens to "know what their government is up to." See Reporters Comm., 489 U.S. at 773. Thus, courts should narrowly construe the statutory exemptions when determining if records requested under the FOIA should be disclosed. See Rose, 425 U.S. at 361.[3]

## A. FOIA Exemptions

### 1. Exemption 3

Exemption 3 of the FOIA excludes from compelled disclosure matters that are "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3). A statute satisfies Exemption 3 only if it "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue," or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." Id. The plaintiff does not dispute that Rule 6(e), which prohibits disclosure of "matter[s] occurring before the grand jury," Fed. R. Crim. P. 6(e), is considered a "statute" for purposes of Exemption 3. Pl.'s Opp'n at 9; see also Fund for Const. Gov't v. Nat'l Archives & Records Serv., 656 F.2d 856, 867-68 (1981). Instead, the plaintiff

---

[3] The plaintiff does not contest that the Archives satisfied the search requirements under the FOIA. Upon initially receiving a FOIA request, an agency must conduct an adequate search for responsive documents and can satisfy the threshold by "demonstrat[ing] beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" See Boyd v. Exec. Office for U.S. Attorneys, 87 F. Supp. 3d 58, 70 (D.D.C. 2015) (citing cases). The FOIA request in this case specifically requested "[a]ll versions of indictments against Hillary Rodham Clinton," and the draft indictments that were discovered are the subjects of this case. Compl. ¶ 5. Thus, the Court need not further discuss the adequacy of the search conducted by the Archives.

asserts that Rule 6(e) does not in itself apply to the Archives, nor is it applicable to the drafts of the proposed indictments because they do not fall within the purview of matters occurring before the grand jury and because the information in the drafts is sufficiently public to warrant disclosure. The Court will address each of the plaintiff's arguments in turn.

### a. The Applicability of Rule 6(e)

Rule 6(e) specifies seven categories of persons that are bound by the Rule's secrecy provision and expressly provides that "[n]o obligation of secrecy may be imposed on any person except in accordance with Rule 6(e)(2)(B)." Fed. R. Crim. P. 6(e)(2)(A). The seven categories of persons who "must not disclose a matter occurring before the grand jury" are: (i) a grand juror, (ii) an interpreter, (iii) a court reporter, (iv) an operator of a recording device, (v) a person who transcribes recorded testimony, (vi) an attorney for the government, or (vii) a person to whom disclosure is made under Rule 6(e)(3)(A)(ii) or (iii). Fed. R. Crim. P. 6(e)(2)(B). The plaintiff contends that because the Archives is not explicitly included in the delineated list, Rule 6(e) secrecy "does not apply to the Archives." Pl.'s Opp'n. at 9. The Court, however, is unpersuaded.

The District of Columbia Circuit has held that an independent counsel is an attorney for the government, which is one of the seven categories, and thus, "is covered by Rule 6(e) and its bonds of secrecy." In re North, 16 F.3d 1234, 1244 (D.C. Cir. 1994). Upon termination of the Office of Independent Counsel, the active independent counsel was obligated to transfer all records which had been created during its tenure to the Archivist of the United States ("Archivist"), 28 U.S.C. § 594(k)(1), and was to "clearly identify which of [those] records [were] subject to rule 6(e)," In re North, 16 F.3d at 1244 (quoting 28 U.S.C. § 594(k)(1)). Furthermore, the Archivist is "responsible for the custody, use, and withdrawal of records transferred to him."

44 U.S.C. § 2108 (2012).  A FOIA analysis of whether to disclose records that have been transferred to the Archives is conducted as if the records remain in the possession of the agency that created them.  See Cause of Action v. Nat'l Archives & Records Admin., 753 F.3d 210, 216 (D.C. Cir. 2014) (holding that transfer of possession to the Archives did not affect the document's status under the FOIA because the Court was "confident that Congress did not intend to expose . . . material to FOIA simply because the material ha[d] been deposited with the Archives"); see also Fund for Const. Gov't, 656 F.2d at 870 (allowing the withholding of the documents at issue even when custody of the documents had been transferred to the Archives). By its own language, the statute governing the Archives provides that the statutory restrictions applicable to an agency also transfer with the records being transferred to the Archives.  See 44 U.S.C. § 2108 ("When records, the use of which is subject to statutory limitations and restrictions, are so transferred, permissive and restrictive statutory provisions with respect to the examination and use of records applicable to the head of the agency from which the records were transferred or to employees of that agency are applicable to the Archivist and to the employees of the National Archives and Records Administration, respectively.").

Because Rule 6(e) applies to the independent counsel, see In re North, 16 F.3d at 1244, and the restrictive statutory provisions that apply to the independent counsel also apply to the Archivist under the express language of 44 U.S.C. § 2108, the Court finds that Rule 6(e) also applies to the Archives.  Prior to the transfer of the draft indictments to the Archives, Rule 6(e) shielded the documents from potential disclosure because the rule extended to the independent counsel as an attorney for the government.  And, just as in Cause of Action v. National Archives & Records Administration, 753 F.3d at 216, where the transfer of documents to the Archives did not affect their FOIA status, the fact that the draft indictments were transferred to the Archives

does not alter the Archives' aptitude to protect the draft indictments from potential disclosure under Rule 6(e). Therefore, the Court finds that Rule 6(e) applies to the Archives.

### b.  The Protections Provided by Rule 6(e)

The defendant contends that the drafts of the proposed indictments are protected from disclosure under Exemption 3 and Rule 6(e) because they "would tend to reveal the secret workings of the grand jury." Def.'s Mem. at 8 (citing Boehm v. FBI, 948 F. Supp. 2d 9, 27 (D.D.C. 2013)). The plaintiff responds that the Archives has failed to meet its burden of showing that the draft indictments constitute "matter[s] occurring before the grand jury," Pl.'s Opp'n at 18, because it relies upon a declarant who "paints with far too broad of a brush," id. at 14, and presents "opaque and shifting, if not contradictory, testimony," Pl.'s Reply at 9.

