[NOT YET SCHEDULED FOR ORAL ARGUMENT]

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

No. 16-5366
_____

JUDICIAL WATCH, INC.

Plaintiff-Appellant,

v.

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

Defendant-Appellee.
_____

ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
_____

**BRIEF OF APPELLANT JUDICIAL WATCH, INC.**
_____

Paul J. Orfanedes
Lauren M. Burke
JUDICIAL WATCH, INC.
425 Third Street, S.W., Suite 800
Washington, DC  20024
(202) 646-5172

*Counsel for Plaintiff-Appellant*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Cir. R. 28(a)(1), counsel provides the following information as to parties, rulings, and related cases:

**(A)    Parties and Amici**

The following parties, interveners, and amici curiae appeared, or sought to appear, below:

Plaintiff:                        Judicial Watch, Inc.

Defendant:                   National Archives and Records Administration

The following parties, interveners, and amici curiae are before this Court on appeal:

Plaintiff-Appellant:       Judicial Watch, Inc.

Defendant-Appellee:     National Archives and Records Administration

**(B)    Ruling under Review**

The ruling under review is the Memorandum Opinion and Order of the United States District Court for the District of Columbia (Walton, J.) issued on October 4, 2016.  The ruling can be found at Joint Appendix pages 387-416.  It also is reported at 2016 U.S. Dist. LEXIS 137314 (D.D.C. Oct. 4. 2016).

**(C)    Related Cases**

Judicial Watch, Inc. does not believe there are any cases related to this matter within the meaning of Local R. 28(a)(1)(C).

*/s/ Lauren M. Burke*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS...................................................................................i

TABLE OF AUTHORITIES ........................................................................ ii

GLOSSARY OF ABBREVIATIONS .......................................................vi

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF ISSUES PRESENTED...................................................1

STATUTES AND RULES ...........................................................................1

STATEMENT OF THE CASE......................................................................4

STATEMENT OF FACTS ...........................................................................5

SUMMARY OF THE ARGUMENT ..........................................................12

ARGUMENT ...............................................................................................13

      I.     Standard of Review ...............................................................13

      II.    Exemption 3/Rule 6(e) ........................................................13

      III.   Personal Privacy v. Public Interest......................................23

      IV.   Segregability .........................................................................31

CONCLUSION............................................................................................36

CERTIFICATE OF COMPLIANCE...........................................................37

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                              **Page**

*Allen v. Central Intelligence Agency*,
  636 F.2d 1287 (D.C. Cir. 1980).....................................................15

*Am. Civil Liberties Union v. United States Dep't of State*,
  878 F. Supp.2d 215 (D.D.C. 2012)...............................................31

*Ass'n. of Am. Physicians and Surgeons, Inc. v. Clinton*,
  997 F.3d 898 (D.C. Cir. 1993).......................................................27

*Beck v. Dep't of Justice*,
  997 F.2d 1489 (D.C. Cir. 1993).....................................................26

*Citizens for Responsibility and Ethics in Washington v. United States
  Dep't of Justice*, 746 F.3d 1082 (D.C. Cir. 2014) ................15, 23, 29, 30, 33

*Dep't of the Air Force v. Rose*,
  435 U.S. 351 (1976) .....................................................................13

*In re North*,
  16 F.3d 1234 (D.C. Cir. 1994)......................................................14

*In re Craig*,
  131 F.3d 99 (2d Cir. 1997) ...........................................................14

*In re Grand Jury Investigation*,
  610 F.2d 202 (5th Cir. 1980) ........................................................20

*In re Grand Jury Subpoena*,
  920 F.2d 235 (4th Cir. 1990) ........................................................19

*In re Sealed Case*,
  151 F.3d 1059 (D.C. Cir. 1998).....................................................34

* Authorities upon which Plaintiff-Appellant chiefly relies are marked with asterisks.

**Page**

*In re Sealed Case*, 192 F.3d 995
(D.C. Cir. 1999) .................................................. 13, 14, 15, 16, 19, 21, 23, 34

*Juarez v. United States Dep't of Justice*,
518 F.3d 54 (D.C. Cir. 2008) ........................................................32

*Kimberlin v. Dep't of Justice*,
139 F.3d 944 (D.C. Cir. 1998) ....................................................26, 27

*Larson v. Dep't of State*,
565 F.3d 857 (D.D.C. 2009) ........................................................14

*Lopez v. v. Dep't of Justice*,
393 F.3d 1345 (D.C. Cir. 2005) ...................................................14

*Mead Data Central, Inc. v. United States Dep't of Air Force*,
566 F.2d 242 (D.C. Cir. 1977) .....................................................32

*Nat'l Archives and Records Admin v. Favish*,
541 U.S. 157 (2004) ...................................................................23

*National Ass'n of Retired Fed'l Employees v. Horner*,
879 F.2d 873 (D.C. Cir. 1989) .....................................................26

*Sample v. Bureau of Prisons*,
466 F.3d 1086 (D.C. Cir. 2006) ...................................................13

*Securities and Exchange Comm'n v. Dresser Indus., Inc.*,
628 F.2d 1369 (D.C. Cir. 1980) ...................................................19

*Senate of Puerto Rico v. United States Dep't of Justice*,
823 F.2d 574 (D.C. Cir. 1987) .....................................................14

*Sussman v. United States Marshals Serv.*,
494 F.3d 1106 (D.C. Cir. 2007) ...............................................13, 31

\* Authorities upon which Plaintiff-Appellant chiefly relies are marked with asterisks.

iii

<u>Page</u>

*Trans-Pacific Policing Agreement v. United States Customs Serv.*,
    177 F.3d 1022 (D.C. Cir. 1999)......................................................................31

*United States v. Hitt*,
    249 F.3d 1010 (D.C. Cir. 2001).....................................................................16

*United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
    489 U.S. 749 (1989)......................................................................................26

## Rules and Statutes

Fed. R. App. P. 4(a)(1)(B) ..................................................................................1

Fed. R. Crim. P. 6(e) ..........................................................................................3

*Fed. R. Crim. P. 6(e)(2) ...................................................................................3

Fed. R. Crim. P. 6(e)(2)(B) ...........................................................................3, 35

Fed. R. Crim. P. 7(c)(1) ....................................................................................16

5 U.S.C. § 552(a)(4)(B) .....................................................................................13

5 U.S.C. § 552(b) ..........................................................................................1, 31

5 U.S.C. § 552(b)(3)......................................................................................1, 13

5 U.S.C. § 552(b)(7)(C) .....................................................................................23

28 U.S.C. § 594(h) ..............................................................................................5

28 U.S.C. § 594(h)(1)..........................................................................................5

28 U.S.C. § 594(h)(2).....................................................................................6, 26

**Page**

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331 ...................................................................................1


**Miscellaneous**

Miller, S.A., "Schumer demands Sessions resign, seeks special prosecutor
     for Russia investigation," *Washington Times* (March 2, 2017) ...................31

\* Authorities upon which Plaintiff-Appellant chiefly relies are marked with Asterisks.