Although Rule 6(e) prohibits disclosure of "matter[s] occurring before [a] grand jury," it should not be read in a manner that creates "a veil of secrecy . . . over all matters occurring in the world that happen to be investigated by a grand jury." Senate of P.R. ex rel. Judiciary Comm. v. U.S. Dep't of Justice, 823 F.2d 574, 582 (D.C. Cir. 1987) (quoting SEC v. Dresser Indus., Inc., 628 F.2d 1368, 1382 (D.C. Cir. 1980) (en banc)). "There is no per se rule against disclosure of any and all information which has reached the grand jury chambers . . . ." Senate of P.R., 823 F.2d at 582. Rather, "the touchstone is whether disclosure would 'tend to reveal some secret aspect of the grand jury's investigation,'" such as "the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of jurors and the like." Id. And, there must be a "nexus between disclosure and revelation of a protected aspect of the grand jury's investigation." Lopez v. Dep't of Justice, 393 F.3d 1345, 1350 (D.C. Cir. 2005) (quoting Senate of P.R., 823 F.2d at 584).

Furthermore, information such as the names of grand jury witnesses and a draft of a

grand jury indictment "tend to reveal the secret workings of the grand jury." Boehm, 948 F.

Supp. 2d at 27 (finding withholding of draft indictment appropriate under Exemption 3). So too

does grand jury testimony. Boyd, 87 F. Supp. 3d at 83 ("[G]rand jury testimony is precisely the

type of information that the provision is designed to protect."). When determining whether to

qualify withheld material as "grand jury" material, it is appropriate to rely on statements by the

government's declarant. See Davis v. U.S. Dep't of Justice, 970 F. Supp. 2d 10, 17 (D.D.C.

2013) (Walton, J.) (allowing withholding of documents based on declarant's statements that

revealing them would impermissibly reveal grand jury information).

   Here, the drafts of the proposed indictment sought by the plaintiff would likely tend to

reveal the inner workings of the grand jury, just like the draft indictments in Boehm, 948 F.

Supp. 2d at 27. The Archives has presented two declarations from Martha Wagner Murphy, the

Chief of the Special Access and FOIA Branch, Research Services at the Archives, outlining the

contents of the draft indictments. See Def.'s Mem., Ex. A (Declaration of Martha Wagner

Murphy ("First Murphy Decl.")) at 1, 8-12; Def.'s Response, Ex. A (Second Declaration of

Martha Wagner Murphy ("Second Murphy Decl.")) at 3-5. In her first declaration, Ms. Murphy

explains that the drafts of the proposed indictment

> collectively reflect[] names and identifying information of individuals subpoenaed
> – or intended to be subpoenaed – to testify before the grand jury, as well as
> information identifying specific records subpoenaed during the grand jury
> process. They reflect and quote grand jury testimony, and reveal the inner
> workings and direction of the grand jury. . . . Similarly, the consideration of
> possible witnesses before the Grand Jury, and internal memoranda and notes
> about the strategy and considerations regarding possible indictments reveal the
> direction of the grand jury investigation.

First Murphy Decl. ¶ 25. Consequently, Ms. Murphy concluded that disclosure of the drafts of

the proposed indictment "would violate the secrecy of the grand jury proceedings by disclosing

the inner workings of the federal grand jury that was tasked with considering these matters." Id.

In her second declaration, which served as a supplement "to strengthen [her] explanation of the analytical process that the Archives engaged in when it reviewed the requested documents,"[4] Second Murphy Decl. ¶ 1, Ms. Murphy added:

> Any indictment is a written accusation of a crime and is crafted for the specific purpose of persuading a grand jury to formally charge one or more individuals. These draft indictments reflect the net result of all of the evidence gathered throughout the grand jury investigatory process; they represent a compilation and distillation of all of the evidence gathered and presented before the grand jury up until the time the draft indictments were prepared.  As a result, they are inextricably intertwined with the grand jury process . . . . [And] none of the drafts that we reviewed contained information that we determined had been obtained separate from the grand jury process.

Id. ¶¶ 5-6.  Thus, the drafts contain precisely the information that Rule 6(e) is intended to protect – information that "would tend to reveal some secret aspect of the grand jury's investigation."

Senate of P.R., 823 F.2d at 582; see also Boehm, 948 F. Supp. 2d at 27; Boyd, 87 F. Supp. 3d at 83.  More importantly,  "[b]ecause a draft indictment  is inextricably  tied to the Grand Jury process, the development of the indictment,  illuminated  as each draft carefully refines the argument for charging the accused individuals,  provides  a roadmap to that process."  Second Murphy Decl. ¶ 7.  Accordingly,  the Court finds that the drafts of the proposed indictment  would disclose the identity  of individuals  who actually testified before the grand jury and who the independent counsel considered calling  as witnesses, as well as the inner workings of the federal grand jury process that would necessarily show the potential direction of the grand jury proceedings,  given that the independent  counsel likely  drafted the documents based on testimony and other information  presented to that body.

        Moreover,  the plaintiff's  contention that the declarations are too vague, generalized, and

---

[4] The plaintiff asserts that the Second Murphy Declaration contradicts the first by stating in broader terms that "[t]hese draft indictments reflect the net result of all the evidence gathered throughout the grand jury investigatory process; they represent a compilation and distillation of all the evidence gathered and presented before the grand jury."  Pl.'s Reply at 6.  The Court, however, finds the Second Murphy Declaration to be consistent, as it merely elaborates on the first.

conclusory to satisfy the Archives' burden is unavailing.  The plaintiff cites Citizens for

Responsibility & Ethics in Washington v. U.S. Dep't of Justice, 746 F.3d 1082, 1100 (D.C. Cir.