## GLOSSARY OF ABBREVIATIONS

FOIA                          Freedom of Information Act

JA                            Joint Appendix

NARA                          National Archives and Records Administration

OIC                           Office of Independent Counsel

# JURISDICTIONAL STATEMENT

The U.S. District Court for the District of Columbia (the "District Court") had jurisdiction pursuant to 28 U.S.C. § 1331, because this FOIA action arises under federal law.  Jurisdiction over this appeal is proper under 28 U.S.C. § 1291, as the appeal is taken from a final judgment.  The appeal is timely under Rule 4(a)(1)(B) of the Federal Rules of Appellate Procedure under because the District Court entered its final judgment on October 4, 2016 and the notice of appeal was filed on December 3, 2016.  JA 387 and 417.

## STATEMENT OF ISSUES PRESENTED

1. Whether the NARA properly withheld the draft indictments under Rule 6(e) of the Federal Rules of Criminal Procedure and FOIA Exemption 3.

2. Whether NARA properly withheld the draft indictments under FOIA Exemptions 6 and 7(C).

## STATUTES AND RULES

**5 U.S.C. § 552(b):**

(b)    This section does not apply to matters that are—

\*    \*    \*

(3)    specifically exempted from disclosure by statute (other than section 552b of this title), if that statute—

1

(A)

(i)    requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

(ii)   establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

(B)    if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

\*   \*   \*

(6)    personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(7)    records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations

2

or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual.

**Fed. R. Crim. P. 6(e)(2):**

(2)    Secrecy.

    (A)    No obligation of secrecy may be imposed on any person except in accordance with Rule 6(e)(2)(B).

    (B)    Unless these rules provide otherwise, the following persons must not disclose a matter occurring before the grand jury:

        (i)    a grand juror;

        (ii)    an interpreter;

        (iii)    a court reporter;

        (iv)    an operator of a recording device;

        (v)    a person who transcribes recorded testimony;

        (vi)    an attorney for the government; or

        (vii)    a person to whom disclosure is made under Rule 6(e)(3)(A)(ii) or (iii).

## STATEMENT OF THE CASE

At issue in this appeal is a draft indictment of Hillary Rodham Clinton. Several versions of the draft were prepared by OIC Deputy Independent Counsel Hickman Ewing, Jr. between 1996 and 1998 and concern false statements allegedly made by Clinton to federal investigators and evidence allegedly withheld by Clinton while she was First Lady of the United States. Various versions of the draft, or portions thereof, have been in NARA's possession, custody, and control since March 2004. Judicial Watch, Inc. asked NARA for the records under FOIA in March 2015. NARA refuses to produce them, citing grand jury secrecy and Clinton's personal privacy.

Because an enormous amount of grand jury and other information from the independent counsel's investigation of Clinton has already been made public, including a January 5, 2001 Final Report of the Independent Counsel and a 206-page "Summary of Evidence Memorandum" detailing the potential charges against Clinton, there is no secrecy or privacy left to protect. NARA's boilerplate assertions to the contrary lack any merit, especially given that the purpose of an indictment is not to present or even summarize evidence, but only to inform a defendant of the nature of the charges.

## STATEMENT OF FACTS

In January 1994, U.S. Attorney General Janet Reno appointed an independent counsel to investigate allegations of criminal activity for a defunct Arkansas thrift institution, the Madison Guaranty Savings & Loan Association ("Madison Guaranty").  *See*, *e.g.*, *JA* 27 and 71-157.  Among other matters, the independent counsel was charged with investigating an Arkansas real estate venture, known as the Whitewater Development Company, Inc., in which Clinton and her husband, then-Arkansas Governor Bill Clinton, had partnered with Madison Guaranty owners Jim and Susan McDougal.  *Id.*  The investigations that followed were among the most controversial, high profile, and politically charged in U.S. history and led directly to President Clinton's 1998 impeachment.  Custody of all records compiled by independent counsel during the investigations were transferred to NARA in March 2004.  *JA* 27.

By law, the independent counsel was required issue to final reports detailing its work and its findings.  *JA* 53; *see* 28 U.S.C. § 594(h)(1).  At least five final reports ultimately were prepared by the independent counsel concerning various aspects of its investigations.  *JA 53.*  Beginning in 2000 and continuing into 2002, this Court approved the reports for publication.[1]  *Id.*  Each report contains

---

[1]    Title 28, Section 594(h) of the United States Code not only authorized the D.C. Circuit to order the reports be made public, but also authorized the Court to "make such orders as are appropriate to protect the rights of the individuals named

5

enormous quantities of investigative materials, including grand jury testimony. *JA* 53-54.  Chapter 3 of January 5, 2001 Final Report, entitled "Mrs. Clinton's Madison Guaranty Representation," addresses Clinton's alleged false statements to prosecutors and alleged withholding of evidence. *JA* 53 and 71-157.

In 2014, Plaintiff submitted a FOIA request to NARA seeking access to a binder of independent counsel materials concerning the potential charges against Clinton. *JA* 55.  The materials had been referenced in a 2011 book. *Id.*  In response, NARA produced 246 pages of records in response, including a 206-page memorandum, dated April 22, 1998, to "All OIC Attorneys," from the "HRC Team" and bearing the line "Summary of Evidence:  Hillary Rodham Clinton and Webb Hubbell." *Id.* at 55-56.  The memorandum was extremely detailed and largely unredacted. *Id.* at 56-57.

The fact that the independent counsel had prepared a draft indictment of Clinton has been public for many years.  Plf's Mem. of P&A in Opp. to Def's Motion for Summary Judgment and in Support of Plf's Cross-Motion for Summary Judgment (Dkt. Entry No. 12) at 6-7.  On March 9, 2015, Plaintiff submitted a FOIA request to NARA for the draft indictment. *JA* 57.  Plaintiff's request specifically sought:

---

in [the] report." 28 U.S.C. § 594(h)(2).  Given that the D.C. Circuit chose to make the reports public, it is fair to conclude that it already weighed the privacy interests at stake and ruled in favor of disclosure.

> All versions of indictments against Hillary Rodham Clinton, including but not limited to Versions 1, 2, and 3 in box 2250 of the Hickman Ewing Attorney Files, the "HRC/___ Draft Indictment" in box 2256 of the Hickman Ewing Attorney Files, and all versions written by Deputy Independent Counsel Hickman Ewing, Jr. prior to September of 1996.