2014), as support for its position that the conclusory descriptions of grand jury material

contained in the draft indictments are not sufficient to warrant their withholding.  There,

however, the defendant's declaration asserted that "the documents contain[ed] information that

'could be used as evidence before a Federal Grand Jury' or 'may be subpoenaed by a Federal

Grand Jury[,]'" Citizens for Responsibility, 746 F.3d at 1100 (emphasis in original), whereas

here, the defendant contends that information that "would reveal some secret aspect of the grand

jury investigation," including "the identities of witnesses, the substance of testimony, [and] the

strategy or direction of the investigation," Senate of P.R., 823 F.2d at 582, is affirmatively

contained in the documents.  Also, the court in Citizens for Responsibility, found fault with the

defendant's failure to specify how many documents were being withheld pursuant to Exemption

3.  Id. But, in this case, the Archives has stated that it is withholding 238 documents responsive

to the plaintiff's FOIA request.  Therefore, unlike the declarations in Citizens for Responsibility,

Ms. Murphy's declarations do not merely state in a conclusory fashion that Rule 6(e) material

has been withheld, but instead specifies the precise nature of the contents of the draft

indictments, sufficiently demonstrating that the withheld material is of the type intended to be

protected by Rule 6(e).

The plaintiff further devotes a significant portion of its argument discussing In re Sealed

Case, 192 F.3d 995 (D.C. Cir. 1999), as support for its contention that the draft indictments are

not matters that occurred before the grand jury.  See Pl.'s Opp'n at 11-13.  Specifically, the

plaintiff argues that In re Sealed places the burden on the agency to show that the withheld

information "will reveal non-public facts known to prosecutors only because of the grand jury's

investigation, not because of [the] prosecutor's own investigations or others' investigations [and] non-public matters that actually occurred or were likely to occur before the grand jury." Id. at 13.

Courts must distinguish between grand jury investigations and coincidental investigations conducted by third parties, such as by independent companies, see Dresser Indus. Inc., 628 F.2d at 1382-83 (holding Rule 6(e) inapplicable to documents that "were created [by a Corporation] for [an] independent corporate purpose" even though government agency subpoenaed the documents while grand jury investigation was being conducted), or prosecutorial investigations, In re Sealed Case, 192 F.3d at 1002-03 (holding mere general statements by Office of Independent Counsel prosecutors to the New York Times regarding their "belief" on the direction of their own investigation did not constitute Rule 6(e) material). When, however, an entity possesses information directly resulting from a grand jury investigation, the material is not coincidental, and Rule 6(e) applies. See Fund for Constitutional Gov't, 656 F.2d at 870 (holding Rule 6(e) applicable because material was not coincidental to grand jury investigation, but rather a direct result of it). The draft indictments are not merely statements of "prosecutorial deliberation" like the statements made by junior attorneys to the New York Times in In re Sealed Case, 192 F.3d at 1001, concerning the possible direction of the investigation in that matter, but rather are documents containing "information that [was not] obtained separate and apart from the grand jury process." Second Murphy Decl. ¶ 6. Likewise, they are not materials prepared coincidentally to the grand jury investigation, but instead were prepared as a direct result of the ongoing grand jury investigation. See id. ¶ 5 ("These draft indictments reflect the net result of all of the evidence gathered throughout the grand jury investigatory process; they represent a compilation and distillation of all of the evidence gathered and presented before the grand jury

up until the time the draft indictments were prepared."). "The relevant inquiry is not whether the party seeking the information has an interest other than in its role in a grand jury investigation, but whether revelation in the particular context would in fact reveal what was before the grand jury." Fund for Const. Gov't, 656 F.2d at 870 (citing Murphy v. FBI, 490 F. Supp. 1138, 1141 (D.D.C. 1980)). Thus, the Archives has established that disclosure of the drafts of the proposed indictment would reveal matters occurring before the grand jury.

In sum, the plaintiff's argument simply seeks to heighten the Archives' burden to a degree of particularized specificity as to the meaning of each word used by the declarant to describe the type of information contained within the withheld documents. However, as the Court noted above, the Archives only bears the burden of showing some "nexus between disclosure and revelation of a protected aspect of the grand jury's investigation." Lopez, 393 F.3d at 1350 (citations omitted). Therefore, because Ms. Murphy's declarations sufficiently establish a "nexus" between disclosing the draft indictments and revealing the inner workings of the grand jury process, the Court finds that the Archives has satisfied its burden of showing that the draft indictments are protected from disclosure under Rule 6(e).[5]

### c.   The Purpose of Rule 6(e)

The plaintiff next argues that the information contained in the draft indictments is sufficiently public to warrant disclosure because the secrecy to be protected by Rule 6(e) no longer exists. "Rule 6(e) does not create a type of secrecy which is waived once public disclosure occurs." In re North, 16 F.3d at 1245 (quoting Barry v. United States, 740 F. Supp.

---

[5] The plaintiff also asserts that, "[t]o the extent [the Archives] claims that it was only following a long-established practice of not disclosing draft indictments unless an indictment was formally issued, then [it] has failed to satisfy its FOIA obligations." Pl.'s Reply at 8 (citing Shapiro v. U.S. Dep't of Justice, 153 F. Supp. 3d 253 (D.D.C. 2016)). The Court, however, does not find that the Archives withheld the drafts pursuant to this practice, but merely used this practice of withholding "any draft indictment of a living person if no indictment is ever formally issued" as a starting point. Second Murphy Decl. ¶ 5. Rather, the Archives explicitly stated that it withheld the drafts in their entirety after reviewing the drafts and determining that they were Rule 6(e) material that should not be disclosed. Id.

888, 891 (D.D.C. 1990)).  However, once information is sufficiently widely known, it has "lost

its character as Rule 6(e) material[, as t]he purpose in Rule 6(e) is to preserve secrecy." Id. at

1244-45 (holding the purported Rule 6(e) material – the final report of the Office of the

Independent Counsel – no longer protected from release because the Independent Counsel's

"four interim reports to Congress included most, if not all, of the 6(e) material now disclosed in

the Final Report.").  To show that withheld information must be disclosed based on prior

disclosure, a plaintiff must show that the specific information sought is already in the public

domain. Elec. Privacy Info. Ctr. v. Nat'l Sec. Agency, 678 F.3d 926, 933 (D.C. Cir. 2012) ("A

plaintiff asserting a claim of prior disclosure bears the burden of pointing to 'specific information

in the public domain that appears to duplicate that being withheld.'"); Davis v. U.S. Dep't of

Justice, 968 F.2d 1276, 1280 (D.C. Cir. 1992) (stating requester must "point to 'specific'

information identical to that being withheld"); see also In re Sealed Case, 192 F.3d at 1004

(holding that usual Rule 6(e) secrecy protecting identity of witnesses did not apply to the

President because it was already widely known that he had testified in front of the grand jury).