*Id.*.

NARA located 12 versions of a draft indictment of Clinton, one "draft indictment without a caption" listing "overt acts," and one record characterized as "scraps of a draft indictment with no caption."[2]  *JA* 35.  Multiple copies of some drafts were located.  *Id.*  One is only 3 pages long.  *Id.*  Another is 40 pages long. *Id.*  NARA advised Plaintiff it was withholding all responsive records in full, citing Exemption 7(C).  *JA* 42-43.  Plaintiff took an administrative appeal, then filed suit when NARA did not respond to the appeal.  *JA* 7, 10, and 24-25.

On summary judgment, NARA argued that it was properly withholding the various versions of the draft indictment under FOIA Exemptions 3, 6, and 7(C). *JA* 387-416.  It submitted a declaration containing the following, boilerplate assertions in support of its Exemption 3 argument:

---

[2]    Several of the drafts apparently are accompanied by memoranda, fax cover pages, and notes.  *JA* 35.  NARA has not differentiated between allegedly exempt material in the draft indictments and allegedly exempt material in the memoranda, fax cover pages, and notes.  Because Plaintiff only requested the draft indictments, the drafts should not be withheld from Plaintiff if the only basis for withholding a particular draft is allegedly exempt material in one of these other, non-responsive records.

> All the responsive documents are directly related to the Independent Counsel's consideration of presenting an indictment to a grand jury. The material collectively reflects names and identifying information of individuals subpoenaed – or intended to be subpoenaed – to testify before the grand jury, as well as information identifying specific records subpoenaed during the grand jury process. They reflect and quote grand jury testimony, and reveal the inner workings and direction of the grand jury. Disclosure would violate the secrecy of the grand jury proceedings by disclosing the inner workings of the federal grand jury that was tasked with considering these matters. Similarly, the consideration of possible witnesses before the grand jury, and internal memoranda and notes about the strategy and considerations regarding possible indictments reveal the direction of the grand jury investigation. Accordingly, all the documents have been properly withheld in full pursuant to Exemption (b)(3).

*JA* 29.  The portion of the declaration that addressed NARA's Exemption 6 and

7(C) withholdings was equally conclusory:

> Despite the role that Mrs. Clinton occupied as the First Lady during President Clinton's administration, Mrs. Clinton maintains a strong privacy interest in not having information about her from the files of the Independent Counsel disclosed. As an uncharged person Hillary Rodham Clinton retains a significant interest in her personal privacy despite any status as a public figure.

*JA* 32.  The declaration does not state that NARA conducted line-by-line

comparisons of the January 5, 2001 Final Report, the 206-page "Summary of

Evidence" memorandum, and the various versions of the draft indictment to

determine whether the drafts contained any grand jury or other private information

that had not already been made public.  In fact, the declaration made no mention of

either the January 5, 2001 Final Report or the 206-page "Summary of Evidence"

memorandum at all.

In response, Plaintiff submitted both the January 5, 2001 Final Report and

the 206-page "Summary of Evidence" and a declaration providing a detailed

analysis of both documents. *JA* 53-368. Plaintiff's declaration and accompanying

documents demonstrated that enormous quantities of grand jury and non-grand

jury information had been made public through the release of the two documents.

*Id.* With respect to the January 5, 2001 Final Report, Plaintiff's declaration

demonstrated that Chapter 3 of the report cites, references, and quotes grand jury

testimony from at least 25 grand jury appearances by 21 witnesses between 1995

and 1998. *JA* 54-55. It also cites, references, and quotes, in some cases

extensively, from as many as 44 different, non-grand jury sources of information,

not including numerous individual documents, gathered from various

investigations.[3] *Id.* With respect to the 206-page "Summary of Evidence,

Plaintiff's declaration demonstrated that the memorandum cites, references, and

quotes testimony from at least 34 grand jury appearances by some 27 witnesses

between 1995 and 1998, including 12 witnesses not referenced in Chapter 3 of the

January 5, 2001 Final Report. *Id.* 56. The memorandum also cites, references, and

quotes from a great many other sources, including as many as 12 separate FBI

302s. *Id.* Finally, Plaintiff's declaration also presented evidence of the substantial,

---

[3]     Plaintiff also submitted a second declaration in reply to NARA's opposition
to Plaintiff's cross-motion for summary judgment. *JA* 378-85. Plaintiff's second
declaration provides further analysis of Chapter 3. *Id.*

public interest in both the independent counsel's investigation of the Clintons – the "Starr Report" – and the draft indictment.  *JA* 57.

In reply, NARA submitted a second declaration that appeared to back away from any claim that the various versions of the draft indictment identify individual witnesses or subpoenaed documents or quote from witnesses' testimony directly. Instead, NARA's second declaration described the draft indictments as a "compilation and distillation" of evidence gathered during the independent counsel's investigation:

> These draft indictments reflect the net result of all the evidence gathered throughout the grand jury investigatory process; they represent a compilation and distillation of all the evidence gathered and presented before the grand jury until the time the draft indictments were prepared.  As a result, they are inextricably intertwined with the grand jury process and are not subject to segregation.

*JA* 372.

NARA's second declaration also described in broad terms a process by which NARA purportedly processed the 206-page "Summary of Evidence" memorandum for release in 2005 – 9 years before it released the memorandum to Plaintiff and 10 years before Plaintiff requested the draft indictments:

> In response to a 2005 FOIA request (not from Plaintiff) for access to a memorandum dated April 22, 1998 from "HRC Team" to "All OIC Attorneys" ("Evidence Memorandum"), NARA examined that document and compared it to the publicly released "Final Report of the Independent Counsel, *In re Madison Guaranty Savings and Loan Association*" of January 5, 2001 ("Final Report').  When NARA

10

examined the Evidence Memorandum for possible release in response to that 2005 FOIA request, we understood that it may contain non-grand jury material. Our examination, which included an analysis of the factual and stylistic presentment in both documents, enabled us to draw important distinctions between information in the Evidence Memorandum that had already been released to the public in the Final Report, and that information in the Evidence Memorandum that was considered grand jury information and should continue to be withheld.

*JA* 371. NARA claimed that it "followed the same approach when it responded to Plaintiff's March 9, 2015 FOIA request," but nowhere explained what that means. *Id.* It did not identify or describe what this "same approach" was. It did not describe what specific analysis or effort, if any, it undertook in response to Plaintiff's 2015 request to compare various versions of the draft indictment to the January 5, 2001 Final Report and the 206-page "Summary of Evidence." It also did not identify who, if anyone, undertook this analysis or effort, or when it was undertaken. NARA did not even say how it purported to know about the "approach" it took in response to the third-party request 10 years earlier. It merely asserted that it "followed the same approach" and took the final report and the memorandum "into account."