　　　　Here, the plaintiff's attempt to demonstrate that the information contained in the draft

indictments is already in the public domain and widely available because of the independent

counsel's final reports and a 206-page memorandum bearing the subject line Summary of

Evidence: Hillary Rodham Clinton and Webb Hubbell ("Evidence Memorandum"), which are

available to the public and contain grand jury information, see Pl.'s Opp'n at 18-19; Pl.'s Reply

at 9, does not rise to the level of specificity required by the District of Columbia Circuit.  The

plaintiff presented two declarations from Paul J. Orfanedes, counsel, officer, and director for

Judicial Watch, Inc., who prepared charts identifying the sources of information included in the

Independent Counsel's January 5, 2001 Final Report ("Final Report") and the Evidence

Memorandum.  See Pl.'s Opp'n, Ex. 1 (Declaration of Paul J. Orfanedes ("First Orfanedes

Decl.")) at 1, 2-5; Ex. A (Chart for Final Report) to Ex. 1 at 4-5; Ex. B (Chart for Evidence

Memorandum) to Ex. 1 at 2-4; see also Pl.'s Reply, Ex. 1 (Second Declaration of Paul J.

Orfanedes ("Second Orfanedes Decl.")) at 2.  Through these declarations and the charts, the

plaintiff purports to show that the Final Report and the Evidence Memorandum "cite[],

reference[], and quote[] testimony" from grand jury witnesses.  First Orfanedes Decl. ¶ 7.  Mr.

Orfanedes also conducted "[G]oogle search[es]" for "Starr Report" and "Hillary Clinton draft

indictment," which rendered 13,200,000 and 547,000 search results respectively.  Id. ¶ 10.  And,

Mr. Orfanedes represents that the plaintiff's "efforts to gain access to the draft indictments has

been the subject of news reports" by various media outlets.  Id. ¶ 11.  While these efforts may

provide some support, the plaintiff has not pointed to specific items of information in the public

domain that sufficiently demonstrate that the information contained in the drafts of the proposed

indictment are publicly available to warrant disclosure.  Instead, the plaintiff contends that

because paraphrased and quoted grand jury testimony was generally released to the public in the

Final Report and the Evidence Memorandum, see Pl.'s Opp'n, Ex. A (Chart for Final Report) to

Ex. 1 at 4-5 (identifying the pin cites of where grand jury testimony was either cited, referenced,

or quoted in the Final Report); Ex. B (Chart for Evidence Memorandum) to Ex. 1 at 2-4

(identifying the pin cites of where grand jury testimony was either cited, referenced, or quoted in

the Evidence Memorandum), the grand jury information in the draft indictments that reveal the

inner workings of the grand jury process must have also been released, and as such, there is no

secrecy left to protect.  The Court is not convinced that such a presumption demonstrates the

level of specificity needed to show that the contents of drafts of the proposed indictments are

sufficiently within the public domain and have lost their exempt status.

Nonetheless, the Archives, in response to a 2005 FOIA request for access to the Evidence Memorandum, "examined that document and compared it to the publicly released" Final Report. Second Murphy Decl. ¶ 3. Because the Archives "understood that [the Evidence Memorandum] may contain non-grand jury material," they conducted

> an analysis of the factual and stylistic presentment in both documents, [which] enabled [them] to draw important distinctions between information in the Evidence Memorandum that had already been released to the public in the Final Report, and that information in the Evidence Memorandum that was considered grand jury information and should continue to be withheld. [This] resulted in a partial release of the Evidence Memorandum with redactions for grand jury material (as well as other redactions).

Id.; see also First Orfanedes Decl., Ex. 3 (Evidence Memorandum).  The Archives conducted the same examination and analysis with respect to the draft indictments, comparing the drafts to the Final Report and the Evidence Memorandum, and concluded that "none of the drafts that we reviewed contained information that we determined had been obtained separate from the grand jury process." Second Murphy Decl. ¶ 6. More importantly, the draft indictments themselves were not released with the Final Report, id. ¶ 4, unlike in In re Sealed Case, "[w]here the general public [was] already aware of the information contained in the prosecutor's statement," which provided the general basis for an indictment of the "[President]'s alleged perjury before a grand jury," and of "the President's status as a witness before the grand jury . . . [because] the President himself went on national television the day of his testimony to reveal this fact . . . well before the New York Times article at issue in [that] case was written," 192 F.3d at 1004, or in In re North, where most, if not all, of the Rule 6(e) material was disclosed in the independent counsel's final report, 16 F.3d at 1245.  Consequently, the Court is not persuaded that the plaintiff has satisfied its burden of demonstrating that the information sought has "lost its character as Rule 6(e) material" due to its alleged considerable availability to the public.

## 2.  Exemptions 6 and 7(C)

The Archives also withheld the drafts of the proposed indictments under Exemptions 6 and 7(c) because the drafts involve a significant privacy interest that is not outweighed by any public interest that would justify disclosure.  Def.'s Mem. at 9.  Because the Archives has invoked both Exemptions 6 and 7(c), the Court will address only the question of whether the drafts were properly withheld under Exemption 7(c).  See Roth v. U.S. Dep't of Justice, 642 F.3d 1161, 1173 (D.C. Cir. 2011) (holding that there is no need to consider Exemption 6 separately if information was "compiled for law enforcement purposes" because Exemption 7(c) constitutes broader protection, so any information falling under Exemption 6 is covered by Exemption 7(c)); accord Gilliam v. U.S. Dep't of Justice, 128 F. Supp. 3d 134, 142 (D.D.C. 2015).  Exemption 7(c) protects "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(c).