On October 4, 2016, the District Court granted NARA's motion for summary judgment and denied Judicial Watch's cross-motion. *JA* 386-416. This appeal followed. *JA* 417.

11

## SUMMARY OF THE ARGUMENT

NARA fails to meet its burden of showing that the various versions of the draft indictment are exempt from disclosure under FOIA Exemptions 3, 6, and 7(C). NARA's declarations merely state in broad, generic terms that the records are subject to grand jury secrecy protection under Rule 6(e) of the Federal Rules of Criminal Procedure and that Clinton has a privacy interest in the contents of the drafts. NARA provides no specific description of the information contained in the drafts nor explains why the drafts' contents warrant continued protection as grand material.

By contrast, Plaintiff identified an enormous amount of information, including grand jury material already published in official reports and other government records about OIC's investigation of Clinton's conduct as First Lady and a high level, high profile presidential advisor. The vague, generalized, conclusory assertions made in NARA's supporting declarations do not satisfy NARA's burden. Therefore, its Exemption 3 claim fails.

NARA's Exemptions 6 and 7(C) claims fail because NARA has pointed to no specific, personal privacy interest Clinton might have in the drafts. Moreover, any such interest has been extinguished by previous disclosure of the grand jury and other investigative materials identified by Plaintiff. Disclosure of the drafts will shed light on both Clinton's conduct during her tenure as a public official and

OIC's investigation of Clinton.  The public interest in disclosure falls well within the purposes and objectives of FOIA and easily outweighs any unidentified privacy interest Clinton might have.

NARA's withholding of the records is unlawful under FOIA, and the records must be produced to Plaintiff.

## ARGUMENT

### I.  Standard of Review.

District court decisions in FOIA cases are reviewed *de novo*.  *Sussman v. United States Marshals Service*, 494 F.3d 1106, 1111-12 (D.C. Cir. 2007) (*citing Sample v. Bureau of Prisons*, 466 F.3d 1086, 1087 (D.C. Cir. 2006)).  FOIA's exemptions are "narrowly construed," and the "burden is on the agency to sustain its action."  *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976); 5 U.S.C. § 552(a)(4)(B).

### II.  Exemption 3/Rule 6(e)

Exemption 3 authorizes the withholding of matters "specifically exempted from disclosure by statute."  5 U.S.C. § 552(b)(3).  There is no dispute that Exemption 3 includes material covered by Rule 6(e).

"The purpose of Rule 6(e) is to preserve secrecy.  Information widely known is not secret."  *In re Sealed Case*, 192 F.3d 995, 1004 (D.C. Cir. 1999) (*quoting In re North*, 16 F.3d 1234, 1245 (D.C. Cir. 1994)).  "The extent to which the grand

jury material in a particular case has been made public is clearly relevant because even partial previous disclosure often undercuts many of the reasons for secrecy." *Id.* (*quoting In re Craig*, 131 F.3d 99, 107 (2d Cir. 1997)).

NARA has failed to satisfy its burden of proving that Rule 6(e) applies. Even if Rule 6(e) may have applied at one time, "[t]here must come a time . . . when information is sufficiently widely known that it has lost its character as Rule 6(e) material." *In re Sealed Case*, 192 F.3d at 1004 (*quoting In re North*, 16 F.3d 1234, 1245 (D.C. Cir. 1994)).

NARA is required to provide reasonable specificity to meet its burden of establishing that a FOIA exemption applies. *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.D.C. 2009). NARA's supporting declarations do not provide sufficient information to make such a determination. *See Senate of Puerto Rico v. United States Dep't of Justice*, 823 F.2d 574 (D.C. Cir. 1987); *Lopez v. v. Dep't of Justice*, 393 F.3d 1345 (D.C. Cir. 2005). The Murphy declarations fail to give a reviewing court a reasonable basis to evaluate NARA's asserted 6(e) privilege of non-disclosure under FOIA Exemption 3.

Plaintiff identified a mountain of grand jury material that has already been made public. Chapter 3 of the January 5, 2001 Final Report, published with this Court's approval, cites to, references, or quotes testimony from at least 25 grand jury appearances by 21 witnesses between 1995 and 1998. *JA* 54-55. The 206-

14

page "Summary of Evidence" disclosed even more grand jury information.  *JA* 56.

Although not an exhaustive count, it cites to, references, or quotes testimony from

at least 34 grand jury appearances by some 27 witnesses between 1995 and 1998,

including 12 witnesses not referenced in the relevant section of the January 5, 2001

Final Report.[4]  *Id.*  Given the enormous quantity of grand jury material already in

the public domain, NARA needed to do more than rely on generic assertions about

grand jury secrecy.  It needed to show what grand jury secrecy was left to protect

and why previous disclosures did not undercut any remaining reason for secrecy.

*In re Sealed Case*, 192 F.3d at 1004.

    NARA's declarations are too vague, generalized, and conclusory to satisfy

this burden.  They merely repeat language taken out of context from case law

applying Rule 6(e).  *Compare JA* 29 *with Citizens for Responsibility and Ethics in*

*Washington v. United States Dep't of Justice*, 746 F.3d 1082, 1100 (D.C. Cir.

2014) ("*CREW*"); *Allen v. Central Intelligence Agency*, 636 F.2d 1287, 1298 (D.C.

Cir. 1980) ("Where the agency affidavits merely parrot the language of the statute

and are drawn in conclusory terms, the court's responsibility to conduct de novo

review is frustrated.").  NARA's broad brush claims that "the materials" "reflect"

---

[4]    Neither this total nor the total for Volume II, Part B, Chapter 3 of the
January 5, 2001 Final Report includes the voluminous documentary evidence cited
in the "Summary of Evidence" or the report.  It is not possible to discern from the
summary or the report whether this evidence was ever presented to or considered
by the grand jury.

and "reveal the inner workings and direction of the grand jury" and that their "[d]isclosure would violate the secrecy of the grand jury by disclosing [its] inner workings" are the same bare statements the Court found problematic in *In re Sealed Case*. 192 F.3d at 1001 ("[W]e cautioned the district court about the problematic nature of applying so broad a definition, especially as it relates to the 'strategy or direction' of the investigation.") (internal quotation omitted).

In addition to failing to meet this burden, NARA's claim that the various versions of the draft indictments "collectively reflect" names and identifying information of witnesses and records subpoenaed by the grand jury or "represent a compilation and distillation of the evidence" misses its mark. The purpose of an indictment is to identify "the essential facts constituting the offense charged" and "the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." Fed. R. Crim. P. 7(c)(1). It "inform[s] the defendant of the nature of the accusation against him" and "enable[s] him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Hitt*, 249 F.3d 1010, 1016 (D.C. Cir. 2001) (citations omitted). The individual who prepared the various versions of the draft indictment, Deputy Independent Counsel Hickman Ewing, was an experienced prosecutor. He would have known the purpose of an indictment and the requirements of Rule 7. He also would have known the requirements of Rule 6(e).