Here, it is undisputed that the draft indictments were compiled in the course of the independent counsel's investigation of possible violations of federal law, and thus were compiled for law enforcement purposes.  Def.'s Mem. at 9-10; Pl.'s Opp'n at 19.  The remaining inquiry for the Court is therefore whether the production of the records would constitute an unwarranted invasion of personal privacy.  5 U.S.C. § 552(b)(7)(c).  To make that determination, the Court must first decide whether there is a legitimate privacy interest protected by Exemption 7(c) and then whether there is a countervailing public interest that outweighs it.  See Citizens for Responsibility, 746 F.3d at 1091 (stating "[o]ur task, then, is 'to balance the [] privacy interest against the public interest in disclosure[,]'" after establishing that the requested records were compiled for law enforcement purposes) (some alteration in original) (citing Nat'l Archives &

Records Admin. v. Favish, 541 U.S. 157, 171 (2004)); see also Boyd, 87 F. Supp. 3d at 72-73.

The Court will address each inquiry in turn.

### a.   Hilary Clinton's Personal Privacy Interests

The parties do not dispute that any person other than Mrs. Clinton has any privacy

interest in the drafts of the proposed indictments.   See Pl.'s Opp'n at 19.   They do, however,

disagree on whether Mrs. Clinton has a viable personal privacy interest that precludes an

unwarranted invasion.   See id.   The Archives asserts that "Mrs. Clinton has a significant personal

privacy interest in avoiding disclosure of the drafts of the proposed indictment," Def.'s Mem. at

10, because such disclosure

> would therefore deprive Mrs. Clinton of the ability to "control[] information
> concerning criminal charges" that were never brought against her, see ACLU, 750
> F.3d at 929, thereby depriving her of "[t]he presumption of innocence [that]
> stands as one of the most fundamental principles of our system of criminal
> justice," see id. [at] 933, and "placing [her] in the position of having to defend
> [her] conduct in the public forum outside of the procedural protections normally
> afforded the accused in criminal proceedings." See Fund for Const. Gov't, 656
> F.2d at 865.

Def.'s Response at 13.   The plaintiff responds that the Archives "fails to identify a single,

specific privacy interest [that] Mrs. Clinton still has in the draft indictments following the

publication[s] of the [Final] Report and the Evidence Memorandum," Pl.'s Reply at 11-12, which

was authorized by the District of Columbia Circuit and the Archives respectively, see id., and

"vitiate[d] Mrs. Clinton's privacy interests [upon their] publishing," id. at 13.

When evaluating the privacy interest relevant to Exemption 7(c), "[t]he privacy interest at

stake belongs to the individual, not the government agency." Petrucelli v. Dep't of Justice, 51 F.

Supp. 3d 142, 164 (Walton, J.) (citing Reporters Comm., 489 U.S. at 763-65).   "[I]nformation in

an investigatory file tending to indicate that a named individual has been investigated for

suspected criminal activity is, at least as a threshold matter, an appropriate subject for exemption

under 7(c)." <u>Fund for Const. Gov't</u>, 656 F.2d at 863 (citation omitted). More specifically, "individuals have a strong interest in not being associated unwarrantedly with alleged criminal activity." <u>Petrucelli</u>, 51 F. Supp. 3d at 164 (quoting <u>Stern v. Fed. Bureau of Investigation</u>, 737 F.2d 84, 91-92 (D.C. Cir. 1984)); <u>see also</u> <u>Dunkelberger v. Dep't of Justice</u>, 906 F.2d 779, 781 (D.C. Cir. 1990). This interest is even more substantial when criminal charges were never filed. <u>See</u> <u>Am. Civil Liberties Union v. U.S. Dep't of Justice</u>, 750 F.3d 927, 933 (D.C. Cir. 2014) ("Although the fact that such defendants were accused of criminal conduct may remain a matter of public record, they are entitled to move on with their lives without having the public reminded of their alleged but never proven transgressions.").

Particularly instructive to this case is the District of Columbia Circuit's analysis of privacy interest under Exemption 7(c) in <u>Citizens for Responsibility</u>. 746 F.3d at 1091-93. There, the Circuit discussed a FOIA request in conjunction with an investigation conducted by the Federal Bureau of Investigation ("FBI") of former House of Representatives Majority Leader Tom DeLay, in addition to other suspects. <u>Id.</u> at 1087. Ultimately, the FBI decided not to file charges against Mr. DeLay. In analyzing his privacy interests under the FOIA, the Circuit determined that there are two cognizable interests for individuals in Mr. Delay's position: (1) "avoiding the stigma of having his name associated with a criminal investigation," and (2) a "distinct privacy interest in the <u>contents</u> of the investigative files." <u>Id.</u> at 1091-93. Despite the fact that it was widely known that Mr. DeLay had been the subject of an investigation, the Circuit nonetheless concluded that he still retained a privacy interest in further disclosure of the files entirely. <u>Id.</u>

In this case, the Court agrees with the plaintiff's assertion that Mrs. Clinton no longer has an interest in "avoiding the stigma" of having her name associated with the criminal

investigation at issue, because it is widely known that this investigation was conducted. Pl.'s Opp'n at 20. However, similar to the individuals in American Civil Liberties Union v. U.S. Department of Justice, 750 F.3d at 933 (holding that the defendants had significant privacy interest in being able to proceed forward with their lives by being able to "control[] information concerning criminal charges" never filed against them), Mrs. Clinton has a significant privacy interest in not re-visiting past criminal investigations, particularly when the investigation resulted in an indictment never being filed against her. See Fund for Const. Gov't, 656 F.2d at 864 ("Typically, the decision not to prosecute insulates individuals who have been investigated but not charged from th[e] rather significant intrusion into their lives."). Although Mrs. Clinton, "as a public official at th[at] time, 'may have a somewhat diminished privacy interest,' [she] 'd[id] not surrender all rights to personal privacy.'" Citizens for Responsibility, 746 F.3d at 1092 (quoting Quinon v. FBI, 86 F.3d 1222, 1230 (D.C. Cir. 1996)). And similar to the conclusion reached in Citizens for Responsibility, Mrs. Clinton still maintains an interest in the contents of the drafts of the proposed indictment, despite the fact that it is widely known that she was one of the subjects of an independent counsel investigation.