16

The notion that Ewing would have drafted an indictment that exceeded the requirements of Rule 7 and, if ultimately returned by the grand jury, violated his Rule 6(e) obligations revealing the inner workings of the grand jury cannot be correct. By contrast, the purpose of the 206-page evidentiary summary was precisely that – to summarize the grand jury and non-grand jury evidence gathered by the prosecutors' investigation for purposes of determining whether to bring charges against Clinton. To disclose the summary, even in redacted form, but withhold the various versions of the draft indictment in their entirety because they "collectively reflect" grand jury material is both entirely upside down and counterintuitive.

Yet that is exactly what NARA has done. In its initial submission on summary judgment, NARA relied on a boilerplate invocation of Rule 6(e) to support its withholding of the drafts in their entirety. NARA declared, "The material collectively reflects names and identifying information of individuals subpoenaed – or intended to be subpoenaed – to testify before the grand jury, as well as information identifying specific records subpoenaed during the grand jury process." *JA* 29. Nowhere does the declaration describe what is meant by "collectively reflect" or how names, identifying information, and records are "collectively reflect[ed]" in "the material." The declaration continues, "They reflect and quote grand jury testimony, and reveal the inner workings and direction

17

of the grand jury." *Id.* It does not explain how the drafts "reflect" grand jury testimony, or, to the extent the drafts contain names of witnesses or identifying information about witnesses who testified before the grand jury *and those witnesses' identities or testimony have not already been made public*, any such information or quotations could not be redacted. The remainder of the paragraph did not provide any additional information about the material purportedly contained in the drafts, but instead states only conclusions.

When Plaintiff highlighted the enormous quantities of grand jury and other investigatory materials already made public in the January 5, 2001 Final Report and 206-page "Summary of Evidence" and the other shortcomings in the declaration, NARA changed tack. It backed away from its earlier claim that the drafts "collectively reflect" the names and identifying information about individual witnesses or subpoenaed documents or quoted from witnesses' testimony. Instead, NARA submitted a second declaration in which it claimed that the draft indictments were a "compilation and distillation" of "all" the evidence, presumably including both grand jury and non-grand jury material. *JA* 372.

Claiming that a record specifically identifies individual grand jury witnesses or subpoenaed documents or quotes from grand jury testimony is fundamentally different from claiming that the same record is a "compilation and distillation" of "all" the evidence gathered during an investigation. NARA's apparent switch only

18

raised additional questions. Do the drafts identify particular, individual witnesses and subpoenaed documents? Do they quote from individual grand jury witnesses' actual testimony, as unlikely as that seems? Or do they refer to such materials generally or simply reflect the collective fruits of "all" the independent counsel's efforts? If the drafts only reflect the collective fruits of the independent counsel's work, how do the draft indictments differ in substance from a final indictment and why would publication of any final indictment not violate Rule 6(e)?

The argument NARA seems to make is: because draft indictments are related to a grand jury investigation, their disclosure will reveal grand jury information subject to secrecy protection of 6(e). However, as the Court in *In re Sealed Case* noted, "we have never read Rule 6(e) to require that a 'veil of secrecy be drawn over all matters occurring in the world that happen to be investigated by a grand jury.'" 192 F.3d at 1001-02 (*quoting Securities and Exchange Comm'n v. Dresser Indus., Inc.*, 628 F.2d 1368, 1382 (D.C. Cir. 1980) (*en banc*)). Moreover, "[i]nformation produced by criminal investigations paralleling grand jury investigations does not constitute matters 'occurring before the grand jury if the parallel investigation was truly independent of the grand jury proceedings.'" *Id.* at 1002 (*quoting In re Grand Jury Subpoena*, 920 F.2d 235, 242 (4th Cir. 1990)). "The disclosure of information obtained from a source independent of the grand jury proceedings, such as a prior government investigation, does not violate Rule

6(e)." *Id.* (*quoting In re Grand Jury Investigation*, 610 F.2d 202, 217 (5th Cir. 1980)). And, on top of these more general principles is the overarching principle referenced above that, to the extent grand jury material in a particular case is made public, it obviates the reasons for further secrecy. *Id.* at 1004. NARA has not met its burden here.

While NARA also asserts in its second declaration that "none of the drafts that we reviewed contained information that we determined had been obtained separate from the grand jury process," it does not explain how it made this determination. *JA* 372. NARA also did not try to differentiate between the grand jury's investigation, the independent counsel's investigations, and regulatory and congressional investigations when it made blanket claims that the draft indictments represent a "compilation and distillation" of "all" the evidence. *Id.*

Equally unavailing is NARA's curious claim about its 10-year old processing of the 206-page "Summary of Evidence." While NARA claims to have compared the January 5, 2001 Final Report to the evidence memorandum when it processed the memorandum for release in response to a 2005 FOIA request from a third party, it makes no claim to have done the same comparison of the various versions of the draft indictment. *JA* 371. A proper comparison would have entailed a line-by-line review of the report, the evidence memorandum, and the drafts to see what identifiable grand jury material in the drafts, if any, had been

made public in either the report or the evidence memorandum. NARA makes no claim to have done such a comparison. It merely asserts that it "follow the same approach" and "took into account" the final report and evidence memorandum. *JA* 371. It provides no explanation of what this means or how the comparison of the final report and evidence memorandum it conducted ten years ago has any relevance to the contents of the drafts or the drafts' disclosure today.

The same is also true for NARA's assertion about revealing persons "intended to be subpoenaed." *JA* 29. NARA does not claim that prosecutors were likely to call any such persons or that their appearances before the grand jury were "clearly anticipated." *In re Sealed Case* makes clear that, for Rule 6(e) to apply, the likelihood must be substantial, such as a witness whose testimony was expected, not something prosecutors were merely considering. 192, F.3d at 1002-03 ("To be sure, we have recognized that Rule 6(e) would be easily evaded if a prosecutor could with impunity discuss with the press testimony about to be presented to a grand jury, so long as it had not yet occurred. Accordingly, we have read Rule 6(e) to cover matters 'likely to occur.'"). The matter must be "clearly anticipated" before Rule 6(e) applies. *Id.* at 1003. NARA makes no such showing. It has not met its burden to the extent it claims that disclosure of the drafts will reveal the identities of persons "intended to be subpoenaed" by the grand jury.