Moreover, the fact that information about the independent counsel's investigation and potential indictment of Mrs. Clinton is readily available to the public does not extinguish Mrs. Clinton's privacy interest, as the plaintiff asserts. See Pl.'s Opp'n at 19 (discussing the release of the Final Report and the Evidence Memorandum, along with numerous hits returned from Google searches). Although an individual's "interests in privacy fade when the information involved already appears on the public record," ACLU, 655 F.3d at 9 (citing U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 764 n.15 (1989)), "the fact that an event is not wholly private does not mean that an individual has no interest in limiting

disclosure or dissemination of [the requested] information," People for the Ethical Treatment of Animals v. Nat'l Insts. of Health, 745 F.3d 535, 542 (D.C. Cir. 2014) (quoting Reporters Comm., 489 U.S. at 770).

Here, the plaintiff has not shown that the information contained in the drafts of the proposed indictment are widely available to the public, let alone to the extent that the privacy interest Mrs. Clinton has in the drafts is extinguished. "Indeed, if the [drafts of the proposed indictments] were 'freely available,' there would be no reason to invoke the FOIA to obtain access to the information they contain." Reporters Comm., 489 U.S. at 764 ("Plainly there is a vast difference between the public records that might be found after a diligent search . . . and [the requested information.]"). And, contrary to the plaintiff's assumption that this Circuit vitiated Mrs. Clinton's privacy rights in the drafts when it authorized the publishing of the Final Report, the plaintiff has not pointed to any evidence that the Circuit actually considered Mrs. Clinton's privacy rights in regards to the content of the drafts, particularly, in light of the fact that the drafts were not included in the Final Report. Accordingly, the Court finds that Mrs. Clinton has a substantial privacy interest in the contents of the drafts of the proposed indictment.

### b.  Countervailing Public Interest

Having found that Mrs. Clinton has a substantial privacy interest that is protected by Exemption 7(c), the Court turns to the question of whether public interest outweighs Mrs. Clinton's significant privacy interest, justifying disclosure of the draft indictments. The plaintiff asserts that the public has two substantial interests in disclosure,

> both of which directly bear on citizens' right to be informed about what their government is up to: (1) public interest in the actions of the independent counsel; and (2) public interest in the actions of Mrs. Clinton as first lady of the United States, as well as in her subsequent actions as a United States senator, United States secretary of state, and the Democratic Party's presumptive nominee for president of the United States.

Pl.'s Reply at 13.

"The Supreme Court has stated that FOIA is focused 'on the citizens' right to be informed about what their government is up to.'" Computer Prof'ls for Soc. Responsibility v. U.S. Secret Serv., 72 F.3d 897, 904 (D.C. Cir. 1996) (quoting Reporters Comm., 489 U.S. at 773). Once the private nature of a document has been established, whether or not disclosure of that document is warranted "turn[s] on the nature of the requested document and its relationship to 'the basic purpose of the Freedom of Information Act to open agency action to the light of public scrutiny.'" See Reporters Comm., 489 U.S. at 772 (quoting Rose, 425 U.S. at 372). To defeat the privacy interest, the requestor "must (1) 'show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake,' and (2) 'show the information is likely to advance that interest.'" Boyd, 87 F. Supp. 3d at 73 (citation omitted). In determining "what the[] government is up to," the relevant public interest is not to find out what was the substance of an agency investigation, but rather the focus is on the conduct of the agency that performed the investigation:

> Official information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose. That purpose, however, is not fostered by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct. In this case-and presumably in the typical case in which one private citizen is seeking information about another-the requester does not intend to discover anything about the conduct of the agency that has possession of the requested records. Indeed, response to this request would not shed any light on the conduct of any Government agency or official.

Reporters Comm., 489 U.S. at 773. "Information that reveals 'little or nothing about an agency's own conduct' does not further the statutory purpose; thus the public has no cognizable interest in the release of such information." Beck v. Dep't of Justice, 997 F.2d 1489, 1493 (D.C. Cir. 1993) (quoting Reporters Comm., 489 U.S. at 773); see also Davis, 968 F.2d at 1282 (holding that

public interest in individual's alleged involvement in criminal activity insignificant because disclosure would reveal little to nothing about agency conduct, let alone conduct of the agency possessing the documents).  Nonetheless, while the public interest cannot be based purely on gathering information about an individual, there is a cognizable public interest in knowing how a government agency goes about investigating high-ranking officials.  See Citizens for Responsibility, 746 F.3d at 1093-94 (recognizing the significance of public interest in knowing how the FBI investigates high-ranking officials).

The plaintiff, in this case, has not established that the information contained in the drafts of the proposed indictment would yield information about what the government "is up to." Reporters Comm., 489 U.S. at 773.  Initially, the plaintiff asserts that the public has an interest in the activities of the independent counsel, and particularly, how he conducted the investigation of Mrs. Clinton, as evidenced by the results disclosed by its Google searches. Pl.'s Reply at 13-14. However, this public interest in the activities of the independent counsel likely does not rise to the level contemplated by the Circuit in Citizens for Responsibility.  There, the court noted that "we have repeatedly recognized a public interest in the manner in which the [Department of Justice] carries out substantive law enforcement policy." Citizens for Responsibility, 746 F.3d at 1093 ("Disclosure of the records would likely reveal much about the diligence of the FBI's investigation and the [Department of Justice]'s exercise of its prosecutorial discretion: whether the government had the evidence but nevertheless pulled its punches.") And admittedly, if the "investigation implicate[s] a public official as prominent as [Mrs. Clinton,]" the public interest is heightened.  Id. at 1094 ("It may show whether prominent and influential public officials are subjected to the same investigative scrutiny and prosecutorial zeal as local aldermen and little-known lobbyists."). But, how the FBI and other investigative government agencies conduct

investigations concerning criminal misconduct, and in the case of <u>Citizens for Responsibility</u> a concurrent criminal investigation, is different from the activities of a discrete and now defunct government agency that has not been in existence for nearly two decades. More importantly, the plaintiff does not allege misconduct on the part of either the Archives or the Office of the Independent Counsel or present compelling evidence that either agency has engaged in improper activity. <u>See</u> <u>Favish</u>, 541 U.S. at 174 ("[T]he requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred."). Consequently, disclosure of the drafts of the proposed indictment would likely "not shed any light on the conduct of [the Office of the Independent Counsel]," but would rather disclose only information about Mrs. Clinton that is "accumulated in various governmental files." <u>Reporters Comm.</u>, 489 U.S. at 773.