The District Court's finding that NARA established a sufficient "nexus" between disclosure of the drafts and the "inner workings of the grand jury process" is not supported.  NARA's inconsistent, if not contradictory, description of the various versions of the draft indictment does not address why, given all the grand jury and other investigative materials that have been made public, any reason for keeping such "inner workings" secret remains.  NARA made no effort to distinguish the substance of the drafts from the clearly identified, publicly available material presented by Plaintiff, and the District Court failed to take proper account of this vast quantity of grand jury and non-grand jury material.  Neither NARA nor the District Court could articulate or identified what "inner workings" remain secret and would be disclosed by making the drafts public.  By focusing on the "nexus" rather than whether any reason for secrecy remains, the District Court erred.

The District Court also erred by imposing a heightened burden on Plaintiff to show that the grand jury information in the various versions of the draft indictments had already been made public.  *JA* 412.  Plaintiff did not claim that whatever readily identifiable grand jury information might be contained in the withheld records has previously been disclosed.  NARA failed to identify that information with any degree of specificity that would have allowed Plaintiff to do so.  Rather, Plaintiff argued that so much grand jury and non-grand jury material

from the independent counsel's investigation has been made public that there is no

reason for any continued secrecy or any secrecy left to protect.[5]  It is NARA that

failed to meet its burden to show that the mountain of information previously

released does not undercut the need for grand jury secrecy as asserted.  *In re*

*Sealed Case*, 192 F.3d at 1004.  NARA's vague, generalized, conclusory assertions

are too broad to satisfy its burden.   Its Rule 6(e) claim must fail.

## III.     Personal Privacy vs. Public Interest.[6]

The second issue for the Court to decide is whether the drafts contain

private, personal information such that disclosure would amount to an *unwarranted*

---

[5]     The same is true for evidence gathered by the independent counsel outside
the grand jury process.

[6]     The parties agree that the analysis and balancing required under Exemptions
6 and 7(C) are sufficiently similar to warrant a consolidated discussion.  The
consolidated analysis here is made under 5 U.S.C. § 552(b)(7)(C).

Exemption 7(C) exempts from disclosure "records or information compiled
for law enforcement purposes, but only to the extent that the production of such
law enforcement records or information . . . could reasonably be expected to
constitute an unwarranted invasion of personal privacy."  *CREW*, 746 F.3d at 1091
(*quoting* 5 U.S.C. § 552(b)(7)(C)).  A reviewing court's "task, then, is 'to balance
the [] privacy interest against the public interest in disclosure.'"  *Id.* (*quoting Nat'l
Archives and Records Admin. v. Favish*, 541 U.S. 157, 171 (2004)).

The draft indictments were "compiled for law enforcement purposes," and
NARA does not claim that any person other than Clinton has any privacy interest
in the draft indictments.  The only issue that remains for NARA's Exemptions 6
and 7(C) claims is whether any privacy interest Clinton might have in whatever
non-public information exists in the draft indictments outweighs the public interest
in disclosure of the draft indictments.

invasion of privacy not outweighed by public interest. NARA fails to identify any personal, private information in the drafts – one of which is a 3-page document "without a caption, listing overt acts" and another is 4 pages of "scraps of a draft indictment with no caption." *JA* 35 (Document Nos. 11 and 12-13). Whatever personal privacy interests Clinton might once have had in such records, publication of the January 5, 2001 Final Report and the 206-page "Summary of Evidence" greatly limited, if not completely negated that interest. Therefore, the District Court erred in determining that Clinton's personal privacy interests in the drafts outweigh the public interest in their disclosure.

NARA asserts generically that "the subject of the investigation has a significant privacy interest in not being associated with any underlying criminal activity." *JA* 32. The District Court correctly determined that Clinton "no longer has an interest in 'avoiding the stigma' of having her name associated with the criminal investigation at issue, because it is widely known that this investigation was conducted." *JA* 406-407. The District Court nonetheless credited NARA's generic claims of personal privacy, holding that Clinton "still maintains an interest in the contents of the drafts of the proposed indictment" without identifying what particular privacy interests remain.[7] *JA* 407.

---

[7]  Oddly, the District Court faulted Plaintiff for not pointing to any evidence that this Court considered Clinton's privacy rights in authorizing the publication of the January 5, 2001 Final Report. That evidence is the authorization itself. The

NARA makes no claim that disclosure of the drafts will reveal any personal, medical, or financial information about Clinton, much less anything intimate or potentially embarrassing. NARA does not even claim disclosure will reveal anything prosaic about Clinton, such as her date or place of birth, date of marriage, street address, telephone number, or email address. The District Court identified no such privacy interest. Instead, NARA relies on, and the District Court appears to have accepted, generic assertions about Clinton's ability to control information, the presumption of innocence, and Clinton's having to defend herself in a non-judicial, public forum. NARA's declaration simply states "[i]n each instance where information was withheld, it was determined that individual privacy rights outweighed the public interest." *JA* 31.

These claims ring especially hollow where hundreds of pages of grand jury materials, non-grand jury materials, and independent counsel legal theories and analysis have been released and are publicly available – including some released with this Court's authorization. NARA identifies nothing on the privacy side of the balancing scale, while Plaintiff has identified a mountain of information already in the public domain. In evaluating the balance required under Exemptions

---

Court was fully cognizant of the privacy implications of releasing the report and even had authority to protect the privacy interests of persons identified in the report. *See* 28 U.S.C. § 594(h)(2) ("The division of the court shall make such orders as are appropriate to protect the rights of any individual named in such report.").

6 and 7(C), there is no need to linger – "something . . . outweighs nothing every time." *Beck v. Dep't of Justice*, 997 F.2d 1489, 1494 (D.C. Cir. 1993) (*quoting National Ass'n of Retired Fed'l Employees v. Horner*, 879 F.2d 873 (D.C. Cir. 1989)).

NARA's assertion that the public has only a "scintilla" of interest in OIC's investigation of Clinton because Clinton was the former Democratic presidential candidate, misconceives and drastically underestimates the public interest in the drafts. *JA* 32. Plaintiff does not seek information buried in a government warehouse about an otherwise anonymous private citizen. *Cf. United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 797 (1989) ("*Reporters Comm.*")). Plaintiff seeks information that will shed light on both what Clinton, in her capacity as a high level public official, and OIC were "up to." In this regard, the Court's case law has differentiated between what a record will reveal about an agency's performance of its statutory duties and what that same record will reveal about the actions of a particular individual. *CREW*, 746 F.3d at 1093. The Court has "endorsed a 'case-by-case balancing' approach that considers 'the rank of the public official involved and the seriousness of the misconduct alleged.'" *Id.* at 1095-1096 (*citing Kimberlin v. U.S. Dep't of Justice*, 193 F.3d 944, 949 (D.C. Cir. 1998).