Furthermore, the plaintiff asserts that the public has an interest in the actions of Mrs. Clinton while she previously served as the first lady of the United States, a United States senator, and the United States Secretary of State, as well as her position as the presumptive Democratic Party's nominee for President of the United States.[6] <u>See</u> Pl.'s Opp'n at 23. In making this assertion, the plaintiff recognizes "that, when weighing whether disclosure is in the public interest, D.C. Circuit case law often differentiates between what a record will reveal about an agency's performance of its statutory duties and what that same record will reveal about the actions of a particular individual." <u>Id.</u> at 24 n.12 (citing <u>Citizens for Responsibility</u>, 746 F.3d at 1093). But, the plaintiff argues that Mrs. Clinton was not a private citizen when the investigation

---

[6] Under the FOIA, "an agency's disclosure obligations are triggered by its receipt of a request," <u>Espinoza v. Dep't of Justice</u>, 20 F. Supp. 3d 232, 238 (D.D.C. 2014) (citing 5 U.S.C. § 552(a)(3)(A)), and continue until the "agency proves that it has 'fully discharged its [FOIA] obligations,'" <u>Sciacca v. Fed. Bureau of Investigation</u>, 23 F. Supp. 3d 17, 27 (D.D.C. 2014) (quoting <u>Moore v. Aspin</u>, 916 F. Supp. 32, 35 (D.D.C. 1996)). At the time the Archives determined it had fully discharged its obligations under the FOIA with respect to the plaintiff's FOIA request, Mrs. Clinton was the presumptive nominee for the Democratic Party's candidate for President of the United States.

was conducted, and that she has held other high level federal positions after the investigation was closed and now is seeking the highest office in the federal government and that Circuit case law, "holding that the only relevant public interest is in shedding light on how agencies perform their statutory duties[,] do[es] not address this highly unique factual situation [and is therefore] inapposite." Id. However, the Court is not convinced that it should (or even can) depart from the precedents already established by the Circuit. While Mrs. Clinton was first lady of the United States at the time of the investigation, she was neither part of a government agency nor a government official when the events that were the subject of the independent counsel's investigation occurred, which led to the drafting of the proposed indictments. More importantly, although the plaintiff seeks to cloak the public interest in this case with the veil of seeking to know "what the government 'is up to,' or at least 'was up to' during her tenure in multiple federal offices [and] 'may be up to' should Mrs. Clinton be elected president," Pl.'s Reply at 15, the Court finds that the proper characterization of this public interest is an attempt to obtain information that "bears on Mrs. Clinton's honesty, credibility, and trustworthiness," Pl.'s Opp'n at 23. Thus, disclosure of the drafts of the proposed indictment would not shed light on any agency's performance of its statutory duties, but potentially shed light solely on the character of Mrs. Clinton, independent to her position as a public official, which is not the objective of the FOIA. See Reporters Comm., 489 U.S. at 773.

Accordingly, because the public interests offered by the plaintiff would not advance the purpose of the FOIA, the Court finds that the proffered public interests do not sufficiently outweigh Mrs. Clinton's privacy interests in the drafts of the proposed indictment to justify an unwarranted invasion of Mrs. Clinton's privacy. Therefore, the drafts of the proposed indictment are protected from disclosure under Exemption 7(c).

## B. Segregability

Because the Court has determined that the drafts of the proposed indictment are protected from disclosure by Exemptions 3, 6 and 7(c), its analysis must next address the issue of segregability. The plaintiff asserts that the Archives, in withholding the drafts of the proposed indictment in their entirety, has not "conduct[ed] a proper segregability analysis of each draft and justifie[d] its determinations with detailed, non-conclusory findings." Pl.'s Reply at 18.

The FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). "[I]t has long been the rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." Wilderness Soc'y v. U.S. Dep't of Interior, 344 F. Supp. 2d 1, 18 (D.D.C. 2004) (Walton, J.) (quoting Mead Data Cent., Inc. v. U.S. Dep't of Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977)). "The focus of the FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." Mead, 566 F.2d at 260.

A district court's determination that agency records are exempt from disclosure under the FOIA is subject to remand if the court does not also make specific findings on the question of segregability. See Krikorian v. Dep't of State, 984 F.2d 461, 467 (D.C. Cir. 1993) (remanding back to district court because no specific findings of segregability were made). To make this determination, the district court must be provided with a "relatively detailed description" of the withheld material. Id. (citing Goldberg v. U.S. Dep't of State, 818 F.2d 71, 78 (D.C. Cir. 1987). Agencies must review the withheld documents and determine whether, absent the exempted material, the resulting document would still be comprehensible, or whether "the result would be

an essentially meaningless set of words and phrases." See Mead, 566 F.2d at 261 (stating result

of meaningless set of words may be sufficient to claim that the information is not segregable). A

"document-by-document" review and a declaration that each piece of information that is

withheld is not reasonably segregable is sufficient to satisfy the requirement. See Juarez v. U.S.

Dep't of Justice, 518 F.3d 54, 61 (D.C. Cir. 2008); Beltranena v. U.S. Dep't of State, 821 F.

Supp. 2d 167, 178-79 (D.D.C. 2011).