Clinton's status as a high level public official, combined with the

seriousness of the misconduct for which she was being investigated, clearly weighs

in favor of disclosure. *Kimberlin*, 139 F.3d at 948.  This Court has already found

that, as First Lady of the United States, Clinton was an officer of the United States,

at least for the Federal Advisory Committee Act.  *Ass'n of Am. Physicians and*

*Surgeons, Inc. v. Clinton*, 997 F.3d 898, 911 (D.C. Cir. 1993).  In addition to

serving as First Lady, Clinton also was a high level, high profile presidential

advisor who played a central role in a great many public policy matters during her

husband's administration.  She famously led President Clinton's Task Force on

National Health Care Reform and had her own office in the West Wing.  After

serving as First Lady from 1993 to 2001, Clinton served as a United States Senator

from the State of New York from 2001-09.  From 2009 to 2013, she served as U.S.

Secretary of State.

The misconduct for which Clinton was investigated – alleged false

statements and withholding of evidence from federal investigators – is undoubtedly

serious.  Making false statements and withholding evidence bears on Clinton's

honesty, credibility, and trustworthiness, not only as First Lady and as an important

presidential advisor, but also in her subsequent government service as a United

States Senator and United States Secretary of State.  Disclosure of the drafts

undoubtedly will assist the public in determining whether there was merit or a lack

27

of merit to the allegations against Clinton, whether Clinton was fairly or unfairly investigated, and whether her substantial role at the White House and subsequently as United States Senator and United States Secretary of State were positive or negative for the country. It will "shed light" on Clinton's decades as a federal official and on "what the government is up to."

The District Court minimized these considerations, erroneously in Plaintiff's view, finding that disclosure of the drafts would only "potentially shed light . . . on the character of Mrs. Clinton, independent to her position as a public official, which is not the objective of the FOIA." *JA* 412. But a public official's character cannot be so easily separated from his or her actions in office. Character and credibility plainly bear on an official's actions in office and the public's assessment of those actions. The importance of character and credibility in office only increases with the rank and visibility of an official's position. So long as public officials are in office, what they do and why they do it is an integral part of "what the government is up to" and subject to scrutiny. The public's ability to access records reflecting on public officials' actions in office, including actions that bear on their character and credibility, is well within the purposes and objectives of FOIA. The drafts fall well within the ambit of the purpose FOIA is meant to serve.

Like in this case, the government in *CREW* sought to minimize the public interest in information about a criminal investigation of a prominent government official – former House Majority Leader Tom DeLay. This Court rejected the government's effort, declaring that "there is considerably more than nothing on the public interest side of the scale." *CREW*, 746 F.3d at 1093. "Matters of substantive law enforcement policy . . . are properly the subject of public concern, and disclosure of the requested records would likely reveal a great deal about law enforcement policy." *Id.* (internal quotations omitted). "Disclosure of the records would likely reveal much about the diligence of the FBI's investigation and the DOJ's exercise of its prosecutorial discretion: whether the government had the evidence but nevertheless pulled its punches." *Id.* "Indeed, we have repeatedly recognized a public interest in the manner in which DOJ carries out substantive law enforcement policy (whether or not that interest outweighs any privacy interest at stake in a given case)." *Id.* "That the investigation implicated a public official as prominent as the former Majority Leader of the House of Representatives further raises the stake." *Id.* at 1094. The public interest in disclosure recognized by this Court in *CREW* is even more significant here given Clinton's substantial official role, not only as First Lady but also as a presidential advisor, during her husband's administration.

29

Adding further to the public interest side of the scale is the significant public

interest in OIC's investigation of Clinton.[8]  The "weighty public interest in shining

a light on" OIC's investigation of Clinton and ultimate decision not to prosecute

her cannot be denied.  *See*, *e.g.*, *CREW*, 746 F.3d at 1092-93.  The public interest

in the operations and activities of OIC under Independent Counsel Ken Starr, who

led one of the most controversial, high profile, and politically-charged criminal

investigations in U.S. history and which led directly to President Clinton's 1998

impeachment, remains substantial nearly two decades later.  *JA* 57 (noting

13,200,000 search results for a Google search using the words "Starr Report").

Disclosure of the draft indictments undoubtedly will shed further light on OIC's

investigation of Clinton, but also on the functioning of independent counsels in

general and the wisdom of appointing them, an issue that continues to arise.[9]  *See*,

---

[8]      NARA identifies Independent Counsel's "statutorily-imposed law
enforcement mission" as "to investigate and, if appropriate, prosecute certain high-
ranking Government officials for violation of federal criminal laws."  *JA* 30.

[9]      The District Court acknowledged that "if the 'investigation implicate[s] a
public official as prominent as [Mrs. Clinton,]' the public interest is heightened."
*JA* 410 (*citing CREW*, 746 F.3d at 1093 ("It may show whether prominent and
influential public officials are subjected to the same investigative scrutiny and
prosecutorial zeal as local aldermen and little-known lobbyists.")).  It distinguished
this case from *CREW*, however, by noting that how the FBI and other investigative
agencies conduct investigations is "different from the activities of a discrete and
now defunct government agency that has not been in existence for nearly two
decades."  *JA* 410-411.  Simply because a government agency serves a specific
purpose and may now be "defunct," does not alter the public's interest in knowing
what it was "up to."

*e.g.*, Miller, S.A., "Schumer demands Session resign, seeks special prosecutor for Russia investigation," *Washington Times* (March 2, 2017). Like in *CREW*, disclosure of the records at issue "would likely reveal a great deal about law enforcement policy." As a result, the public interest in disclosure easily outweighs any privacy interests that Clinton might still have in the various versions of the draft indictment.

## IV.    Segregability.

An agency must disclose "[a]ny reasonably segregable portion" of an otherwise exempt record. 5 U.S.C. § 552(b). A "district court must make specific findings of segregability regarding the documents to be withheld." *Sussman.*, 494 F.3d at 1116 (citation omitted). When, as here, records are withheld in their entirety, a determination must be made whether any portion of those records could have been segregated and released. *Trans-Pacific Policing Agreement v. United States Customs Serv.*, 177 F.3d 1022, 1027-28 (D.C. Cir. 1999).

"Even when an agency may properly withhold a responsive record under one of FOIA's enumerated exemptions, it nevertheless must disclose any non-exempt information that is 'reasonably segregable.'" *Am. Civil Liberties Union v. United States Dep't of State*, 878 F. Supp.2d 215, 225 (D.D.C. 2012) (*citing* 5 U.S.C. § 552(b)). "The question of segregability is by necessity subjective and context-specific, turning upon the nature of the documents and information in question."