Here, the Court is satisfied that the Archives has conducted a proper segregability

analysis and may withhold the drafts of the proposed indictment in their entirety. Upon receipt

of a "FOIA request for access to a box or records that a prior Independent Counsel has marked as

containing grand jury material, the Archives examines each individual record in the box to

determine whether each document should be withheld pursuant to Exemption 3 (Fed. R. Crim. P.

6(e))." Second Murphy Decl. ¶ 3. And while the independent counsel's markings are used as a

reference point, the Archives "conduct[s] an independent review in order to make its own

determinations as to whether the material does constitute grand jury information." Id. In its

review of the production request in this case, the Archives decided to withhold all of the

documents it identified as responsive to the plaintiff's request because

> the material collectively reflects names and identifying information of individuals
> subpoenaed – or intended to be subpoenaed – to testify before the grand jury, as
> well as information identifying specific records subpoenaed during the grand jury
> process.   They reflect and quote grand jury testimony, and reveal the inner
> workings and direction of the grand jury.  Disclosure would violate the secrecy of
> the grand jury proceedings by disclosing the inner workings of the federal grand
> jury that was tasked with considering these matters.  Similarly, the consideration
> of possible witnesses before the Grand Jury, and internal memoranda and notes
> about the strategy and considerations regarding possible indictments reveal the
> direction of the grand jury investigation.

First Murphy Decl. ¶ 25. In addition to this detailed description of the contents of the drafts of

the proposed indictment, the Archives submitted a chart, indexing and further describing the

materials.  See id. ¶ 23; see also id., Ex. A (Description of Records of Independent Counsel

Kenneth Starr/Robert Ray/Julie Thomas).  Based on this review, the Archives concluded that all

of the materials are "inextricably intertwined with the grand jury process and are not subject to

segregation . . . [because] none of the drafts that [the Archives] reviewed contained information

that [the Archives] determined had been obtained separate from the grand jury process."  Second

Murphy Decl. ¶¶ 5-6.[7]

The Court finds particularly relevant here, the discussion of segregability in Goland, 607

F.2d at 350, which differentiated the segregability analysis under Exemption 3 from the other

FOIA exemptions.  "Exemption 3 differs from other FOIA exemptions in that its applicability

depends less on the detailed factual contents of specific documents; the sole issue for decision is

the existence of a relevant statute and the inclusion of withheld material within that statute's

coverage."  Id.  Thus, the scope of the exemption is not determined by the FOIA itself, but by the

protective statute that is being invoked under Exemption 3.  See Beltranena, 821 F. Supp. 2d at

179 (noting that when conducting a segregability analysis for material withheld under Exemption

3, "the court is mindful that while an agency must provide a 'detailed justification' for the non-

segregability of any material withheld, an agency is also constrained by the need to avoid

compromising 'the secret nature of potentially exempt information.'") (citations omitted).  As

noted above, the Court is satisfied that the Archives has properly applied Rule 6(e) to protect

grand jury material, and because the Archives has provided a detailed justification for

withholding the drafts of the proposed indictment pursuant to Rule 6(e), the records can be

withheld in their entirety.

The plaintiff also contends that a "mountain of grand jury material" has already been

---

[7] The Archives also represents that the accompanying documents such as the "fax cover pages, notes, and/or memoranda" were likewise withheld because "they were physically attached to – and an integral part of – the drafts."  Second Murphy Decl. ¶ 6.

made public, in light of the release of the independent counsel's Final Report and the Evidence Memorandum, and that the "enormous volume of publicly available material must be taken into account in a proper segregability analysis." Pl.'s Reply at 18. The Court again notes that the draft indictments were not released with either the Final Report or the Evidence Memorandum, and more importantly, the plaintiff has failed to show that the specific information contained in the draft indictments is already in the public domain. Although, the Archives, in response to a FOIA request, provided "a partial release of the Evidence Memorandum with redactions for grand jury material (as well as other redactions)," Second Murphy Decl. ¶ 3, this occurred because the Archives' examination, "which included an analysis of the factual and stylistic presentment of" the Final Report and the Evidence Memorandum, revealed "distinctions between information in the Evidence Memorandum that had already been released to the public in the Final Report, and that information in the Evidence Memorandum that was considered grand jury information and should continue to be withheld.," id. And, in its review of the drafts of the proposed indictment, the Archives "took into account the Final Report, and the redacted Evidence Memorandum." Id. ¶ 4.

Based on the declarations attesting to the review conducted by the Archives, coupled with the chart which indexed and further described the draft indictments, the Court finds that the Archives properly withheld the documents in full.

## IV.   CONCLUSION

For the foregoing reasons, the Court concludes that it must grant the defendant's motion for summary judgment and deny the plaintiff's cross-motion for summary judgment.

**SO ORDERED** this 4th day of October, 2016.[8]

REGGIE B. WALTON
United States District Judge

---

[8] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.

USCA Case #16-5366   Document #1668146   Filed: 03/28/2017   Page 420 of 421

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.  15-cv-1740 (RBW) |
| v. | ) | |
| | ) | |
| NATIONAL ARCHIVES AND | ) | |
| RECORDS ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## NOTICE OF APPEAL

Notice is hereby given that Judicial Watch, Inc., Plaintiff in the above-named case,

hereby appeals to the United States Court of Appeals for the District of Columbia Circuit from

the final judgment entered in this action on October 4, 2016.

Dated:  December 3, 2016

Respectfully submitted,

JUDICIAL WATCH, INC.

*/s/ Paul J. Orfanedes*
Paul J. Orfanedes
D.C. Bar No. 429716
425 Third Street SW, Suite 800
Washington, DC  20024
Tel:     (202) 646-5172
Fax:     (202) 646-5199
Email:  porfanedes@judicialwatch.org

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2017, I filed via the CM/ECF system the foregoing **JOINT APPENDIX** with the Clerk of the Court. Participants in the case are registered CM/ECF users and service will be accomplished by the Appellate CM/ECF system.

I also certify that I caused seven copies to be delivered to the Clerk of Court via hand delivery.

*/s/ Lauren M. Burke*