*Id.* (*citing Mead Data Central, Inc. v. United States Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977) (citation omitted).  To satisfy its segregability obligation, an agency "must provide a reasonably detailed justification rather than conclusory statements to support its claim that the non-exempt material in a document is not reasonably segregable." *Id.*  An agency was found to satisfy its segregability obligation where it

> stated that it had conducted a page-by-page review of all investigative records contained in the requested documents, and determined that each document, and each page of each document, contained information subject to law enforcement withholding exemptions.  It justified its inability to simply redact sensitive portions (i.e., informant names) from these documents by pointing out that the balance of the information remaining in the documents could still reveal the extent of the government's investigation, the acts on which it focused, what evidence of wrongdoing it is aware of, the identity of cooperating sources, and the agency's investigative techniques in this investigation.  The affidavits further attested that release of any of this information could jeopardize the investigation.  For these reasons, we are satisfied that no portion of the withheld documents may be segregated and released to appellant.

*Juarez v. United States Dep't of Justice*, 518 F.3d 54, 61 (D.C. Cir. 2008).

No segregability analysis was undertaken here.  NARA does not claim to have even tried to undertake a segregability analysis.  It claims to have followed a longstanding policy of not doing so:

> Because a draft indictment is inextricably tied to the grand jury process, the development of the indictment, illuminated as each draft carefully refines the argument for charging the accused individuals, provides a roadmap to that process.  Unlike the Evidence Memorandum, which NARA released in part, draft indictments that

32

> do not result in any further prosecutorial action are not capable of
> similar segregability without revealing the workings of the Grand
> Jury. Again, this has been NARA's practice reaching back many
> years, starting with indictments drafted by the Watergate Special
> Prosecution Force during Watergate.

*JA* 373.

NARA must conduct a segregability analysis of each of the various versions of the draft indictment. Given that the responsive records are draft indictments and are likely in paragraph form, any particular paragraph containing non-public material about a matter before the grand jury or in which Clinton has some identifiable privacy interest can easily be redacted, allowing the remainder of the record to be produced. *CREW*, 746 F.3d at 1096. If after analyzing each record, NARA determines that no portion of the record is reasonably segregable, it must provide a detailed, non-conclusory justification for its determination. Following a general policy of not conducting segregability analyses of draft indictments does not satisfy FOIA.

In addition, NARA's assertion that, unless a prosecution results, segregable material in a draft indictment can never be released without disclosing "the workings of the Grand Jury" is a *non sequitur*. Whether an indictment has been issued has nothing to do with whether segregable material in a draft indictment can be disclosed. Disclosure depends on many factors, including whether the draft includes segregable, non-grand jury material, whether the grand jury material is no

longer secret, and the form of the document itself.    NARA's blanket, boilerplate

assertion to the contrary is exactly the type of generalized, conclusory claim that

cannot satisfy an agency's burden under FOIA.  It also begs the question, if

disclosure of a draft indictment will reveal the inner workings of a grand jury, why

wouldn't disclosure of an indictment returned by a grand jury do the same?

NARA's segregability claim also suffers from at least two additional flaws.

First, and as with its other arguments, NARA ignored the mountain of grand jury

material already made public.  Both the January 5, 2001 Final Report and the 206-

page "Summary of Evidence" have already disclosed the roadmap about which

NARA claims to be concerned.  This enormous volume of publicly available

material must be considered in a proper segregability analysis.

Second, and also demonstrated previously, the Archives reads the phrase

"matters occurring before the grand jury" in Rule 6(e) too broadly.  The D.C.

Circuit warned against this precise error.  "[W]e cautioned the district court about

'the problematic nature of applying so broad a definition', especially as it relates to

the 'strategy or direction of the investigation'." *In re Sealed Case*, 192 F.3d at

1001 (*quoting In re Sealed Case*, 151 F.3d 1059, 1071 n.12 (D.C. Cir. 1998)

(citations omitted))).  Not all statements by prosecutors, which includes draft

indictments, are protected from disclosure by Rule 6(e). "Prosecutors' statements

about their investigations . . . implicate the Rule only when they directly reveal

grand jury matters." *Id.* at 1002. "[I]nternal deliberations of prosecutors that do not directly reveal grand jury proceedings are not Rule 6(e) material." *Id.* at 1003. Segregable material that does not directly reveal secret grand jury matters must be disclosed.

NARA does not claim that every line in each draft indictment reveals "a matter occurring before the grand jury." Fed. R. Crim. P. 6(e)(2)(B). Any such claim would be disingenuous. An indictment typically contains a caption, a list of offense(s) being charged, a brief statement of when and where the alleged offense(s) took place and how the accused is alleged to have committed the offense(s), and a signature block. For each count, the indictment also must give the official or customary citation of the statute, rule, regulation, or other provision of law that the accused is alleged to have violated. Indictments rarely if ever identify witnesses who testified before the grand jury or documents that were subpoenaed by the grand jury, and it would seem even rarer that an indictment would quote from or even describe grand jury testimony or subpoenaed documents.

If, after conducting a proper segregability analysis of each draft indictment, NARA can identify specific grand jury material that remains secret and its disclosure would "directly reveal" "grand jury matters" or "grand jury proceedings" within the meaning of Rule 6(e), any such material may properly be

35

redacted.  The same is true for any non-public information about Clinton, the

disclosure of which would not outweigh any privacy interest Clinton might have in

the information.  The remainder must be disclosed.

## CONCLUSION

For the foregoing reasons, Judicial Watch respectfully requests that the District Court's decision be reversed and the various versions of the draft indictment be released.  At a minimum, the case should be remanded so that any truly non-public, grand jury information can be redacted from the drafts before their release.

Dated: March 29, 2017                         Respectfully submitted,

JUDICIAL WATCH, INC.

/s/ *Paul J. Orfanedes*
Paul J. Orfanedes

/s/ *Lauren M. Burke*
Lauren M. Burke
425 Third Street, S.W., Suite 800
Washington, DC  20024
Tel:   (202) 646-5172
Email: porfanedes@judicialwatch.org
          lburke@judicialwatch.org

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7).  The brief, excluding exempted portions, contains 9,453 words (using Microsoft Word 2010), and has been prepared in a proportional Times New Roman, 14-point font.

*/s/ Lauren M. Burke*

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2017, I filed via the CM/ECF system the foregoing **BRIEF OF APPELLANT JUDICIAL WATCH, INC.** with the Clerk of the Court. Participants in the case are registered CM/ECF users and service will be accomplished by the Appellate CM/ECF system.

I also certify that I caused eight copies to be delivered to the Clerk of Court via hand delivery.

*/s/ Lauren M. Burke* _____